IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| DANNY BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 07 C 3750 |
| | ) | |
| THE UNITED STATES OF AMERICA, et al. | ) | Judge Solomon Oliver, Jr. |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**PLAINTIFF'S SUPPLEMENTAL RESPONSE TO DEFENDANT LUCAS'**
**MOTION FOR SUMMARY JUDGMENT**

Jon Loevy
Mark Loevy-Reyes
Debra Loevy-Reyes
LOEVY & LOEVY
312 North May, Suite 100
Chicago, IL 60607
(312) 243-5900

Attorneys for Plaintiff

**Introduction**

At the August 30, 2010, status conference, the Court asked plaintiff to file an alternative

response to summary judgment delineating what evidence is presently available to refute

summary judgment, so that the Court could consider whether defendants' claims of qualified

immunity can be denied at this juncture or whether discovery is necessary in order to evaluate

defendants' claims of qualified immunity.  In accordance with that request, plaintiff submits the

following supplemental response to summary judgment in support of his claim that defendant

Lucas is not entitled to qualified immunity.

**Factual Background**

On March 16, 2006, a superceding indictment was filed against twenty-two individuals

for crimes allegedly committed in the Mansfield, Ohio area between February 2004 and

November 2005.  (*See* Appendix Exhibit 8).  With few exceptions, the crimes charged related to

alleged drug sales to the defendants' confidential informant, Jerrell Bray.  It has now come to

light that Bray was framing innocent people with abandon, and he has since pled guilty to

violating the civil rights of several of the conspiracy's victims.  (App.[1] ¶ 95).  Bray is currently in

custody for his role in framing people for drug crimes.  (App. ¶ 95).

After Bray's lies came to light, the government filed a motion seeking to allow the

conspiracy victims who pled guilty to withdraw their pleas and to dismiss the charges against

them.  (App. ¶ 96).  In that motion, the government argued that "Bray's illegal conduct was so

pervasive and his credibility so tainted" that those charged based on his testimony should be

_____

[1] The evidentiary support for plaintiff's factual allegations is set forth in the appendix to
this response, hereinafter cited as "App."

1

permitted to withdraw their guilty pleas.  (App. ¶ 96).  The government noted that after those

pleas are withdrawn, Bray remains an essential witness who is not reliable or credible, so the

charges should all be dismissed.  (App. ¶ 96).  At prosecutors' requests, federal judges have now

freed everyone who pled guilty to any alleged drug deal involving Bray.  (App. ¶ 97).

Danny Brown was charged with selling drugs to Bray through a courier named Frank

Douglas on November 8, 2005.  (App. Exhibit 8, Counts 22 and 52).  Brown was also charged

with conspiracy to possess crack cocaine with intent to distribute between Winter 2004 and

November 8, 2005.  (App. Exhibit 8, Count 1).  After a jury trial, Brown was acquitted of all

charges.  (App. 99).

Defendant Lucas is the DEA agent who worked directly with Bray in a surveillance or

undercover capacity during many of the Mansfield frame-ups and who assisted in the prosecution

of the conspiracy victims.  (App. ¶ 2-4).   According to the investigation report, the officers

involved in investigating the alleged sales involving plaintiff included Lucas and defendants

Cross, Metcalf, Faith, and Mayer.  (App. ¶ 100).

Because no depositions have yet been taken and no written discovery – not even basic

26(a)(1) disclosures – has been tendered in this matter, there are likely far more facts relevant to

defendant Lucas' misconduct that have not yet been uncovered.  With that caveat, the evidence

unearthed thus far indicates that prior to Danny Brown's trial, Lucas had material information

that would have severely impeached Bray, himself, and the other investigating officers, but rather

than disclose that evidence to the prosecution or plaintiff's defense, Lucas affirmatively hid the

evidence through false reporting, altering transcripts, and lying to the prosecutors.  There is also

evidence that Lucas was part of a larger conspiracy in Mansfield to frame people for drug crimes

2

they did not commit, including framing Danny Brown for a drug sale he did not participate in.

## Defendant Lucas Failed to Disclose *Brady* Material

Once he became involved, Lucas' role in this conspiracy permeated every stage and provided the key support so that Bray's lies would go undetected.  First of all, Lucas drafted reports about each of the deals Bray was involved with, and those reports (called DEA-6 reports) included false support for charges and omitted exonerating evidence.  (App. ¶ 11, 12, 18-20, 26, 28, 30-31, 33, 38, 41, 56, 80, 89).  For instance, Bray routinely dialed the identical telephone numbers for unrelated suspects, called one suspect while claiming he had called another, and/or had a different phone encounter from the one described by Bray or detailed in Lucas' report, but Lucas never documented these subterfuges.  (App. ¶ 18).  Instead, Lucas actually altered the text of at least two telephone transcripts to mask inconsistencies between the calls and Bray's claims.  (App. ¶ 45-47, 60-61).  While much of the false reporting discovered to date occurred in investigations of other individuals, it is evidence that Bray was a false witness, and Lucas was preventing that fact from coming to light.

Lucas worked hard to protect Bray's credibility, despite Bray's blatant cheating, stealing and lying.  In furtherance of that goal, Lucas' reports neglected to note obvious discrepancies between the drug weights allegedly transferred by Bray during the deals and the actual weights, which allowed Bray to deal his own drugs or steal money from the DEA without being caught.  (App. ¶ 18, 20, 72).  When a defendant's proffer revealed that Bray was selling his own drugs on the side, in addition to the buying he was doing for the government, Lucas buried that impeaching fact as well.  (App. ¶ 20).  Lucas also buried the fact that Bray was caught stealing money from the DEA during a deal.  (App. ¶ 12-13).  Indeed, Lucas lied to the prosecutor on

3

more than one occasion to cover for Bray.  (App. ¶ 36, 39).

Additionally, during the conspiracy to frame innocent Mansfield citizens, Lucas testified falsely against conspiracy victims, suborned perjury, and failed to correct patently false testimony.  For example, Lucas testified falsely and/or watched several individuals get prosecuted when it was readily apparent to him that they were wrongly accused.  (App. ¶ 21, 23-25, 34-35, 42-44, 51, 56, 62, 63-66, 67-68, 75-76, 83, 87, 91-92).  Lucas also sat silently at the prosecutors' table while defendant Metcalf perjured himself during the trial of Danny Brown and his co-defendants (a fact Metcalf now openly admits), and Lucas was aware that Metcalf's testimony was false, but he did nothing to address the perjury.  (App. ¶ 32-33, 37).  Likewise, although Lucas knew the testimony to be false, he repeatedly sat silently while Bray perjured himself and even backed up Bray's false testimony with false testimony of his own.  (App. ¶ 39, 48-50, 81-82, 86).  Lucas also knowingly drafted a false search warrant affidavit for Metcalf to sign.  (App. ¶ 40).

On May 12, 2009, Lucas was indicted in an eighteen count federal indictment for violating 18 U.S.C. §§ 1503(a) (obstruction of justice), 1001(a)(3) (knowing creation of a false government document), 1623(a) (false testimony and/or creation of a material false declaration), and 242 (deprivation of rights under color of law).  (App. ¶ 6).  The indictment's allegations all related to Lucas' actions in conjunction with using Jerrell Bray as a duplicitous informant.  (App. ¶ 6).  After Lucas was indicted, he drafted a memo that he distributed to others, including some of the defendants here.  (App. ¶ 10).  The memo had false information about Lucas' investigations regarding who saw what and how certain deals were verified, and Lucas now admits that the memo was inaccurate.  (App. ¶ 10).  Lucas admits that his intention in drafting

4

the memo was to coordinate what the witnesses would say at his trial about the investigations.

(App. ¶ 10).  The government failed to prove Lucas guilty beyond a reasonable doubt.

## Lucas' Behavior During Specific Drug Buys Establishes
## His Efforts to Help Bray Frame Innocent People, Including Plaintiff

### *Danny Lee Brown*

In an effort to frame Danny Brown, Bray made two recorded telephone calls to Brown, but Bray was unable to set up a drug deal during those two calls  – in the first Bray left a message and in the second, Brown asked Bray to call him back in twenty minutes.  (App. ¶ 53).  Phone records show that Bray then tried to call Brown 28 times, but that Brown did not take Bray's calls.  (App. ¶ 54).  When Brown would not speak to Bray, Bray told the officers that Brown's telephone number was changed to a number that was actually registered to Robert Harris, another target of the investigation.  (App. ¶ 55).  This pivotal fact was not documented, and the two later calls that the DEA-6 report attributed to Brown were instead readily recognizable as being to Robert Harris.  (App. ¶ 56).

During the resulting the drug deal, falsely attributed to Danny Brown, Frank Douglas was the courier who delivered the drugs.  (App. ¶ 57).  The deal took place close to the home of Chris Jordan, Bray's known friend and fellow drug dealer whom Bray worked to keep free of allegations in the Mansfield roundup.  (App. ¶ 57-58).  Bray's body recording during the deal recorded Bray saying at the end of the buy, "That's cool, that's cool.  Here, give that to Chris," which would alert a listener that the money was going to Chris, not Danny Brown.  (App. ¶ 60). Because Bray's slip undermined his contention that Danny Brown, not Chris Jordan, was the person behind the drug deal, the copy of the transcript of the body wire prepared by defendants

for Danny Brown's trial omitted the statement, "give that to Chris."  (App. ¶ 61).

Lucas then gave false testimony during the criminal trial against Brown to bolster Bray's testimony.  At his own criminal trial, Lucas testified that during the alleged Brown deal, it was raining so hard that Lucas could not see the drug courier.  (App. ¶ 62).  But at Brown's criminal trial, Lucas testified that he identified the courier as Frank Douglas.  (App. ¶ 62).

### Roosevelt Williams

Lucas' misconduct during conspiracy victim Roosevelt Williams' frame-up is evidence of his role in hiding, supporting and enabling Bray's false allegations.  Williams has proven with evidence that he was in Chicago when the deal he was accused of participating in happened in Ohio.  (App. ¶ 21).  Detective Wheeler was very familiar with Williams from well before this deal, having spent hours watching him during surveillance.  (App. ¶ 22).  According to Wheeler, who was conducting surveillance with Lucas during the deal, even though Roosevelt Williams is tall, thin, and light-skinned with freckles, the person Lucas identified as Williams was short, dark-skinned, and stocky. (App. ¶ 23).

Immediately after the drug deal, detective Wheeler informed Lucas that the suspect Lucas identified as Williams was misidentified.  (App. ¶ 24).  Ignoring this informed opinion, Lucas insisted that the identification was correct, and Lucas' report of the buy omitted Wheeler's credible claim that the suspect was not Williams.  (App. ¶ 25-26).  In order to support Bray's frame-up of Williams, Wheeler's findings were not documented by Lucas, and Wheeler's claim of misidentification was, therefore, never revealed to the defense.  (App. 26-27).

In actuality, Robert Harris acted as a "stand-in," impersonating Roosevelt Williams. (App. ¶ 28).  Harris also acted as a stand-in during Johnny Robertson's fake drug deal, wearing

6

the same shirt during both deals.  (App. ¶ 28).  The exonerating fact that the same man wearing

the same shirt was identified as both Williams and Robertson was never noted or documented by

Lucas in his reports nor disclosed during either's prosecution.  (App. ¶ 28).

As if Harris' unlawful impersonation was not obvious enough, during the supposed

Williams deal, Lucas saw the drug dealer alleged to be Williams actually arrive in Bray's car –

the same car that Lucas previously saw Bray use during the alleged Nabors drug deal.  (App. ¶

29).  In fact, during the so-called Williams deal, defendant Ansari ran the license plate of the car

driven by the dealer and confirmed that the car was Bray's.  (App. ¶ 30).  To hide this startling

fact, a second DEA-6 report was generated, falsely identifying the make of car driven by the fake

drug-dealer.  (App. ¶ 30).  Additionally, Lucas saw and commented on the fact that the seller not

only drove Bray's car, but he drove it back to Bray's house after the purported drug deal.  (App. ¶

31).  That important observation was also omitted from Lucas' DEA-6 report.  (App. ¶ 31).

### *Dwayne Nabors*

Lucas' false testimony in support of the frame-up conspiracy was unmistakable in the

fabricated case against Dwayne Nabors.  Defendant Chuck Metcalf now admits that he blatantly

lied during Dwayne Nabors' criminal trial.  (App. ¶ 32).  Metcalf's fictitious testimony included

his false identification of Dwayne Nabors as a participant during the drug deal at issue.  (App. ¶

32).  Metcalf now admits that in actuality, during the fake Nabors deal, Metcalf saw Nabors go

into Platinum Status (where Nabors worked), and Nabors was not outside in the car dealing

drugs, as Metcalf and Lucas falsely testified.  (App. ¶ 32).  When questioned about why he

testified falsely against Nabors, Metcalf answered, "Because I really thought this is what

everybody else was going to testify to.  This is what was on paper. . . . Because it had to make

sense."  (App. ¶ 33).  Metcalf explained that he perjured himself "because I regurgitated what [came] off the DEA-6 report."  (App. ¶ 33).  The DEA-6 report, of course, was full of the false statements that typified Lucas' reports in the Mansfield cases.

Although there is "a vast difference" in the physical appearances of Nabors and the person who admitted to driving the car, Lucas falsely identified Nabors as the driver of the car. (App. ¶ 34-35).  In support of their false identification, defendants Lucas and Metcalf lied to the prosecutor Blas Serrano, telling him that there was no video capturing this deal when there was in fact a video taken.  (App. ¶ 36).  Metcalf then falsely testified that there was no video tape taken of the supposed Nabors deal, and although Lucas sat at the prosecutors' table during this false testimony, he did not alert the prosecutor to Metcalf's lie.  (App. ¶ 37).

Lucas' express efforts to falsely bolster Bray's credibility were also readily apparent in the alleged Nabors deal.  During that deal, Bray flagrantly stole thousands of dollars from the DEA, an exculpatory fact that goes directly to Bray's credibility, but that Lucas never documented or revealed to any of the conspiracy victims during their prosecutions.  (App. ¶ 38). During Nabors' trial, Bray tried to cover up the fact that he was paid for the drugs in part with a Cutlass that he kept for himself (leading to the DEA's shortfall) by falsely testifying that the recorded discussion about a "Cutty" was actually a discussion about Nabors' "Caddy" (Cadillac). (App. ¶ 39).  When a prosecutor angrily confronted Bray about his obviously false explanation, Lucas stepped up to cover up Bray's false explanation by telling the prosecutor that "Cutty" was another word for "dope."  (*Id.*).  Lucas never told anyone that he was lying about that.

### *Lowesco Ballard*

Lucas' role in the frame-up conspiracy is also demonstrated by the evidence arising from

the Ballard case.  Lucas saw the same stand-in, Darren Transou, impersonate both Noel Mott and Lowesco Ballard in two separate drug deals. (App. ¶ 42).  The obviousness of this ruse was augmented by the fact that Transou looked nothing at all like Ballard, who Lucas saw during the prosecution.  (App. ¶ 4, 43).  Lucas testified that he looked at a picture of Darren Transou to rule him out before (falsely) identifying Ballard. (App. ¶ 44).  But, defendant Cross did not actually order the identification picture of Transou for the DEA file until more than a year after Lucas' false identification, so Lucas' testimony was pure fiction.  (App. ¶ 44).   Lucas' testimony is laughable regardless because Transou admits that he was in fact used as a stand-in for Ballard.

Additionally, during a recorded telephone conversation, Transou referred to Lowesco Ballard in the third person, even though it was supposed to be a call with Ballard. (App. ¶ 45).  In the written transcript of that call, Lucas falsely changed the identity of the speaker from Ballard to Ronald Davis (another conspiracy victim) in order to mask the obvious inconsistency.  (App. ¶ 46).  In the new telephone transcript, Lucas also inserted ellipses to eliminate the reference to Ballard altogether, even though the portion eliminated could be clearly heard.  (App. ¶ 47). During Bray's cross-examination at Ballard's criminal trial, even though this phone call was to the same phone number Bray had used for the earlier purported Ballard calls, to a person who sounded just like the person who was supposedly Ballard in the earlier calls, but to a person who spoke of Ballard in the third person, Bray claimed that the call was actually to Ron Davis.  (App. ¶ 48).  Lucas backed Bray's lies with his own false testimony that the call where the recipient referred to Ballard in the third person was to Davis.  (App. ¶ 48).  Obviously, if the call was with Davis, that call would have needed to be disclosed to Davis' defense, but it was not.  (App. ¶ 50).

9

**Joe Ward**

In order to frame Joe Ward,  Bray had his girlfriend bring drugs to him outside the house, so that Bray could go inside, pretend to make a purchase, and come back out with drugs that he could claim to have purchased.  (App. ¶ 62, 66).  The recording device that Bray wore recorded that a woman said "take it" to Bray before he went into the house.  (App. ¶ 64).  Bray's girlfriend's delivery occurred in Lucas' plain view – at Ward's criminal trial, Lucas testified that he never let Bray out of his sight before the Ward deal and that he specifically watched for a drug hand-off.  (App. ¶ 65).  Although Bray now admits that there was a hand-off, and the recording device actually captured the hand-off, Lucas falsely testified at Ward's criminal trial that it never happened.  (App. ¶ 64-65).

**Noel Mott**

The Mott deal is further evidence Lucas' efforts to hide Bray's sloppy frame-ups from plaintiff and Lucas' other victims.  For instance, Lucas ignored that Bray did not turn on his recording device until after the alleged Noel Mott deal was completed.  (App. ¶ 67).  Also, Lucas was present when Bray used the same stand-in, Darren Transou, to impersonate both Mott and Lowesco Ballard, but did not tell anyone about that fact. (App. ¶ 68).

The Mott case also demonstrates how above the law Lucas believed himself to be during this conspiracy.  He admits that he ordered Ohio state troopers to steal money from Mott.  (App. ¶ 69).  According to Lucas, Mott and others were driving to Detroit to allegedly buy a large quantity of drugs.  (*Id.*).  Lucas came up with a plan to have Ohio troopers stop the car and essentially steal the money:  "Our game plan was to take the money that they were going to use to make the buy up in Detroit before they got up to Detroit.  That way, no one would get arrested, if

10

we just took the money and we didn't arrest anyone, so the case could keep going. . . ."  (*Id.*).  At

Lucas' instruction, the "ruse" was for the officers to find the money, "seize the money and

identify who was in the vehicles" without charging anyone with doing anything illegal.  (*Id.*).

### Ronald Davis (a.k.a. Herman Price) and Geneva France

As in the other sham deals, in the Ron Davis/Geneva France investigation, Bray was the

confidential informant who purportedly purchased the drugs, supposedly Davis' drugs with

France acting as a courier.  (App. ¶ 70).  Bray now admits under oath that neither Davis nor

France was actually involved in the deal.  Instead, selling his own drugs, Bray "staged a set-up

deal" to frame the person that he thought was Davis.  (App. ¶ 70).  Bray sought to make it appear

as if Davis was delivering drugs through France by staging the deal near Davis' house and using

Bray's friend "Shea Shea" (Karmiya Moxley) to pose as France.  (App. ¶ 71).

Lucas participated directly in this frame-up drug purchase.  Moxley/"Shea Shea" got into

the car with Lucas, had a conversation with him, and conducted a drug deal in the close confines

of inside a car.  (App. ¶ 73).  Soon thereafter, Lucas arrested and prosecuted France but never

identified that she was not the same person he spoke with earlier in the car, nor did Lucas ever

alert plaintiff or any other conspiracy victim to this difference.  (App. ¶ 73-74).

As in the other deals, the conspirators' efforts to connect Davis and France to the deal

was fiction.  While defendants Lucas and Metcalf monitored Bray's recorded telephone call to set

up the deal, Bray claimed that he was speaking with Davis, when the recording shows that he

was actually speaking to a woman.  (App. ¶ 76).  In the recording, it sounds as if the woman

trying to deepen her voice to sound like a man, and she said that she would "send the girl."

(App. ¶ 76).  Immediately after the call, Bray told Lucas and Metcalf that the phone conversation

11

was with Davis and said, "He [Davis] said he's sending his girl."  (App. ¶ 77).  Lucas' DEA-6 report, however, actually correctly identifies the phone call as one to a female recipient, but does not include that Bray lied and tried to pass the call off as one to Davis.  (App. ¶ 77).  In an effort to bolster Bray's false testimony at Price's criminal trial, Lucas testified that he overheard the call between Bray and Davis, though he now admits that this testimony was a lie.  (App. ¶ 80).

Given that the phone call connecting Davis to the deal was actually not a phone call with Davis, defendants needed some way to tie Davis to the deal.  Accordingly, immediately before the deal Bray stopped by to see the person he believed to be Davis.  (App. ¶ 81).  But in the recording of that meeting, that person never said anything about the deal, never alluded to Bray needing to meet with a person delivering drugs, and never directed Bray to a location.  (App. ¶ 81).  Nevertheless, Bray falsely claimed (and later testified) that during this meeting Davis instructed Bray where to meet Davis' drug courier.  (App. ¶ 82).  Lucas had heard the recording of the meeting and knew this was false testimony, but did nothing to correct it or to alert the defense or any other victim of the conspiracy that the recordings contradicted Bray's testimony and destroyed his credibility.  (App. ¶ 82-83).  Bray's false testimony occurred in February 2006, months before plaintiff's trial, but it was not disclosed to the prosecution or plaintiff's defense. (App. ¶ 105).

To further bolster Bray's false testimony, Lucas testified falsely at Davis' criminal trial that he saw Davis outside with a gun in his hand when he did not actually see Davis with a gun. (App. ¶ 84).  Lucas also testified falsely about an incident during the deal in an effort to salvage Bray's credibility.  During the drug deal, there was a dispute about the weight of the drugs being delivered.  (App. ¶ 85).  Bray pretended to call Davis to resolve the matter, but in actuality did

not dial anyone and merely pretended to have a conversation with Davis, in which Davis agreed

to give $200 back because the drugs were short.  (App. ¶ 85).  Bray's phone records support that

no call was actually made.  (App. ¶ 85).  Although this was an entirely fictional conversation,

there is evidence that no such call was made, and Bray dealt his own drugs, Lucas testified

falsely at both Geneva France's criminal trial and at his own that he was sitting close enough to

Bray that he actually heard Davis say "take two back" on Bray's cell phone.  (App. ¶ 86).

In addition to the many obvious examples of Bray lying that Lucas had to be aware of, a

few days after the France criminal trial (months before plaintiff's trial), a prosecutor told Lucas

that Bray failed three lie detector tests regarding the France/Davis deal and that it appeared Bray

has no credibility.  (App. ¶ 94).  Lucas never documented that admonishment.

## Argument

## I.     The Applicable Legal Standards, Should this Court Find That it Is Appropriate to Adjudicate Summary Judgment on the Merits at this Juncture

### A.     The Standard for Adjudicating Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law."  *Nance v. Goodyear Tire & Rubber

Co.*, 527 F.3d 539, 546 (6th Cir. 2008); Fed. R. Civ. P. 56(c).  The ultimate inquiry is "whether

the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law."  *Nance*, 527 F.3d at 547, *quoting

Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  When deciding a motion for

summary judgment, a court must view the evidence in favor of the non-moving party and draw

13

all reasonable inferences in that party's favor.  *Hardesty v. Hamburg Twp.*, 461 F.3d 646, 650 (6th

Cir. 2006), *citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B.     The Standard for Assessing Qualified Immunity in the Context of *Brady* Violations

Law enforcement officers are not entitled to qualified immunity for committing *Brady*

violations because such conduct violates an accused's clearly established constitutional rights.  In

accordance with *Brady v. Maryland*, 373 U.S. 83, 87 (1963), "the suppression by the prosecution

of evidence favorable to an accused upon request violates due process where the evidence is

material either to guilt or to punishment, irrespective of the good faith or bad faith of the

prosecution."  Even when the defense has not specifically requested information in discovery, the

prosecution has a duty to volunteer exculpatory evidence if it is "material."  *Kyles v. Whitley*, 514

U.S. 419, 433 (1995), *quoting Brady*, 373 U.S. at 108.  Material evidence is evidence that, if

disclosed, "undermines confidence in the outcome of the trial."  *United States v. Bagle*y, 473

U.S. 667, 682, 678 (1985).

In keeping with that definition of materiality, for *Brady* purposes, exculpatory evidence

includes evidence that impeaches a witness for the prosecution.  *See Johnson v. Bell*, 525 F.3d

466, 496 (6th Cir. 2008) ("The Supreme Court has repeatedly 'disavowed any difference between

exculpatory and impeachment evidence for *Brady* purposes.'"), *citing Kyles*, 514 U.S. at 433;

*Napue v. Illinois*, 360 U.S. 264 (1959) ("jury's estimate of the truthfulness and reliability of a

given witness may well be determinative of guilt or innocence"); *Bagley*, 473 U.S. at 676.  Each

individual bit of impeachment should not be considered separately; rather the impeachment

evidence should be considered cumulatively to assess whether the collective evidence was

14

material.  *Kyles*, 514 U.S. at 437-38.

A police officer commits "a constitutional deprivation analogous to that recognized in *Brady* by withholding or suppressing exculpatory material."  *Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009).  In other words, officers inflict "constitutional injury when they hide, conceal, destroy, withhold, or even fail to disclose material exculpatory information."  *Moldowan*, 578 F.3d at 379; *see also Id.*, quoting *California v. Trombetta*, 467 U.S. 479, 488 (1984) (a constitutional violation occurs when an officer  makes a "calculated effort to circumvent the disclosure requirements established by *Brady* [ ] and its progeny.").  Where exculpatory evidence is withheld or destroyed by the police, the defendant is not required to prove that the officer acted in bad faith.  *Moldowan*, 578 F.3d at 382-89.

A police officer's failure to disclose impeachment evidence is particularly significant when the impeachment of an informant reflects on both the informant's credibility and the caliber of the police work.  *Kyles*, 514 U.S. 442, 445-45.  In *Kyles*, for instance, the prosecution was aware of evidence impeaching the government's informant.  *Id.* at 424-27.  Specifically, the police did not report or question the informant's numerous inconsistencies in accusing the defendant.  *Id*. at 426-27.  The Court held that such evidence was *Brady* material that had to be disclosed both because it undermined the witness directly and also because it was evidence of the police officers' shoddy work.  *Id*. at 442 n.13, 445 ("disclosure would have revealed a remarkably uncritical attitude on the part of the police"), 446 n.15 (when "the probative force of evidence depends on the circumstances in which it was obtained and those circumstances raise a possibility of fraud, indications of conscientious police work will enhance probative force and slovenly work will diminish it").

15

**C.**     **The Standard For Assessing Qualified Immunity in Terms of Framing an Innocent Accused**

Officers are liable for violating an accused constitutional rights if they intentionally developed false evidence, tampered with evidence, assisted a witness in committing perjury, and/or misled prosecutors, in an effort to frame an accused for a crime that he did not commit. *See, e.g., Gregory v. City of Louisville*, 444 F.3d 725, 745 n.2 (6th Cir. 2006) (fabricating evidence violates clearly established law); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (knowingly using false evidence violates clearly established rights); *United States v. Bagely*, 473 U.S. 667, 679 n.7 (1985) (use of perjured testimony and the deliberate suppression of favorable evidence violates established rights).

Evidence that the defendant officers participated in framing the other Mansfield conspiracy victims is also directly relevant to the issue of whether they also assisted in framing plaintiff.  Federal Rule of Evidence 404(b) provides, in pertinent part, that evidence of other crimes, wrongs, or acts may be admissible for purposes such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." FED. R. EV. 404(b).  Rule 404(b) evidence is also admissible to show "*a common scheme or plan.*"  *United States v. Carney*, 387 F.3d 436, 450 (6th Cir. 2004) (emphasis in original; citation omitted).   A defendant's claims "of innocent presence or association . . .  routinely open the door to 404(b) evidence. . . ."  *United States v. Lattner*, 385 F.3d 947, 957 (6th Cir. 2004).  When there is a similarity between the conduct at issue and the other acts, "this renders proof of the prior acts admissible under FRE 404(b) to show plan and method of operation."  *Id*. at 957-58.

16

D.    **The Standards for Assessing Qualified Immunity in Terms of Plaintiff's Conspiracy Theory**

The Mansfield frame-ups can be viewed as part of a single conspiracy that was ongoing when Lucas joined, so his active participation in any part of the greater frame-up conspiracy is sufficient to inculpate him in framing the victims like plaintiff, who were arrested well after Lucas joined.  *See United States v. Avery,* 128 F.3d 966, 971 (6th Cir. 1997) (to be liable for a conspiracy a defendant need not have participated in all aspects of the conspiracy; it is sufficient that the defendant "was a party to the general conspiratorial agreement," and "the connection between the defendant and the conspiracy need only be slight").

The conspiratorial agreement "may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan."  *United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir. 1991)  (citation omitted).  In *United States v. Melendez*, 2004 WL 162937, *2 (E.D.Mich. 2004), for instance, the court found that police officers had a single conspiracy to violate the civil rights of a number of accused, where "the same *modus operandi* was repeated in many of the civil rights violations."  The court noted that the defendants planted incriminating evidence in many of the cases, falsified police reports in a number of the cases, and used force to unlawfully enter residences in a number of the cases.  *Id.*  The pattern of conduct occurred within a ten square mile radius, during a two year time period.  *Id.*

Here, the pattern of conduct is similarly apparent – every conspiracy victim was framed within a nine month period in an alleged sale involving Bray as the buyer.  Stand-ins were frequently used and audio recordings were often altered to make the deals more plausible.  Most of the fake deals involved false case reporting to bury contrary information.  All of the fake deals

17

occurred in the City of Mansfield.

## II.     Even if This Court Were to Adjudicate Summary Judgment Pre-Discovery, Lucas is Not Entitled to Qualified Immunity

The *Brady* violations committed by Lucas are manifest: as detailed above, through his false reporting, Lucas hid evidence that Bray was stealing drugs and money from the DEA, dealing his own drugs on the side, and blatantly lying to inculpate people in fictional drug sales. Lucas also hid evidence of other investigating officers' subterfuge in support of Bray, such as Metcalf's lies to the prosecutors and Faiths' awareness of the differences between the audio transmissions and what Bray claimed to have said and heard. Such evidence is sufficient for a jury to find that Lucas violated plaintiff's clearly established constitutional rights by failing to disclose impeaching and exculpatory evidence.

As for the evidence of Lucas' participation in a conspiracy to frame plaintiff, there is evidence that Lucas was part of a conspiracy with a clear *modus operandi* – Bray would fictionalize drug deals, and the defendant officers would alter recording transcripts, draft inaccurate or incomplete reports, and do whatever else necessary to make Bray's lies appear plausible. The evidence establishes that Danny Brown fell victim to this conspiracy – when Brown refused to take the bait on Bray's first thirty attempts to ensnare him in a drug deal, Bray told the officers that Brown's telephone number was changed to a number that was actually registered to Robert Harris, another target of the investigation. (App. ¶ 53-55). Defendants' subterfuge included failing to document that the supposed switch was to Harris' number and ignoring that the two later calls attributed to Brown were readily recognizable as being to Harris. (App. ¶ 56). A jury could easily conclude that the allegations against Brown fit the conspiracy's

18

pattern.

Finally, there is sufficient evidence for a jury to conclude that Lucas is part of the conspiracy. As set forth above, Lucas' conduct in the deals involving Roosevelt Williams, Dwayne Nabors, Lowesco Balard, Joe Ward, Noel Mott, Ronald Davis, and Geneva France would support a jury finding that Lucas was an active participant. Accordingly, based on the presently available evidence, a jury could find that Lucas conspired to violate Danny Brown's clearly established due process rights.

## Conclusion

Defendant Lucas has never contested, as a legal matter, that if he failed to tender exculpatory evidence, participated in framing Brown, or participated in a conspiracy that included framing Brown, he has violated Brown's clearly established constitutional rights. There is now evidence supporting each of those allegations. Accordingly, Lucas' assertions of qualified immunity should be denied.

RESPECTFULLY SUBMITTED,


/s/ Mark Loevy-Reyes
Attorneys for Plaintiff

Jon Loevy
Mark Loevy-Reyes
Debra Loevy-Reyes
LOEVY & LOEVY
312 North May, Suite 100
Chicago, IL 60607
(312) 243-5900

19

## CERTIFICATE OF SERVICE

I hereby certify that on September 1, 2010, I filed electronically a copy of the foregoing Plaintiff's Supplemental Response to Defendant Lee Lucas' Motion for Summary Judgment. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Any other parties will be served by regular U.S. mail. Parties may access this filing through the Court's system.

s/ Mark Loevy-Reyes
Mark Loevy-Reyes
LOEVY & LOEVY
312 North May Street, Suite 100
Chicago, IL 60607
Ph. – 312-243-5900
Fx. – 312-243-5902
loevy@loevylaw.com
