IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| DANNY BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 07 C 3750 |
| | ) | |
| THE UNITED STATES OF AMERICA, et al. | ) | Judge Solomon Oliver, Jr. |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**APPENDIX OF EVIDENTIARY MATERIAL IN SUPPORT OF
PLAINTIFF'S SUPPLEMENTAL RESPONSE TO DEFENDANT
LEE LUCAS' MOTION FOR SUMMARY JUDGMENT**

The evidentiary citations for all factual claims made in plaintiff's supplemental response to defendant Lee Lucas' motion for summary judgment are set forth below.  All transcript citations labeled "Tr." refer to testimony in *United States v. Lucas*,1:09-cr-0222, attached hereto in numerical order as Exhibit 1.  Transcript citations labeled "Tr.II" refer to testimony in *United States v. Nabors, et al.*, 1:05-CR-00537, attached hereto in numerical order as Exhibit 2.

**General Background Information**

1. Jerrell Bray became a confidential informant for Richland County Sheriff's Office in January 2005.  (Tr. 560).  His first drug buy as an informant for Richland County took place on February 12, 2005.  (Tr. 560).

2. The DEA signed Bray on as an informant in August 2005.  (Tr. 563).  Bray's first drug buy as a DEA informant took place on September 6, 2005.  (Tr. 563).

3. Defendant Lucas is a DEA agent who began working with Bray as an informant on the

1

September 6, 2005 drug buy. (Tr. 561).

4. For all of the criminal prosecutions arising out of the indictments predicated on Bray's informant testimony, both as a Richland County informant and/or as a DEA informant, Lucas sat at the prosecution's table during the criminal trials. (Tr. 2651).

5. Although many of the cases were tried, not one of the drug deals committed through Bray led to a conviction by a jury. (Tr. 3462-63).

6. On May 12, 2009, Lucas was indicted in an eighteen count federal indictment for violating 18 U.S.C. §§ 1503(a) (obstruction of justice), 1001(a)(3) (knowing creation of a false government document), 1623(a) (false testimony and/or creation of a material false declaration), and 242 (deprivation of rights under color of law). The indictment's allegations all related to Lucas' actions in conjunction with using Jerrell Bray as an informant. (Exhibit 3).

7. The indictment alleged that Lucas "knowingly included false and misleading information and concealed evidence favorable to accused individuals in DEA-6s of drug purchases made by Bray" and otherwise provided false and misleading evidence in the criminal matters based on Bray's informant activities. (Exhibit 3, ¶¶ 9, 12).

8. The indictment further alleged that Lucas knowingly testified falsely about material matters at the defendants' criminal trials. (Exhibit 3, ¶ 11).

9. The indictment also alleged that Lucas concealed favorable evidence from the accused and their counsel in the criminal matters resulting from Bray's informant activities. (Exhibit 3, ¶ 12).

10. After Lucas was indicted, he drafted a memo that he distributed to others, including at

least defendants Verhiley and Ansari.  (Tr. 3472).  The memo had many inaccurate statements about Lucas' investigations regarding who saw what and how certain deals were verified.  (Tr. 3470-72).  Lucas' intention in drafting the memo was to coordinate what the witnesses would say about the investigations.  (Tr. 3472-73).

**Throughout the Mansfield Investigations, Defendant Lucas Buried *Brady* Materials and Gave Tacit Approval to Jerrell Bray to Frame Innocent People**

11. Lucas drafted the vast majority of the DEA-6 reports in the Mansfield cases.  Lucas' DEA-6 reports documenting his investigations were rife with inaccuracies, omissions and patently false statements, and video evidence contradicted some of his reports.  (Tr. 1244, 1555-56, 1560, 1684-85, 1706, 1775-76, 2937-38, 3059-60, 3074-75, 3217, 3417-19, 3425-27).

12. In 2007 (long after the conspiracy victims' criminal cases were tried or resolved), DEA supervisor, John Ferster, learned that Jerrell Bray had stolen money given to him for a drug buy, while acting as a DEA informant.  (Tr. 1265).  Defendants Verhiley and Ansari reported this theft to Lucas when it occurred.  (Tr. 1265-67, 3068).  Lucas did not document this theft, and it was not disclosed to any of the criminal defendants whose cases relied on Bray's informant testimony – instead his report stated that Bray returned the money to him after the buy.  (Tr. 3069).

13. Bray testified that Lucas was personally aware Bray was stealing money from the DEA during his purported drug deals.  (Tr. 212-214).  Because Lucas did not discipline or confront Bray, Bray believed he had tacit permission to continue lying and cheating.  (Tr. 214- 215).

3

14. In 2007, Ferster also learned that an investigating officer told Lucas that a person criminally charged was not the same person as the one who participated in the buy. (Tr. 1268). This misidentification was not documented by Lucas, remedied by Lucas, or reported to the defense.

15. Dawn Brown, a 27 year veteran with the Richland County Sheriff's Office had such concerns about the investigations and the way that Bray was being handled, which was so contrary to the way that she was trained, that in February 2005, she began taking personal notes to document improprieties. (Tr. 1515, 1533).

16. When conducting the criminal investigations, Lucas never confirmed whether the addresses Bray attributed to suspects were actually tied to the alleged occupants, who were then charged with crimes purportedly occurring at their home. (Tr. 598, 600-01).

17. DEA recordings of purported drug buys did not include identifying headers, which is standard operating procedure. (Tr. 610-11).

18. Bray routinely dialed the identical telephone numbers for unrelated alleged suspects, called one suspect while claiming he called another, or had a different phone encounter from the one detailed in the DEA-6 form, and Lucas never documented the obvious subterfuge. (Tr. 621, 630-31, 698-99, 716, 724, 1855-57).

19. Lucas overlooked obvious discrepancies between the drug weights allegedly transferred by Bray during the deals and the reality. (Tr. 715). This allowed Bray to steal some of the drugs he was supposed to be selling. (Tr. 1019).

20. At a December 2005 proffer by criminal defendant Jerry Moton, Moton revealed that Bray was selling his own drugs on the side, in addition to the buying he was doing for the

government. (Tr. 2753). Lucas DEA-6 report of Moton's proffer omits that revelation. (Tr. 2754). The fact that Bray was dealing his own drugs on the side, while acting as an informant, was never revealed to the accused facing criminal charges based on Bray's testimony. (Tr. 2755).

### Lucas' Behavior During Specific Drug Buys is Indicative of His Effort to Help Bray Frame Innocent People

*Roosevelt Williams*

21. Roosevelt Williams has proven with evidence that he was in Chicago when the deal he was accused of participating in happened in Ohio. (Tr. 2058-60, 2064, 2074-75).

22. Detective Wheeler was very familiar with Williams prior to this deal, having encountered Williams countless times, having followed his doings for five to six months, and having spent hours watching him during surveillance. (Tr. 2086, 2112).

23. According to Wheeler, although Roosevelt Williams is tall, thin, and light-skinned with freckles, the person Lucas identified as Williams was short, dark-skinned, and stocky. (Tr. 2091).

24. Immediately after the deal, detective Wheeler informed Lucas that the suspect Lucas identified as Roosevelt Williams was misidentified. (Tr. 1686-87, 2218-19).

25. Lucas nevertheless insisted that the identification was correct. (Tr. 1687-88).

26. The DEA-6 report for this deal lists Cross, Metcalf, Lucas, and Verhiley as the ones who saw the alleged-Williams leave, but omits Wheeler, who was also present, but adamantly claimed that the person at the scene was not Williams. (Tr. 1838-39). Wheeler's observations were never documented by Lucas. (Tr. 1839).

5

27. Wheeler generated a supplemental report about the misidentification, but that report was never tendered to the defense. (Tr. 1807, 2098, 2101-02).

28. Robert Harris acted as a "stand-in" (impersonating different people) in the fake drug deals ensnaring Roosevelt Williams and Johnny Robertson. (Tr. 260). Harris actually wore the same shirt during both deals. (Tr. 3452-53). These facts are never noted or documented by Lucas in his reports nor disclosed during either's prosecution.

29. During the Williams deal, Lucas saw the dealer alleged to be Williams arrive in Bray's car, a car that Lucas previously saw Bray use during the alleged Nabors drug deal. (Tr. 1832, 1835-36).

30. During the supposed Williams deal, defendant Ansari ran the license plate of the car driven by the dealer and confirmed that the car was in fact Bray's. (Tr. 1836, 2092). To hide this startling fact, a second DEA-6 report was generated, changing the make of car driven by the dealer. (Tr. 1837). On information and belief, only the second DEA-6 report was tendered to Williams' attorneys.

31. Lucas saw and commented on the fact that the alleged-Williams drove Bray's car to Bray's home after the purported drug deal. (Tr. 250-252). That observation was not included in any DEA-6 report.

*Dwayne Nabors*

32. Chuck Metcalf now admits that he blatantly lied during Dwayne Nabors' criminal trial. (Tr. 1721-29). Metcalf's fictitious testimony included his false identification of Dwayne Nabors as a participant during the drug deal at issue. (Tr. 1722). Metcalf now admits that in actuality, during the fake Nabors deal, Metcalf saw Nabors go into Platinum Status

(where Nabors worked), and Nabors was not outside in the car dealing drugs, as Metcalf falsely testified. (Tr. 1794).

33. When questioned about why he testified falsely against Nabors, Metcalf answered, Because I really thought this is what everybody else was going to testify to. This is what was on paper. . . . Because it had to make sense." (Tr.1724, 1727). Metcalf explained that he perjured himself "because I regurgitated what [came] off the DEA-6 report." (Tr. 1722).

34. Lucas also falsely identified Nabors as the driver of the car, when according to Metcalf, Nabors was not in the car. (Tr. 1722, 1794, Tr.II 1122).

35. According to the prosecutor, there was "a vast difference" in the physical appearances of Nabors and the person who admitted to actually be driving the car, who was falsely identified as Nabors. (Tr. 2696).

36. Lucas and Metcalf lied to the prosecutor Blas Serrano, telling him that there was no video capturing this deal when there was in fact a video taken. (Tr. Tr.743-44, 1721, 2651, 2699).

37. Metcalf then falsely testified that there was no video tape taken of the supposed Nabors deal. (Tr. 743-55, 1721). Although Lucas sat at the prosecutors' table during this false testimony, he did not alert the prosecutor to Metcalf's lie. (Tr. 2651).

38. Bray flagrantly shorted the DEA thousands of dollars during the deal framing Dwayne Nabors, an exculpatory fact that goes directly to Bray's credibility, but that Lucas never documented or revealed to the defense. (Tr. 236-237).

39. During Nabors' trial, Bray tried to cover up the fact that he was paid for the drugs in part

7

with a Cutlass, that he kept for himself (leading to the DEA's shortfall), by falsely testifying that the recorded discussion about a "Cutty" was actually a discussion about Nabors' "Caddy" (Cadillac). (Tr. 240-41). When a prosecutor confronted Bray about his false explanation, Lucas stepped up to cover up Bray's false explanation by falsely telling the prosecutor that "Cutty" was another word for "dope." (Tr. 242-43).

40. Lucas drafted a search warrant affidavit about the Nabors deal for Metcalf to sign. (Tr. 1709). Metcalf swore to the veracity of the affidavit even though it contained false statements, attributed to Metcalf, that Metcalf had never told Lucas. (Tr. 1714-16).

41. Lucas put Nabors' licence plate number in his report, even though he did not see the plates, nor was he told the plate number by anyone who could see them. (Tr. 3344).

*Lowesco Ballard*

42. Lucas saw the same stand-in, Darren Transou, impersonate both Noel Mott and Lowesco Ballard. (Tr. 170-171, 175-176, 184, 190-191).

43. The obviousness of this ruse was augmented by the fact that Transou looked nothing at all like Ballard, who Lucas would have seen during the arrest and prosecution. (Tr. 186-87).

44. Lucas testified that he looked at a picture of Darren Transou to rule him out before (falsely) identifying Lowesco Ballard (when Transou now admits that he was in fact used as a stand-in for Ballard), but defendant Cross actually ordered the identification picture of Transou for the DEA file more than a year after Lucas' false identification. (Tr. 688-92, 790, 3322).

45. Additionally, during a recorded telephone conversation, Transou referred to Lowesco in the third person, even though he was supposed to be Lowesco Ballard. (Tr. 193).

46. In the written transcript of that call, Lucas changed the identity of the speaker from Ballard to Davis, presumably to mask the obvious inconsistency. (Tr. 632-39, 640).

47. In the new telephone transcript, Lucas also inserted ellipses to eliminate the reference to "Westco," altogether, even though the portion eliminated was not indecipherable or unclear. (Tr. 642-43).

48. During Ballard's criminal trial, when Bray was cross-examined about the phone call to the same phone number he had used for the earlier purported Ballard calls, to a person who sounded just like the person who was supposedly Ballard in the earlier calls, but to a person who spoke of Ballard in the third person, Bray claimed that the call was actually to Ron Davis. (Tr. 3432-33). Lucas backed Bray's false testimony, testifying that the call where the recipient referred to "Westco" in the third person was actually to Davis. (Tr. 3432-34).

49. This conversation that Lucas attributed to Davis discussed a different drug amount from the drugs sold during the alleged Davis deal. (Tr. 3434-35).

50. The transcript of the telephone call that Lucas and Bray claimed was with Davis was never tendered to Davis' defense. (Tr. 3437-38).

*Joshawa Webb*

51. Lucas conducted a drug deal in the close quarters of a car with Jeremiah Conrad, the stand-in used to impersonate Joshawa Webb. (Tr. 268, 2220-28, 2232-33). Lucas did not tell anyone during the arrest or prosecution of Joshawa Webb that the man Lucas purportedly bought drugs from in the car was not the same man as the one being prosecuted for the crime.

52. DEA agent Cross admitted that the Joshawa Webb deal did not abide by DEA procedures. (Tr. 2987).

*Danny Lee Brown*

53. Bray made two recorded telephone calls to Danny Brown. (Tr. 1954). Bray was unable to set up a drug deal during the two telephone calls to Brown – in the first Bray left a message and in the second, Brown asked Bray to call him back in twenty minutes. (Tr. 1954).

54. Phone records show that Bray then tried to call Brown 28 times, but that Brown did not take Bray's calls. (Tr. 1960-61).

55. Bray then told the officers that Brown's telephone number was changed to a number that was actually registered to Robert Harris, another target of the investigation. (Tr. 1954-56).

56. Two subsequent calls the DEA-6 report attributed to Brown were instead recognizable as being to Robert Harris. (Tr. 1957, 1961-62).

57. During resulting the drug deal, falsely attributed to Danny Brown, Frank Douglas was the courier who delivered the drugs. (Tr. 1963-64)

58. The deal took place close to Chris Jordan's house. (Tr. 1970-73).

59. Chris Jordan was Bray's friend and fellow drug dealer, a person Bray worked to keep free of allegations in the Mansfield roundup. (Tr. 1937-39).

60. Bray's body recording during the deal recorded Bray saying at the end of the buy, "That's cool, that's cool. Here, give that to Chris." (Tr. 1974, 1977).

61. The copy of the transcript of the body wire prepared for Danny Brown's trial omitted the statement, "give that to Chris." (Tr. 1975-76).

62. Lucas testified at his own criminal trial that during the alleged Danny Brown deal, it was raining so hard that Lucas could not see the person who delivered the drugs. (Tr. 3276-77). Nevertheless, back at Danny Brown's criminal trial, Lucas testified that he saw the courier jump into the car with Bray, and he identified the courier as Frank Douglas. (Tr.II 1134).

*Joe Ward*

63. While Lucas watched Bray immediately before the fake Joe Ward deal, Bray had his girlfriend bring drugs to him outside the house, so that Bray could go inside, pretend to make a purchase, and come back out with drugs. (Tr. 200-201).

64. A recording device recorded that a woman said "take it" to Bray before he went into the house. (Tr. 3444-45).

65. At Ward's criminal trial, Lucas testified that he never let Bray out of his sight before the Ward deal and that he specifically watched for a drug hand-off, but that it never happened. (Tr.2 at 1117, 1119-20, 1219; Tr. 3444).

66. After purchasing just $20 worth of marijuana at Ward's house, Bray falsely claimed that Ward sold him the crack that his girlfriend delivered during the deal. (Tr. 202-203).

*Noel Mott*

67. Lucas overlooked the fact that Bray did not turn on his recording device until after the alleged Noel Mott deal was completed. (Tr. 703-4).

68. Lucas was present when Bray used the same stand-in, Darren Transou, to impersonate both Noel Mott and Lowesco Ballard. (Tr. 170-72, 175-76).

69. Lucas' testimony at his criminal trial establishes that he ordered Ohio state troopers to

11

steal money from Mott. According to Lucas, Mott and others were driving to Detroit to buy a large quantity of drugs. (Tr. 3281). Lucas came up with a plan to have Ohio troopers stop the car and essentially steal the money: "Our game plan was to take the money that they were going to use to make the buy up in Detroit before they got up to Detroit. That way, no one would get arrested, if we just took the money and we didn't arrest anyone, so the case could keep going. . . ." (Tr. 3281). At Lucas' instruction, the "ruse" was for the officers to find the money, "seize the money and identify who was in the vehicles" without making an arrest. (Tr. 3281-82).

### The deal purportedly involving Ronald Davis/Herman Price and Geneva France was a Farce

70. On November 9, 2005, Herman Price (a.k.a. Ronald Davis) was charged in a two count indictment with co-defendant Geneva France for allegedly distributing 50 grams or more of a substance containing crack cocaine in proximity to a school. (Exhibit 4).

71. Bray, the confidential informant who purportedly purchased the drugs from Price and France, has now admitted under oath that neither Price nor France was actually involved in the deal. Bray "staged a set-up deal" to frame the person that he thought was Ronald Davis. (Tr. 270-71).

72. Bray sold his own drugs for that fake drug deal. (Tr. 271).

73. Bray sought to make it appear that Davis was delivering drugs through Geneva France by staging the deal near Price's house and using his friend "Shea Shea" (Karmiya Moxley) to pose as France. (Tr. 272, 276-77).

74. Karmiya Moxley has described how she, not France, was the one who delivered the drugs

to Lucas and how she did so for Bray, not Price. (Tr. 2296-2302)

75. Lucas participated directly in this drug purchase. (Tr. 272-73). Moxley/"Shea Shea" got into the car with Lucas, had a conversation with him, and conducted a drug deal in the close proximity of the inside of the car. (Tr. 276, 2296-2302).

76. Geneva France was falsely charged with being the seller who got into the car with Lucas. (Tr. 277, 280). Lucas would have seen France during her arrest and prosecution, but he never alerted anyone that France was not the person who sold him the drugs. (Tr. 3429-30).

77. Geneva France went to trial on the charges against her. The only evidence tendered to her defense were the audiotape of the buy attributed to her and a criminal history information sheet on Jerrell Bray. (Tr. 2643).

78. The person charged as Ronald Davis (Herman Price) was not the same person as the one with whom Bray attempted to "stage a set-up deal." (Tr. 277-78).

79. While Lucas, Verhiley and Metcalf monitored Bray's recorded telephone call to set up the deal, Bray claimed that he was speaking with Davis, when the recording shows that he was speaking to a woman. (Tr. 281-82, 1883, 1924-25). It appears that the woman was trying to deepen her voice to sound like a man, and she said that she would "send the girl." (Tr. 3357).

80. Bray told Lucas, Verhiley, and Metcalf that the phone conversation was with Davis and said, "He [Davis] said he's sending his girl," but the DEA-6 form generated lists the phone call as one to, "Little S," (the nickname of the woman who delivered the drugs) and specifically lists "female" for the call recipient. (Tr. 1883, 1888, 1924).

13

81. At France's criminal trial, after listening to the transcript of the telephone call between himself and a woman, Bray falsely testified that at the end of the call, he realized it was a female and that he told the agents that. (Tr. 1919-20). There is a recording of the conversation immediately after the call, when Bray told Lucas and Metcalf, "He said he's sending his girl." (Tr. 1919-20).

82. Lucas was present at counsel's table when Bray testified falsely. (Tr. 2651). He did nothing to correct the false testimony.

83. Lucas falsely testified that he overheard the telephone call between Bray and Davis. (Tr. 1911, 1929-30). In actuality, Lucas was on another telephone call during that call and listened to a recording of the conversation afterward. (Tr. 3356). According to Lucas, the voice on the phone was recognizable as a woman impersonating a man. (Tr. 3357).

84. Immediately before the deal, when Bray stopped by to see the person he believed to be Ron Davis, that person never said anything about Bray needing to meet with a person delivering drugs nor did he direct Bray to a location. (Tr. 1891-92).

85. Nevertheless, when Bray left Ron Davis' house, he told Lucas that Davis told Bray "to go over and meet the girl on Glessner." (Tr. 3406). The transcript Lucas heard of Bray's recording device, however, had Bray mentioning "meeting the girl" twice, but Bray's declaration is met with silence rather than instructions on where to meet her. (Tr. 3406).

86. Bray falsely testified at the criminal trial regarding this conversation, and Lucas sat at the prosecution's table without correcting the false testimony or alerting the prosecution. (Tr. 2651, 3407).

87. Lucas testified at Davis' criminal trial that he saw Davis outside with a gun in his hand

14

when he did not actually see Davis with a gun. (Tr. 3393-94).

88. Price did not know Jerrell Bray, he did not authorize anyone to sell drugs to Bray on his behalf, and he had no knowledge of this drug deal. (Tr. 2505, 2508-9, 2514).

89. The DEA-6 report of this deal omits altogether one of the telephone calls supposedly associated with the deal. (Tr. 1908).

90. When Moxley, who was supposed to be Davis' drug courier, exited the car after the deal, Bray was recorded as calling Moxley, at the same phone number he used when he purportedly called Davis, and telling Moxley, "don't go back to my house." (Tr. 286, 1894). Lucas was present when Bray said that. (Tr. 276).

91. During that drug deal, there was a dispute about the weight of the drugs being delivered. Bray pretended to call Davis to resolve the matter, but in actuality did not dial anyone and merely pretended to have a conversation with Davis, in which Davis agreed to give $200 back because the drugs were short. (Tr. 287-88, 2301-2). Bray's phone records support that no call was actually made. (Tr. 1893-94).

92. Even though this was an entirely fictional conversation, Lucas testified at both Geneva France's criminal trial and his own that he was sitting close enough to Bray that he actually heard Davis say "take two back" on Bray's cell phone. (Tr. 1947-49, 2800-01, 2804-5, 3370).

93. At the end of the deal, Bray purportedly called Davis to confirm that the deal went smoothly. The transcript of that telephone call does not include any reference to the deal that had just happened. (Tr. 1899-1900).

94. A few days after the France criminal trial (months before plaintiff's criminal trial), a

15

prosecutor told an officer, most likely Lucas, that Bray failed three lie detector tests regarding the France/Davis deal and that it appeared Bray has no credibility. (Exhibit 5). Lucas never documented that admonishment.

95. It has now come to light that Bray was framing innocent people with abandon, and he has since pled guilty to violating the civil rights of several of the conspiracy's victims. (Exhibit 6 at p.4-5). Bray is currently in custody for his role in framing people for drug crimes. (Exhibit 6 at p.4).

96. After Bray's lies came to light, the government filed a motion seeking to allow conspiracy victims to withdraw their guilty pleas and to dismiss the charges against them. (Exhibit 6). In that motion, the government argued that Bray was an "essential witness" to the drug charges that the victims pled guilty to. The government argued that "Bray's illegal conduct was so pervasive and his credibility so tainted" that victims should be permitted to withdraw their guilty pleas. (Exhibit 6 at p.5). The government noted that after the pleas are withdrawn, Bray remains an essential witness who is not reliable or credible, so the charges should all be dismissed. (Exhibit 6 pp.5-6).

97. The government's motion was granted, and victims of the frame-up conspiracy who pled guilty were allowed to withdraw their pleas. (Exhibit 7). Charges against those victim were withdrawn. (Exhibit 7).

98. On March 15, 2006, Danny Brown was charged along with twenty-one others in a superceding indictment. Brown was charges with three drug offenses: two related to an alleged sale to Jerrell Bray through a courier named Frank Douglas on November 8, 2005. (App. Exhibit 8, Counts 22 and 52); and one count was for conspiracy to possess crack

cocaine with intent to distribute between Winter 2004 and November 8, 2005. (App. Exhibit 8, Count 1).

99. After a jury trial, Danny Brown was acquitted of all charges against him. (Exhibit 9).

100. According to the investigation report, the officers involved in investigating the sale allegedly involving plaintiff included Lucas and defendants Cross, Metcalf, Faith, and Mayer. (Exhibit 10).

101. In the criminal case against plaintiff, the government's discovery disclosure to plaintiff stated that the government had no knowledge of exculpatory materials or *Brady* evidence. (Exhibit 11).

                RESPECTFULLY SUBMITTED,

                /s/ Mark Loevy-Reyes
                Attorneys for Plaintiff

Jon Loevy
Mark Loevy-Reyes
Debra Loevy-Reyes
LOEVY & LOEVY
312 North May, Suite 100
Chicago, IL 60607
(312) 243-5900

**CERTIFICATE OF SERVICE**

  I hereby certify that on September 1, 2010, I filed electronically a copy of the foregoing Appendix to Plaintiff's Supplemental Response to Defendant Lee Lucas' Motion for Summary Judgment. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Any other parties will be served by regular U.S. mail. Parties may access this filing through the Court's system.

                s/ Debra Loevy-Reyes
                Debra Loevy-Reyes
                LOEVY & LOEVY
                312 North May Street, Suite 100
                Chicago, IL 60607
                Ph. – 312-243-5900
                Fx. – 312-243-5902
                loevy@loevylaw.com