Page 144

1   Mr. Lucas.

2               So that's what I wanted to state generally.

3               You may proceed.

4               MR. TEITELBAUM:  Yes, sir.

5        DIRECT EXAMINATION OF JERRELL BRAY

6   BY MR. TEITELBAUM:

7   Q.    Would you state your name for the record, please, sir?

8               THE CLERK:  Could I swear him in?

9               THE COURT:  I'm sorry.  Let me have you sworn

10  in, sir.

11                   JERRELL BRAY,

12      of lawful age, a witness called by the Government,

13           being first duly sworn, was examined

14               and testified as follows:

15       DIRECT EXAMINATION OF JERRELL BRAY

16  BY MR. TEITELBAUM:

17  Q.    If you could maybe pull that microphone down towards

18  you a little bit, please, sir.

19               All right.  Would you state your name, please?

20  A.    Jerrell Bray.

21  Q.    Mr. Bray, how old are you, sir?

22  A.    Thirty-eight.

23  Q.    You are currently in the care and custody of the U.S.

24  Bureau of Prisons serving a sentence, is that correct, sir?

25  A.    Yes, sir.

1    A.    Thirty-two.

2    Q.    Did Noel Mott become the first target of your first

3    buys after the DEA was involved?

4    A.    Yes.

5    Q.    And do you know how Mr. Mott was selected?

6    A.    He was from Detroit.

7    Q.    What did that mean?

8    A.    Detroit was making a bunch of noise down in Mansfield.

9    Q.    Could you elaborate on that a little bit?

10          What's that mean, Detroit was making a bunch

11   of noise?

12   A.    That mean they was a problem down in Mansfield.  They

13   was coming down from Detroit to get rid of they drugs and

14   making Mansfield, Ohio.

15   Q.    So the authorities, the guys you were working for,

16   were targeting some of these Detroit guys, is that what

17   you're saying?

18   A.    Yes.

19   Q.    Now, could you make a buy off of Noel Mott?

20   A.    Yes.

21   Q.    And in that first buy under DEA, did you, in fact, buy

22   off of Noel Mott?

23   A.    No, sir.

24   Q.    Why not?

25   A.    Because I bought all his drugs.

1   Q.   Could you explain that?  What do you mean by that?

2   A.   When they wanted me to do him, he was out of drugs

3   because I had already bought them all.

4   Q.   So he didn't have drugs?

5   A.   No, sir.

6   Q.   So what did you decide to do?

7   A.   Sell my own.

8   Q.   And how do you arrange to do that?

9   A.   I arranged -- I arranged for a friend to call me and

10  he would call me, or if I didn't have a friend call me I

11  would buy the drugs off another guy.

12  Q.   Well, let me ask you, do you know a guy by the name of

13  Darren Transou?

14  A.   Yes.

15  Q.   And who was Darren Transou?

16  A.   Another drug dealer from Detroit.

17  Q.   Were you involved with Mr. Transou?

18  A.   Yes.

19  Q.   In what capacity?

20       What was the relationship between you and

21  Transou?

22  A.   I was buying weight off of him, too.

23  Q.   And what kind of weight would you be buying off of

24  Mr. Transou?

25  A.   Eighths.

1   Q.    Eighth kilos?

2   A.    Yes.

3   Q.    What would you pay for that?

4   A.    Twenty-eight to -- in between 2800 to 3200.

5   Q.    Now, in general, once DEA got involved, who was your

6   principal point of contact with DEA?

7   A.    Mr. Lee Lucas.

8   Q.    Was Mr. Lucas involved in all the deals you did?

9   A.    Just about.

10  Q.    And was he in Mansfield?

11  A.    Yes, he would come to Mansfield.

12  Q.    What was the procedure used with the DEA buys?  Was it

13  the same as you described for the Sheriff's?

14  A.    Oh, leading up to the drug deal?

15  Q.    Yes, sir.

16  A.    The telephone calls?

17  Q.    Yeah.

18  A.    No, sir.

19  Q.    And in what sense was it different?

20  A.    Sometimes my car wasn't searched.  Sometimes I wasn't

21  searched.

22  Q.    How about the telephone calls; like every deal, would

23  there always be telephone calls?

24  A.    Yes.

25  Q.    Setting up the deal?

1                   Do you recall?

2    A.    No.

3    Q.    All right.  Did you successfully do a deal?

4    A.    With Noel Mott?

5    Q.    Yeah, with Mott.

6    A.    No, sir.

7    Q.    How about with Transou?  With Transou?

8    A.    Yes.

9    Q.    Do you recall an occasion in relation to one of the

10   deals with Transou where you ended up where you were going

11   to go to Detroit, follow him to Detroit?

12   A.    Yes, sir.

13   Q.    All right.  What was that all about?

14               What was the trip to Detroit supposed to be?

15   A.    We was supposed to go to Detroit and pick up more

16   drugs.

17   Q.    And who was supposed to go to Detroit?

18   A.    Me, Noel Mott, and I guess his girlfriend.

19   Q.    Was it Noel Mott?

20   A.    No, sir.

21   Q.    Okay.  All right.  So who did you actually go to

22   Detroit with?

23   A.    Transou.

24   Q.    Did you tell the police about this trip to Detroit?

25   A.    Yes, I did.

1  Q.    And when I say "the police," was that the DEA at the

2  time?

3  A.    Yes.

4  Q.    And what did you tell them?

5  A.    That we was going to Detroit to pick up some drugs.

6  Q.    You and who?

7  A.    Noel Mott.

8  Q.    And did you actually set out for Detroit with anybody?

9  A.    Yes, sir.

10 Q.    And who was that?

11 A.    Transou.

12 Q.    Why did you tell the DEA you were going to Detroit

13 with Mott when you were going to be going with Transou?

14 A.    For it can look like I'm going to Detroit with Mott.

15 Q.    Did you start out for Detroit?

16 A.    Yes.

17 Q.    What were you driving?

18 A.    A white Saturn.

19 Q.    And were you caravanning?  Were you driving together?

20 Were you in the same car with Transou?

21 A.    No, sir.

22 Q.    What was he driving?

23 A.    A green Bronco.

24 Q.    Did something happen en route to Detroit?

25 A.    Yes.

1    BY MR. TEITELBAUM:

2    Q.    Mr. Bray, we were just starting to talk about the

3    Ballard deal.  And did you, in fact, do a drug deal that was

4    supposed to be with Mr. Ballard?

5    A.    No, sir.

6    Q.    You had told the police you could, though, is that

7    correct?

8    A.    Yes, sir.

9    Q.    All right.  And so what did you do?

10   A.    I called Transou and asked him how much weight did he

11   have left.  After talking to him, I told him I was going to

12   be calling him for an eighth, and he said he was okay.

13   Q.    And what did you tell the police that you were working

14   with?

15   A.    Excuse me?

16   Q.    Did you come up with a plan formulated with your law

17   enforcement handlers to -- as to how to carry out the deal?

18   A.    Yes, we was going to meet at the Eastgate apartments.

19   Q.    And where is that?

20   A.    In Mansfield.

21   Q.    Why the Eastgate apartments?

22   A.    Because I had a girlfriend staying there.

23   Q.    Who picked the location?

24   A.    I did.

25   Q.    What was the significance of having a girlfriend

1   there?

2   A.    Because I had bought an eighth from Transou earlier

3   that day.

4   Q.    And what did that have to do with where the location

5   would be?

6   A.    So I could pass off the eighth that I had and do the

7   drug -- and buy the eighth off of Transou.

8   Q.    The prior deal with Transou that was supposed to be

9   Mott, where did that take place?

10  A.    The prior deal?

11  Q.    The one you had done before that was supposed to be

12  Noel Mott where you went and bought from Transou, where did

13  that occur?

14  A.    Tremont.

15  Q.    And what is Tremont?

16  A.    That's where Transou lived.

17  Q.    So was that his house?

18  A.    Yes.

19  Q.    And this next deal is supposed to be Ballard now, is

20  that correct?

21  A.    Yes, sir.

22  Q.    Okay.  You had met Mr. Ballard before you had done the

23  deal with him, you said?

24          I'm sorry, earlier you had -- you had

25  indicated you knew who Ballard was, is that correct?

1   A.    Yes, sir.

2   Q.    Okay.  What -- did you have any concern as to doing

3   the deal with Transou, that was supposed to be Ballard, in

4   terms of the police being able to see this?

5   A.    My concern was I couldn't do the drug deal on Tremont,

6   and I had to get Transou to come to me and not get out of

7   the vehicle.

8   Q.    Not get out of your vehicle or his vehicle?

9   A.    Out of his vehicle.

10   Q.    All right.  Do you know what kind of car Mr. Transou

11   normally drove?

12   A.    Usually he drove rent-a-cars.

13   Q.    So what was your plan, what was in your thought

14   process of what was going to occur at Eastgate, how the deal

15   would go down?

16   A.    He was going to pull up.  We -- I was going to get in

17   the vehicle with him.  We was going to exchange the money

18   for the dope.  And the deal was going to be done, and he was

19   going to pull off and it was going to be over with.

20   Q.    In your opinion, does Mr. Ballard resemble

21   Mr. Transou?

22   A.    No, sir.

23   Q.    Is there some type of noticeable difference between

24   them?

25   A.    Transou is about five-seven, five-eight.

1              Westco was about six-two, six-three.

2  Q.    So do you end up going to Eastgate?

3  A.    Yes.

4  Q.    Is anybody with you?

5  A.    No.

6  Q.    When you go to do a deal either at somebody's house or

7  out at Eastgate, do you have any type of equipment with you

8  that's going to record the deal in any way?

9  A.    I have a cobble phone and a body recorder.

10  Q.    What is a cobble phone, sir?

11  A.    It's a telephone.

12  Q.    And how does that -- what does that do, do you know?

13  A.    It transmit the conversations that's going on right

14  there next to the cobble phone.

15  Q.    And is that to your surveillance people?

16  A.    Yes.

17  Q.    And the body recorder does what?

18  A.    It records the same thing, but the cobble phone gives,

19  like, a live recording.

20  Q.    And as you go off to do a deal, who turns these

21  devices on or off?

22  A.    I don't know.

23  Q.    The deal now with Ballard, do you go to Eastgate?

24  A.    Yes.

25  Q.    Are you by yourself or with somebody?

1   A.      Yes, sir.

2   Q.      And why were you familiar with that green Bronco?

3   A.      Because it belonged to another drug dealer.

4   Q.      Who was that?

5   A.      Rico Spires.

6   Q.      Were you expecting that car to arrive?

7   A.      No, sir.

8   Q.      What happened when the Bronco came into the lot?

9   Where did it go?

10  A.      It parked down the further end from me.

11  Q.      Could you describe this a little bit?

12          What kind of apartment complex is this?  How

13  is it set up?

14  A.      They got a front row apartments; you got apartments on

15  the side.

16  Q.      Where is the parking lot?

17  A.      It sits down the hill from the Salvation Army.

18  Q.      And that's where you were parked?

19  A.      Yes.  I was parked on the front row.

20  Q.      Okay.  How far away do you think it was that

21  Mr. Transou parked when he pulled in in the Bronco?

22  A.      He had to come down the hill.  He parked, like, four

23  cars over from me.

24  Q.      What was your thought?  What was your reaction when

25  you saw that?  What did you do?

1    A.    I started walking towards the truck.

2    Q.    Did you get to the truck?

3    A.    I was headed there.

4    Q.    And what happened?

5    A.    He came around the back.

6    Q.    Back of what?

7    A.    The back of the truck.

8    Q.    Did you --

9    A.    Headed towards me.

10   Q.    So he's out of the car now?

11   A.    Yes.

12   Q.    What do you do?

13   A.    I tried to meet him.

14   Q.    And what ends up happening?

15   A.    He wind up walking up to my car.

16   Q.    So you're standing out in the open with Mr. Transou?

17   A.    Yes, sir.

18   Q.    How does the deal go?  Does the deal go down?

19   A.    Yes, it does.

20   Q.    What happens?

21   A.    We goes back to his truck.  When we get back to his

22   truck, there was another car that I was unaware of that had

23   pulled up with him, and he grabbed the drugs from them.  We

24   got in his truck and exchanged the money for the drugs.

25   Q.    Do you know who those people were?

1    A.    One of them was his girlfriend.

2    Q.    Were you expecting another car to be on the scene?

3    A.    No, sir.

4    Q.    Did you get the drugs?

5    A.    Yes, sir.

6    Q.    Do you recall, sir, what quantity you were supposed to

7    be purchasing that day?

8    A.    An eighth.

9    Q.    And what were you to pay for that?

10   A.    Thirty-two.

11   Q.    Did you, in fact, buy an eighth?

12   A.    Yes.

13   Q.    Do you recall what you paid?

14   A.    No, sir.

15   Q.    I'd like to go back for one second now back to the

16   telephone calls setting this deal up.

17              We heard two; one at the beginning, one en

18   route giving directions.

19              And direct your attention to N 2, Track 2.

20              (Tape playing).

21   BY MR. TEITELBAUM:

22   Q.    Who was that with?

23   A.    Transou.

24   Q.    Was that part of this same deal?

25   A.    Yes, sir.

1    Q.    At the one point in the conversation Mr. Transou says

2    "My man Westco wants one or is waiting on one," and you

3    moan.

4              Why do you moan?

5    A.    Because he said "Westco."  He was supposed to be

6    Lowestco.

7    Q.    To your knowledge, were there any other Lowestcos in

8    Mansfield?

9    A.    No, sir.

10   Q.    Do you recall being asked by the defendant -- well,

11   let me go back for a second.

12             Did you eventually have to testify at a trial

13   where Mr. Ballard was the defendant?

14   A.    Yes, sir.

15   Q.    And do you recall being asked by the defense about

16   this call?

17   A.    Yes, sir.

18   Q.    Do you recall telling the jury there who it was on

19   that call?  Do you recall who you said it was?

20   A.    No, sir.

21   Q.    Okay.  Now, during the buy, sir, were you wearing one

22   of those recording devices?

23   A.    Yes, sir.

24   Q.    Do you know whether or not this particular buy was

25   videotaped?

1    A.    I went over to his house.  He was sitting on the

2    porch.  Just as I was pulling up, Lee Lucas and Matt Mayer

3    was just riding by in a black pickup truck, and it was

4    obvious; I mean, if you sit on the porch you can pretty much

5    tell who they was when they rode by.

6              So I circled the block and came around.  He

7    was sitting on the porch and I asked him did the truck come

8    back around.  He was like no.  So me and him started talking

9    about a PS2, and I had told him I needed a 20 of weed and he

10   sent me in to buy from his mother.

11   Q.    Why did you bring up the weed?

12   A.    Because it sounds like crack, like we dealing and

13   wheeling.

14             It sounds like we engaged in a drug deal.

15   Q.    So you talked money and loosely so it would sound like

16   a crack deal?

17   A.    Yes, sir.

18   Q.    So were you at the police, the sheriff's station

19   earlier that day before the deal?

20   A.    Yes, sir.

21   Q.    Were you searched, to your knowledge, if you recall?

22   A.    I don't recall.

23   Q.    Okay.  Did you have -- your girlfriend had already

24   given you the drugs when you left the police station?

25   A.    No, she hasn't.

Page 201

1    Q.    Where did she give you the drugs?

2    A.    In front of Joe Ward's house.

3    Q.    How did she know to be there?

4    A.    I told her to be there.

5    Q.    And what's your girlfriend's name?

6    A.    Alexis Younger.

7    Q.    Did she know what was going on?

8    A.    No, sir.

9    Q.    And by that I mean did she know you were working with

10   the police?

11   A.    No, sir.

12   Q.    Did Alexis know whether or not you were a drug dealer?

13   A.    Yes, she did.

14   Q.    Were there other occasions when she had either

15   delivered drugs to you or participated in some manner?

16   A.    Yes, sir.

17   Q.    Now, sir, I'd like -- we're going to play a little

18   bit, this is now N 3.  I believe there's only one track

19   there.

20             Okay.  I'm sorry, that's N 3, Track 3.

21             MR. TEITELBAUM:  And let me -- just give me

22   one second, Your Honor, to find the page because this is a

23   rough recording.

24             THE COURT:  I guess there's no way around it,

25   we have to amplify it loud to get what we can, I guess.

Page 202

1              It's pretty loud.

2              MR. TEITELBAUM:  Actually after this -- the

3    one part we will be playing, we will only play a short

4    excerpt of this, it does have to be loud on this one because

5    the relevant part is pretty soft.

6              Other than that -- Page 2 is where we will be

7    starting.

8              (Tape playing).

9    BY MR. TEITELBAUM:

10   Q.    That voice that just said "Take it," who is that?

11   A.    It's my girlfriend.

12   Q.    What was your girlfriend referring to?

13   A.    The quarter ounce I told her to bring to.

14   Q.    So you went into the house, you bought marijuana, is

15   that correct?

16   A.    Yes, sir.

17   Q.    And how much was that?

18   A.    $20.

19   Q.    And then what did you do?

20            As you leave the house, where do you go?

21   A.    To the Sheriff's Department.

22   Q.    And what do you give back to the police officers?

23   A.    Marijuana and crack.

24   Q.    And what do you tell them?

25   A.    I told them he gave me marijuana, too.

1  Q.   And what about the crack?

2  A.   I told them he gave me crack.

3  Q.   Did Mr. Ward and his mother Ms. Parker go to trial?

4  A.   Yes, sir.

5  Q.   And do you recall whether or not you were asked by the

6  defense whether or not you had met with a young woman prior

7  to going into the house?

8  A.   Yes, sir.

9  Q.   And what did you tell them?

10 A.   I don't recall.

11 Q.   Did you tell them, tell the Court and the jury that

12 day who gave you the crack?

13 A.   No, sir.

14 Q.   I'm sorry, did you testify as to regarding Mr. Ward

15 and Ms. Parker about the crack?

16 A.   Yes, I testified that they gave me the crack.

17 Q.   Was that true?

18 A.   No, sir.

19 Q.   You indicated to us earlier that this whole thing

20 started with the Sheriff's Office folks; that one of the

21 first names mentioned was Tyron Brown, is that correct?

22 A.   Yes, sir.

23 Q.   Did you do a later buy, a buy now that after DEA was

24 involved, that was supposed to be with Tyron Brown?

25 A.   Yes, sir.

1          THE COURT:  That's -- if you want to play it
2     again.
3          MR. TEITELBAUM:  I think we can just move on
4     to -- we'll go back to the same number, N 5, Track 2.
5          Okay.  And we'll start right at the beginning
6     on this one.  Excuse me one second.
7          (Tape playing).
8          MR. TEITELBAUM:  We're going to stop and move
9     to the -- there's a driving part here.
10         THE COURT:  All right.
11         MR. TEITELBAUM:  We are going to jump ahead.
12    Sorry, I should have done that a minute ago.
13         Middle of Page 2.
14         (Tape playing).
15         MR. TEITELBAUM:  Okay.  We'll stop, stop
16    there.
17    BY MR. TEITELBAUM:
18    Q.   Mr. Bray, part of that transcript where we stopped the
19    first time, and it says "16, 17, 18," what are you doing?
20    A.   Counting money.
21    Q.   What money?
22    A.   The money that I was taking from the DEA.
23    Q.   Part of the buy money?
24    A.   Yes, sir.
25    Q.   After you counted it in the car, what did you do with

Page 213

1    it?

2    A.    Put it behind my radio.

3    Q.    Which car were you in?

4    A.    My Riviera.

5    Q.    Did you have a place in that?

6    A.    Yes.

7    Q.    Then we jumped ahead, and you're getting out of your

8    car and there's voices there, you're talking to people,

9    right?

10   A.    Yes.

11   Q.    What happens when you get back to the station in

12   regards to the money?

13   A.    Jamaal and a guy from BCI, I don't know if I'm saying

14   that right, had went over there to start searching my car

15   and I had seen them trying to pull the face off my radio.

16              So as I'm looking at them, I'm telling Lee

17   that, you know, that's the rest of they money and that

18   I -- that I paid 16 when I had already told them that I

19   spent all their money.

20   Q.    So the police found the money, and then it gets into

21   the part where you talked about, "That's the rest of your

22   money"?

23   A.    Yes, sir.

24   Q.    In your mind, Mr. Bray, that day when the police

25   pulled the money out of your dash, what was going on?  What

1   had happened?

2   A.   I just got caught stealing from the DEA.

3   Q.   You mentioned then something about that house and guns

4   and so forth.

5            Do you recall that?

6   A.   Yes, sir.

7   Q.   What was that all about?

8   A.   Try to get they mind off the subject that they just

9   caught me with they money.

10  Q.   Did it work?

11  A.   Yeah.

12  Q.   Did -- did anybody ever question you, discipline you,

13  do anything about that money after this?

14  A.   No, sir.

15  Q.   At this point, this stage of your working with DEA as

16  an informant after this occurred, what was your thought

17  process?

18            What was going on in your mind in terms of

19  your relation with the agents?

20  A.   What do you mean?

21  Q.   You just came back from a buy, right?

22  A.   Yes, sir.

23  Q.   Let me go back for a second.

24            You did the Ballard deal, right?

25  A.   Yes, sir.

Page 215

1    Q.    And Transou got out of the car?

2    A.    Yes, sir.

3    Q.    Anybody -- Metcalf showed you the video, asked you if

4    you were sure?

5    A.    Yes, sir.

6    Q.    Were you ever questioned or challenged other than that

7    about that being Transou at the location?

8    A.    No, sir.

9    Q.    A few days later the money's found in your car.

10              What's your thought?  Do you have any thoughts

11   about what your status is or how far you can go?

12   A.    I thought it was over with.

13   Q.    When you got caught?

14   A.    Yes, sir.

15   Q.    And how about after nothing happened and it wasn't

16   over with?

17   A.    I was kind of amazed.

18   Q.    Did it have any effect on your future actions?

19   A.    Yes.

20   Q.    In what regard?

21   A.    Kind of made me feel like I could get away with just

22   about anything.

23   Q.    Now, sir, did you know an individual by the name of

24   Albert Lee?

25   A.    Yes, sir.

1    A.    No, sir.

2    Q.    What do you do when you get inside the house?

3    A.    We start talking about the short of the package.

4    We -- me and Ailee had already had a discussion on the phone

5    about another deal that popped up while I was waiting,

6    waiting to get the rest of the drugs.

7    Q.    What kind of deal?

8    A.    He wanted me to take this Cutlass that he had in

9    exchange for some of the money that was in on this drug

10   deal.

11   Q.    So in other words, you would -- you gave him the

12   10,000 already?

13   A.    Yeah, he already had it.

14   Q.    And you would get drugs plus the Cutlass?

15   A.    Yes.

16   Q.    And how did you feel about that?

17   A.    I mean, off the surface it didn't sound like a bad

18   deal.

19   Q.    Were you familiar with the Cutlass?

20   A.    Yes, sir.

21   Q.    What was it worth?

22             Had you discussed with Lee previously your

23   interest in the Cutlass?

24   A.    He had asked me did I want to buy it once upon a time,

25   and at that time I didn't.

Page 237

1  Q.   All right.  So what was the Cutlass worth to you?

2  A.   I thought I was going to pull anywhere from four to

3  5,000 off of it.

4  Q.   Off the Cutlass?

5  A.   Yes.

6  Q.   All right.  Do you get any more drugs?

7  A.   Yes, sir.

8  Q.   Did you get the Cutlass that night?

9  A.   The next morning.

10  Q.   And what, what do you do after you get -- who gives

11  you the drugs?

12  A.   I don't recall.

13  Q.   Let me ask it this way:  Do you find out when you're

14  at Hill Street who Ailee's source is?

15  A.   Yes.

16  Q.   And who is that?

17  A.   Unc Wee Wee.

18  Q.   Do you get some more drugs?

19  A.   Yes, sir.

20  Q.   And what do you do with them?

21  A.   I give them to the DEA.

22  Q.   To your knowledge was the weight okay now?

23  A.   It -- it was still off, but it was off by what I took

24  off for the Cutlass, but they didn't know that.

25  Q.   So it was acceptable, the weight that you did

Page 240

1  moan.

2              Why?

3  A.    I'm not supposed to be talking about no car deals

4  during a drug deal on the phone.

5  Q.    Do you recall whether or not when you were

6  testifying -- Ailee didn't go to trial, is that correct?

7  A.    I don't think so.

8  Q.    How about did Dwayne Nabors go to trial?

9  A.    Yes, sir.

10 Q.    Did you testify?

11 A.    Yes, sir.

12 Q.    Who did you tell that Court and that jury was there at

13 Platinum Status?

14 A.    Dwayne Nabors.

15 Q.    Do you recall when you were testifying being asked by

16 the defense about that conversation and about Cutty?

17 A.    Yes, sir.

18 Q.    Do you recall what you told them?

19 A.    I said he said Caddy, not Cutty.

20 Q.    What was the significance of a Caddy?

21 A.    Because I was going to buy Dwayne's Cadillac once upon

22 a time.

23 Q.    To your knowledge, did Mr. Nabors have a Cadillac?

24 A.    Yes, sir.

25 Q.    Did you see that Cadillac Dwayne Nabors -- well, let

Sue Trischan                440-570-6950

Page 241

1   me go back for a second.

2               Did you know whether Mr. Nabors had a Cadillac

3   at the time you did the deal at Platinum Status?

4   A.    Yes, sir.

5   Q.    Did you see that car that day?

6   A.    No, sir.

7   Q.    Do you know whether or not it was present at Platinum

8   Status when you were there?

9   A.    I didn't see it.

10  Q.    How about up at Hill Street?

11  A.    It wasn't there.

12  Q.    Do you recall what type of Cadillac that was?

13  A.    A DeVille.

14  Q.    Does that look the same as -- I'm sorry, what type did

15  you say Mr. Lee had?

16  A.    A Seville.

17  Q.    And are those two different cars?

18  A.    Yes, sir.

19  Q.    Do they look the same?

20  A.    No, sir.

21  Q.    Mr. Nabors and Mr. Lee, you're familiar with both of

22  them?

23  A.    Yes, sir.

24  Q.    In your opinion do they look similar?

25  A.    No, sir.

1    Q.    Did you have any concern when you were going to meet

2    up at Platinum Status, if any of your surveillance people

3    were to see you meeting Albert Lee instead of Dwayne Nabors,

4    that you would get caught at what you were doing?

5    A.    No, I didn't have no concerns.

6    Q.    Why not?

7    A.    Because I had got away with it a few times.

8    Q.    Going back to trial, when you were asked about that

9    transcript about Cutty and Caddy, did you do trial

10   preparations with the prosecutor before going into court?

11   A.    Yes, sir.

12   Q.    Do you recall whether or not that reference to that

13   car in the transcript caused any problem during trial

14   preparation?

15   A.    Yes, it did.

16   Q.    What happened?  What do you recall about that,

17   Mr. Bray?

18   A.    It made Blas mad.

19   Q.    Who is Blas?

20   A.    He is the attorney that -- the AS attorney.

21   Q.    The government attorney?

22   A.    Yes, sir.

23   Q.    And where did this take place that he got mad?

24   A.    In this building.

25   Q.    What were you doing at the time?

Page 243

1    A.    What do you mean?

2    Q.    In other words, how did this subject even come up?

3    What were you in here for?

4    A.    Because we was listening to the tapes.

5    Q.    And do you recall -- well, what happened when Blas got

6    mad?

7    A.    He was asking me the question, and he kind of took me

8    for a loop meaning that he was asking me a question that I

9    really didn't want to answer.

10   Q.    Who was with you and Mr. Serrano?

11   A.    Mr. Lee Lucas.

12   Q.    And what happened when this issue came up?

13   A.    Mr. Lee said "He talking about Cutty, that's another

14   phrase for dope."

15   Q.    And what did Mr. Serrano do?

16   A.    He got mad at Lee and asked him to tell -- well, he

17   told Lee to let me answer the questions.

18   Q.    And then what did you say?

19   A.    I said I was talking about that's another phrase for

20   dope.

21   Q.    Mr. Serrano, did you know an individual by the name of

22   Roosevelt Williams?

23   A.    Excuse me?

24   Q.    I'm sorry, did you know an individual by the name of

25   Roosevelt Williams?

1  Q.    Is this the same Riviera you had used on the prior

2  deals?

3  A.    Yes, sir.

4  Q.    Was it the Riviera used in the Nabors deal?

5  A.    Yes, sir.

6  Q.    What was your reaction when Duke pulled up next to you

7  as Roosevelt Williams driving your car?

8  A.    I couldn't believe it.

9  Q.    What did you do?

10  A.    I got mad.

11  Q.    Did you go through with the deal?

12  A.    Yes.

13  Q.    Harris gets in the car?

14  A.    Yes.

15  Q.    And what takes place in the car?

16  A.    Him -- him and Lee Lucas proceeded to do the deal.

17  Q.    Now, Harris, when he gets in the car, does he have any

18  type of script or role to play when he gets in there?

19  A.    Just sell it, take the price that I told him to take.

20  Q.    And does the deal go down?

21  A.    Yes, sir.

22  Q.    What happens at the end of the deal?

23  A.    At the end of the deal he got back in my -- my other

24  car.

25          Me and Lee was pulling out.  He was already

1   pulling out, headed back towards the house.

2   Q.    And where were you going?

3   A.    Back to the Sheriff's Department.

4   Q.    Okay.  And as you pull out of the Dairy Mart to go

5   back to the Sheriff's Department, does anything happen en

6   route?

7   A.    Yeah, me and Mr. Lucas seen my car pulling up in the

8   parking lot.

9   Q.    Which parking lot?

10  A.    Parking lot where I was staying.

11  Q.    On Sturgess?

12  A.    Yes, sir.

13  Q.    You went by Sturgess on the way to the Sheriff's?

14  A.    Yes, sir.

15  Q.    And your car now pulls up in front of your house?

16  A.    Yes, sir.

17  Q.    Did Lee Lucas know that you were living at that house

18  on Sturgess?

19              MR. ROTH:  Objection, unless there's a

20  foundation laid.

21              MR. TEITELBAUM:  Sorry.

22  BY MR. TEITELBAUM:

23  Q.    Do you know whether or not Agent Lucas knew you were

24  living in that house?

25  A.    Yes, sir.

1   Q.   How do you know that?

2   A.   We met there once.

3   Q.   As you passed Sturgess, where was your car?

4   A.   Which one?

5   Q.   The Riviera.

6   A.   It was pulling into the parking space.

7   Q.   Did you and Agent Lucas have any conversation or

8   discussion about that Riviera?

9   A.   He asked me did I sell it.

10  Q.   What did you tell him?

11  A.   I told him I did.

12  Q.   Was there any further follow-up or discussion about

13  the Riviera?

14  A.   No, sir.

15  Q.   Mr. Williams, Roosevelt Williams, are you familiar

16  with him?

17  A.   Yes.

18  Q.   In your opinion, is there any physical resemblance

19  between Roosevelt Williams and Robert Harris?

20  A.   No, sir.

21  Q.   Were you ever questioned about whether or not that was

22  Roosevelt Williams?

23  A.   No, sir.

24  Q.   I'd like to play you just a quick -- just a quick call

25  from that buy.

1   A.    Yes, sir.

2   Q.    Now, as part of this deal, do you recall at the end of

3   the deal whether or not you -- well, let me go back first

4   and ask you this:  You knew Agent Lucas was there shortly

5   before he had been -- Bobby Harris had been Roosevelt

6   Williams in your car, right?

7   A.    Yes.

8   Q.    Did you have any concerns that the person who was

9   supposed to be Roosevelt Williams was going to show up at

10  your car in the presence of Agent Lucas and others as now

11  being Johnny Robertson?

12  A.    No, sir.

13  Q.    Why not?

14  A.    I done got away with it before.

15  Q.    So you figured having gotten away with it before, it

16  would just work again?

17  A.    Yes, sir.

18  Q.    At the end of the Johnny Robertson deal, did you have

19  to end up identifying Duke to the police?

20  A.    Yes, sir.

21  Q.    And how did that come about?

22  A.    I had to identify him, identify him, because he got

23  into it with Jamaal, and Jamaal was pushing, you know, "Make

24  sure we get him."

25  Q.    Who had you said Bobby Harris was?  Bobby Harris

Page 268

1   Q.    Where's Conrad?

2   A.    On the passenger seat.

3   Q.    What happens when you get to the gas station?

4   A.    When I get to the gas station, Lee pulled up on my

5 driver's side, got out of the car and got into my car, the

6 back seat of my car, and him and Conrad was talking.

7   Q.    Where were the drugs?

8   A.    In the -- right by my armrest.

9   Q.    And did Lee get the drugs?

10   A.    Yes, sir.

11   Q.    How did Agent Lucas get the drugs?

12   A.    I handed them to him.

13   Q.    And when you gave the drugs to Agent Lucas, what did

14 he do?

15   A.    He looked at it and passed the money.

16   Q.    To who?

17   A.    To me.

18   Q.    What did you do with the money?

19   A.    I gave it to Conrad.

20   Q.    Then what happened?

21   A.    A few words was exchanged.  The drug deal was done.  I

22 pulled off.

23   Q.    All right.  Agent Lucas, I took it, got out of the

24 car?

25   A.    Yes.

1   A.   I knew -- I knew of him.

2   Q.   But you had never done anything with him?

3   A.   No, sir.

4   Q.   Just heard his name?

5   A.   Just heard his name.

6   Q.   And the guy you met that night in the club, you

7   believed to be Ron Davis, is that correct?

8   A.   Yes, sir.

9   Q.   Did you know whether or not Ron Davis was a person of

10  interest to the police or DEA?

11  A.   No, I didn't.

12  Q.   So what did you do after you met this guy?

13  A.   I told them that I had another dude that I just met

14  that I could get weight off of.

15  Q.   Was Davis purported to be a bigger player in the

16  business?

17  A.   I took him as to be.

18  Q.   And did you play him to set up, make arrangements to

19  do a deal off of Ron Davis?

20  A.   Yes, sir.

21  Q.   Was this going to be a real deal?

22  A.   Yes, sir.

23  Q.   So what did you arrange, what did you set up to

24  happen?

25  A.   Well, after I gave it some thought, I went on ahead

1   and staged a set-up deal.

2   Q.    All right.  Why did you do that?  If you believed you

3   could do a real deal off of Davis, why did you decide to

4   stage one instead?

5   A.    Because in my head he could have been a potential

6   bigger connect.

7   Q.    Okay.  What did you decide to do?

8         How were you going to set this one up?

9   A.    Well, I made calls, I made legitimate calls to Ron

10  Davis to meet with him to get him associated with this drug

11  deal that I had conjured up in my mind.

12  Q.    All right.  Whose drugs were you going to use to

13  actually do the deal?

14  A.    Mine.

15  Q.    Do you recall how much it was supposed to be for?

16  A.    An eighth, I think.

17  Q.    All right.  So you set up a meeting with Ron Davis to

18  sort of bring him into play?

19  A.    Yes.

20  Q.    Was that similar to what you had done at Joe and

21  Mary's with Johnny Robertson?

22  A.    Yes.

23  Q.    Okay.  And then how were you going to work it to sell

24  your own drugs on this deal?

25  A.    I had to work it to make it seem like he's -- he was

Page 272

1    bringing -- sending this girl to drop the drugs off to me.

2    Q.    Okay.  That was your plan?

3    A.    Yes.

4    Q.    That would have been sort of the equivalent then of

5    like when Robert Harris was delivering for Johnny Robertson

6    at Joe and Mary's?

7    A.    Yes.

8    Q.    Okay.  And do you recall where this deal was going to

9    take place?

10   A.    It was going to take place in an alley.

11   Q.    Okay.  And any particular reason why this alley was

12   picked?

13   A.    Because it's near his house.

14   Q.    Near Ron Davis' house?

15   A.    Yes.

16   Q.    Okay.  And did the deal go down?

17   A.    Yes.

18   Q.    What happened?

19   A.    We went out on the deal.

20   Q.    Who is "we"?

21   A.    Me and Lee.

22   Q.    You and Agent Lucas were in the car together?

23   A.    Yes.

24   Q.    Whose car?

25   A.    Mine.

1   Q.    All right.  And where do you go?

2   A.    After I got off the phone with him he told me to meet

3   him on Adams.

4   Q.    All right.  Adams is another street?

5   A.    Yes.

6   Q.    Okay.

7   A.    So me and Lee went to Adams.

8             Lee sat in the truck.  I went in the house.

9   Q.    And what was your purpose for going into the house?

10  A.    To make it appear like I got him involved in the drug

11  deal.

12  Q.    And did you talk drugs, drug business with Ron Davis

13  when you got in the house?

14  A.    Yes.

15  Q.    Did -- the drugs you were talking, did it have

16  anything to do with the drug deal that was set up for that

17  day?

18  A.    I don't understand what you're saying.

19  Q.    In other words, did Ron Davis have any idea that you

20  had already planned to have a woman come and deliver you

21  drugs that day?

22  A.    Oh, no.  No, sir.

23            MR. ROTH:  Judge, I object.  Again can I come

24  to side-bar, please?

25            THE COURT:  Sure.

1   A.   Yes.

2   Q.   With whom did you speak on the phone?

3   A.   I think it was my daughter's mother.

4   Q.   Do you recall what that was about?

5   A.   Bringing me some drugs.

6   Q.   Do you get in the truck with Mr. Lucas?

7   A.   Yes.

8   Q.   Where do you guys go?

9   A.   To the alleyway, to the alley.

10  Q.   And what happens when you get to the alley?

11  A.   My daughter's mother's friend met us in the alley and

12  she got in the truck with us.

13  Q.   And who was that?

14          MR. ROTH:  I'm sorry, daughter's mother's

15  friend?

16  Q.   You said --

17          MR. ROTH:  Could we explore that a little bit?

18  Q.   Daughter's mother is who?

19  A.   Alexis' friend Shea Shea got in the car with me and

20  Lee Lucas.

21  Q.   And what happened when she got in the car?

22  A.   She produced the drugs.  Her and Lee Lucas engaged in

23  a conversation, and they exchanged the drugs for the money

24  and the deal was done.

25  Q.   And where -- what happened to Shea Shea at the end of

1    the deal?

2    A.    She got out of my truck.

3    Q.    What did you and Agent Lucas do?

4    A.    We started heading back towards the Sheriff's

5    Department.

6    Q.    After this deal -- well, let me ask you this:  Do you

7    know whether or not Ron Davis was charged with this drug

8    deal?

9    A.    The guy that I thought was Ron Davis was.

10   Q.    All right.  And do you know -- well, was Shea Shea,

11   was Ms. Moxley charged with being a courier in that deal?

12   A.    No, sir.

13   Q.    Was somebody else charged?

14   A.    Yes, sir.

15   Q.    Who was that?

16   A.    Geneva France.

17   Q.    You just said "The guy I believed was Ron Davis got

18   charged," is that correct?

19   A.    Yes, sir.

20   Q.    Would you explain to the jury what you mean by that,

21   "The guy I thought was Ron Davis"?

22   A.    Well, the guy that I thought was Ron Davis wasn't even

23   Ron Davis.

24   Q.    How did you find that out?

25   A.    I found out later through -- through pictures and

1   actually seeing a picture of him.

2   Q.    You saw a picture of Ron Davis?

3   A.    The real Ron Davis.

4   Q.    In what context?

5   A.    On -- on a chart.

6   Q.    Chart put together for the arrests and charges in this

7   case?

8   A.    All the ones that was going to be arrested.

9   Q.    And you saw Ron Davis' picture?

10  A.    I didn't see the Ron -- the guy that I thought was Ron

11  Davis.

12  Q.    You saw a picture of a guy marked as being Ron Davis,

13  is that correct?

14  A.    Yes.

15  Q.    And are you saying that the guy who was pictured Ron

16  Davis was not the person you met with that day?

17  A.    No, it wasn't.

18  Q.    Where did you first meet, physically meet, Ron Davis

19  that day?

20  A.    I don't understand what you're saying.

21  Q.    On the day of the deal, you went over to the house to

22  meet Ron Davis?

23  A.    The guy that I thought was Ron Davis.

24  Q.    The guy you thought was Ron Davis?

25  A.    Yes.

Page 280

1    A.    No, sir.

2    Q.    Geneva France, how was it -- well, one, who is Geneva

3    France?

4    A.    A girl from the neighborhood.

5    Q.    How is it that Geneva France ends up getting named as

6    the person in the car?

7    A.    I think I told him it was her.

8    Q.    And why did you have to come up with -- why did you

9    come up with a name for the person, the girl that was in the

10   car?

11   A.    Because I didn't want Shea Shea to get charged.

12   Q.    And did Geneva France have anything to do with this?

13   A.    No, sir.

14   Q.    Geneva France go to trial?

15   A.    Yes, sir.

16   Q.    And you testified?

17   A.    Yes, sir.

18   Q.    And did you identify Geneva as being the person that

19   was in the car that day?

20   A.    Yes, sir.

21   Q.    Okay.  I'd like to play you a couple of the phone

22   calls from this deal.

23              This would be N 19, Tracks 1, 2 and 3.

24              Start with number one.

25              (Tape playing).

Page 281

1    BY MR. TEITELBAUM:

2    Q.    Mr. Bray, who was with you when you made that call?

3    A.    The Sheriff's Department and Mr. Lee Lucas.

4    Q.    Who was that call supposed to be to?

5    A.    Ron Davis.

6    Q.    Who was it actually to?

7    A.    Shea Shea.

8    Q.    That was her voice?

9    A.    Yes.

10   Q.    Did she know what was going on?

11   A.    Excuse me?

12   Q.    Did she know what was going on, that she was going to

13   get in the car with a DEA agent?

14   A.    No, sir.

15   Q.    Did she have a script or plan?

16   A.    Yeah, he was supposed to be my connect from Bucyrus.

17   Q.    Bucyrus is another town in Ohio, down near Mansfield

18   somewhere?

19   A.    Yes.

20   Q.    Mr. Bray, in that conversation when you ask "How much

21   is it," and the answer is "Six, six-five," what does that

22   mean?

23   A.    I think she was saying -- I'm not sure.  I think she

24   was saying the weight.

25   Q.    The weight in grams?

1   A.    Yes.

2   Q.    Okay.  The "two and a half" means, when you're asking

3   for two and a half, does that refresh you as to the amount

4   of the purchase?

5   A.    Yes, sir.

6   Q.    And what is that?

7   A.    That's how many -- the total grams it would be, two

8   and a half ounces.

9   Q.    Okay.  And a ticket, we've heard the term "a ticket" a

10  bunch.  That means what?

11  A.    That's how much it's going to cost.

12  Q.    So this call was to be to Ron Davis, is that correct?

13  A.    Yes, sir.

14  Q.    If you're going to meet Ron Davis in reality anyway,

15  how come you didn't call Ron Davis?  Why do you need this

16  call as part of your plan?

17  A.    I don't understand what you're saying.

18  Q.    As part of your plan, why do you need this call to

19  work out what was going to happen?

20  A.    For they can hear what was going to happen.

21  Q.    Let's play Track 2, please.

22            (Tape playing).

23  BY MR. TEITELBAUM:

24  Q.    You were asked who that was and you said "His

25  partner."

1   they was going to have to walk back.

2   Q.    And from here then you get in the car with Agent

3   Lucas?

4   A.    Yes, sir.

5   Q.    Where do you guys go?

6   A.    To the alley.

7   Q.    All right.  Now, we're going to jump to Track 5.

8              (Tape playing).

9   BY MR. TEITELBAUM:

10  Q.    Mr. Bray, the woman that was in the car, that was

11  who?

12  A.    Shea Shea.

13  Q.    That conversation at the end where Shea Shea's gotten

14  out of the car, you and Lucas are in the car and you're

15  saying -- referencing don't go back to my house and so

16  forth, whom are you speaking to?

17  A.    Shea Shea.

18  Q.    And what's the purpose of that call?

19  A.    I didn't want them to go to my house.

20  Q.    Why not?

21  A.    In case they was being followed.

22  Q.    While you're inside the car, the drugs get weighed, is

23  that correct?

24  A.    Yes.

25  Q.    And when you have the conversation appearing to talk

1   to somebody about the "Give 200 back"?

2   A.   Yes.

3   Q.   Do you know what I'm referring to?

4   A.   Yes, sir.

5   Q.   To whom are you speaking?

6   A.   Nobody.

7   Q.   What's going on there?  Tell us what happens.

8   A.   I staged the call like I was calling him back, and I

9   didn't call nobody.

10  Q.   Who weighs the drugs?

11  A.   What you mean who weighs --

12  Q.   In the car when the drugs are turned over, who weighs

13  them and determines they're light?

14  A.   I don't understand what you're saying.

15  Q.   During the deal there's a determination the drugs are

16  light, the weight is off, right?

17  A.   Right.

18  Q.   All right.  Who has weighed the drugs and decided

19  they're light?

20  A.   Lee Lucas weighed the drugs.

21  Q.   Whose scale did he use?

22  A.   We used the one that we brought from the Sheriff's

23  Department.

24  Q.   And when the drugs are off, why do you stage a call?

25  When the weight's off, what causes you to stage a call?

1  A.     Because we in the middle of a deal and it looked like

2  a deal that was going backwards for a minute so --

3  Q.     So what do you do?  How do you fake a call?

4  A.     I opened up my cell phone and went through my contact,

5  my contact, and just strolled down like I was looking for

6  somebody.

7  Q.     And then you had this one-sided conversation?

8  A.     Yes, sir.

9  Q.     Was, when you were doing that in that car, was there

10  anybody else on the other end of that phone?

11  A.     No, sir.

12  Q.     Okay.  Two more.

13         Do you know a person by the name of Nolan

14  Lovett?

15         THE COURT:  Why don't we take a 15-minute

16  break now?

17         (Recess taken).

18         THE COURT:  Be seated.

19         Sir, you're still under oath.

20         THE WITNESS:  Yes, sir.

21         THE COURT:  Okay.

22  BY MR. TEITELBAUM:

23  Q.     Okay.  Mr. Bray, two more names to ask you about.

24         The first one I think right when we broke, I

25  asked you if you knew a man by the name of Nolan Lovett?

Page 549

1                    KIMBERLY THOMAS,

2        of lawful age, a witness called by the Government,

3              being first duly sworn, was examined

4                   and testified as follows:

5        DIRECT EXAMINATION OF KIMBERLY THOMAS

6   BY MR. TEITELBAUM:

7   Q.    Would you state your name, please, and tell the jurors

8   your occupation?

9   A.    My name is Kimberly Thomas, T-H-O-M-A-S, and I work

10  for the United States Department of Justice, Office of the

11  Inspector General, as the Assistant Special Agent in Charge

12  of the Chicago region.

13  Q.    And in appearing here this afternoon, Ms. Thomas, by

14  way of an introduction, our intent is to go through

15  approximately the first half of the buys on the chart and

16  direct the Court and the jury's attention to various

17  documents and tapes and how they interrelate, is that

18  correct?

19  A.    Yes, sir.

20  Q.    Would you tell us, please, where were you born and

21  raised?

22  A.    I was born in Iowa City, Iowa in January, 1959, and at

23  a young age, a couple of years old, three, four, five years

24  old moved to Wisconsin and was raised there through high

25  school.

1   added and additional people were added is what a superseding

2   indictment is.

3   Q.    And the buys that we've heard about, about both the

4   chart that lists the DEA buys and Mr. Roth's also that

5   includes the Richland County Sheriff's, were all those buys

6   incorporated into these charging documents?

7   A.    Yes, sir, they were.

8   Q.    Okay.  Were there some additional charges in the

9   indictments resulting from, for example, drugs or guns that

10  may have been found in the course of arresting the

11  individuals for the original indictment?

12  A.    Yes, sir.

13  Q.    Now, from what you've gathered, did you know when

14  Mr. Bray was opened as an informant by the Richland

15  Sheriff's Office?

16  A.    Yes, sir.  It was in January of 2005.

17  Q.    And the buys, as Mr. Roth put up on the chart, started

18  when?

19  A.    February 12th I believe was the first buy.

20  Q.    Do you recall how many buys there are altogether?

21  A.    Prior to DEA getting involved in the case there were

22  17 that were done just by Richland County.

23  Q.    And the drug quantities in those buys?

24  A.    Most of them were very small amounts ranging from five

25  grams up to, I'm not certain, maybe a quarter of an ounce, I

Page 561

1    think, or thereabouts.

2    Q.    Now, after your initial investigation and interviews,

3    did you make any type of demarcation between the earlier

4    Richland buys and the later DEA ones in terms of your

5    investigation?

6    A.    Yes, sir, we did.

7    Q.    And on which group did you focus?

8    A.    We focused on the buys starting on September 6th, 2005

9    because the allegations that we received were only against

10   Mr. Lucas, and since he was not involved in any of the

11   earlier buys, we focused only on those buys from when he

12   became involved in the investigation onward.

13   Q.    And your jurisdiction is over the Department of

14   Justice, is that correct?

15   A.    Correct, sir.

16   Q.    The United States Attorney's Office, as this was being

17   done over the first several months of the investigation, was

18   the U.S. Attorney's Office for the Northern District of Ohio

19   participating in assisting in the investigation?

20   A.    No, sir.  In fact, as soon as the investigation got

21   assigned to me, that's one of the first things we did was go

22   through the proper channels to see about having this office

23   recused, which means have them cut out from it entirely.

24              So they, from the very beginning of the

25   investigation, were not involved in the investigation

1    itself.

2              From time to time I did have to confer with

3    them on certain matters because they were matters that only

4    they could handle despite having been recused.

5    Q.    At the time you began your investigation, interviewed

6    Mr. Bray, started other interviews, getting documents out

7    of -- were a large number of the defendants still

8    incarcerated?

9    A.    Yes, sir.

10   Q.    Ultimately, are you aware whether or not the U.S.

11   Attorney for this district dismissed all of the cases, all

12   of the charges and convictions involving people, Bray's

13   involvement with the Mansfield cases?

14   A.    Yes, sir.  All of those charges were dismissed.

15             However, a couple of the defendants were not

16   released because they were in prison on other convictions

17   for other crimes that were separate and independent from the

18   Mansfield investigation.

19   Q.    But at some point by the beginning of '08 all the

20   Mansfield cases that we've been discussing were all

21   dismissed, is that correct?

22   A.    Yes, sir.

23   Q.    During the course of your investigation, approximately

24   how many times would you think you've interviewed Mr. Bray?

25   A.    Off the top of my head I'd say approximately seven or

1    eight, thereabouts.

2    Q.    Was -- were there ever any occasions where you

3    conducted interviews without the presence of Mr. McCaffrey

4    or one of the associates from his firm?

5    A.    No, sir.  Never.

6    Q.    Now, the Drug Enforcement Administration opened

7    Mr. Bray as an informant when?

8    A.    In August of 2005, sir.

9    Q.    And that was in relation to -- was that in relation to

10   a Mansfield case, or something different?

11   A.    It was in relation to something different, sir.

12   Q.    And what case was that?

13   A.    That was the case involving Michael Frost up in

14   Cleveland.

15   Q.    And there was an arrest and prosecution of Mr. Frost?

16   A.    Yes, sir.

17   Q.    And following that, did the Mansfield cases begin?

18   A.    Yes, sir.

19   Q.    Now, the first DEA drug buy took place when?

20   A.    On September 6th of 2005.

21   Q.    And that's the first one on the chart up there?

22   A.    Yes, sir.

23   Q.    For the buys, just so we have an understanding going

24   into this, sort of the investigative file that you

25   uncovered, can you tell us what a DEA-6 is?

1    Q.    What number -- what number is Mr. Bray calling?

2    A.    The 3247 number.

3    Q.    Does he ever call the 5428 number?

4    A.    No, sir.

5    Q.    The DEA-6 for 9/7 records the fact, documents the fact

6    that the stop has already occurred, is that correct?

7    A.    Yes, sir.

8    Q.    Therefore, the report, the 6, is not written until

9    sometime after the events all occurred?

10   A.    Yes, sir.

11   Q.    Now, according to the DEA-6, the buy itself, the buy

12   on 9/6 took place at 435 Tremont?

13   A.    Yes, sir.

14   Q.    I believe yesterday you indicated that you have

15   reviewed all of the Richland County Sheriff's Office files

16   on this matter?

17   A.    Yes, sir.

18   Q.    All of the DEA files?

19   A.    Yes, sir.

20   Q.    The U.S. Attorney's Office files?

21   A.    Yes, sir.

22   Q.    In any of the investigative files relating to this

23   case, is there anything that would document any

24   investigative effort to determine or corroborate the

25   resident or occupant of 435 Tremont?

1   nature?

2   A.    Yes, sir.

3   Q.    And in whose name were the items seized?

4   A.    The mail all went to either Crystal Dillard or Arrico

5   Spires.

6   Q.    Was any -- anything seized at that address relating to

7   Noel Mott?

8   A.    No, sir.

9   Q.    Did you make efforts when you became involved to

10  determine who occupied the premises at 435 Tremont?

11  A.    Yes, sir, I did.

12  Q.    Are you familiar with something called Autotrack?

13  A.    Yes, sir, I am.

14  Q.    What is Autotrack?

15  A.    Autotrack is an Internet database that government

16  agents like our agency subscribes to be able to use it.

17          Private investigators, attorneys can also

18  subscribe to be able to use it, and it's a database whereby

19  you can search any number of a variety of records.

20          You can search by a person's name, the city

21  they live in, their Social Security Number, their date of

22  birth, their driver's license number, their license plate

23  number, and it will come up and give you a record and show

24  every address they've ever lived at, some of the phone

25  numbers they've used, property they've owned, who their

1   relatives are, and a lot of background information.

2   Q.    And is that a standard investigative tool used by law

3   enforcement agencies?

4   A.    Yes, sir, it is.

5   Q.    Did you search Autotrack to determine any association

6   with that address with Noel Mott?

7   A.    Yes, sir, I did.

8   Q.    And was there any?

9   A.    No, sir, there was not.

10  Q.    Did you make efforts to determine who -- was that a

11  rental property, 435?

12  A.    Yes, sir, it was.

13  Q.    And did you take investigative steps to determine who

14  was renting 435 Tremont during the relevant time period?

15  A.    Yes, sir, I did.

16  Q.    And who was that?

17  A.    In the early summer it was rented first by a lady

18  named Cheryl Kleer, K-L-E-E-R, and after she vacated the

19  property it was rented by Crystal Dillard who is Darren

20  Transou's girlfriend.

21  Q.    And Mr. -- I'm sorry -- Ms. Kleer we will hear a

22  little bit, she will actually be here a little bit later, is

23  that correct?

24  A.    Yes, sir.

25  Q.    Turn your attention or direct your attention, please,

Page 610

1    called a header?

2    A.    Yes, sir.

3    Q.    And what is a header?

4    A.    Generally I know in my agency and most of the other

5    law enforcement agencies I've worked at, when we make a tape

6    recording, either be it a body wire or record a telephone

7    call, we will put an introductory what we call a header on

8    it where we will say "This is my name, I'm a case agent,

9    this is my case number, today's date is such and such a

10   date, the time is this time, this is going to be a recorded

11   call from this phone number to that phone number," so that

12   anybody that ever listens to it again can easily identify

13   what is that recording, when it was made, and what it was

14   supposed to be of.

15                   And then we will also say for voice

16   identification "This is Kim Thomas," and whoever else is

17   going to be on it, you have them speak, except obviously the

18   bad guy because you're not with them.

19   Q.    So it's an indexing system?

20   A.    Yes, sir.

21   Q.    And on the tapes, the recordings done by Richland

22   County prior to DEA's involvement, were there headers?

23   A.    Some of them had them in the early stages.  Towards

24   the end they did not.

25   Q.    And after the DEA portion, you know, on all of the

1    calls and bodies, would you do the same thing, put a header

2    on a body recording?

3    A.    Oh, yes, sir, absolutely.

4    Q.    Are there any headers on any of the recordings, the

5    DEA recordings?

6    A.    No, sir, not on any of them.

7    Q.    Now, in going through the tapes of the various buys,

8    are there times when it appears that the chronological order

9    of the recordings has been mixed up?

10   A.    Yes, sir, it does.

11   Q.    And would you describe for us how, when you're doing

12   that translating, these come out in tracks, is that correct?

13   A.    Yes, sir.

14   Q.    And can you just sort of describe that process, what

15   it looks like that's going on?

16   A.    Okay.  Well, on the digital recorder and I think I

17   referenced yesterday that when you turn it on, it will start

18   a new track.  When you turn it off, it will shut it off and

19   automatically number it.

20              And that's why like at the beginning of the

21   transcript number, they are numbered like DM 2008, DM 2009.

22   Sometimes when you take them off the digital recorder and

23   transfer them to the CD, to make it easier agents

24   will -- you can renumber and rename the tracks at that time

25   if you want to, and so sometimes people will change them and

1   Q.   During the buy on 9/6?

2   A.   Yes, sir.

3   Q.   Track 2 -- and that's the track Mr. Bray was asked

4   about where the person on the phone who you've identified as

5   Transou says "Hurry up" or words to the effect "My man

6   Westco wants one," is that correct?

7   A.   That's correct, sir.

8   Q.   At the time Bray was making the calls according to the

9   6, who was he supposed to be calling?

10  A.   He was supposed to be speaking to Lowestco Ballard.

11  Q.   And you've reviewed the entire trial transcripts of

12  the Nabors trial?

13  A.   Yes, sir, I have.

14  Q.   Did the government play in its case in chief, did they

15  play Track 1?

16  A.   Yes, sir, they did.

17  Q.   And the next phone call, the call with the directions,

18  if you can recall?

19  A.   I -- what do you mean by "the next phone call," sir?

20  Q.   There's a phone call then where he's calling in for

21  the directions, I think it's Track 4 that we played?

22  A.   Correct, sir.  That one was played.

23  Q.   Was Track 2 played by the government at the Nabors

24  trial?

25  A.   No, sir, it wasn't.

1            "Answer:  Yes.

2            "Question:  In a separate case from this one,

3    I gather?

4            "Answer:  Yes."

5    Q.    All right.  You can stop there.

6            So just to go back, put this in context,

7    Mr. Bray was asked about Track 2 on cross, is that correct?

8    A.    Yes, sir.

9    Q.    And identified the speaker of Track 2 as being Ron

10   Davis?

11   A.    Yes, sir.

12   Q.    And that the Track 2, the Ron Davis call, related to a

13   separate case, not the Ballard deal?

14   A.    That's what he testified to, yes, sir.

15   Q.    And the part you just read from Agent Lucas, is that

16   on cross-examination or is that on direct?

17   A.    I believe that's on direct, sir.  Yeah, it's by

18   Mr. Serrano, it's on direct.

19   Q.    So Mr. Bray has testified?

20   A.    Yes, sir.

21   Q.    And Mr. Lucas was the case agent?

22   A.    Yes, sir.

23   Q.    Testified last?

24   A.    Yes, sir.

25   Q.    And also says that that call was to Ron Davis on a

Page 631

1    separate case?

2    A.    Yes, sir.

3    Q.    Would you turn, please, to same thing in Mr. Lucas's

4    testimony, to Page 1171, starting at Line 23?

5              Actually I guess Line 21 would be better.

6    A.    I'm sorry, Line 21, you said?

7    Q.    Oh, I'm sorry, let's start at -- I'm sorry, I had the

8    wrong line there.

9              THE COURT:  Why don't you call off the page

10   again, too?

11             MR. TEITELBAUM:  I'm sorry, Page 1171, and I

12   think starting at Line 3.

13   A.    Line 3?

14   Q.    Yes.

15   A.    Okay.  "Question:  But you are not familiar with

16   Mr. Ballard's voice?

17             "Answer:  I'm not.

18             "Question:  Prior to September 9th, 2005, you

19   never heard that voice before?

20             "Answer:  You are correct.

21             "Question:  You wouldn't be able to just

22   recognize it, right?

23             "Answer:  No, sir, I could not.

24             "Question:  And so the reason it appears, his

25   name appears on Government's 4, Page 1, is because the

Page 632

1    informant says so?

2                "Answer:  Because he says 'What's up, Westco,'

3    so --

4                "Question:  Well, you were here last week when

5    we heard a lot of discussion about people using phony names?

6                "Answer:  Yes.

7                "Question:  And you heard of people using

8    phony names?

9                "Answer:  Yes.

10               "Question:  The reason why people use phony

11   names is to avoid detection?

12               "Answer:  Correct.

13               "Question:  Now, I'm confused about one thing

14   in this transcript.  On Government's Exhibit 2, I'm sorry,

15   Government 4, Page 2, call 2 --

16               "Answer:  Yes.

17               "Question:  -- lists Ronald Davis as the

18   speaker?

19               "Answer:  Yes.

20               "Question:  And call two is kind of sandwiched

21   in between call one, which you say is Mr. Ballard, and call

22   three, which you say is Mr. Ballard?

23               "Answer:  Correct."

24               Then it says "Mr. Robey:  Your Honor, may I

25   approach the witness?  We have Defendant's Exhibit 1040, and

Page 633

1    we also have -- we would ask permission to publish this

2    transcript to the jury.

3                   "The Court:  All right.  Have you shared it

4    with the government, please?

5                   "Mr. Robey:  Yes, I have.

6                   "The Court:  Exhibit 1040?

7                   "Mr. Robey:  Yes, sir.  This is brand new,

8    Judge, so if I could approach the bench, I have a copy for

9    you.

10                   "The Court:  Yes, please.  If I could see it,

11   please.

12                   "Mr. Robey:  Yes, sir.

13                   "The Court:  All right, sir, you may.

14                   "Mr. Serrano:  Could we approach for a minute?

15                   "The Court:  Yes, you may."

16                   Then it says in parentheses, "The following

17   discussion was conducted at the side-bar between Court and

18   counsel out of the hearing of the jurors as follows:

19                   "Mr. Serrano:  I would like to object to the

20   use of this exhibit.  First of all, this is a transcript or

21   a draft that was provided to counsel, and I believe where

22   he's going is they initially -- this in call number two, the

23   person, one of the participants, was identified as Ballard.

24                   "The Court:  Yes.

25                   "Mr. Serrano:  And then after the calls were

1   placed to the source --

2                "The Court:  I'm sorry?

3                "Mr. Serrano:  After the calls were placed to

4   the source, he indicated that is not Ballard.  This is a

5   preparing draft, and I think where he is headed is that he

6   had him identify the speaker as Ballard when, in fact, it is

7   Davis.  And I think that's an unfair use of this transcript

8   because if he had any objections at the time, he should have

9   brought it to our attention in terms of the

10  misidentification.

11               "The Court:  Sir?

12               "Mr. Robey:  I believe I was given the second

13  version of this on July 5th, which would be several

14  days -- July 6th, several days prior to trial.  This goes to

15  the main issue in the case, the ability to properly identify

16  Mr. Ballard.

17               "The Court:  All right.  It's overruled.  I'm

18  going to allow the inquiry.  You can clear it up on

19  redirect, if you wish."

20               And then it says in parentheses, "The

21  following proceedings were conducted in open court:

22               "The Court:  All right.  Proceed.

23               "Mr. Robey:  May I approach, Your Honor?

24               "The Court:  Yes.

25               "By Mr. Robey:  Question:  I'm going to hand

1   you what has been premarked as Defendant's Exhibit 1040.

2                   "Mr. Robey:  Judge, we have extra copies for

3   the jury.

4                   "The Court:  Make the inquiry, first, sir,

5   please.

6                   "By Mr. Robey:  Question:  You've seen

7   Defendant's Exhibit 1040 before?

8                   "Answer:  It looks like a transcript.  I

9   haven't seen it marked 1040, but it looks like the

10  transcript.

11                  "Question:  Transcript?

12                  "Answer:  Of the call, the first call.

13                  "Question:  From September 9th, 2005?

14                  "Answer:  Correct.

15                  "Question:  I want to direct your attention to

16  Page 2, call two.  Do you have that spot?

17                  "Answer:  Yes.

18                  "Question:  In this exhibit, Defendant's

19  Exhibit 1040, Mr. Ballard is listed as the speaker in call

20  two?

21                  "Answer:  Correct.

22                  "Question:  So someone has apparently

23  mistakenly identified Mr. Ballard as the speaker in call two

24  in this transcript?

25                  "Answer:  I can explain that.  It was me.

1              "Question:  Now, I'm confused about another

2   part of this transcript.  On Government's Exhibit 4, Page 2,

3   call two, what is the number that the informant is calling

4   Ronald Davis at?

5              "Answer:  I don't have it here.

6              "Question:  Can I look at Page 1, the top of

7   it, same exhibit?

8              "Answer:  Yes.

9              "Question:  The top of it, on Page 1, it's got

10  614-390-8578, right?

11             "Answer:  Correct.

12             "Question:  This is the number that the

13  informant is supposedly calling Mr. Ballard?

14             "Answer:  Yes.

15             "Question:  The transcript, Government Exhibit

16  4, doesn't have a separate number for Ronald Davis?

17             "Answer:  No, because he wasn't involved in

18  this case.

19             "Question:  And we know that the informant did

20  call Ronald Davis?

21             "Answer:  Yes.

22             "Question:  According to what you say here,

23  right?

24             "Answer:  Yes.

25             "Question:  Can we agree that if the informant

1   called Mr. Davis at a different number than 614-390-8758, it

2   would appear on this transcript?

3                "Answer:  No.

4                "Question:  I want to now have you look at

5   Government's Exhibit 4, Page 1, call one.  You see the part

6   where the informant is talking about his car being broken

7   down and he's trying to fix it?

8                "Answer:  Yes.

9                "Question:  Now, I'll direct you over to Page

10  2, call two.  We have the same conversation going on about a

11  broken down car with Ronald Davis?

12               "Answer:  Correct, about getting in the shower

13  or take a shower, stuff like that.

14               "Question:  And the claimed deal with

15  Mr. Ballard was supposedly -- was supposed to be for 3200?

16               "Answer:  Correct.

17               "Question:  On Government 4, Page 2, call two,

18  we have a talk of 3200 with Mr. Davis?

19               "Answer:  Correct.

20               "Question:  So I'm confused about one more

21  thing, then.  Perhaps you can help clear it up.

22               "I'm looking at the transcript here.  We've

23  got call one, which comes back to Mr. Ballard, right?

24               "Answer:  Correct.

25               "Question:  Call two, which you say is Ronald

1   Davis?

2               "Answer:  Yes.

3               "Question:  And then we jump back to call

4   three which you say is Mr. Ballard?

5               "Answer:  Correct.

6               "Question:  And presumably these are all in

7   order?

8               "Answer:  Yes.

9               "Question:  All on the same date?

10              "Answer:  Yes.

11              "Question:  Chronologically?

12              "Answer:  Yes."

13  Q.    Thank you.  So Government's Exhibit 4, there was a

14  draft version that listed the speaker as Ballard, is that

15  correct?

16  A.    Yes, sir.

17  Q.    And then a trial version, a version given over where

18  it was changed from Ballard to Davis, is that correct?

19  A.    Yes, sir.

20  Q.    And during the course of what you read, Mr. Lucas

21  acknowledges that it was he who changed the name from

22  Ballard to Davis on the transcript?

23  A.    Yes, sir.

24  Q.    And then it goes on to describe what occurred.

25              Now, we've just seen and listened to and seen

Page 639

1   your transcript of N 2, T 2, is that correct?

2   A.    Yes, sir.

3   Q.    And 53 is what again?

4   A.    53 is our exhibit of the copy of the final version of

5   the transcript from the Nabors trial which I obtained from

6   the U.S. Attorney's Office files.

7   Q.    All right.  And so it's been after the name was

8   changed to -- from Ballard -- from Davis -- I'm sorry, this

9   is the Ballard name on it?

10  A.    Well, call one has the Ballard name on it, sir.

11  Q.    Okay.

12  A.    On Page 2, call two, it's been changed to Davis.

13  Q.    So it's then the amended one, I'm sorry.

14  A.    Yes, sir.

15  Q.    All right.  And I would just, before looking at

16  Government's Exhibit 53 -- and, I'm sorry, where did you say

17  53 came from?

18  A.    I got it from the United States Attorney's Office

19  files of the prosecution of the Nabors case.

20  Q.    Okay.

21            MR. TEITELBAUM:  And Maria, could we have the

22  Elmer?

23  BY MR. TEITELBAUM:

24  Q.    Just showing you first, this is N 2, Track 2, your

25  transcript?

1    A.    Yes, sir.

2    Q.    All right.  And at the bottom of the page, I just --

3    "Bray:  I wanted to let you know," and Transou says what?

4    A.    Transou says "Yeah.  Yeah, you better try to come

5    because my man, what's his name, Westco, was trying to get

6    one.  So you better -- I think that's what's up."

7    Q.    And before the name was changed to Davis, it was

8    attributed as being a call from Ballard, is that correct?

9    A.    Yes.

10   Q.    On Government's Exhibit 4 -- 53, rather?

11   A.    Yes, sir.

12   Q.    I show you the transcript for call two which is our

13   track two, is that correct?

14   A.    Yes, sir.

15   Q.    Both being N 2?

16   A.    Yes, sir.

17   Q.    And it starts, can you read that?

18   A.    Yes, sir, I can read it.

19   Q.    Okay.  This is call two, the same transcript that was

20   prepared for the Ballard trial?

21   A.    Yes.

22   Q.    Would you start -- would you read call two?

23   A.    Yes, sir.

24             "Davis:  Hello.

25             "Source:  What's up, kid?

Page 641

1                    "Davis:  What yo, baby.

2                    "Source:  Hey, what's up?  Hey, check this

3       out, right?

4                    "Davis:  Um-hmm.

5                    "Source:  I got 32, man.  I meant to tell you

6       that the other day.

7                    "Davis:  Oh, yeah?

8                    "Source:  Yeah.

9                    "Davis:  Okay.  Come on and see me.

10                   "Source:  No, man.  You going to have to come.

11      My car broke down, buddy.

12                   "Davis:  You going to bring 32 with you?

13                   "Source:  Can you handle it?

14                   "Davis:  Yeah, I'll tell you what I'm going to

15      do, I'm going to ride and see exactly where it's at, you

16      hear me?"

17      Q.    Flipping the page.

18      A.    "Source:  All right.

19                   "Davis:  Cause I don't like to be searching,

20      you know, like that.

21                   "Source:  If I can, I'm going to try to get

22      somebody's car to get a little closer to you.

23                   "Davis:  That will work then.

24                   "Source:  I'll let you know.  I'm about to hit

25      this water.  I was down there working on my car.

1                    "Davis:  Okay.

2                    "Source:  I wanted to let you know mother

3     fucker trying to get it right.

4                    "Davis," then it shows dot, dot, dot, dot,

5     dot, "That's what up, kind of funny though.

6                    "Source:  Okay.

7                    "Davis:  Okay.

8                    "Source:  All right."

9     Q.     And in the original version, the name on this

10    transcript was Ballard and Source, right?

11    A.     Yes, sir.

12    Q.     Source is Bray?

13    A.     Yes, sir.

14    Q.     Is there any difference between that transcript and

15    the transcript you prepared?

16    A.     Yes, sir, there is.

17    Q.     And where does that take place?

18    A.     It takes place on this transcript that we're looking

19    at, one, two, three, four lines from the bottom of call two.

20                    If you start from call three and go up four

21    lines where it says "Davis:  Dot, dot, dot, dot, that's what

22    you did," it leaves out the line that says "You better come

23    because my man, what's his name, Westco, he's trying to get

24    one."

25    Q.     So the omission was the line to the reference to

1  Westco?

2  A.    Yes, sir.

3  Q.    And the call was originally supposed to be to?

4  A.    To Lowestco Ballard.

5  Q.    We've heard that tape a couple of times?

6  A.    Yes, sir.

7  Q.    Is there anything inaudible, harder to hear about that

8  line relating to Westco than anything else in the call?

9  A.    No, sir, there's not.

10  Q.    There was a deal with Ron Davis?

11  A.    Yes, sir, there was.

12  Q.    When did it take place?

13  A.    On October 25th of 2005.

14  Q.    How much was it for?

15  A.    It was for two and a half ounces, $2500.

16  Q.    And that's a reference to -- Ron Davis was also the

17  Geneva France buy?

18  A.    Yes, sir.

19  Q.    Did that matter go to trial?

20  A.    Yes, sir, it did.

21  Q.    When did it go to trial?

22  A.    On February 13th of 2006.

23  Q.    About five months before this trial, the Nabors trial?

24  A.    Yes, sir.

25  Q.    Was there, in anything in the Davis trial, was there

1    A.    Yes, sir.

2    Q.    And this is the picture of the individual that he

3    purportedly looked at on September 9th when he went back

4    into the station --

5    A.    Yes, sir.

6    Q.    -- to confirm the identification of the -- of his

7    observation of Mr. Ballard?

8    A.    Yes, sir.

9    Q.    A second individual whose picture was looked at,

10   according to the testimony before the jury, before Ballard's

11   jury, was a Maurice Luckie?

12   A.    Yes, sir.

13   Q.    Have you been able to discover any Maurice Luckie that

14   has any connection to the Mansfield case?

15   A.    No, sir.

16   Q.    Did you search the databases, the Ohio and Michigan

17   databases, for any inquiry as to a Maurice Luckie?

18   A.    Yes, sir, I did.

19   Q.    Did you come up with any hits on a Maurice Luckie?

20   A.    No, sir, we couldn't even find a man named Maurice

21   Luckie.

22   Q.    Is there a name -- is the name Luckie associated with

23   the Ford Bronco in any way?

24   A.    Yes, sir, it is.

25   Q.    And in what capacity?

1   **A.**    The Bronco back then was registered to a Toyce Luckie,

2   that's spelled T-O-Y-C-E, who is a female who was Arrico

3   Spires' girlfriend.

4   **Q.**    Was there any picture in either the RSO or DEA files

5   of Toyce Luckie?

6   **A.**    Not that I recall, sir.

7   **Q.**    I take it it's a she?

8   **A.**    Yes, Toyce is a she.

9   **Q.**    Mr. Ballard and Mr. Spires, were their pictures in the

10  files --

11  **A.**    Yes, sir.

12  **Q.**    -- of the RSO or DEA?

13  **A.**    Yes, sir.

14  **Q.**    That leaves Darren Transou?

15  **A.**    Yes, sir.

16  **Q.**    Was there a picture in the DEA or RSO file of Darren

17  Transou?

18  **A.**    No, sir, I didn't find one.

19  **Q.**    Was there ever a search initiated by either the RSO or

20  the DEA for a picture of Darren Transou?

21  **A.**    Yes, sir, by the DEA.

22  **Q.**    Darren Transou was stopped on September 7th of '05, is

23  that correct?

24  **A.**    Yes, sir.

25  **Q.**    On the trip to Detroit?

Page 690

1   A.    Yes, sir.

2   Q.    And between September in '05 and over the course of

3   the next year, was a picture ever ordered?

4   A.    Yes, sir, it was.

5   Q.    And when was that?

6   A.    On June 6th or 7th of 2006, and I believe we have

7   that.

8   Q.    That's all right.

9   A.    Actually I don't know if it's in there, but it was

10  June 6th or June 7th, I'm uncertain of which day, of 2006.

11  Q.    Who ordered --

12              MR. ROTH:  I object.  I object to speculation

13  on these issues.

14              MR. TEITELBAUM:  We'll clarify the date if you

15  want us to take a moment to look for it.

16              THE COURT:  Yeah, why don't you lay a

17  foundation and use the exhibits?

18              MR. TEITELBAUM:  Okay.

19              THE COURT:  If you have them.

20              MR. TEITELBAUM:  Yes, sir.

21  A.    I believe it's in Exhibit 28.

22  Q.    28?  Handing Ms. Thomas Government's Exhibit 28.

23  A.    This is a letter I received from the State of

24  Michigan, Department of State Police in Lansing, addressed

25  to me from the identification section, a man named Pete

1    Langenfeld, Michigan State Police.

2              This says "Per my request, on June 7th, 2006,

3    at 1312 hours," which is 1:12 p.m., "a user with the e-mail

4    address of Joanne dot" -- I can't spell the last -- I can't

5    say the last name, it gives an e-mail address, "requested a

6    search of the Michigan Digital Image Retrieval System for an

7    image of subject Transou, date of birth 8/21/1967."

8              And then it tells "A Mr. Ron Vrancheff of

9    Michigan Department of State completed this query to

10   retrieve the request at," and a number where I can reach

11   him.

12   Q.   And who made the request?

13   A.   The request was made by Joanne Pruchniewski,

14   P-R-U-C-H-N-I-E-W-S-K-I.

15   Q.   Who is she?

16   A.   She's with the DEA Detroit office, in Detroit,

17   Michigan.

18   Q.   And does it say on whose behalf the Detroit office

19   made the request to the Michigan database?

20   A.   Yes, sir, at the request of Special Agent Robert Cross

21   of the DEA Cleveland office.

22   Q.   And Agent Cross, did he participate in the Mansfield

23   investigation?

24   A.   Yes, sir, he did.

25   Q.   And is that the individual that Jerrell Bray referred