1   to as Doogie?

2   A.    Yes, sir.

3   Q.    Were there any other inquiries by RSO or DEA to Ohio

4   or Michigan databases for a picture of Darren Transou?

5   A.    No.   The Michigan data -- or the Ohio databases both

6   replied to me that they have no information relative to

7   Darren Transou in any of their databases.

8   Q.    And he was a Detroit person, is that correct?

9   A.    Yes, sir.

10  Q.    The date June 7th, '06, is there any significance to

11  that date in terms of this investigation?

12  A.    Yes, sir.

13  Q.    And what is that?

14  A.    That's approximately five days after -- I shouldn't

15  say "approximately" -- it is five days after Arrico Spires

16  participated in his proffer interview in accordance with his

17  plea.

18  Q.    And the proffers are at Tab 1-B?

19  A.    1-B, yes, sir.

20  Q.    In chronological order?

21  A.    Yes, sir.

22  Q.    And that would be --

23  A.    I misspoke, sir.  I did my math wrong.

24            It's six days after the proffer, not five.

25  Q.    And who authored that report?  I'm sorry, people are

1   recorded and monitored phone call to Brown at that same

2   419-610-1691 number basically to say that he purchased the

3   drugs but he didn't know who the person was, and that Brown

4   had assured him that person, he had sent that person on his

5   behalf to deal with Bray.

6   Q.   The number, the 419 number according to Bray's toll

7   records, was that ever called?

8   A.   The 419-610-1691?

9   Q.   Yes.

10  A.   No, sir, not at the times of the buy.

11  Q.   Okay.  And are there calls corresponding to Bray's

12  toll records matching up with the times of the calls on the

13  6?

14  A.   Yes, sir, there are.

15  Q.   What number is called?

16  A.   The number that's called is -- oh, and this is

17  contained in the binders at Exhibit Number 17-C is the page

18  from Bray's phone records for that date, and it shows that

19  the DEA-6 -- I'm sorry -- the DEA-6 says that at 2:51 and

20  2:52 phone calls were made to that 1691 number.

21           The records show that at 2:49 and 2:51 there

22  are two calls, but they're to the number 419-520-5428.

23  Q.   And have we seen that phone number before?

24  A.   Yes, sir, we have.

25  Q.   Where?

1    **A.    Way back on the September 6th of 2005 buy allegedly**

2    **with Noel Mott, the DEA-6 says in Paragraph 1 that Bray came**

3    **in and advised that he received an incoming call from Mott**

4    **at that -- from that number 419-520-5428.**

5    **Q.    Now, speaking of Mr. Mott, there was an additional buy**

6    **with him?**

7    **A.    Yes, sir, there was.**

8    **Q.    Two days later on the 15th?**

9    **A.    Yes, sir, there was.**

10   **Q.    And could you -- we sort of have heard about this buy.**

11            **Could you sort of synopsize for us what took**

12   **place according to the 6?**

13   **A.    Yes, sir.  Paragraph 1 says that again Mr. Lucas,**

14   **Mr. Verhiley, TFO Jamaal Ansari, Special Agent Robert Cross**

15   **and Captain Faith interview Bray relative to his ability to**

16   **buy crack from Mott.**

17            **It says that Bray says that he can contact**

18   **Mott on cell phone number 419-989-3247 and that Mott is**

19   **distributing crack from that 435 Tremont Avenue address.**

20            **It says at approximately 5:25 p.m. and**

21   **5:28 p.m., Bray made two monitored and recorded calls to**

22   **Mott at that 3247 number and that they -- and that Bray and**

23   **Mott agreed to meet at Ritchie's store which is located near**

24   **the 435 Tremont address in order to make a crack**

25   **transaction.  Actually the 6 says located near Mott's**

1  Q.    Okay.  Was there a Bray buy approximately one week

2  prior to 9/15?

3  A.    Yes, sir, there was.

4  Q.    And which buy was that?

5  A.    That was the Ballard buy.

6  Q.    How much was bought on that?

7  A.    Three.  It was supposed to be for three and a half

8  ounces.  It was three that Bray actually bought on that buy.

9  Q.    All right.  And then that was the cobble phone, is

10  that correct?

11  A.    Yes, sir.

12  Q.    All right.  And the same N 5, Track 2 is the body

13  recorder?

14  A.    Yes, sir.

15  Q.    Is there something unique about the -- when the body

16  recording is turned on or activated in this buy?

17  A.    Yes, sir.

18  Q.    And what is that?

19  A.    The recorder, the body recorder is not turned on

20  during the actual buy, and it appears that Bray -- well, it

21  doesn't appear.

22        Bray turns it on after the buy is finished as

23  he's getting ready to leave before he gives that whole

24  commentary about needing his tail because the buy has

25  already gone down.

Case: 1:07-cv-03750-SO Doc #: 133-2 Filed: 09/01/10 5 of 65. PageID #: 2114

1    Q.    Okay.  And this starts about 20 seconds into Track

2    5 -- or Track 2, I'm sorry.  N 5, Track 2?  Okay.

3                   (Tape playing).

4                   THE COURT:  Mr. Teitelbaum, unless you have

5    questions related to this that you want to wrap up with, I

6    think it's a good time to take our lunch.

7                   MR. TEITELBAUM:  It would be a great time.

8                   THE COURT:  Okay.  So it's 12:30 now, so come

9    back at 1:30.

10                  (Jury out).

11                  (Luncheon recess taken).

12                       - - - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

1    advised Bray that he'd be arriving shortly.

2              Paragraph 15 says that at approximately

3    9:14 p.m., Ansari observed a Buick Regal with Ohio temporary

4    tag number K 183223 arrive at the residence, and that

5    vehicle was registered to James Burton.

6              And then it says Ansari observed Albert Lee

7    driving the vehicle with Nabors as the passenger.  It then

8    says Ansari observed them remove something from the driver's

9    door panel, and that Bray observed four kilo-sized bricks

10   being removed from that door panel.

11             And then it says Bray accompanied Lee and

12   Nabors into the residence where three females and the same

13   thin black male that Bray and Ansari had observed earlier

14   that same day at Brown's residence, and a black male named

15   Uncle Wee Wee, who was identified as James Burton, were also

16   observed.

17             Paragraph 16 says that Bray stated that Nabors

18   opened one of the kilo panels and removed some cocaine

19   powder from the package.  That Bray stated it weighed out to

20   about 280 grams on Nabors' scale.  That Bray stated that

21   Nabors gave Bray that package and that Bray departed the

22   residence and gave it to Ansari.

23             And that Bray was then searched again with

24   negative results.

25             It says that "Agent's Note:  This package was

1    weighed by a scale at the Richland County SO and the DEA,

2    and weighed approximately 171.9 gross grams."

3              It says shortly after Bray and Ansari departed

4    460 Hill Street, the Buick Regal departed and was lost.  And

5    it says at approximately 10:07 p.m. Bray again made a

6    monitored and recorded phone call to Nabors at that same

7    5107 phone number, and that in summary Bray advised Nabors

8    that he again shorted Bray on the drug amount, but Nabors

9    denied that the amount was short.  And it says the

10   recordings and calls for the meetings will be known as N 8

11   C.

12   Q.    So N 8 C are the phone calls at the last stage of the

13   process when Mr. Nabors is going to get the drugs, the

14   remaining drugs to bring them back, is that correct?

15   A.    Yes, sir.

16   Q.    The Cadillac that arrives at Platinum Status on the

17   first deal being driven by Mr. Nabors is registered to who?

18   A.    Albert Lee, sir.

19   Q.    The telephone number, the 5107 number, is

20   subscribed -- comes back to who?

21              Well, let me ask it this way:  Was it the same

22   telephone number used shortly before in the Albert Lee buy?

23   A.    Yes, sir.

24   Q.    And the 6 acknowledges that, is that correct?

25   A.    Yes, sir.

1    A.    Yes, sir.

2    Q.    And Bray has testified that the call is with Dwayne

3    Nabors?

4    A.    Yes, sir.

5    Q.    The telephone number, the number dialed, both

6    according to the 6 and according to the 6, comes back to

7    who?

8    A.    Albert Lee, sir.

9    Q.    How about Bray's phone records?

10   A.    Bray's phone records shows the calls are to that

11   number.

12   Q.    Albert Lee has been seen at a deal five days before in

13   a Cutlass?

14   A.    Yes, sir.

15   Q.    Mr. Bray buys that Cutlass?

16   A.    Yes, sir.

17   Q.    Referring back to the 6 for a minute, if you have to

18   look at it, what kind of car does Mr. Nabors have?

19   A.    A Cadillac.

20   Q.    And the Cadillac is spotted where, according to the 6?

21   A.    At -- at Platinum Status, and later in the 6 it says

22   at 460 Hill.

23   Q.    So it's parked out front of the business at Platinum

24   Status?

25   A.    Yes, sir.

1    language sound familiar to you?

2              "Answer:  The affidavit is correct.  I believe

3    the transcription is wrong.

4              "Question:  Well, I don't -- here's my

5    question.  You prepared an affidavit that you presented to

6    Judge Alt, correct?

7              "Answer:  Correct.

8              "Question:  And you know from your training,

9    of course, as a law enforcement official who's been in the

10   business, what, more than 20 years?

11             "Answer:  Well, 13.  Go ahead.

12             "Question:  I'm sorry, 13, forgive me.

13             "Answer:  Yeah.

14             "Question:  You know that when you swear an

15   affidavit in front of a Judge, that the Judge relies on the

16   information contained there, correct?

17             "Answer:  Correct.

18             "Question:  And you told Judge Alt that there

19   was a meeting or that the videotape, the transaction at 3:55

20   that you referenced here today in the parking lot, was

21   videotaped with Detective Metcalf and Sergeant Mayer, I mean

22   you said that to Judge Alt, right?

23             "Answer:  Correct."

24   Q.    The videotape of Platinum Status, was that played at

25   the Nabors trial?

Sue Trischan                    440-570-6950

Page 744

1   A.    No, sir, I don't believe it was.

2   Q.    And --

3   A.    It wasn't.

4   Q.    And Metcalf indicated there wasn't one, is that

5   correct?

6   A.    Correct, sir.

7   Q.    Would the videotape or does the videotape establish

8   who Detective Metcalf was with at Platinum, whose car he was

9   in?

10  A.    Yes, sir, it does.

11  Q.    And who is that?

12  A.    With Matt Mayer.

13  Q.    And he testifies that he and Lucas together turn out

14  and identify Nabors as he leaves the parking lot, is that

15  correct?

16  A.    Yes, sir.  That's correct.

17  Q.    And he testifies that by the time he is at Pleasant,

18  however, he is with Detective Mayer, Sergeant Mayer, is that

19  correct?

20  A.    Yes, sir.

21  Q.    And I believe the one section, he uses the phrase on

22  933, Lines 17, 18, what does he say?

23  A.    He says "Sergeant Mayer and I hooked up later, and Lee

24  Lucas and Dawn Shavinski were together at that point."

25  Q.    So he's distinguishing who's in which car between

1    Platinum and Pleasant, is that correct?

2    A.    Yes, sir.

3    Q.    Now, does Agent Lucas also testify to the events at

4    Platinum?

5    A.    Yes, sir, he does.

6    Q.    And in this trial, was Agent Lucas -- I'm sorry, I

7    didn't ask you, we've referenced a Dawn, and you said either

8    Brown or Shavinski.

9              Who is Dawn Brown, or are Brown and Shavinski

10   the same person?

11   A.    Yes, sir, they are.

12   Q.    And who is she?

13   A.    Dawn Brown, and I don't remember which is her maiden

14   name and which was her married name, Dawn Brown or Dawn

15   Shavinski, they are the same person.

16             She is a detective who actually works for the

17   Richland County Sheriff's Office but is assigned to the

18   Metropolitan, Metropolitan Enforcement Team of Richland

19   County or we've heard it referred to here as METRICH.

20   They're the narcotics investigation unit in Mansfield and

21   the Richland County area.

22   Q.    And did she participate in some of these buys?

23   A.    Yes, sir.

24   Q.    In what capacity?

25   A.    As surveillance, sir.

1   Q.   Now, I'm sorry, so Agent Lucas also testified as to

2   events surrounding the identification of Dwayne Nabors as

3   being in the Cadillac at Platinum Status?

4   A.   Yes, sir, he does.

5   Q.   And direct you to Tab 8 A, Page 1120. And this would

6   be direct examination, is that correct?

7   A.   Yes, sir.

8   Q.   And if you could read us, please, Page 1120, Line 5

9   through 1123, Line 25.

10   A.   Beginning on 1120, Line 5.

11         "Question:  Now, calling your attention to

12   the date of September 20th, 2005, was there a controlled buy

13   conducted on that day?

14         "Answer:  Yes, there was.

15         "Question:  And who was the target of that

16   controlled buy?

17         "Answer:  Dwayne Nabors.

18         "Question:  And do you know how much it was

19   supposed to be purchased from him?

20         "Answer:  It was supposed to be a half kilo of

21   crack for $10,000.

22         "Question:  And what happened prior to the

23   actual controlled purchase?

24         "Answer:  We had to get the money, which we

25   pooled our money together.  4,000 came from DEA, 3,000 from

1    the Cleveland Police Department, and 3,000 from Ohio BCI,

2    the State Police.

3                "Question:  Now, in relation to that buy, what

4    were your duties on that day?

5                "Answer:  It was basically the same thing.  I

6    was the surveillance agent searching the informant, his

7    vehicle, and provided the money, and then I was the

8    surveillance agent on that day, also.

9                "Question:  Were you by yourself or in company

10   of another officer?

11               "Answer:  No, we started out myself and Chuck

12   Metcalf, we had the video camera and we set up across the

13   street.

14               "Question:  And did you actually record or

15   videotape any activities on that date?

16               "Answer:  We did -- I didn't.  We started out

17   across the street from Nabors' business, it was a rim shop,

18   a music store, and it's right on one of the main roads, Park

19   Avenue, Parkview Avenue.  It is one of the main roads in --

20               "Question:  Park Avenue West?

21               "Answer:  Park Avenue West in Mansfield.  And

22   it has -- I think it's two lanes and two lanes on the other

23   side.

24               We were directly across the street in a car

25   dealership, and as we pulled up and we pulled in, a salesman

1    came up.  He kept on talking to us so we were able to keep

2    surveillance on Jerrell Bray and Jamaal Ansari and security

3    for our $10,000, but at that point we were not allowed to

4    video.

5                    "Question:  And while you were there, can you

6    tell us what you observed on that day?

7                    "Answer:  Parked in the lot was a white

8    Corvette and a black Cadillac, both that came back to Dwayne

9    Nabors.

10                   "Jerrell Bray and Jamaal Ansari arrived.

11   Jerrell went in for a second.  He went in for a short time,

12   came out.  He advised Jamaal that Dwayne's not here yet.

13   Jamaal Nexteled me and told me he's not here yet.

14                   "So we waited, and eventually a black --

15   another black Cadillac, a different one, this one was

16   registered to Albert Lee, arrived.  And I saw Jerrell Bray

17   go up to the passenger side of this vehicle.  There was some

18   motions like they were speaking.  I obviously couldn't

19   overhear what was being said.

20                   "And when the vehicle left, myself and Chuck

21   Metcalf, who were together, jumped in our car.  We left.

22   They made a right pulling out of the lot.  We had to make a

23   left to get behind them.  We went up a distance until we

24   could pull up next to them.

25                   "I identified Dwayne Nabors as being the

1    driver and there was another black male who at that time we

2    didn't have identified as the passenger.

3              "Question:  Have you been able to identify the

4    second individual as of now?

5              "Answer:  Yes.

6              "Question:  And who was that?

7              "Answer:  A guy named Davis.

8              "Question:  Now, the individual that you

9    referred to as Dwayne Nabors, do you see him here in the

10   courtroom?

11             "Answer:  I do.

12             "Question:  Could you point him out and

13   identify him for the record?

14             "Answer:  Yes.  He's seated at the defense

15   table.  He has a -- he's a bigger guy, he has a white shirt

16   on with a tie and he's seated at the end of the table.

17             "Mr. Serrano:  May the record reflect he has

18   identified Dwayne Nabors?

19             "The Court:  The record will so reflect.

20             "By Mr. --"

21   Q.    Thank you.

22             So the method by which Mr. Nabors was

23   identified was pretty much similar to the method by which

24   Mr. Ballard was identified?

25             MR. ROTH:  Your Honor, I object to

1    Mr. Teitelbaum testifying.

2                    THE COURT:  Okay.

3                    MR. ROTH:  That's not a question.

4                    THE COURT:  All right.  Okay.

5                    MR. TEITELBAUM:  I'll --

6                    THE COURT:  Okay.  Rephrase.

7                    MR. TEITELBAUM:  I didn't word that very good.

8    BY MR. TEITELBAUM:

9    Q.    According to Agent Lucas at the Nabors trial, at

10   Platinum Status he was in the same vehicle with Detective

11   Metcalf, is that correct?

12   A.    Yes, sir.

13   Q.    And who is he with subsequently in his testimony by

14   the time he's at the second delivery point at Pleasant?  I

15   know we can read it here --

16   A.    Right.  The DEA-6 says he's with Dawn Brown.

17   Q.    Does he also testify to that at trial?

18   A.    I believe he does, sir, yes, sir.

19   Q.    And could you turn to Page 933, please, in that

20   same -- or did we just read that?

21   A.    No, we are in the 1100s, sir.

22   Q.    I'm sorry, I looked at the wrong thing.  I'm sorry.

23                    Now, we went to Pleasant and then the final

24   delivery is at Hill Street, is that correct?

25   A.    Yes, sir.

1  Q.    And you indicated that the 6 states at Paragraph 13

2  that the Nabors' Cadillac is observed as is Lee parked

3  outside of Hill Street during the final delivery, is that

4  correct?

5  A.    Yes, sir.  Paragraph 13 says both the Cadillacs are

6  there.

7  Q.    And does the 6 attribute that identification to

8  anybody?

9  A.    No, sir, it doesn't.

10 Q.    During the trial was Jerrell Bray asked about the

11 Cadillacs -- who went into the house at 460 Hill?

12 A.    Jerrell Bray did, sir.

13 Q.    And who was with him at the location?

14 A.    Ansari went to the location with him.

15 Q.    Right.

16 A.    Only Jerrell Bray went into the house.

17 Q.    Right.  Bray, did he go in the house?

18 A.    Yes, sir, he did.

19 Q.    Bray did.  How about Ansari?

20 A.    No, sir, Ansari did not go in the house.

21 Q.    Where is he?

22 A.    Ansari is outside in the car, in Bray's car.

23 Q.    At the trial were either one of those two persons

24 asked whether or not they saw either of those Cadillacs at

25 Hill Street?

1    A.    No, sir, they weren't.

2    Q.    Did somebody testify to seeing Dwayne Nabors' Cadillac

3    at Hill Street?

4    A.    Yes, sir.

5    Q.    And who was that?

6    A.    Mr. Lucas, sir.

7    Q.    And would you turn, please, to Page 1130, Line 7.  And

8    when everybody's set, read through 1132, Line 9.

9    A.    Okay.  Beginning on 1130, Line 7.

10   Q.    Um-hmm.

11   A.    It actually starts above, Line 6, it says:

12              "Question:  Okay."  Then 7 starts "Now, you

13   indicated at some point that you went over to a location on

14   Hill Street.

15              "Answer:  Yes.

16              "Question:  Would that have been 642 Hill

17   Street?

18              "Answer:  Yes.

19              "Question:  Would you know who actually had

20   any connections to that address, if you know?

21              "Answer:  James Burton, whose street name was

22   Unc or Uncle or Uncle Wee Wee, and I believe Albert Lee was

23   also involved or seen at that residence throughout the

24   investigation.

25              "Question:  And how long after the calls were

1    made did you actually go to the Hill location?

2                  "Answer:  It was probably four, close to five

3    hours later.

4                  "Question:  And did you actually go there to

5    Hill?

6                  "Answer:  Yes.

7                  "Question:  Were you by yourself or with

8    somebody else?

9                  "Answer:  No.  I was with someone else in the

10   car.

11                 "Question:  And what did you observe at that

12   time when you went to Hill?

13                 "Answer:  The same black Cadillac that was

14   registered to Dwayne Nabors that I observed earlier at

15   Platinum Express, I saw two Cadillacs at Platinum Express

16   that day.

17                 "Question:  Platinum Status?

18                 "Answer:  Platinum Status, Dwayne Nabors' rim

19   shop, music shop.  There was a white Corvette and a black

20   Caddy, and a second black Caddy arrived, but over at that

21   house on Hill was the black Caddy that was registered to

22   Nabors.

23                 "Question:  Did you see actually or can you

24   tell us approximately what time of the day or night it was?

25                 "Answer:  It was night.  It was at night.

```
 1                    "Question:  Was there a video recording of
 2     this?
 3                    "Answer:  No.
 4                    "Question:  For what reason?
 5                    "Answer:  We couldn't do one at night.  And
 6     that Jamaal, I was advised there were lookouts painting each
 7     other.
 8                    "Mr. Shamansky:  Object as to what he was
 9     told, Your Honor.
10                    "The Court:  Sustained.  Disregard the answer.
11                    "By Mr. Serrano, question:  Were you paying
12     attention to anything in particular based on the information
13     you had received?
14                    "Answer:  Yes.
15                    "And what was that?
16                    "Answer:  Lookouts.
17                    "Question:  Now, while you were at the
18     location can you tell us what, if anything, you saw and what
19     happened?
20                    "Answer:  I observed a Regal arrive.  It was
21     dark so I couldn't see who was in the Regal, but I saw a
22     Regal arrive later that had a temp tag on it.  The temp tag
23     came back to a James Burton."
24     Q.    Thank you.
25                    Did Detective Dawn Brown-Shavinski testify at
```

1    the Nabors trial?

2    A.    No, sir, she didn't.

3    Q.    Is she referenced in the -- well, strike that.  I

4    apologize.

5               The last reading section we did when we were

6    talking about the identification of Platinum, when we ended

7    on Page 1123, we ended with the identification, in-court

8    identification of Dwayne Nabors?

9    A.    Yes, sir.

10   Q.    At Page 1123, Line 9.  And I apologize, I stopped you.

11              If you would go through Line 6 of the next

12   page.

13   A.    Yes, sir.

14              THE COURT:  Going back now to 11?

15              MR. TEITELBAUM:  1123, Line 11.  I'm sorry, I

16   stopped Agent Thomas a little shy.

17   A.    Okay.  Starting on -- we read through Line 9.

18   Starting Line 10.

19              "The Court:  The record will so reflect.

20              "By Mr. Serrano, question:  Did there come a

21   time when you left the area or the immediate area of the

22   shop there on Park Avenue West?

23              "Answer:  Yes.

24              "Question:  Where did you go from there?

25              "Answer:  Back to the -- back to the Richland

Page 757

1          THE COURT:  Okay.  It's 2:53.  Why don't we

2    take our 15 minutes now?

3              (Recess taken).

4          THE COURT:  You may be seated.

5          I don't know how long you have been back in

6    here.  There was a breakdown in the system because I have a

7    loud shrill buzzer that will get me when she punches that,

8    and it doesn't work.

9          THE CLERK:  I asked Sue and she heard it

10   because it beeps out here, too.

11         THE COURT:  Not at all.

12         THE CLERK:  You'd come right out.  I know.

13         THE COURT:  Sorry.  You may proceed.

14         MR. ROTH:  Thank you, Judge.

15     CROSS-EXAMINATION OF KIMBERLY THOMAS

16   BY MR. ROTH:

17   Q.   Ms. Thomas, could you just refer to whatever the first

18   DEA-6 is in Volume 1?

19   A.   And that would be in Exhibit 1-A, Mr. Roth.

20   Q.   Right.  That's Volume 1, the general exhibit.

21   A.   Yes, sir.

22   Q.   Just turn to the first one.

23   A.   Okay.

24   Q.   I want to ask you some general questions.

25   A.   All right, sir.

1    A.    Correct, sir.

2    Q.    And what is Mr. Transou's position as to whether or

3    not this is him on the Ballard deal?

4    A.    When I interviewed Mr. Transou and --

5    Q.    Yes.

6    A.    -- and I spoke to him about it, he told us that it is

7    him at the Ballard deal and that -- you put your hand up.

8    Did you want me to stop?

9    Q.    My question was not that.

10              My question was this conversation.

11   A.    This particular conversation?

12   Q.    This conversation.

13   A.    Oh, I'd have to check my notes, sir.

14              My recollection is that two of the tracks he

15   agreed that it was him, and one of them he wasn't certain,

16   but again I'd have to check my notes to be certain.

17   Q.    What about this one that we just played?

18   A.    As I said, sir, I don't recollect which was which.

19   I'd have to check my notes.

20   Q.    Okay.  Did you, when you interviewed Mr. Transou, did

21   you ask him whether or not he had a drug relation with

22   Mr. Ballard?

23   A.    I don't remember if I asked him that or not, sir.

24   Q.    Well, in this conversation, the person you claim is

25   Mr. Transou is clearly making a drug reference to somebody

1    **length of imprisonment for the July, 2005 drug deals?**

2    **A.    Fifty-seven months.**

3    **Q.    Did you serve all 57 months?**

4    **A.    No, I did not.**

5    **Q.    Why not, sir?**

6    **A.    I was released.**

7    **Q.    Do you know why you were released?**

8    **A.    Because of the -- because of this case right here.**

9    **Q.    And at some point after your release, did you meet**

10   **with Mr. Teitelbaum and Ms. Thomas?**

11   **A.    Yes.**

12   **Q.    And during that meeting did you sign an agreement**

13   **wherein any information you provided would not be used**

14   **against you?**

15   **A.    Yes.**

16                   MR. COMBER:  Nothing further.

17                   THE COURT:  All right.  Cross-examination,

18   Mr. Roth.

19                   MR. ROTH:  Thank you, Judge.

20                   THE COURT:  You still want that on the screen?

21                   MR. COMBER:  Oh.  Thank you, Your Honor.

22          CROSS-EXAMINATION OF ARRICO SPIRES

23   BY MR. ROTH:

24   **Q.    Mr. Spires, during your preparation with the**

25   **government to testify in this matter, did they play any**

1    because it appears, from what you said, that maybe Mr. Bray

2    didn't turn in all the drugs that you gave him, am I

3    correct?

4              Is that what you were trying to say on direct

5    examination?

6    A.   No, that wasn't -- wasn't what I was trying to say.

7    Q.   Okay.  Did -- I thought you said that you actually

8    sold Mr. Bray 5.7 grams?

9    A.   That's what he turned in, sir.

10   Q.   Oh, I see.  So you sold him more than 5.7 grams, and

11   Mr. Bray turns in 5.7 grams?

12   A.   Yes, I sold him 56.

13   Q.   Okay.  All right.  So you sold him 56 grams and he

14   claims it's 5.7, correct?

15   A.   No, he gave them 5.7 out of it.

16   Q.   Sir, I'm confused.

17              You gave him how much?

18   A.   Fifty-six grams.

19   Q.   Grams.  And then how does the 5.7 come in?

20   A.   That's what I was charged with.

21   Q.   Oh, I see.  I see.  But is it your understanding that

22   you were charged with 5.7 grams because Mr. Bray only turned

23   in 5.7 grams of the 56 that you gave him?

24   A.   Yes.

25   Q.   Okay.  So he made out by not turning in all the drugs

1                         And so the stipulation is as follows:  The

2       parties hereby stipulate that at the Ballard trial, after

3       consultation with his attorney and following inquiry by the

4       Court where Mr. Spires responded under oath to the Court's

5       questions, Mr. Spires asserted his Fifth Amendment privilege

6       and did not testify before the jury.

7                         So that's the stipulation.  And the parties

8       have put that in writing and I've just read that to you.

9                         Call your next witness.

10                        MR. COMBER:  Your Honor, the government would

11      call Sergeant Matt Mayer.

12                        THE COURT:  All right.  Sir, as you could see,

13      the witness stand is here on my left.

14                        THE WITNESS:  Okay.  Thank you.

15                        THE COURT:  Go ahead.  Before you

16      actually -- go ahead and step up.  Before you actually sit

17      down, my deputy will swear you in.

18                              MATT MAYER,

19           of lawful age, a witness called by the Government,

20                      being first duly sworn, was examined

21                            and testified as follows:

22              DIRECT EXAMINATION OF MATT MAYER

23      BY MR. COMBER:

24      **Q.    Good morning, Sergeant.**

25      **A.    Good morning.**

1    A.    I checked with the senior high, they didn't have a

2    yearbook, they told me to go to the Ray Milton school which

3    they archive, they may have a yearbook.

4              I went out there, talked to the lady.  She

5    said she didn't have a yearbook in that era because we kind

6    of estimated, you know, about the year or whatever, but she

7    did -- she was familiar with her and she said she had a, I

8    believe, a middle school picture attached to a file.

9              I took a photograph with a digital camera of

10   it.

11   Q.    You took a photograph of the photograph, is that what

12   you're saying?

13   A.    Yes.

14   Q.    Okay.

15   A.    And I wanted that for a benchmark just to get an idea.

16             At this point in time I don't know if it's

17   Geneva France.  We can't find a picture to put her in a

18   lineup, and she's in middle school, so sometimes when people

19   go through puberty they change in height and size and facial

20   structure, so I didn't know how this was going to -- you

21   know, I just -- at the time I was doing this as a task of --

22   I don't know if it's Captain Faith, Metcalf, or whoever.

23             You know, I was just doing it as a task to get

24   a picture so we could try to put it in a photo lineup or at

25   least have a general idea if this is the person that sold

1   **drugs to, I believe, Lee on an earlier date.**

2   **Q.   Sir, about to show you a picture that's been marked as**

3   **one of our Joint Exhibits.**

4               MR. COMBER:  Mr. Roth, any objection to

5   displaying the picture to the jury?

6               MR. ROTH:  No, no objection.

7               MR. COMBER:  Your Honor, may we display the

8   picture?

9               THE COURT:  You may.

10              MR. COMBER:  Thank you.

11              THE COURT:  Do we have an exhibit -- is there

12  an exhibit number?

13              MR. COMBER:  Your Honor, I apologize.  It's

14  one of our Joint Exhibits.  I don't have the list in front

15  of me.  I will get it to the Court and make sure it's part

16  of the record.

17              THE COURT:  I want the record to be clear what

18  we are looking at.

19              MR. COMBER:  Absolutely.  I will provide it to

20  the Court.  Thank you.

21  BY MR. COMBER:

22  **Q.   Sir, the picture that is on the screen in front of**

23  **you, do you recognize that picture?**

24  **A.   It's been quite awhile, but that looks like the**

25  **picture I took of the picture.**

Page 1192

1   Q.    Okay.  So that is the picture that you took of the

2   picture in Ray Milton school of Geneva France?

3   A.    Yes, it looks like it.

4               MR. COMBER:  One brief moment, Your Honor.

5               THE COURT:  Sure.

6               (Pause).

7   BY MR. COMBER:

8   Q.    Sir, after you -- I think we had the answer.

9               Thank you so much.

10               MR. COMBER:  For the record, that was Exhibit

11   27.

12               THE COURT:  All right.

13               MR. COMBER:  Apologize, Your Honor, for not

14   having that at the ready.

15   BY MR. COMBER:

16   Q.    Sir, after you obtained that picture, what did you do

17   with it?

18   A.    I went back with it in my camera, made a still print

19   out of the computer.

20   Q.    To whom did you provide the still print?

21   A.    My memory would be Chuck Metcalf.

22   Q.    At some point were you present when Jerrell Bray

23   identified that picture?

24   A.    Yes.

25   Q.    Please describe what happened.

Page 1193

1    A.    One day after I gave it to Metcalf, probably within --

2    it could have been the same day, several days, I'm not sure,

3    I can't remember the time, I was in my office.  My office is

4    the first one in line when you walk in from the outside

5    normal entrance of the detective bureau.

6              And when I'm on a task I try to finish it,

7    otherwise you could be interrupted all day.  So I think I

8    heard it was Bray.  I had my door about three-fourths shut

9    and I knew he was coming in to talk to Chuck or Larry.  And

10   I take care of my business until they ask, you know, if I

11   could partake, and I just -- and I heard a commotion in

12   Chuck's office which is across the hallway but just a little

13   bit further down.

14             And I went in to see what the commotion was,

15   and it was Bray saying pretty loud "Well, that's the girl,

16   that's the Geneva France right there."  And he was pointing

17   to the picture.

18   Q.    At that point are you aware personally of how

19   Mr. Metcalf communicated to Agent Lucas that Mr. Bray had

20   identified Geneva France?

21   A.    You know, I don't know when he did or how he did.

22             I can't recall.

23   Q.    Okay.  Thank you.

24             MR. COMBER:  Nothing further, Your Honor.

25             THE COURT:  All right.  Cross-examination.

1        CROSS-EXAMINATION OF MATT MAYER

2    BY MR. ROTH:

3    Q.    Sir, do you know -- let me get my microphone.  I

4    thought I was better trained.

5                Sergeant Mayer, good morning.

6    A.    Good morning.

7    Q.    Do you know whether it was Lucas or Bray who

8    identified that photograph first?

9    A.    Five years ago, I couldn't swear.  I thought it was

10   Lucas -- or not Lucas, but Bray.  Then I thought it was

11   forwarded on.

12               But it's been quite some time, so I don't want

13   to mislead you, but I thought it was Bray.

14   Q.    Now, were you present when Mr. Lucas was shown that

15   photo?

16   A.    I don't think I was.  I can't remember it.

17   Q.    Now, sir, I thought you indicated that what your

18   intention was was to get a photograph of the person that was

19   possibly the person that Bray said was Geneva?

20   A.    Yes.

21   Q.    And put it in a photo spread?

22   A.    Yes.

23   Q.    Okay.  I take it that never happened?

24   A.    No, that was the aggravating part of that.  When

25   I -- when Bray said he seen her, I thought that shot that

1   to -- you know, what can you do once he sees it?  You can't
2   ever take it back.

3           It kind of undermined the work we did, but
4   then again it also served as a benchmark so if, you know,
5   whoever or if Lee does an actual hand-to-hand buy to her,
6   he'd have an idea so if he testified, or at least he'd have
7   an idea who it was.

8   Q.    Well, sir, I noticed that the photograph that you
9   selected -- and can we put it back up there?

10          MR. COMBER:  Sure.

11  A.    Has her name.

12  Q.    Sir, I notice that photograph has a name on the
13  left-hand column.  It says "France, Geneva."

14  A.    That wouldn't be fair either, would it?  It wouldn't.

15          This is my explanation for this.  I create
16  original videotapes.  I take original photographs.  This,
17  indeed, on my camera if you pulled up the CD, it may have a
18  lot more information, but that -- so this photo, if it was
19  obtained through the actual one that was given to Lee or the
20  actual one in Metcalf's office, it very well, as you all
21  know, if you -- it's pretty common now to get on the
22  computer to develop your pictures.

23          You know, you can take a picture of me, you
24  can get my face, my uniform, the Judge in the background, as
25  much as you want, so I can't say this would accurately

1    depict what was showed.

2              It's the same picture, but I don't know how

3    much of the original showed Geneva France or not, and it

4    very well could have been right there and Bray could have

5    read it, for all we know.

6              I wasn't in there, and it wasn't meant to be

7    shown to him at that time so, you know, I couldn't control

8    that.  That was in Metcalf's office.  I don't think he -- or

9    he didn't expect that Bray would come in.  Because I'm the

10   supervisor, I said, "Man, why did you show him that?"  He

11   said "I didn't.  He just seen it.  When he came in it was

12   unexpected, it was laying there."  That's his explanation to

13   me.

14   Q.    Sir, were you present when he identified this photo,

15   or were you not?

16   A.    I was in my office.  I heard -- as I testified, I

17   heard this scuttlebutt, went over there, and after he told

18   Metcalf, he reiterated to me.

19              That's what happened.

20   Q.    Okay.  So you actually weren't present?

21   A.    There on the first time, yes.

22   Q.    You weren't present when he actually ID'd.  You came

23   in later?

24   A.    That's correct, sir.

25   Q.    All right.  Now, my question was:  The photograph that

Page 1244

1    if they're -- or for the prosecutor, defense to ask me

2    direct questions about it, but, you know, up until just

3    recently, I didn't -- you know, I really didn't have a

4    chance to view it or decide if there were discrepancies or

5    intentional or just a matter of, you know, inaccurate

6    rewriting.

7               I don't even know if he wrote them.  Maybe a

8    partner wrote them and he just -- I don't know.  I didn't

9    have enough time or I didn't really get a chance to look at

10   them up until -- and I haven't seen all of them, I don't

11   think.

12   Q.    All right.  And you think the one on the Ballard deal

13   you saw for the first time yesterday?

14   A.    Yeah.  And it was in a -- some paperwork.  It was

15   paperwork.  Wonder if that means --

16               THE COURT:  Check it, Maria.

17   A.    There was, if I recall right, there's a part about

18   a -- about him seeing a black car, him pulling up close

19   before.  I don't remember seeing that, but I'm in the back.

20   You could go by the video of how far it went in the lot, but

21   if I'm recalling right it was at the beginning there was a

22   paragraph he seen the drivers of the car.

23               And I didn't see them.

24   Q.    All right.  But that --

25   A.    If I'm right.

Page 1260

1   A.    No, I didn't.  No, I didn't.

2              MR. COMBER:  Thank you.  No further questions.

3              THE COURT:  Anything further, Mr. Roth?

4              MR. ROTH:  Just one question.

5       RECROSS-EXAMINATION OF MATT MAYER

6   BY MR. ROTH:

7   Q.    Isn't it true, sir, that you have no personal

8   recollection of that event?

9   A.    I think -- okay.  I don't remember seeing it at all,

10  but if I would have pulled up to it, I believe that would be

11  a significant factor I'd remember all this time after if I

12  looked at them.

13             I'm not saying -- five years, I could be

14  wrong, but I'd say I'd remember that.

15  Q.    Sir, did you just say after five years you could be

16  wrong?

17  A.    I could be wrong, but my recollection is that we never

18  pulled up beside it, and the last I saw it was after it

19  pulled out and went up, down towards the left.

20  Q.    Sir, before you looked at the video, your recollection

21  was that one vehicle went to the left and the other vehicle

22  went to the right?

23  A.    Yes, I -- I can appreciate what you're saying and I

24  would use caution with what I say.  It's five years old.  I

25  didn't remember which way it went.

1    Q.    Sir, directing your attention not to one of the buys

2    specifically in 2005, but at some point thereafter did you

3    become aware of an allegation that money had been stolen by

4    the confidential informant during one of those Mansfield

5    buys?

6    A.    Yes, I did.

7    Q.    Okay.  Do you recall when it was that you came to

8    learn of the allegation that money had been stolen?

9    A.    June 13th, 2007.

10   Q.    Without getting into the specifics, what was told to

11   you?

12              How did you become aware?

13   A.    I was told by Task Force Officer Verhiley that during

14   a purchase --

15   Q.    Sir, again not -- I don't want to get into -- just so

16   the record is clear, I don't want to get into the

17   discussion.

18              MR. ROTH:  No, no objection to the hearsay,

19   Your Honor.

20   Q.    In that case what did Task Force Officer Verhiley tell

21   you?

22   A.    He told me that at the conclusion of one of the buys,

23   he and another individual Task Force Officer Jamaal Ansari

24   were conducting a search of the informant and his vehicle.

25              At this time they found some currency that was

1   supposed to have been used for the -- to purchase drugs.

2   Q.   Okay.  And without getting into any greater detail

3   about the substance because that's not the focus of your

4   testimony, as a result of learning that --

5              MR. ROTH:  No objection to the substance, Your

6   Honor.

7   Q.   Okay.  After that conversation, what did you do?

8   A.   The next day, June 14th, I spoke with Task Force

9   Officer Ansari.

10  Q.   And what did Task Force Officer Ansari tell you?

11  A.   He confirmed with -- he confirmed what Task Force

12  Officer Verhiley had said, and they had both told me that

13  they had informed Special Agent Lucas at the time when they

14  discovered the money.

15  Q.   Okay.  As a result of learning of the allegation of

16  theft by the confidential source, what did you do?

17  A.   On June 15th, during a conversation I was having with

18  Mr. Lucas, I asked him if the informant had stolen some

19  money.

20              And I --

21  Q.   And how did Mr. Lucas respond?

22  A.   He told me that it was not true; that if any informant

23  would have stolen money, he would have beat him.

24              I said "That's right, Lee.  I believe that's

25  how you operate.  You would never call time out, report

1  him."

2         He also said that anyone that said that, that

3  they were liars.

4         I said "So Jamaal and Tom are lying?  Let's

5  get them in here."

6         At that time he left my office.

7  Q.    Okay.  After he left your office, did he return after

8  a certain period of time?

9  A.    Yes, approximately 20 to 30 minutes later.

10  Q.   And what happened when Agent Lucas returned to your

11  office?

12  A.   He came in, he was visibly shaken, he was red in the

13  face, he was crying, and he asked me not to report it.

14         I said no, I wasn't going to do that.

15  Q.   Did you ever, in fact, report it?

16  A.   Yes, I did, later that day.

17  Q.   Okay.  To whom did you report it?

18  A.   Assistant Special Agent in Charge Anthony Marotta.

19  Q.   Okay.  Had you become aware of the information in

20  September of 2005 at the time of the buy itself, what would

21  you have done as a result of learning of that allegation?

22  A.   We would have had to stop the investigation, report it

23  to the United States Attorney handling the case what had

24  occurred, and then we'd have to put everything on hold, we

25  should have put everything on hold until we investigated it.

1   Q.   Okay.  Are you aware of what the case status was by

2   that point in June of 2007 with respect to the Mansfield

3   cases?

4          Where were they in the prosecutorial life

5   span?

6   A.   I believe that was at the time when they were

7   beginning to dismiss all the cases.

8   Q.   Okay.  Later did you become aware of an allegation

9   that an officer on the scene during a separate buy that was

10  part of the Mansfield buys had indicated to Agent Lucas that

11  the person who was charged was, in fact, not the person who

12  was present for the buy?

13  A.   Yes.

14  Q.   When did you learn of that allegation?

15  A.   During late October of 2007.

16  Q.   Had you learned of that allegation, that another

17  officer had contradicted Agent Lucas's identification at the

18  time of the buy, had you learned of that information at the

19  time of the buy in October, 2005, what would you have done?

20  A.   It would have been reported and once again the

21  investigation would have been stopped momentarily to look

22  into that, to see, to try to prove if that was true or

23  false.

24  Q.   Okay.  When you learned of that allegation in October,

25  2007, did you, in fact, report it to anyone?

1           (Witness excused)

2           THE COURT:  Call your next witness.

3           MR. COMBER:  Thank you, Your Honor.  We call

4    Detective Dawn Brown.

5                     DAWN BROWN,

6      of lawful age, a witness called by the Government,

7           being first duly sworn, was examined

8                and testified as follows:

9      DIRECT EXAMINATION OF DAWN BROWN

10   BY MR. COMBER:

11   Q.    Good afternoon, Detective.

12   A.    Good afternoon.

13   Q.    Could you please state your name, spelling your last

14   name for the record?

15   A.    My name is Dawn Brown, B-R-O-W-N.

16   Q.    Detective, how are you employed?

17   A.    I'm employed by the Richland County Sheriff's Office.

18   Q.    How long have you been with Richland County Sheriff's

19   Office?

20   A.    Over 27 years.

21   Q.    Okay.  Could you briefly summarize for our jury your

22   law enforcement training and experience before joining

23   Richland County?

24   A.    My training was after I was hired with Richland County

25   and I received my certificate after graduating from the Ohio

Page 1531

1    Offered for cross.

2              THE COURT:  All right.  Mr. Roth, you may

3    cross-examine.

4              MR. ROTH:  Thank you, Judge.

5         CROSS-EXAMINATION OF DAWN BROWN

6    BY MR. ROTH:

7    Q.    Good afternoon.

8    A.    Good afternoon.

9    Q.    Now, ma'am, were you involved in any of the pretrial

10   preparation in the Nabors trial?

11   A.    No.

12   Q.    For the Nabors trial?

13   A.    No, I was not.

14   Q.    I believe the Nabors trial happened in July of 2006,

15   and it was -- the prosecutor was Mr. Serrano.

16             Did Mr. Serrano ever make an appointment with

17   you and sit down and talk to you about what you remembered

18   or what you knew about the Nabors case?

19   A.    No, he did not.

20   Q.    Okay.  So when was the first time after

21   September 20th, 2005 that you ever spoke to anyone about the

22   surveillances that occurred, that you engaged in on that

23   date with respect to, for want of a better term, the Nabors

24   surveillance?

25   A.    I was contacted by the Department of Justice, I

1    which you drafted these?

2    A.    Initially when this investigation started I had some

3    concerns over some of the methods used during the

4    investigation, and for -- as a police officer we learn that

5    for our own protection and for liability reasons that

6    sometimes it's a good idea to keep notes if we have

7    concerns.

8    Q.    Okay.  And would it be fair to say that these notes

9    that you started begin on about February the 4th of 2005?

10   A.    Yes.

11   Q.    Okay.  So your concerns began long before DEA got

12   involved, correct?

13   A.    I had some operational concerns, yes.

14   Q.    And your concerns were with the way, I guess, some of

15   the people in Richland County were handling Mr. Bray?

16   A.    It was contrary to the way that I was trained, yes.

17   Q.    Okay.  And even though you were with the Richland

18   County Sheriff's Office, you were a permanent member of the

19   METRICH unit, correct?

20   A.    Well, not permanent, but I was assigned to METRICH.

21   Q.    Okay.  But was that on a long-term basis?

22   A.    It's basically at the Sheriff's will and pleasure.

23   Q.    Okay.  By 2005, how long had you been with METRICH?

24   A.    Since 1995.

25   Q.    Okay.  So for ten years already?

1    specifically on Page 2, the first full paragraph.

2                   Preliminarily let me ask you a question.

3                   Prior to coming here today, did you have an

4    opportunity to review this?

5    A.      Yes.

6    Q.      Okay.  And this was the report of interview of you on

7    November the 18th, 2008?

8    A.      Yes.

9    Q.      Okay.  And on Page 2, there's a reference to you being

10   shown the DEA-6 of the Nabors buy, correct?

11   A.      Yes.

12   Q.      And would it be accurate that the only thing you

13   reported as being inaccurate after reviewing the report was

14   that you did not see Bray throw money into the black

15   Cadillac as reported in Page 3 of the DEA-6?

16   A.      I did report that.  I also provided the information

17   that I just gave to you.

18   Q.      Okay.  Well, let's look at the reference that's in

19   this report.

20                   If you could, do you have Volume 1 up there?

21                   MR. ROTH:  Your Honor, could I approach and

22   assist her to get the report?

23                   THE COURT:  Sure.

24                   MR. ROTH:  It might save some time.

25                   THE COURT:  Just to get her oriented.

Page 1556

1           MR. ROTH:  Here.  (Indicating).

2     BY MR. ROTH:

3     Q.    And that would be at Page 30, under Volume 1, 1-A.

4           I would ask you to take a look at Page 10 --

5     I'm sorry -- Paragraph 10 of that report.

6           And if you could read it to yourself, please.

7           (Pause).

8           Have you read Paragraph 10?

9     A.    Yes.

10    Q.    Okay.  And is the incident that's reflected in

11    Paragraph 10 the incident that you took exception to during

12    your interview?

13    A.    I simply stated I did not witness it.

14    Q.    Okay.  And would you agree that in Paragraph 10, it

15    does not say that you witnessed it; it says that you and

16    Mr. Lucas drove by and he witnessed it?

17    A.    Yes.

18    Q.    Okay.  Now, going back to 460 Hill, would it be

19    important if you're going to be on surveillance at that

20    location to drive by that location at least once before the

21    deal so that if there's an emergency or if something

22    happens, you know where to respond?

23    A.    Most often we do know where to go, yes.

24    Q.    Well, were you familiar with the Hill Street location

25    before that night?

Page 1557

1    A.    No, I was not.

2    Q.    And did you believe that Mr. Lucas was?

3    A.    I assumed that he was.

4    Q.    And why would you assume that?

5    A.    Because it was his investigation; not mine.

6    Q.    Well, ma'am, was there any pre-knowledge before that

7    date that there would ever be a deal at 460 Hill?

8    A.    Not my knowledge, no.

9    Q.    Okay.  Now, after the second leg of the deal after

10   Pleasant Street, you go back to the Richland County

11   Sheriff's Office, correct?

12   A.    Yes.

13   Q.    And would it be fair to say that all the agents and

14   officers involved in that deal had to wait about four or

15   five hours for the next leg to occur?

16   A.    It was a long period of time.

17   Q.    Okay.  And would it be fair to say that it wasn't

18   until right before the deal that you all knew that it was

19   going to take place on Hill?

20   A.    I believe that to be accurate.

21              MR. ROTH:  I have nothing further, Your Honor.

22              THE COURT:  Anything further?

23              MR. COMBER:  Thank you, Your Honor.

24

25

1      REDIRECT EXAMINATION OF DAWN BROWN

2  BY MR. COMBER:

3  **Q.    Detective, you were just asked about the time you**

4  **spent waiting at the Richland County Sheriff's Office in**

5  **between stages two and three of the deal.**

6          **Did you ever hear any discussions between**

7  **Mr. Lucas and Mr. Metcalf about the potential for putting**

8  **together a federal conspiracy case?**

9              MR. ROTH:  Objection.  Hearsay.

10             MR. COMBER:  Your Honor, I asked if she had

11 firsthand knowledge of those conversations.

12             THE COURT:  Okay.  Did she hear a conversation

13 regarding that?

14             You're not to the details yet.

15             MR. COMBER:  Correct, Your Honor.

16             THE COURT:  All right.

17 **A.    Yes, I did.**

18             MR. COMBER:  Your Honor, the next question is

19 going to get into the details, if I could make a proffer at

20 side-bar if the Court wishes.

21             THE COURT:  Okay.

22             MR. ROTH:  Your Honor, I have no objection.

23             THE COURT:  Okay.

24             MR. ROTH:  I withdraw my objection.

25             THE COURT:  Okay.

1   BY MR. COMBER:

2   Q.    Please explain what you heard.

3   A.    The only thing I can tell you is that I heard them

4   discussing putting a conspiracy together with numerous

5   individuals to be prosecuted federally.

6             I was not privy to the actual investigation;

7   only bits and pieces of it when we were asked to assist

8   them.

9             My concern at the time was that Jerrell Bray

10  was also at the Sheriff's Department and seemed to be able

11  to access the entire area where the officers were, and my

12  concern was that by giving him that information, obviously

13  he would know who law enforcement wanted to target.

14  Q.    Why did that concern you?

15  A.    For safety reasons.  For -- because with my training

16  and experience, we're taught never to discuss operational

17  plans in front of an informant.

18  Q.    What is the basis for that teaching, do you know?

19  A.    Entrapment and safety are big issues.

20  Q.    Mr. Roth likewise referenced what is in front of you

21  under Tab 1-A at Number -- excuse me -- Page Number 30.

22            If you could again look to Paragraph 10, the

23  paragraph Mr. Roth directed your attention to.

24            In the second sentence, who does Mr. Lucas in

25  his report indicate that he drives by the Pleasant Street

1    meeting with?

2    A.    Myself.

3    Q.    Further down on that page you'll see Paragraph 13.

4          Please read that to yourself.

5          (Pause).

6          Did you personally observe either of those

7    referenced Cadillacs parked around 460 Hill that night?

8    A.    I did not.

9    Q.    Are you aware of anyone else observing either of those

10   Cadillacs parked around 460 Hill that night?

11   A.    No.

12   Q.    On the page before, at Paragraphs 5 and 6, is there

13   any reference whatsoever to you being present at Platinum

14   Status that day?

15   A.    No.

16   Q.    Did the fact that you almost got burnt in your

17   surveillance at Pleasant in any way impact where you set up

18   for the Hill buy?

19   A.    We're always extremely cautious, and again especially

20   when there's an undercover police officer.  We knew he was

21   not familiar with the location.

22          But because of the location of Hill Street or

23   Hill Avenue, it was just impossible to set up surveillance

24   any closer.

25   Q.    Do you specifically remember being at the Platinum

Page 1650

1 would say if they had testified?

2 A.    Well, they never said anything.

3           All they said was they wanted to assert their

4 rights to the Fifth Amendment.  It was nothing further

5 discussed outside of that.

6 Q.    Okay.

7           MR. ROTH:  I have nothing further, Judge.

8           THE COURT:  All right.  Anything further?

9           MR. TEITELBAUM:  No, sir.

10          THE COURT:  You may step down, sir.

11          (Witness excused).

12          THE COURT:  Call your next witness.

13          MR. COMBER:  Thank you, Your Honor.  The

14 government would call Mr. Charles Metcalf.

15          THE COURT:  Come all the way down to the

16 front.  Go ahead, step up.  Before you take your seat, my

17 deputy will swear you in.

18          THE WITNESS:  Okay.  Thank you, sir.

19               CHARLES METCALF,

20     of lawful age, a witness called by the Government,

21          being first duly sworn, was examined

22               and testified as follows:

23     DIRECT EXAMINATION OF CHARLES METCALF

24 BY MR. COMBER:

25 Q.    Good morning, sir.

Page 1684

1   A.    No.

2   Q.    Sir, in front of you is several binders.  One of them

3   is a smaller binder marked "Volume 1."

4              Would you please take that binder and turn to

5   Tab 1-A?  Down in the bottom right, you'll see a Bates

6   label.  Please turn to Page 00040.

7              Please read Paragraphs 4, 5 and 6 to yourself.

8   A.    I may be wrong on this one.

9              MR. COMBER:  May I approach, Your Honor?

10              THE COURT:  You may.

11              THE WITNESS:  Page 40?

12              MR. COMBER:  Okay.  Right here.

13  BY MR. COMBER:

14  Q.    For the record, Detective Metcalf, correctly

15  clarified, the 6 starts on Page 40.  The paragraphs I

16  referenced were on Page 41.

17  A.    Okay.

18  Q.    Please read Paragraphs 4, 5 and 6 slowly to yourself.

19              (Pause).

20  A.    Okay.

21  Q.    Sir, do you recognize this document?

22  A.    I don't recognize it.  This is the first time I've

23  seen it.

24  Q.    Okay.  Did you make any of the observations that are

25  attributed to you in Paragraphs 4, 5 and 6?

1  A.    No, I didn't see Roosevelt Williams.

2  Q.    Did you tell Mr. Lucas that you saw Roosevelt

3  Williams?

4  A.    No.

5  Q.    Do you know a Detective Perry Wheeler?

6  A.    Yes.

7  Q.    Who is Detective Perry Wheeler?

8  A.    He works for the METRICH drug task force.

9  Q.    To your knowledge, was Detective Wheeler involved in

10 the buy that was supposed to be off of Roosevelt Williams?

11 A.    Correct.

12 Q.    Do you know what Detective Wheeler's role for that buy

13 was?

14 A.    Again security, surveillance.

15 Q.    At some point after the buy took place, did you

16 observe a conversation between Detective Wheeler and Agent

17 Lucas?

18 A.    Yes.

19             MR. ROTH:  Judge, I object.  Side-bar, if we

20 could, please.

21             (Proceedings at side-bar:)

22             MR. ROTH:  Your Honor, it's my understanding

23 that he did not observe this but heard about it later, so I

24 would object on the grounds of hearsay.

25             MR. COMBER:  Your Honor, and it will be

1    clarified through his testimony, I will in no way get into

2    any hearsay about the discussion between Mr. Wheeler and

3    Mr. Lucas.

4              Next question is going to be "After you saw

5    that conversation, what next occurred" and it's a statement

6    from Mr. Lucas to Mr. Metcalf.

7              THE COURT:  Okay.

8              MR. COMBER:  That's why I was being careful to

9    phrase the question as I did.

10             MR. ROTH:  Withdraw the objection.

11             THE COURT:  All right.

12             (End of side-bar conference).

13   BY MR. COMBER:

14   Q.    Sir, after you observed this conversation between

15   Detective Wheeler and Agent Lucas, what did you personally

16   observe Agent Lucas do?

17   A.    He came up to me.

18   Q.    Okay.  What happened when he came up to you?

19   A.    He told me that Perry Wheeler and himself -- Perry

20   Wheeler had told him that it was not Roosevelt Williams.

21   Q.    Did Detective -- excuse me -- did Agent Lucas say

22   anything else to you at that time?

23   A.    Yeah, he wanted to see a picture.

24   Q.    Picture of who?

25   A.    Roosevelt Williams.

1  Q.    Were you able to provide him with a picture of

2  Roosevelt Williams?

3  A.    Yes.

4  Q.    Tell us how that happened.

5  A.    It must have been in one of our prior files.  It

6  wasn't a regular BMV image because I don't think he was from

7  Ohio.

8           And Lucas looked at it and positively

9  identified him as Roosevelt Williams, the guy that was in

10  the car.

11  Q.    Take us through specifically what happens when you

12  observe Agent Lucas look at this picture.

13  A.    Rephrase that again.

14  Q.    You saw Agent Lucas look at the picture?

15  A.    Yes.

16  Q.    Describe what happens when he looks at the picture.

17  A.    He said "That was the guy."

18  Q.    Did you have any further discussions with Agent Lucas

19  about Detective Wheeler?

20  A.    Not that I recall.  I mean, no.

21  Q.    Was Detective Wheeler referenced as observing the

22  person thought to be Roosevelt Williams in any of those

23  paragraphs in the DEA-6 that you read?

24  A.    No.

25  Q.    Was there any mention of Detective Wheeler in any of

1    those paragraphs that you read?

2    A.    No.

3    Q.    After Agent Lucas looks at the picture of Roosevelt

4    Williams, what happens next?

5    A.    It was over with.

6    Q.    When you say "It was over with," what are you

7    referring to?

8    A.    The deal was over with.

9    Q.    Okay.  At any point that day did you observe Detective

10   Wheeler come back to the Sheriff's Office?

11   A.    I don't remember him coming back.

12              I remember there was either a phone call came

13   in to Captain Faith or myself.  I don't remember, I was

14   probably in my office.

15   Q.    Okay.

16   A.    I don't remember the contents of it.

17   Q.    Sir, just so the record is clear, I'm not asking you

18   about contents of a phone call you didn't hear.

19              Just asking you your recollection.  Do you

20   personally recall Detective Wheeler coming back to the

21   Sheriff's Office?

22   A.    I don't remember him coming back.

23   Q.    Okay.  I want to move on to another deal that was

24   supposedly done with a woman by the name of Geneva France.

25              Do you recall that deal, sir?

1          MR. COMBER:  Could I have a very brief moment,

2    Your Honor?

3          THE COURT:  You may.

4          (Pause).

5          MR. COMBER:  Thank you, Your Honor.

6    BY MR. COMBER:

7    Q.    Sir, at some point after -- sir, again in the book in

8    front of you at Tab 1-A, the lower right corner, the 6

9    begins at number 00059.

10          Directing your attention on Page 60 to what is

11    marked Paragraph 5, I would again ask you to read that

12    quietly to yourself.

13   A.    Page 60?

14   Q.    Please.  Paragraph 5.

15          (Pause).

16   A.    Okay.

17   Q.    At any time did you make the observation attributed to

18    you in Paragraph 5?

19   A.    No.

20   Q.    At any time did you tell Agent Lucas that you made the

21    observation attributed to you in Paragraph 5?

22   A.    No.

23   Q.    At some point after you had finished making all these

24    various buys, were a series of search warrants executed?

25   A.    Yes.

1  Q.  Okay.  At some point did you express to anyone a

2  concern about your ability to write a historical search

3  warrant?

4  A.  Yes.

5  Q.  Tell us what happened.

6  A.  I contacted Lee Lucas, and he was familiar with a

7  historical search warrant.

8           It was -- again I don't know how it got down

9  here.  I'm reasonably certain it was an e-mail.

10 Q.  Let me take you step by step, sir.

11 A.  Okay.

12 Q.  When you say you contacted Agent Lucas, what did you

13 say?

14 A.  I wasn't real familiar how to do a historical search

15 warrant for drugs.

16 Q.  What did he tell you?

17 A.  It was not a problem; they could do it.

18 Q.  Pardon me, sir?

19 A.  It was not a problem; they could do it.

20 Q.  Do you know to whom he was referring to when he said

21 they could do it?

22 A.  I'm assuming the DEA.

23 Q.  What happened next?

24 A.  I believe I received it in an e-mail.

25 Q.  What did you receive in an e-mail?

1    A.    The actual affidavit, the warrant and the affidavit.

2    Q.    In that same small book in front of you, sir, I ask

3    you to turn to Tab 2-A.   For the record, Volume 1.

4    A.    Okay.   Can you tell me what page?

5    Q.    Certainly.   00123.

6    A.    Okay.

7    Q.    Take a moment and review to yourself that which is

8    behind Tab 2-A.

9              (Pause).

10             Do you recognize this document, sir?

11   A.    Yes, I do.

12   Q.    What is it?

13   A.    It is a search warrant with the affidavit attached.

14   Q.    Which search warrant, sir?

15   A.    20 Sunset.

16   Q.    Is this the warrant you were referring to as having

17   difficulty drafting because it was a historical warrant?

18   A.    Correct.

19   Q.    Directing your attention to what is Page A 11 in the

20   warrant.

21   A.    Um-hmm.

22   Q.    And the Bates Number on the bottom right, it's 137.

23   A.    I'm there.

24   Q.    Okay.   Sir, in the middle of the page where it says

25   "Affiant," is that your signature?

1   **A.**   Yes.

2   **Q.**   And whose signature is below you?

3   **A.**   Jerry Alt.

4   **Q.**   Who is Jerry Alt?

5   **A.**   Judge, Mansfield Municipal Court.

6   **Q.**   Okay.  Is that the Judge before whom you swore out

7   this warrant?

8   **A.**   Yes.

9   **Q.**   Okay.  Is he also the Judge before whom you swore out

10  the other warrants?

11  **A.**   I believe so, yes.

12  **Q.**   Do you recall whether those other warrants that you

13  wrote that day were presented at about the same time as this

14  warrant?

15  **A.**   I think every one of them was at the same time.

16  **Q.**   Okay.  Sir, the content of this warrant that describes

17  what you called probable cause, did you actually write the

18  content?

19  **A.**   No.

20  **Q.**   Where did you get the content from?

21  **A.**   I should change that.  My pedigree is in here.

22  Somebody had to put that in here.

23  **Q.**   When you say "pedigree," what do you mean?

24  **A.**   Well, the history of what you are.  You've got to put

25  in the law enforcement so many years, you've investigated

Page 1712

1  narcotics squad -- narcotic cases or theft cases or

2  whatever.

3          It's just basically an outline of you, that

4  you're the affiant.

5  Q.    Similar to what we went through when we asked the

6  initial questions here today?

7  A.    Yes.

8  Q.    Okay.  Separate from your pedigree and other details,

9  did you actually write the information that sets out the

10  specific probable cause in the warrant?

11  A.    No.

12  Q.    Specifically, directing your attention to Bates

13  numbers 131, it's Page A 5 of the warrant so six pages

14  earlier.

15  A.    I'm there.

16  Q.    Beginning at that bottom paragraph, "On 9/20/05,

17  SA Lee Lucas and Detective Metcalf interviewed the CRI."

18          Did you write that actual information?

19  A.    No.

20  Q.    Have you personally used the term "CRI" before?

21  A.    No.

22  Q.    And do you know what it was meant to be an

23  abbreviation for?

24  A.    Confidential something.  I don't know.

25  Q.    In this case referring to whom?

Page 1713

1    A.    I imagine Jerrell Bray.

2    Q.    Okay.  Sir, before getting up and swearing this

3    warrant out to Judge Alt, did you review in detail the

4    content of the information that was provided to you?

5    A.    No, I didn't.  I scanned it.  I don't remember who

6    added the pedigree in because if it was me it would have

7    been all caps because that's just the way I type a warrant,

8    instead of similar to this.

9                Everything I do is in all caps.

10   Q.    Sir, please explain to the jury, though, if you are

11   swearing under oath --

12   A.    Um-hmm.

13   Q.    -- to a State Court Judge --

14   A.    Um-hmm.

15   Q.    -- information that you say gives you justification to

16   search someone's house --

17   A.    Correct.

18   Q.    -- how could you not have read it before you swore

19   under oath?

20   A.    If you look at the date, it says 11/9.  We hit

21   everything on 11/10, number one.

22                Number two, there was probably four or five

23   search warrants.

24                I scanned it.  It looked okay to me.  And

25   again I wasn't real familiar with it.

Page 1714

1   Q.    Okay.

2   A.    And I looked at it and it looked good to me.  And did

3   I read every portion of it?  No.

4   Q.    Specifically, sir, if you could turn to the next page.

5   A.    Which one is that?

6   Q.    A 6.

7   A.    What number?

8   Q.    Bates Number 132.

9   A.    Okay.  Go ahead.

10  Q.    The paragraphs aren't numbered, but the bottom

11  paragraph, the one that begins "At approximately

12  3:26 p.m." --

13  A.    Um-hmm.

14  Q.    Would you read that paragraph in full to yourself?

15  A.    Yes.  Okay.

16  Q.    Sir, did you make the observation attributed to you in

17  that paragraph?  Specifically, did you observe Dwayne Nabors

18  and an unidentified black male arrive driving a black

19  Cadillac?

20  A.    No, I did not.

21  Q.    And this is referring to the Platinum Status buy,

22  correct?

23  A.    Right.

24  Q.    Okay.  Did you tell Agent Lucas that you did?

25  A.    No.

1    Q.    Going on to the next paragraph at the top of Bates

2    133, please read that to yourself.

3                  (Pause).

4    A.    No.

5    Q.    Sir, we have to go step-by-step.

6                  Having read that to yourself, did you make the

7    observation attributed to you in that particular paragraph?

8    A.    Not that I remember, no.

9    Q.    Did you ever tell Agent Lucas that you observed Dwayne

10   Nabors and what's written here is FNU LNU to depart in that

11   Cadillac?

12   A.    No.

13   Q.    For the record, FNU LNU is a common law enforcement

14   abbreviation, right?

15   A.    Not for us.

16   Q.    Not for Richland County?

17   A.    No.

18   Q.    Did you even know what FNU LNU meant at that point in

19   time?

20   A.    Yes.

21   Q.    At that point in time did you know?

22   A.    No.

23   Q.    What do you now know it to be?

24   A.    First Name Unknown Last Name Unknown.

25   Q.    Sir, if that warrant contained observations that you

1    didn't make, nor did you ever tell Agent Lucas you made, why

2    did you swear it out in front of a State Court Judge?

3    A.    Because I just briefed it, thought it was right.  We

4    was in a hurry.  There was, I think, four or five search

5    warrants.

6    Q.    Did you specifically see those statements before you

7    went to in front of the Judge?

8    A.    No.

9    Q.    Had you seen them, would you still have taken that

10   warrant in front of the Judge?

11   A.    I probably would have had to change some things.

12   Q.    Did you, in fact, obtain the warrant for that Sunset

13   house?

14   A.    Yes.

15   Q.    Sir, you indicated that there was a difference in

16   format between this warrant and your other warrants.

17   A.    Um-hmm.

18   Q.    How did the format differ from one warrant to another?

19   A.    This is almost in a book form, paragraph by paragraph.

20            The ones I did are the -- or the ones that we

21   did at that point were what we call points, number one, two,

22   three, four, five, six, seven, eight, nine and they are all

23   in capital letters.

24            And the drug part of the search warrant was

25   boilerplate.  You know, we'd just say we was looking at this

1   Q.    He was the prosecutor on that case?

2   A.    Yes.

3   Q.    We have multiple page numbers for each page.  You see

4   in the top right how it actually has the page of the

5   transcript?

6   A.    Yes.

7   Q.    Okay.  Those are going to be the numbers I refer to,

8   just so we don't get ourselves confused, okay?

9   A.    Okay.

10  Q.    Ask you to turn to transcript Page 925, and read to

11  yourself from Line 25 through to the next page, Line 7.

12             (Pause).

13  A.    Okay.

14  Q.    Sir, specifically Line 25, you were asked whether you

15  conducted any video surveillance at Platinum Status.

16             How did you answer?

17  A.    No.

18  Q.    Earlier you indicated that there was video

19  surveillance, and we viewed a portion of it.

20             Why would you testify here under oath there

21  wasn't video surveillance?

22  A.    Lied.

23  Q.    Why?

24  A.    I can't give you a straight out answer on that.

25             Just did.

Page 1722

1   Q.   Please move ahead to also Page 926, Lines 12 to 23.

2        Please read those to yourself.

3   A.   Yes.

4   Q.   Specifically, Lines 21 to 23, you testified that you

5   went left on Park Avenue and Officer Lucas and you both

6   identified the driver as Dwayne Nabors.

7        Sir, is that true?

8   A.   No.

9   Q.   Why is it you testified under oath to having

10  identified Dwayne Nabors?

11  A.   Probably because I regurgitated what come off the

12  DEA-6 report.

13  Q.   Let's talk about that for a moment.

14       Again what is the DEA-6 report?

15  A.   This is the report of the actual event of the drug

16  buy.  I'm not real familiar with it.  That's what it is.

17  Q.   What's the purpose -- sir, what's the purpose?

18  A.   To say what took place, the drug buy, how it happened.

19  Similar to our general offense report.

20  Q.   Did you have your own general offense report written

21  about the Nabors buy?

22  A.   We had one but there was nothing, no statements, no

23  follow-ups, no nothing in it, but it was just used to keep

24  video or what have you in it.

25       There was no -- we had no follow-ups or