1    confidentials of my personal from there.

2    Q.    Did it have any of the details, sir?

3    A.    No.

4    Q.    Where were the details memorialized?

5    A.    In the DEA-6.

6    Q.    Okay.  Prior to trial, did you review the DEA-6 of the

7    Dwayne Nabors buy?

8    A.    Yes.

9    Q.    When -- do you recall how close to trial were you when

10   you first reviewed the DEA-6 of the Dwayne Nabors buy?

11   A.    I'd imagine probably the day of the trial.

12   Q.    Do you recall who provided it to you?

13   A.    I don't recall.

14   Q.    Do you recall where you were in the courthouse when it

15   was provided to you?

16   A.    It would have been the witness room.

17   Q.    You're in the witness room, you're reading this DEA-6

18   report.

19             At that time do you notice that it ascribes to

20   you observations that you didn't make?

21   A.    It didn't sound completely right.

22   Q.    Yet after you reviewed it, you got on the stand,

23   correct?

24   A.    Correct.

25   Q.    And even though it didn't sound completely right, you

Sue Trischan              440-570-6950

Exhibit 1

1    still testified to what it said?

2    A.    Correct.

3    Q.    Why?

4    A.    Because I really thought this is what everybody else

5    was going to testify to.  This is what was on paper.

6    Q.    If you knew it not to be correct, why would what was

7    on paper and what everyone else was going to testify to

8    matter at all?

9    A.    I -- I didn't catch that again.

10   Q.    If you knew it wasn't correct, if you knew you didn't

11   see that which it said you saw, why would you testify to

12   something just because other people were going to testify to

13   it and because that was what was on paper?

14   A.    Because I wanted to support the case.

15   Q.    Knowing it not to be true?

16   A.    Knowing it not to be true.

17   Q.    I want to go back to the trial transcript binder, sir.

18   A.    Which one?

19   Q.    Where we were in the transcript.

20   A.    Okay.

21   Q.    At Page 926.  Move ahead one to Page 927.

22   A.    Okay.

23   Q.    Ask you to read to yourself Lines 18 to 20.

24   A.    Yes.

25   Q.    Is this referring to stage three of the Nabors buy

1    around Hill Street?

2    A.    Yes.

3    Q.    And you testified at that trial under oath that you

4    actually went to the Hill Street location.

5              Sir, did you go to the Hill Street location?

6    A.    You know, I believe I did, but I believe it was much

7    later after the deal went down because there was

8    three -- supposedly three keys of crack cocaine there, and I

9    believe we was thinking on hitting it with a search warrant.

10             We did not, but during this particular

11   purchase I was running surveillance at the office.

12   Q.    Was it your intention to imply that you were actually

13   on surveillance while the Hill Street deal went down?

14   A.    I don't remember.

15   Q.    If it had been, would that have been true?

16   A.    No, it would not have been.

17   Q.    Okay.  On to the next page, sir, transcript Page 928,

18   Lines 3 to 13.  Please read those to yourself.

19             (Pause).

20   A.    Okay.

21   Q.    Sir, were you ever at the Hill Street portion of the

22   buy in any position --

23   A.    I was not.

24   Q.    -- in any position to see a black Cadillac pull in?

25   A.    No, I was not.

1   Q.    Were you ever at the Hill Street portion of the buy

2   during the buy in any position to see a white Suburban be

3   present?

4   A.    No, I was not.

5   Q.    Sir, moving ahead several pages to 933, ask you to

6   read to yourself Lines 14 to 22.

7               (Pause).

8   A.    Okay.

9   Q.    For background, are you still being asked questions by

10  Mr. Serrano at this point, sir?

11  A.    No.   This is Mr. Shamansky.

12  Q.    Would this be on cross-examination then?

13  A.    Yes.

14  Q.    Do you recall who Mr. Shamansky was representing, if

15  you recall?

16  A.    No, I don't.

17  Q.    Okay.  You indicate here that you and Mr. Mayer had to

18  hook up later to get to Pleasant.

19               Was there ever a time from the time you left

20  Richland County Sheriff's Office to Pleasant where you

21  weren't driving -- if I may rephrase that.

22               Whenever you were driving from one point to

23  another, from Richland County Sheriff's to Platinum to

24  Pleasant, were you always driving with Detective Mayer?

25  A.    Yes.

1   Q.   Was there ever a point where you had to go anywhere

2   other than those three locations to hook up with Detective

3   Mayer?

4   A.   No.

5   Q.   Why then did you testify that you had to in this case?

6   A.   Because it made sense on the video.

7   Q.   Explain what you mean, sir.

8   A.   Well, to somehow say there wasn't a video made and

9   Mayer and I hooked up together and there was a video made,

10  it made sense.

11  Q.   Had you previously indicated that you were with Agent

12  Lucas at Platinum?

13  A.   Yes.

14  Q.   And was there a video where voices are heard when

15  you're with Detective Mayer at Pleasant?

16  A.   Yes.

17  Q.   So what were you trying to do in this portion of the

18  transcript?

19  A.   Lie.

20  Q.   Pardon me?

21  A.   Lie.

22  Q.   Why?

23  A.   Because it had to make sense.

24  Q.   Sir, had you been in Richland County State Court and

25  prior to testimony seen a report from one of your fellow

 1   **deputies that contained observations, recorded observations**

 2   **that you never made, would you still have testified to**

 3   **having made those observations?**

 4              MR. ROTH:  Judge, objection.  Irrelevant.

 5              THE COURT:  Okay.  I'm not sure I understand

 6   the question, really.

 7              MR. COMBER:  Your Honor, the follow-up will be

 8   how this situation differed.

 9              MR. ROTH:  Judge, I object.

10              THE COURT:  Okay.  Let me read the question

11   again.

12              "Sir, had you been in Richland County State

13   Court and prior to testimony seen a report from one of your

14   fellow deputies that contained observations, recorded

15   observations that you never made, would you still have

16   testified to having made those observations?"

17              Are you going to his motivation for doing --

18              MR. COMBER:  Why this situation was different.

19              THE COURT:  Okay.  Overruled.

20   **A.    No, I would not.**

21   **BY MR. COMBER:**

22   **Q.    So why did this situation --**

23   **A.    Because I wasn't running the show.  If I was, and I**

24   **seen something that was odd, I'd bring it out.**

25   **Q.    What difference does you running the show make, sir?**

1   **A.      Because it's my game and I'm in charge of it.   If**
2   **there's something different and it's not right, I want it to**
3   **be right.**
4   **Q.      But if you're not running the show, you're still**
5   **willing to lie to a jury?**
6   **A.      Some of this I read in the DEA-6 and some of this I**
7   **may have remembered or may not have, you know, but that's**
8   **the way it went.**
9   **Q.      Sir, back in May of this year you pled guilty to what**
10  **is called a criminal Information, correct?**
11  **A.      Bill of Information, yes.**
12  **Q.      Okay.  And to your understanding, before we get into**
13  **the specifics of the content, what is a criminal**
14  **Information?**
15  **A.      I pled guilty to a misdemeanor, deprivation of civil**
16  **rights of Dwayne Nabors.**
17  **Q.      Okay.  Specifically what conduct did you plead guilty**
18  **to that involved depriving Dwayne Nabors of his civil**
19  **rights?**
20  **A.      About the video not being made.**
21  **Q.      Was the plea made in federal court?**
22  **A.      Yes.**
23  **Q.      Sir, why -- let me back up.**
24               **As part of that plea agreement, do you know**
25  **what your potential exposure to jail is?**

1                    AFTERNOON SESSION

2                    THE COURT:  You may be seated.

3                    Sir, you're still under oath.

4                    Mr. Roth, you may proceed.

5                    MR. ROTH:  Thank you, Your Honor.

6            CROSS-EXAMINATION OF CHARLES METCALF

7    BY MR. ROTH:

8    Q.    Good afternoon, Detective Metcalf.

9    A.    Good afternoon.

10   Q.    Now, sir, you started working with Mr. Bray as early

11   as late 2004?

12   A.    It would have been probably coming into 2005 because

13   the homicide didn't happen until late 2004.

14   Q.    Okay.  And did you have certain individuals in mind

15   when you started working with Mr. Bray as to who might be

16   involved in the homicide?

17   A.    Correct.

18   Q.    And who was that?

19   A.    Tyron Brown, Jason Westerfield, and Danny Brown.

20   Q.    Okay.  And were you familiar with those individuals by

21   reputation or otherwise prior to Mr. Bray being signed up as

22   an informant?

23   A.    By reputation.

24   Q.    Okay.  And did Mr. Bray tell you anything that

25   confirmed that they may have been involved in the homicide?

1    was something different?

2              "Yes.  There was a lot of evidence that came

3    up afterwards that I didn't have and now I do have."

4    Q.    Could you stop there?

5              You told -- these are questions by a grand

6    juror, correct?  Not Mr. Comber; a grand juror, correct?

7    A.    Yes.

8    Q.    Grand juror wants to know what changed, essentially,

9    correct?

10   A.    Correct.

11   Q.    And you said there's now information that you have

12   today in the grand jury that you didn't have at the Nabors

13   trial, correct?

14   A.    Correct.

15   Q.    Okay.  What is that evidence that you have today that

16   you didn't have then that has changed your testimony so

17   completely?

18   A.    Well, number one, you know, the DEA-6, I hadn't gotten

19   a chance to really read that and what had happened, and it

20   wasn't true.  It just wasn't true.

21   Q.    Sir, I thought you said you had the benefit of having

22   read the DEA-6 by the time you testified?

23   A.    And when I read it, I scanned it, and I testified

24   exactly verbatim what it was.

25              And then I looked back at it, it was not true.

1   Q.   Sir, but what is the new evidence?  Not -- the DEA-6

2   you had, correct?  That you had before, before you

3   testified; you read it, correct?

4   A.   You know, I scanned a lot of paperwork back then.  I

5   mean, there's been a lot of paperwork.

6            But Lee Lucas and I was not in a vehicle

7   together, number one.  And when I say I didn't make the

8   video, I didn't make the video.  The video was made by Matt

9   Mayer.  That should have been corrected.  It wasn't.  And

10   I'm correcting it now.

11   Q.   Sir, what difference does it make whether you made the

12   video or Matt Mayer?  What does that have to do with

13   anything?

14   A.   Because I was asked that by Blas Serrano.

15   Q.   Sir, what I'm trying to find out is what is it, what

16   new evidence -- you had the DEA-6, correct?

17   A.   Correct.

18   Q.   What new evidence do you have today that changed your

19   testimony?

20   A.   I have nothing except what we have here.

21   Q.   Sir, isn't the evidence that you were talking about

22   there the video at Platinum Status?  Isn't that what you

23   were referring to?

24   A.   I think it was my testimony and everything that had

25   went wrong.

1  A.  Is this it right here?

2  Q.  Yes.

3  A.  (Pause).  Go ahead.

4  Q.  So am I correct, sir?

5  A.  Correct.

6  Q.  And it wasn't until the third time that you told them

7  you really didn't see Mr. Nabors, correct?

8  A.  No, I did see Mr. Nabors.

9  Q.  You did?

10  A.  Yes, I did.

11  Q.  And where did you see Mr. Nabors, sir?

12  A.  Up by the store front by the door the day we was out

13  there.

14  Q.  And what was Mr. Nabors doing?

15  A.  Looked to me like he was going into the store.

16  Q.  Well, was Mr. Bray there at the time?

17  A.  I can't recall that.

18  Q.  Was he engaging Mr. Bray in conversation?

19  A.  I can't recall that either.  I don't remember.

20        I don't believe.

21  Q.  Now, sir, you knew what Mr. Albert Lee looked like as

22  of September the 20th, 2005?

23  A.  Somewhat, yes.

24  Q.  Because you had done two prior deals with Mr. Lee, you

25  and Mr. Bray, correct?

1   A.    That was my take on it, that it was backed off.

2   Q.    Okay.  Did you communicate that to Mr. Lucas?

3   A.    I believe I did.

4   Q.    Now, sir, were you aware that at some point

5   Mr. Wheeler generated a handwritten report of what he saw?

6   A.    I was aware after I seen a lawsuit.  I didn't know

7   that there was one prior to that.

8   Q.    Okay.  So if Mr. Wheeler generated a lawsuit -- a

9   report, would it be fair to say that he did not provide a

10  copy to Richland County?

11  A.    I never seen it.

12  Q.    Okay.  So you didn't see it until you said there was a

13  lawsuit, correct?

14  A.    Correct.

15  Q.    All right.  Are you one of the individuals that's been

16  sued?

17  A.    Yes.

18  Q.    Okay.  And how many suits are you facing?

19  A.    I don't know.  Seven.

20  Q.    Okay.  And would it be fair to say that it was only as

21  a result of that lawsuit that you ever saw Wheeler's report?

22  A.    I can't make that -- I don't know.

23  Q.    Well, I thought that you linked seeing that report to

24  the lawsuit in some way?

25  A.    Right.  But, I mean, I don't know if I'd ever seen it

1      DIRECT EXAMINATION OF KIMBERLY THOMAS

2  BY MR. TEITELBAUM:

3  Q.    Ms. Thomas, I believe -- sorry.  When you were here on

4  the stand the last time, you summarized and then stopped

5  after the Nabors buy, I believe, is that correct?

6  A.    Yes, sir.  That's correct.

7  Q.    And on the chart which is still up there, I don't know

8  if anybody can read it, but the next two buys I believe are

9  the September 27th and 29th buys from Mr. Burton, is that

10  correct?

11  A.    Yes, sir.  That's correct.

12  Q.    And in essence, did both Mr. Bray and Mr. Burton both

13  testify here that they were buying and selling off of each

14  other or Bray was buying off of Burton during that time

15  period?

16  A.    Yes, sir.

17  Q.    And did you conduct any detailed analysis or question

18  any of the activities as to those two buys?

19  A.    Not at great length, sir.

20            There was -- Bray initially had said that he

21  thought one or both of them might have been bad and that he

22  might have brought his own drugs to them, but he couldn't

23  remember which.

24            And when we talked to Mr. Burton, he basically

25  said "I was dealing with him so much I can't say I wasn't at

1    those two."

2              So in light of the fact that they both

3    acknowledged an extensive dealing with each other, we didn't

4    spend a lot of time on those two.

5    Q.    The next buy on the chart is the October 5th buy from

6    Mr. Roosevelt Williams, is that correct?

7    A.    Correct, sir.

8    Q.    And I believe in the book at Volume 1, Tab A on

9    Page 00040 is the DEA-6 of that buy, is that correct, made

10   on 10/5/05?

11   A.    Yes, sir, Bates stamped number 00040.

12   Q.    Now, if we go through this 6 a little bit.  It's

13   signed at the bottom by whom?

14   A.    By Lee Lucas, sir.

15   Q.    And approved by?

16   A.    By his supervisor John Ferster.

17   Q.    And on what date did each of them sign it?

18   A.    Both of them were signed on October 5th, 2005.

19   Q.    And at the top corner on Line 8, I believe it is, says

20   the preparation date?

21   A.    Yes, sir.  It says October 5th, 2005.

22   Q.    And that was also, according to the body of the

23   report, the date the buy actually occurred, is that correct?

24   A.    Yes, sir.  That's correct.

25   Q.    All right.  Going through the -- well, starting at

1    Line 9, could you tell us who was present for that deal?

2    A.    Okay.   Line 9 says "Other officers," it says "Captain

3    Larry Faith, Detective Chuck Metcalf, TFO Tom Verhiley,

4    SA Bob Cross and Detective Perry Wheeler."

5    Q.    And "Purchase of Exhibit 10," that's the number that

6    the drug evidence is given, just to refresh us, is that

7    correct?

8    A.    Yes, sir.   That's right.

9    Q.    And N 11 refers to what?

10   A.    That refers to an item of nondrug evidence which in

11   this case was the audio recordings of the phone

12   communication and the body wire during the buy.

13   Q.    All right.   And skipping over that little synopsis

14   there, could you just sort of synopsize what's in the

15   Paragraphs 1 through 7 for us, please?

16   A.    Yes, sir.   The first paragraph says essentially that

17   on October 5th of '05 Metcalf, Lucas, Cross and Verhiley met

18   with -- again it says CS number 05120217 which is the

19   confidential informant number for Bray -- they met with him

20   to coordinate a controlled purchase of two ounces of crack

21   from Roosevelt Williams, and they say that Bray provided a

22   Nextel direct-connect number of 136*101*20755 for Williams.

23                  Paragraph 2 says that at approximately

24   4:24 p.m., the four officers named above monitored and

25   recorded a push-to-talk conversation between Bray and

 1   Williams during which Bray ordered two ounces of crack and
 2   the deal was set to go at the Dairy Queen parking lot in
 3   Mansfield.

 4              Paragraph 3 says that at that time Lucas,
 5   Verhiley and Cross searched Bray and his vehicle with
 6   negative results for any drugs or money, and that Bray
 7   stated that earlier the same day, he'd seen Williams,
 8   advised Williams that he was interested in purchasing two
 9   ounces of crack, and that it was agreed that Lucas, acting
10   in an undercover capacity, would ride along with Bray to
11   make the purchase; that Bray was equipped with a recording
12   device; that Lucas had possession of the $2,000 official
13   government funds which the numbers had been previously
14   recorded.

15              Paragraph 4 says that at approximately
16   4:40 p.m., Metcalf and Verhiley followed Bray and Lucas into
17   the Dairy Queen lot at 273 Glessner Avenue and that upon
18   entering the lot Lucas observed Mr. Williams, who was
19   wearing a green camouflage shirt and dark shorts, standing
20   next to a gray Buick Riviera with fancy chrome rims and
21   having the Ohio temporary license plate number K as in kilo,
22   250307.

23              And it says Williams was also observed by
24   Detective Metcalf and TFO Verhiley.  That Bray parked his
25   vehicle.  Williams walked over to the vehicle, got into the

1  back passenger seat behind Lucas, and that Metcalf and
2  Verhiley observed that occur, of Williams getting into the
3  vehicle.
4           Paragraph 5 says Williams got into the
5  vehicle, handed Lucas a clear plastic bag containing the
6  crack cocaine.  That Bray advised Williams that Lucas wanted
7  to weigh it.  That at that time Lucas weighed it and then
8  handed Williams the buy money.
9           Williams asked Bray if he counted it.  Bray
10 said no.  And Lucas said that there was $2,000.  And that at
11 that time Williams got out of the vehicle and returned to
12 his Buick Riviera, and that Metcalf and Verhiley observed
13 that as well and that Lucas.  And Bray then departed the
14 area.
15          Then it says in Paragraph 6 that at
16 approximately 4:42 p.m., Verhiley, Metcalf and Cross
17 observed Williams depart in -- it says the Cutlass, and that
18 surveillance was then terminated.
19 Q.    And 7 just says what the evidence is designated,
20 correct?
21 A.    Correct, sir.
22 Q.    Now, at Paragraph 6 -- let me go back for a minute.
23 In Paragraphs 4 and 5 it refers to a Buick Riviera?
24 A.    That's correct, sir.
25 Q.    And in Paragraph 6 it says "Williams departed."

1              Is there any prior reference to a Cutlass
2    anywhere in this report?
3    A.    No, sir, there's not.
4    Q.    The plate is given as, I believe, K 250307?
5    A.    Correct, sir.
6    Q.    And are you familiar with that plate?
7    A.    I am, sir.
8    Q.    And that plate is registered to who on what?
9    A.    That's registered to Jerrell Bray on the Buick Riviera
10   that was at the Dwayne Nabors buy on September 20th of 2005.
11              MR. TEITELBAUM:  Mr. Comber, if you could put
12   up a picture from the Nabors still, please, video still.
13   BY MR. TEITELBAUM:
14   Q.    Do you recognize that shot, Ms. Thomas?
15   A.    Yes, sir, I do.
16   Q.    And where is that still taken from?
17   A.    That's a still shot that we took from the video that
18   was taken in front of Dwayne Nabors' shop by the Richland
19   County Sheriff's Office on September 20th of 2005.
20   Q.    And on that day Agent Lucas and the others surveilled
21   that car sitting at the parking lot of Platinum Status for
22   approximately a half hour?
23   A.    Correct, sir.
24   Q.    And the plate number on that car, is that the same
25   plate --

1   A.   Yes, sir, it is.

2   Q.   -- listed for Mr. Williams in the Riviera?

3   A.   Yes, sir, it is.

4   Q.   To your knowledge according to the files, the DEA case

5   file, did the Drug Enforcement Administration in 2005 ever

6   have that plate, K 250307, run through NCIC or any of the

7   State databases?

8   A.   Yes, sir, they did.

9   Q.   And who did that and when?

10  A.   TFO Ansari ran that plate on October 12th of 2005.

11  Q.   Out of the DEA Cleveland office?

12  A.   Yes, sir.

13  Q.   And who did it come back to at that time?

14  A.   It came back to Jerrell Bray, sir.

15  Q.   Now, if you would just turn the page, please, over to

16  00043, could you tell us what this is?

17  A.   Yes, sir.  This is another DEA-6 of the purchase of

18  Exhibit 10 from Roosevelt Williams.  It's essentially

19  another report of the same drug transaction that occurred on

20  October 5th allegedly with Roosevelt Williams.

21  Q.   All right.  And the top line says who was present.

22  Are the people the same?

23  A.   Yes, sir, they're all the same.

24  Q.   Date of preparation?

25  A.   Is the same date as the first one, 10/05/05.

1  Q.   Looking down at the signature lines, who signs this
2  DEA-6?
3  A.   Lee Lucas signs it and also his supervisor John
4  Ferster.
5  Q.   On what date?
6  A.   On 10/6 of '05, both of them on October 6th.
7  Q.   The day after the previous one?
8  A.   Yes, sir.
9  Q.   Have you compared line-by-line this copy of the signed
10 DEA-6 with the previous one?
11 A.   Yes, sir, I have.
12 Q.   And are there any differences or discrepancies between
13 the two reports?
14 A.   Yes, sir.  Essentially the main discrepancy is that in
15 Paragraphs 4 and Paragraphs 5 Mr. Lucas has replaced the
16 word "Riviera" with the word "Cutlass."
17 Q.   And the Cutlass stays the same in Paragraph 6 as it
18 was in the prior one, is that correct?
19 A.   Correct, sir.
20 Q.   But Paragraphs 4 and 5 where it previously said "Buick
21 Riviera" now says a "Cutlass"?
22 A.   Yes, sir.
23 Q.   Same license plate?
24 A.   Yes, sir.
25 Q.   And that license plate came back to a Riviera, is that

1    correct?

2    A.     Correct, sir.

3    Q.     Now, referring you to Paragraphs 4 and 5, who is it --

4    who is listed at Paragraph 4 as being the officers making

5    the observation of Williams coming into the car in

6    Paragraph 4?

7    A.     In Paragraph 4 it says that Lucas sees him getting

8    into the car and that also Metcalf and Verhiley both see him

9    get into the car.

10   Q.     And Paragraph 5, who is listed as having seen Williams

11   get out of the car?

12   A.     Obviously Mr. Lucas and also Metcalf and Verhiley.

13   Q.     And is there reference in Paragraph 6, I believe it

14   is, to seeing persons leaving?

15   A.     Yes.

16   Q.     Mr. Williams leave?

17   A.     Yes, sir.  It says Verhiley, Metcalf and Cross all

18   watch Williams depart in the Cutlass.

19   Q.     Is there anywhere in either of the two 6s that makes a

20   reference to Detective Perry Wheeler making any observations

21   regarding the individual getting into or out of the car?

22   A.     No, sir, there's not.

23   Q.     You've looked at the entire DEA case file?

24   A.     Yes, sir.

25   Q.     And the entire Richland County Sheriff's file?

1   A.    Yes, sir.

2   Q.    Are there any supplemental reports?  Other than the

3   fact there's a second edition of this 6, are there any

4   supplemental reports of any type noticing Detective

5   Wheeler's observation?

6   A.    Not that I found, sir.

7   Q.    Now, the Exhibit N 1 -- well, let me go back for a

8   second.

9              There is a direct-connect cell phone number at

10  the top of the 6?

11  A.    Yes, sir.

12  Q.    And do you know whether or not that cell number, that

13  direct-connect number, was subpoenaed back in '05 by anyone?

14  A.    Yes, sir, it was.  It was subpoenaed by DEA.

15  Q.    And do you recall when?

16  A.    I don't recall the date specifically.  I'd have to

17  look it up.  But I want to say mid-October, thereabouts, is

18  the best of my recollection.

19  Q.    And the subpoena itself, a copy of the subpoena sent

20  to the phone company, was that in the file?

21  A.    Yes, sir.

22  Q.    And was there anything in the -- was there anything in

23  the file indicating, noting whether or not the subpoena was

24  actually sent out and served on the phone company?

25  A.    There's a sheet on the back behind the subpoena that

Page 1855

1    A.    Yes, sir, I am.

2    Q.    And what street is that on?

3    A.    On Sturgess, sir.

4    Q.    Is that the same street that Jerrell Bray was living

5    at the time?

6    A.    Yes, sir.  His house was two doors down from the

7    store.

8    Q.    And the store, is that located on a corner?

9    A.    Well, there's one building between it and the corner,

10   but it's essentially one building down from the intersection

11   of Sturgess and Glessner.

12   Q.    And then, what, there's a house between Joe and Mary's

13   and Bray's house or the house he was staying with Moxley?

14   A.    Correct, sir.

15   Q.    And that voice, are you familiar with that voice?

16   A.    Yes, sir.

17   Q.    And in your opinion, that is who?

18   A.    Robert Harris, sir.

19   Q.    Just to go back for a second, the 6 of this buy, the

20   report, listed a telephone number being called for Robertson

21   as 419-610-5735, is that correct?

22   A.    Correct, sir.

23   Q.    And did you look at Bray's phone records to match up

24   to that number?

25   A.    Yes, sir, I did.

Page 1856

1    Q.    And were there calls to that number?

2    A.    Yes, sir, there were two calls to that number at 6:23

3    and 6:24.

4    Q.    And according to the 6, was there a call purportedly

5    to that number at around 6:30 that was the first recorded

6    call?

7    A.    Yes, sir.

8    Q.    And did you look at the records for that?

9    A.    Yes, sir, I did.

10   Q.    And what did those reveal to you?

11   A.    The records show, and it's actually on Bray's phone

12   records which is at Exhibit Page 17-H, shows that there's a

13   call at 6:27 p.m. but it is not to that phone number.  It's

14   to a different phone number, which actually is 419-522-8191.

15            We weren't able to determine whose phone that

16   was.

17   Q.    And --

18   A.    But there is -- we also got Robert Harris' phone

19   records for that day, and his phone records show an incoming

20   call at 6:30 p.m., so I can't tell if that's actually the

21   call to Harris or not because of the -- they don't show the

22   incoming phone number.

23   Q.    So you don't know, Harris got a call at that time, but

24   you can't determine --

25   A.    Right.  At 6:30, which the DEA-6 says.  However,

1   Bray's records have no call at 6:30.

2   Q.    And how about later at 6:36?

3   A.    Okay.  The DEA-6 says that at approximately 6:36 Bray

4   received an incoming call from that same cell phone number

5   they list for Harris which is 419-610-5735.

6            Now, Bray's phone records actually show an

7   incoming call at 6:34 p.m., which is roughly 6:36, but

8   Robert Harris' records show an outgoing call at 6:36 p.m.,

9   but it's to the phone number associated with Bray's Boost

10  phone.

11  Q.    Okay.  So there's a call from Harris at 6:36 to Bray's

12  Boost phone?

13  A.    Right.

14  Q.    Rather than cell phone that had been being used

15  earlier?

16  A.    Correct, sir.

17  Q.    Now, according to the 6, I guess it's about 6:50 that

18  evening, the agents and Bray and Ansari all go to Joe and

19  Mary's for the meet?

20  A.    Correct, sir.

21  Q.    And does it turn out that there is a video from Joe

22  and Mary's?

23  A.    Yes, sir.

24  Q.    And do you know how the video was made or where, from

25  where it was obtained?

1           The exhibit number for the calls is N --

2    A.    N 19.

3    Q.    N 19?

4    A.    N 19, sir.

5    Q.    Okay.  Yes, if we could turn to N 19, and Track 1 will

6    be which, which telephone call?

7    A.    This is the call that in the DEA-6, Paragraph 2, says

8    that at approximately 2:05 p.m. a call is made to that

9    number, and Bray is speaking with Little S.

10   Q.    And it's purportedly the number for Ron Davis?

11   A.    Correct, sir.

12   Q.    Okay.

13         MR. TEITELBAUM:  And, Mr. Comber, if you

14   could, please.

15              (Tape playing).

16   BY MR. TEITELBAUM:

17   Q.    At the end of the conversation, to whom is Mr. Bray

18   speaking?

19   A.    Metcalf and Lucas are there with him.

20   Q.    And what gender, to what gender does he reference the

21   individual that he just had this conversation with?

22   A.    Bray says "He said he's sending his girl, though."

23   Q.    And again this call was purportedly to --

24   A.    According to the 6, to Little S at Ron Davis' cell

25   phone number.

1    deal that occurs in the car while Bray and Lucas are meeting
2    with the girl they called Little S.
3    Q.    So they're both from Jerrell Bray's body recorder?
4    A.    Yes, sir.
5    Q.    Why, if it's the same recorder on Jerrell Bray during
6    the same deal, is it split into two tracks?
7    A.    Because it shut off -- once they leave 187 Adams
8    you'll actually see in the transcript and hear on the tape
9    that Lucas tells him to shut that off, so he turns it off
10   while they're driving over to go meet the girl.
11   Q.    And just to give us a little sense of the geography of
12   this whole thing, Jerrell Bray at this point in time is
13   living -- well, let me go back.
14            Where is Moxley's house?
15   A.    Moxley's house is on Sturgess within a block and a
16   half or so of 121 Glessner where Ronald Davis, who's
17   actually Herman Price, was actually living.
18   Q.    And where is Adams in relation to that?
19   A.    Adams Street is -- I've got to think of my map.
20            Adams Street is east of 121 Glessner, and a
21   little bit north, I believe, within about a mile and a half.
22            I haven't actually gone out and gotten in my
23   car and taped it, but it's within about a mile and a half or
24   thereabouts.
25   Q.    So Adams is a little distance, a mile or so, from

1    Glessner, and Glessner is within like a couple of blocks of

2    Sturgess where Moxley lives?

3    A.    Correct, sir.

4    Q.    And at that point in time was Bray still living at

5    Moxley's house on Sturgess?

6    A.    No, sir.  At this point in time he and Alexis, his

7    girlfriend, were just -- had just moved within a few days to

8    460 Hill but were still hanging out at Moxley's a good

9    portion.

10   Q.    460 Hill is the house where the Nabors deal went down

11   that Mr. Burton was on, correct?

12   A.    Correct, sir.

13              MR. TEITELBAUM:  Mr. Comber, could we hear

14   Track 4?

15   BY MR. TEITELBAUM:

16   Q.    And Track 4 will be the meeting in the house at Adams

17   Street between Bray and the purported Mr. Davis, correct?

18   A.    Correct, sir.

19              (Tape playing).

20   BY MR. TEITELBAUM:

21   Q.    Now, Ms. Thomas, at Page 4, about the fourth line down

22   Mr. Bray -- well, let me go back for a minute.

23              When this recording starts, you've listened to

24   this numerous times?

25   A.    Yes, sir.

Page 1890

1    Q.    Does it begin inside or outside?

2    A.    It begins outside.

3    Q.    And there's reference to some cars?

4    A.    Correct, sir.

5    Q.    And based on your listening to the tape, does it

6    appear to you that it moves indoors at some point?

7    A.    Yes, sir.

8    Q.    And that would correspond with the 6, that the two of

9    them went inside for a couple of minutes?

10   A.    Yes, sir.

11   Q.    There's then a conversation when they park where Bray

12   says "Where you at?  You ain't in the Saturn, is you?"

13   A.    Correct.

14   Q.    Correct?

15             And that's Bray speaking to someone between

16   leaving the house and going into the car with Lucas?

17   A.    Correct, sir.

18   Q.    Okay.  And have you checked Jerrell Bray's cell phone

19   records for that time?

20   A.    Yes, sir, I have.

21   Q.    And we'll come to a chart in a minute matching up the

22   times from the tapes and the 6 and so forth, is that

23   correct?

24   A.    Correct, sir.

25   Q.    But at that time frame, as you'll see from the chart,

1  does Jerrell Bray place a telephone call?

2  A.    Yes, sir, he does from his regular cell phone.

3  Q.    And places it to what number?

4  A.    He places it to the same phone number that he placed

5  to the first call referenced in Paragraph 2.

6          Even though it claims Ronald Davis' cell phone

7  number, the records show in fact he calls a different

8  number, and this call as he's leaving the house is to that

9  same number that he actually called on that first call.

10  Q.    To the voice that -- well, on Track 1, does that voice

11  appear masculine or feminine to you?

12  A.    Feminine.

13  Q.    And that's one at the end where Bray refers to it as

14  "He is sending his girl"?

15  A.    Correct, sir.  Although the 6 identifies it as Little

16  S on the phone.

17  Q.    According to the DEA-6, in Track 4 Bray is told during

18  that conversation to go meet the girl on Glessner?

19  A.    Yes, sir.

20  Q.    And is there any reference on Track 4 to the purported

21  Ron Davis telling Bray anything about meeting a girl on

22  Glessner?

23  A.    No, sir.

24          The purported Ron Davis never tells Bray to go

25  meet her.  Bray twice says "I'm going to go meet the girl"

1  or "I'm going to go get with the girl," but Davis doesn't

2  respond to it in any way.

3  Q.    Now, Track 5, as you indicated, Bray walks out, we

4  just heard on the tape "Turn the recorder off."

5  A.    Correct, sir.

6  Q.    And is the recorder subsequently turned back on?

7  A.    Yes, sir, it is.

8  Q.    Okay.  And it is turned on at what point?

9  A.    Just before they pick the girl up.  And you don't hear

10  it on Track 5 because obviously it's not on yet, but you

11  hear on Track 8, which is recording the cobble, you actually

12  hear Lucas just before they meet her say "Turn that on" and

13  then Bray turns that on.

14  Q.    Okay.  Let me go to Track 8 for a second.

15            What is Track 8?

16  A.    Track 8 is the cobble phone recording from when

17  they're out there, and it -- it has all of Track 4 on it,

18  the body wire from when they're in the house, and all of

19  Track 5 on it, the body wire from when they're in the car,

20  as well as comments and things said by Captain Faith and

21  Chuck Metcalf in the car where they're monitoring the cobble

22  phone.

23  Q.    Okay.  And that's sort of on Track 4 where we

24  heard -- or before we heard some of those broadcasts?

25  A.    Correct.  But Track 8 has all of 4 and all of 5,

1    plus --

2    Q.    And it is a continuously running tape so that you can

3    time out events by the length of Track 8, correct?

4    A.    Correct, sir.  With the exception that once the buy is

5    over, the cobble is shut off, so it picks up slightly more

6    than what the cobble has on it.

7    Q.    And when we get to the chart, you can explain that

8    while everybody is looking at it.

9    A.    Yes, sir.

10          MR. TEITELBAUM:  So, Mr. Comber, can we hear

11   Track 5, please?  We are now ready to pick that back up.

12          (Tape playing).

13   BY MR. TEITELBAUM:

14   Q.    All right.  On Page 2 on the transcript of that call,

15   the talk about give two hundred back, they say "It's light,

16   a whole quarter," and then Bray says "Hey, baby, we light."

17   A.    Yes, sir.

18   Q.    And that's preceded, you hear some beeps?

19   A.    Yes, sir.

20   Q.    As though from a telephone?

21   A.    Yes, sir.

22   Q.    All the earlier calls that day were placed on

23   Jerrell's, Mr. Bray's cell phone?

24   A.    Yes, sir.

25   Q.    Is there any telephone call on the records at that

1   time?

2   A.    No, sir, there's not.

3   Q.    And on Page 5 where "Hey" -- "Mr. Bray:  Hey, that's

4   good looking out, right?  But I'm going to have to -- I have

5   to take my dude to Bucyrus," is there any outgoing or

6   incoming call at that time from Mr. Bray's phone?

7   A.    No, sir, there's not.

8   Q.    Later on Track 5 there is a call where he's talking to

9   somebody "Hey, baby, don't go back to the house, don't go

10  back to the car"?

11  A.    Yes, sir.

12  Q.    Are you familiar with that?  And I think that's

13  Page -- find that real quick -- yeah, it's on Page 4?

14  A.    Yes, sir.

15  Q.    All right.  Is there a telephone call that will

16  correspond to that time on Mr. Bray's cell phone?

17  A.    Yes, sir, there is.

18  Q.    And what number is called during that time frame?

19  A.    The same number that -- to Shea Shea Moxley that's

20  called in the very first call of the deal and that's called

21  as he's leaving the house to say "I'm coming to get you

22  now."

23  Q.    And sort of what you've been discussing about the

24  phone records and the times is sort of put down on three

25  charts, is that correct?

1   A.     Correct, sir.

2   Q.     And is there any call on any of the tapes or in the 6

3   relating to that?

4   A.     No, sir, they've all been -- the recordings have all

5   been shut down by then.

6   Q.     Okay.  And I take it that would also be the same then

7   for 2:49?

8   A.     Yes, sir.  2:49 is not on the recordings of the body

9   wire or buy, but later that day they do record another call,

10  Track 10, to Ron Davis.  And I believe that that's that

11  call.

12  Q.     Okay.

13  A.     And let me see if it gives a time.

14          No, it doesn't give a time, that there's a

15  call later in the day, but there's a recording for it so --

16  Q.     What does Track 10, the call to Ron Davis, what's the

17  message of the -- the content of Track 10?

18  A.     Well, and we actually have a transcript in the binder

19  from that.

20          But basically he talks to find out if what

21  he'd ordered in the house earlier that day is ready, and the

22  man purported to be Ron Davis says "I'm going to have to

23  cook it.  I'm going to have to cook it."

24          And then Bray says "Okay, I'm cool, but

25  whatever we do, it's between you and me; not you, me and

1    Unc."

2              And then he says -- he gets off the phone and

3    tells at least Metcalf is there, "He's going to cook the

4    other two for the two."

5    Q.    All right.  Is there any report, document of any type

6    to reflect whether or not there was any type of follow-up,

7    another buy, another contact with Ron Davis to get the

8    amount of crack that is purportedly being cooked up for

9    Bray?

10   A.    No, sir, there's not.

11   Q.    Chart 47 is the second chart you prepared?

12   A.    Yes, sir.

13   Q.    It's the -- to show that, that's 47.  We'll see if we

14   can zoom in here for a minute.  A little -- oh, I guess we

15   can't.

16              All right.  And it says across "Davis/France

17   buy time line:  Call Record and Recording

18   Analysis & Comparison."

19              Could you explain to us what the call -- I'm

20   sorry, starting on the left and going across, where the

21   information comes from?

22   A.    Yes, sir.  I made this in order to try to establish at

23   what times things actually really occurred.

24              So the first column where you see it says

25   "Call to Davis (Moxley), call to Jordan," all of those,

1          It also shows that that cell phone received a

2  call from Jerrell Bray's cell phone at 2:22 p.m., which is

3  the one we've got here.

4          It then shows that there are -- there are

5  three other phone calls prior to the buy ending, but none of

6  them are to or from any of the other numbers associated with

7  Jerrell Bray.

8          And then, let me see, then the next phone call

9  that is received from Jerrell Bray's phone is at 2:49 p.m.,

10  which was the last one we had on our chart which we believe

11  was Track 10.

12  Q.    And is there a reason why you can't say for certain

13  that Track 10 is, in fact, that call at 2:49?

14  A.    Yes, sir, because it's not referenced in the DEA-6.

15  Q.    And is there any header on Track 10, the disk?

16  A.    No, sir, so I can't tell actually when it was made or

17  recorded.

18  Q.    So according to the DEA-6 of the buy and all of the

19  tapes on that day, there should have been four calls to the

20  Davis number, is that correct?  I'm sorry, five calls.

21  A.    Correct.  The first one, the third one, the one during

22  the buy, the one after the buy.  And the 6 doesn't reference

23  that last track.

24  Q.    But when you listen to the tapes, there would be the

25  first call to the girl?

Page 1911

1  Q.    2:03, I'm sorry.

2  A.    Correct.  No, that's not in either of the records.

3  There's a 2:03, but not to that number.

4  Q.    And the 2:05 call?

5  A.    That's in both records.

6  Q.    And, I'm sorry, I neglected on the 2:03, that's the

7  one to the girl?

8  A.    Correct.

9  Q.    That's in neither?

10 A.    That's in Bray's records, but it doesn't go to Ronald

11 Davis' cell.

12 Q.    And at 2:05?

13 A.    That goes to Chris Jordan's cell.

14 Q.    That's on Bray's records?

15 A.    Correct.

16 Q.    And then at 2:08?

17 A.    That one is in both Bray's records and the Ronald

18 Davis alleged cell's records.

19 Q.    So the 6 is accurate in that there was a call to that

20 number at that time?

21 A.    Correct, sir.

22 Q.    And at the 2:22, what you're characterizing as the

23 "I'm here" call --

24 A.    Correct.

25 Q.    -- is that in either of the cell phones' records?

1  as those parts are concerned.

2              "And let me further add that you must read the

3  transcript, follow along when you listen to the tape, follow

4  along with the transcript, do not move ahead of the tape.

5              "Are you ready, Mr. Serrano?

6              "Mr. Serrano:  Yes, Your Honor.

7              "The Court:  All right.  You may open the

8  folder, but again please do not read ahead.

9              "(Government's Exhibit 3 is played for the

10  jury).

11              "Question:  Now, did you recognize the voices

12  in that conversation?

13              "Answer:  I'm not quite understanding what

14  you're saying.

15              "Question:  Do you recognize the voices or any

16  of the voices in the conversation?

17              "Answer:  Yes.  One of them was mine.

18              "Question:  Okay.  Did you know who you were

19  talking to at that time?

20              "Answer:  Not at that point.

21              "Question:  Now, you indicated that at some

22  point you realized it was a girl, a female, not a male.

23  When did you realize that?

24              "Answer:  I realized that probably at the end

25  when we asked where we was going to meet at, and then I

1  turned to the agent and told him that's a female on the

2  phone."

3  Q.    All right.  Thank you.  And we heard that track just a

4  little while ago, is that correct?

5  A.    Yes, sir.

6  Q.    And what does Jerrell Bray say at the end of that?

7  A.    At the end of that he says "He says he's going to send

8  his girl."

9  Q.    And then jumping to cross-examination, would you first

10 look at Page 24, Lines 1 through 17?

11 A.    And did you want me to read it, sir?

12 Q.    Yes, please.

13 A.    Okay.  "Question:  When did you review the CD the

14 government has provided in this case?

15                "Answer:  On the 10th of this month.

16                "Question:  I'm sorry, of -- I didn't hear the

17 answer due to the microphone being too close.

18                "Answer:  The 10th of this month.

19                "Question:  On the 10th of February?

20                "Answer:  Yes.

21                "Question:  And where did you review this CD,

22 sir?

23                "Answer:  At the Prosecutor's Office.

24                "Question:  Located where?

25                "Answer:  In this building we're in now.

1   female, and I'm talking about it's the Government's

2   Exhibit 4.

3           "Answer:  Yes.

4           "Question:  Okay.  And on that last phone we

5   just heard you're asking about is he going to deal with me,

6   and he said he's going to send his girl because he ain't

7   never dealt with me before, right?

8           "Answer:  Right.

9           "Question:  Okay.  And yet the government has

10  on here 'female' at the very beginning.

11          "Mr. Serrano:  Objection, Your Honor.

12          "Question:  Correct?

13          "The Court:  No.  Overruled.

14          "Answer:  Yes.

15          "Question:  Now, we move to another

16  Government's Exhibit when you make the third call, correct,

17  supposedly to the same number as the first call, is that

18  right?

19          "Answer:  Yes.

20          "Question:  Okay.  What is that number again,

21  sir?

22          "Answer:  612-3269.

23          "Question:  And in that third call, the person

24  you talked with the first time wasn't the person you spoke

25  to then, was it, on the third call?  You called the same

1   number, right?

2              "Answer:  Yes.

3              "Question:  But you talked to a different

4   person, right?

5              "Answer:  Yes.

6              "Question:  And could you explain to the

7   ladies and gentlemen of the jury if you called the same

8   number?

9              "Answer:  I'm not understanding what you're

10  saying.

11             "Question:  What I'm saying is you called the

12  same number, correct?

13             "Answer:  Yes.

14             "Question:  The first time you talked to the

15  person who sounded young with the young voice?

16             "Answer:  Yes.

17             "Question:  The government says 'female,' but

18  you're saying 'he,' correct?

19             "Mr. Serrano:  Objection to the form of the

20  question.

21             "Answer:  Yes.

22             "The Court:  Overruled.

23             "Question:  Now, the third time you make a

24  phone call to the second number, am I right?

25             "Answer:  Yes.

1   there, and it was Jerrell Bray who actually took me in to

2   meet the different people that I bought from.

3                "Question:  Okay.  Now, taking you back to

4   October the 24th and 25th, if you will, were you focusing on

5   any specific target or targets on that day?

6                "Answer:  Yes.

7                "Question:  And you were sitting here while

8   the name of Rodney Davis was mentioned?

9                "Answer:  It was Ronald Davis.

10               "Question:  Ronald Davis, I am sorry.  Can you

11   tell us, did there come a time when you actually met Ronald

12   Davis?

13               "Answer:  I didn't meet him.  We met at the

14   office earlier, at the Mansfield -- well, it's the Richland

15   County SO, their Sheriff's Department.  We met the

16   informant, we made some recorded calls, and then the

17   informant and I, I searched the informant and his vehicle.

18               "Mr. Mullin:  Objection, Your Honor.  Not

19   responsive.

20               "Question:  So you never actually met Ronald

21   Davis?

22               "Answer:  No.  I saw him.  I was closer than

23   you and I are, but I never actually met him.

24               "Question:  Okay.  October the 25th of 2005,

25   were you aware that there was a contact, a telephonic

1    contact with Ronald Davis on that day?

2                "Answer:  Yes.

3                "Question:  And at approximately what time was

4    that?

5                "Answer:  About 2:05 in the afternoon.  I was

6    present and overheard it, watched the tape recording,

7    actually was there and dialed the numbers.

8                "Now, when you're using a source to dial the

9    telephone number of a target, what procedure is followed?

10               "Answer:  Usually I'll have them give me the

11   number and dial it, or the person will dial it and I watch

12   it and afterwards I look at his phone to make sure that's

13   the number they dialed.

14               "Question:  Now, in this particular case was a

15   telephone number directed to Ronald Davis dialed?

16               "Answer:  Yes.

17               "Question:  And was the conversation recorded?

18               "Answer:  Yes, it was."

19   Q.    All right.  And still on direct, if you would jump to

20   Page 12, Lines 4 through 13.

21   A.    Line 4.  "Question:  Now, in terms of the buy itself,

22   was there communication with the target, that being Ronald

23   Davis, prior to the actual drug transaction?

24               "Answer:  Well, we made a call.  We made two

25   tape recorded calls to the same phone number, and at first

1   speaking?

2          "Answer:  I was speaking to a friend.

3          "Question:  You were speaking to a friend?

4          "Answer:  Yes.

5          "Question:  And does that friend have a name

6   for the Court?

7          "Answer:  Yes.

8          "Question:  And the friend's name is what?

9          "Answer:  Chris Jordan.

10         "Question:  Chris Jordan.  And how is Chris

11  Jordan related to this drug case here in this court?

12         "Answer:  He's not.

13         "Question:  If he's not related to this drug

14  case, then why would you call him and ask 'Shit, your dude,

15  is he going to deal with me or not'?  How could you say he's

16  not related to this drug case?

17         "Answer:  Because he wasn't involved in the

18  transaction.

19         "Question:  I see.  And interestingly, we

20  don't have a phone number up there for that guy, do we?

21         "Answer:  No.

22         "Question:  So we're trying to keep him out of

23  it, aren't we?

24         "Answer:  If that's what you're trying to say.

25         "Question:  I'm asking you.  He has been kept

1   out of this drug case, hasn't he?

2                   "Mr. Serrano:  Objection, Your Honor.

3                   "The Court:  Sustained.  Rephrase your

4   question.

5                   "Question:  Mr. Bray, is it Chris Jordan your

6   friend that you called here and asked if his dude was going

7   to deal with you?

8                   "Answer:  Yes.

9                   "Question:  Chris Jordan?

10                  "Answer:  Yes.

11                  "Question:  Now, is Chris Jordan, to your

12  knowledge, is he involved in this drug case in any way as

13  far as a defendant, or is he on the police side or anything

14  like that?

15                  "Mr. Serrano:  Objection.

16                  "The Court:  Sustained.

17                  "Question:  To your knowledge, Mr. Bray, has

18  Chris Jordan been charged with any crimes in reference to

19  this transaction?

20                  "Answer:  I can't say yes and I can't say no.

21  I don't know.

22                  "Question:  Okay.  Well, you don't see him in

23  the courtroom as a defendant?

24                  "Mr. Serrano:  Objection.

25                  "Question:  Do you?

```
 1                    "Mr. Serrano:  Objection.

 2                    "Answer:  No.

 3                    "The Court:  Overruled.  The answer 'no' will

 4     stand.

 5                    "Question:  Okay.  So you called this

 6     fellow -- and I am sorry to take so long on these CDs, Your

 7     Honor, but this is important.

 8                    "On Track 2 you call your friend Chris Jordan

 9     and say 'Is your dude going to deal with me?  He says he's

10     going to send his girl.'  You both laugh.  He asks him 'Did

11     he tell you what you wanted?'  Didn't he ask you that?

12                    "Answer:  Yes.

13                    "Question:  He said 'Yeah, I'm going to call

14     him directly and I'm going to see what's happening.'  Isn't

15     that what you said?

16                    "Answer:  Yes.

17                    "Question:  'And then I'll get back with you,'

18     is that what you said?

19                    "Answer:  Yes.

20                    "Mr. Mullin:  I would ask, that's a real short

21     one, could we play that second one again, please?

22                    "The Court:  You don't have to ask me,

23     Mr. Mullin.

24                    "Thank you, Your Honor.  I'm asking

25     Mr. Serrano."
```

```
 1                    "Answer:  Yes.
 2                    "Question:  Okay.  And, in fact, you had
 3    mentioned to Jerrell, Mr. Bray, these two, three hundred,
 4    you heard that, right?
 5                    "Answer:  Yes.
 6                    "Question:  But all we could hear on the tape
 7    was 'Take two back'?
 8                    "Answer:  I was --
 9                    "Question:  Do you remember him saying that?
10                    "Answer:  Yes.  And I also remember -- I was
11    close enough, I mean when Jerrell and I --
12                    "Question:  I'll ask the questions.  Do you
13    remember --
14                    "Mr. Serrano:  May the witness finish the
15    answer, Your Honor?
16                    "The Court:  No, there wasn't a question
17    before him.  Go ahead.
18                    "Question:  Do you remember hearing 'Take two
19    back'?
20                    "Answer:  Yes.
21                    "Question:  Who said that?
22                    "Answer:  I heard Davis say it.  I heard
23    Jerrell say it.  And I heard her say it, your client.  Three
24    people I heard say it that day.
25                    "Question:  Okay.  So when we play the tape,
```

 1  we're going to be able to point out for the jury members

 2  where Davis is being heard on that tape?

 3              "Answer:  No.  I could hear Davis.  I'm next

 4  to Mr. Bray.

 5              "Question:  I'm referring to the CD.

 6              "Mr. Serrano:  May he complete his answer,

 7  Your Honor?

 8              "The Court:  You may.

 9              "Answer:  Yeah, I'm -- no, I couldn't hear,

10  you won't hear that on the tape from his phone.

11              "Question:  Okay.

12              "Answer:  Or his recorder in his pocket.  But

13  being close enough to him I heard that just as I testified,

14  'Take two back.'

15              "Question:  But it wasn't recorded?

16              "Answer:  No.

17              "Question:  So the jury members can't hear

18  that when they take that tape back to deliberate, right?

19              "Answer:  Obviously."

20  Q.    And finally, on redirect, Page 43, Line 19 through

21  45-1.

22              And I believe -- yeah, I'm sorry.  43-19.

23  A.    Okay.  43, Line 19.

24              "Question:  Now, you indicated that you were

25  close enough to Bray, to Jerrell Bray that you could

1    overhear the conversation from the other side of the phone,

2    am I correct?

3              "Answer:  Yes.

4              "Question:  Now, was the voice that was coming

5    through the telephone from the other side, was that

6    recorded?

7              "Answer:  No.

8              "Question:  And why was that not recorded?

9              "Answer:  The one recorder is in his pocket

10   and then the phone was on his belt, you know.  The one

11   transmitter is a phone so it's on his belt.  The other one

12   is in his pocket, so I guess the recorder can't hear it.

13             "Question:  So he would have to have an

14   earpiece like he testified in order to record the

15   conversation?

16             "Answer:  No.  We made the tape recorder

17   calls.  We plugged in an earpiece and you put it in your ear

18   and you put the phone over it, and you have your recorder

19   and it's the controlled calls.

20             "When you're making -- when you're undercover,

21   a call comes in, you can hear the person speak, the guy

22   who's next to you or has the recorder, but you can't hear

23   the other one unless you pull the recorder out and put it

24   right next to the phone or you put the earpiece in and

25   plugged it in, which you obviously can't do if you're

1    Q.    And would you tell us, according to the 6, what

2    occurred on November 7th and 8th?

3    A.    Yes, sir.  Essentially in Paragraph 1 it says that on

4    November 7th, 2005, at approximately 9:03 p.m., Bray made a

5    recorded monitored phone call to Danny Lee Brown at cell

6    phone number 419-989-2200, and left his call-back number on

7    Brown's voicemail.

8            And then it says at approximately 9:12 p.m.

9    Bray telephoned Brown again but didn't get an answer, and

10   that at approximately 9:34 p.m. Bray made a recorded and

11   monitored call to Brown at that same number, and that in

12   summary Brown advised that he was cooking crack and for Bray

13   to call back in 20 minutes.

14           And then it says further attempts to contact

15   Brown on November 7th were negative.

16           In Paragraph 2 it says that the following day,

17   on November 8th, Bray advised that he'd been contacted by

18   Brown and that Brown was using a different cell phone number

19   which was 419-610-5399.

20           It says that at approximately 3:30 p.m. Bray

21   made a recorded call to Brown at that new cell phone number,

22   and that in summary Bray asked for one ounce of crack and

23   Brown told Bray the price would be $950 and to meet someone

24   in the alley off Mulberry Street.

25           Paragraph 3 says that at that time Bray and

1     his vehicle were searched with negative results for drugs or

2     money.  He was provided with $950 buy money to make the buy

3     and equipped with a recording device.

4                   And that --

5     Q.    Do you -- I'm sorry, go ahead.

6     A.    And that he was then followed to Mulberry Street.

7     Q.    Let me stop you there for a minute and just go back to

8     the first couple paragraphs about the telephone numbers.

9                   419-989-2200, were there recorded calls to

10    that telephone number?

11    A.    Yes, sir, there were.

12    Q.    And how many were there to that number?

13    A.    Two, two recordings of calls to that number.

14    Q.    And those are Tracks 1 and 2 of N --

15    A.    Twenty-six.

16    Q.    -- 26?

17    A.    Yes, sir.

18    Q.    And have you listened to those calls?

19    A.    I have, sir.

20    Q.    And do you know whose phone number that is?

21    A.    Yes, sir.

22    Q.    And whose phone number is it?

23    A.    That was Danny Lee Brown's cell phone.

24    Q.    And have you listened to the voices on those first two

25    tracks?

Page 1956

1   A.   Yes, sir, I have.

2   Q.   And whose voice in your opinion is it?

3   A.   Danny Lee Brown's, sir.

4   Q.   The next day Mr. Bray indicates, according to the 6,

5   the telephone number has been changed?

6   A.   Yes, sir.

7   Q.   And what is purportedly Mr. Brown's new phone number?

8   A.   419-610-5399.

9   Q.   And are you familiar with that telephone number?

10   A.   Yes, sir, I am.

11   Q.   And to whom is that subscribed?

12   A.   It's subscribed to by Robert Harris.

13   Q.   And was the -- was that record subpoenaed by the DEA

14   as part of their investigation back in '05?

15   A.   Yes, sir, it was.

16   Q.   And that result came back at that time to being to

17   Robert Harris?

18   A.   Yes, sir, those records are in the DEA file.

19   Q.   And that, in fact, comes out at trial, is that

20   correct?

21   A.   Yes, sir, it does.

22   Q.   Have you listened to that, to the call on the 8th?

23            Well, let me ask you this, is there a recorded

24   call on the 8th?

25   A.   Yes, sir, two of them.

Page 1957

1   Q.    And have you listened to those calls?

2   A.    Yes, sir, I have.

3   Q.    And do you recognize the voices on that?

4   A.    Yes, sir, I do.

5   Q.    And in your opinion whose voice is that?

6   A.    Robert Harris.

7              MR. TEITELBAUM:  They are all short calls.  If

8   we could play N 26, Track 1, 2, 3 and 4.

9   Q.    Tracks 1 and 2 will be the two calls from the 7th to

10  the 2200 number, is that correct?

11  A.    Correct, sir.

12             MR. COMBER:  Play?

13             MR. TEITELBAUM:  Yes, please.

14             MR. COMBER:  Track 1?

15             MR. TEITELBAUM:  Track 1.

16             (Tape playing).

17  BY MR. TEITELBAUM:

18  Q.    And that, is that a voice you recognize as --

19  A.    That's Danny Lee Brown.

20  Q.    And Track 2, please.

21             (Tape playing).

22  BY MR. TEITELBAUM:

23  Q.    So these calls are both on the 7th?

24  A.    Yes, sir.

25  Q.    And have you looked at Mr. Bray's cell phone records

Page 1960

1   Q.   All right.

2   A.   And I don't know what that number is.

3   Q.   Okay.  Now, from 9:34 p.m. on on the 7th, are there a

4   series of calls from Jerrell Bray's phone to Danny Lee

5   Brown's cell phone?

6   A.   Yes, sir.  And that's what the last column with

7   numbers indicates.  Between 9:34 p.m. and 3:26 -- well,

8   actually 2:45 p.m. the next day, Bray makes 28 phone calls

9   to Danny Lee Brown's phone, and Danny Lee won't answer the

10  phone or didn't answer the phone, I should say.

11  Q.   How do you know the phone is not answered?

12  A.   I'm sorry, sir?

13  Q.   How do you know the phone is not answered?

14  A.   Well, first of all, the calls are very short and Danny

15  Lee himself told me that Bray called him.

16  Q.   Okay.  There's no lengthy calls, there's no

17  recordings?

18  A.   No, sir.  And there's no recordings of them.  And in

19  fact, the DEA-6 says that other than those two recordings,

20  further attempts to contact Brown were negative.

21  Q.   So there's a -- looks like a final attempt at that

22  call at 2:45 p.m.?

23  A.   Correct, sir.

24  Q.   And then starting at 3:19 there's calls to the 5399

25  number?

Page 1961

1   **A.**    Correct, sir.

2   **Q.**    And that number again is whom?

3   **A.**    Robert Harris, sir.

4   **Q.**    And according to the DEA-6, two of those calls are

5   recorded at 3:30 and 3:44 p.m.?

6   **A.**    Correct, sir.

7   **Q.**    And they're reported in the 6.  And then there's a

8   number of calls after the deal --

9   **A.**    Correct, sir.

10  **Q.**    -- that are on there, and those are just calls for the

11  rest of the day?

12  **A.**    Correct, sir.

13         MR. TEITELBAUM:  Could we play N 26, 3 and 4,

14  please?

15  BY MR. TEITELBAUM:

16  **Q.**    So we're now going to hear the two recorded calls from

17  November 8th, is that correct?

18  **A.**    Correct, sir.

19            (Tape playing).

20  BY MR. TEITELBAUM:

21  **Q.**    And that voice is again who?

22  **A.**    Robert Harris.

23  **Q.**    And in your opinion, is that voice on Tracks 3 and

24  4 -- did we play -- I'm sorry, we didn't play Track 4, I'm

25  sorry.

1  A.    Actually it's five is the next one.

2  Q.    That's right.  Four is the body, is that correct?

3  A.    Correct, sir.

4              MR. TEITELBAUM:  Okay.  Five.

5              (Tape playing).

6  BY MR. TEITELBAUM:

7  Q.    And when was Track 5, when was that placed?

8  A.    After the buy, sir.

9  Q.    And in your opinion, is the voice on Tracks 3 and 5

10 distinctly different from Tracks 1 and 2?

11 A.    Yes, sir.

12 Q.    Now, going back to the DEA-6, I think we were just

13 heading out to the buy?

14 A.    Correct, sir.  We finished where it says Bray was

15 given the buy money and equipped with a body recording and

16 followed to an alley off North Mulberry.

17             Paragraph 4 says that at approximately

18 3:35 p.m., Bray made a call to Brown at that Robert Harris

19 cell phone number, in which the CS advised Brown that he was

20 almost there, and that the call was monitored but not

21 recorded.

22             Paragraph 5 says that at approximately

23 3:37 p.m., Mr. Lucas and Detective Metcalf observed a black

24 male wearing a black shirt and black headband approach and

25 enter Bray's vehicle in an alley between North Mulberry

1   Street and Lida Street almost directly behind 521 North

2   Mulberry, and that at approximately 3:38 p.m. the male got

3   out of the vehicle and Bray was followed to a predetermined

4   meet location.

5           Paragraph 6 says that Bray provided the

6   officers with the crack cocaine that he'd gotten during the

7   buy, and stated that he purchased the substance from a black

8   male for the $950 buy money, that his vehicle and his body

9   were again searched with negative results for drug or money,

10  and that the transaction had been monitored and recorded.

11          And then at Paragraph 7 at 3:44 p.m., Bray

12  placed a recorded and monitored call to Brown at the

13  419-610-5399 cell phone number and stated that the package

14  was short, but that Brown responded that it wasn't short

15  when he gave it to him.

16  Q.    And that was T 5, what we just heard on that call?

17  A.    Yes, sir.

18  Q.    Now, was there a body recording of the buy itself?

19  A.    Yes, sir, there was.

20  Q.    Let me go back for one second.

21          At trial who was charged as having

22  participated in this buy?

23  A.    Danny Lee Brown was charged with this buy, and Frank

24  Douglas was also charged with this buy.

25  Q.    And Frank Douglas, what was subscribed to him as being

Page 1964

1   his role in this buy?

2   A.     His role was allegedly that he was the -- the delivery

3   man or what they call the mule that went out into the alley,

4   met Bray, and got in the truck, delivered the crack, and got

5   the money and left.

6   Q.     Had Frank Douglas, had his name come up?  Was he

7   associated with any other activity in this investigation?

8                  Was he alleged to have participated in any

9   other buys?

10  A.     Prior to his identification later?

11  Q.     Yes.  Yes.

12  A.     Well, I'm not -- I'm not sure of the question, sir.

13  Q.     Well, Frank Douglas, the person in the car eventually

14  gets identified as Frank Douglas, is that correct?

15  A.     Yes, sir.

16  Q.     And I believe we heard about that from Mr. Metcalf

17  yesterday?

18  A.     Yes, sir.

19  Q.     And was Frank Douglas, who went by the nickname Little

20  Rellie, the delivery person at a previous buy?

21  A.     Yes, sir.  He was also charged with and alleged to

22  have been the delivery person at a drug transaction with

23  Tyron Brown back on March 17th of '05.

24  Q.     And again the relationship between Tyron and Danny

25  Lee?

1           AFTERNOON SESSION

2               THE COURT:  You may be seated.

3               Okay.  You're still under oath.

4               THE WITNESS:  Yes, Your Honor.

5               MR. TEITELBAUM:  Sorry, I forgot the

6   microphone.

7       DIRECT EXAMINATION OF KIMBERLY THOMAS (RESUMED)

8   BY MR. TEITELBAUM:

9   Q.    Now, Agent Thomas, I believe we were just getting up

10  to the actual buy at 6 -- the buy itself, I'm sorry.

11  A.    Yes, sir.

12  Q.    And just for one second, to refer you back to the

13  DEA-6, I apologize if I asked this to you, but that's at

14  Page 00059?

15  A.    Yes, sir.

16  Q.    And in the 6 itself, the buy is at Paragraph 6, the

17  report of the buy, is that correct?

18  A.    Yes, sir.

19  Q.    And is the delivery person in the alley identified in

20  any way?

21  A.    No, sir, not at the time the 6 was written.

22  Q.    So it just says "black male"?

23  A.    Yes, sir, and gives some clothing description.

24  Q.    And purportedly what was testified at trial, this is

25  the same person who was already known to Bray that had

1    after the B in Mulberry, there is a red dot, is that

2    correct?

3    A.    Yes, sir.

4    Q.    And did you cause that red dot to be placed there?

5    A.    One of the people helping me on the case did, sir,

6    yes, that made the maps for us.

7    Q.    Agent Parker sort of put the dot there?

8    A.    Yes, sir.

9    Q.    And if I could zoom there again, excuse me, zoom in a

10   little bit.

11            Are you familiar with what the red dot

12   indicates?

13   A.    Yes, sir.  It's from the map program that they use.

14   That is approximately where Chris Jordan's house was located

15   on North Mulberry Street.

16   Q.    So Chris Jordan lived on Mulberry?

17   A.    Yes, sir.

18   Q.    And when you say "Approximately," MapQuest, the

19   computer does that?

20   A.    Yes, sir.

21   Q.    And you've been there yourself?

22   A.    Yes, sir.

23   Q.    Is the house actually where the red dot is?

24   A.    No, sir.  It's actually a bit north of there, perhaps

25   closer to the N in North Mulberry.  If you go straight up to