1  the top of the page from the dot, I believe it's a little

2  bit closer to the N in North Mulberry.

3  Q.   All right.  And the house faces Mulberry where the N

4  would be?

5  A.   Yes, sir.  As you're looking at North Mulberry Street,

6  Mr. Jordan's house would actually be on the right-hand side

7  of the word Mulberry, facing what would be the left side of

8  the page.

9            You want me to show?

10  Q.   If you could show.

11  A.   Well, the arrow is pointing in the wrong direction,

12  but that's about where the house would be on the right-hand

13  side of the street as you look at the map, and then facing

14  to the left.

15  Q.   And the next -- the next street down looking down the

16  map is Harker, is that correct?

17  A.   Yes, sir.

18  Q.   And so Harker is a real street, is that correct?

19  A.   Yes, sir.

20  Q.   Two lanes of traffic?

21  A.   Yes, sir.

22  Q.   Parking?

23  A.   Yes, sir.

24  Q.   And Mulberry is?

25  A.   A regular street, sir, two lanes of traffic.  I

1    believe room for parking as well.

2    Q.    And how about Daisy?

3    A.    Daisy is a regular street as well, sir, two lanes of

4    traffic, room on both sides for parking.

5    Q.    Now, between Mulberry and Daisy -- well, let me go up.

6          One little grid up from Harker coming into

7    where the street is on Mulberry, there's like a little white

8    line there.

9          Do you see that?

10   A.    Yes, sir.  Near where the street is and the red mark

11   from Detective Metcalf?

12   Q.    Yes.  What is that -- so what Detective Metcalf saw is

13   looking up an alley, correct?

14   A.    Correct, sir.

15   Q.    And if you were looking in the other direction to the

16   right of the number one, is that also an alley?

17   A.    Yes, sir.  It's the continuation of the same alley.

18   Q.    Now, if you were to go down that same alley halfway

19   between Mulberry and Daisy Street, looks like there's

20   another little white line on the computerized map, is that

21   correct?

22   A.    Yes, sir.

23   Q.    And are you familiar with that?

24   A.    Yes, sir, I am.

25   Q.    Oh, sorry.  "Focus."  Well, that didn't help.

1          There we go.  And is that also a little alley?

2    A.    Yes, sir.

3    Q.    All right.  And does that alley continue from, let's

4    say, call it Metcalf's alley up all the way past the back of

5    Chris Jordan's house?

6    A.    Yes, sir, it does.

7    Q.    And then sort of hooks up with like a larger alley

8    then continuing up to Chester Avenue?

9    A.    Yes, sir.

10   Q.    Which direction from here is the Sheriff's Office?

11   A.    As you're looking at this map, the Sheriff's Office

12   would be -- the street it's on, Park Avenue, would be south

13   of this map, and then it would be located farther to the

14   east, which would be to the right of this map.

15   Q.    All right.  So down off beyond -- behind Daisy Street

16   there?

17   A.    Yes, sir.

18   Q.    All right.  Okay.  Thank you.

19         There was a body tape, you indicated, of the

20   buy itself?

21   A.    Yes, sir.

22   Q.    That's pretty short, isn't it?

23   A.    Yes, sir.  Well, the recording's actually pretty long,

24   but the buy portion of it is --

25   Q.    By itself --

1   A.      -- less than a minute.

2   Q.      Less than a minute?

3   A.      Yes, sir.

4   Q.      And then there's some driving around time and a

5   telephonic communication later on, is that correct?

6   A.      Correct, sir.

7   Q.      And that is N 26, T 4.  And this will be from the body

8   recording at the Danny Lee Brown buy, is that correct?

9   A.      Correct, sir.

10          MR. TEITELBAUM:  Mr. Comber, please.

11          (Tape playing).

12  BY MR. TEITELBAUM:

13  Q.      And this transcript, did you prepare this?

14  A.      Yes, sir, I did.

15  Q.      And at about halfway down into it you have from

16  Mr. Bray:  "That's cool, that's cool.  Here, give that to

17  Chris."

18  A.      Yes, sir.

19  Q.      Now, do you know whether or not a transcript was

20  prepared for use at the Nabors trial?

21  A.      Yes, sir, it was.

22  Q.      Danny Lee Brown was a defendant?

23  A.      Yes, sir, he was.

24  Q.      And the alleged person in the car was who?

25  A.      I'm --

1    Q.    In the buy?

2    A.    Alleged was Frank Douglas.

3    Q.    Are you familiar with Government's Exhibit 60?

4    A.    Yes, sir.

5    Q.    And it is what?

6    A.    Government's Exhibit 60 is a copy of the transcript

7    that was prepared for the Nabors trial of the recordings

8    from the Danny Lee Brown buy.

9    Q.    And this came from where?

10   A.    Out of the United States Attorney's Office files.

11   Q.    Okay.  And it includes the telephone calls we heard

12   earlier on the first part?

13   A.    Yes, sir.

14   Q.    A couple of tracks.

15   A.    Yes, sir.

16   Q.    There's three, I believe.

17   A.    Yes, sir.

18   Q.    And on Page 4 is the transcript for the body wire,

19   which we just heard?

20   A.    Yes, sir.

21   Q.    Okay.  And let me just show you, I believe this was

22   known as Government's Exhibit Number 8 at the Nabors trial?

23   A.    I believe that's right, sir.  It's on the front page

24   there.

25   Q.    Oops.  All right.  And at the top it reads "Body wire

1   recording, November 8th, 3:37 p.m."?

2   A.    Yes, sir.

3   Q.      "Confidential source."

4   A.    Correct, sir.

5   Q.    And "Frank Douglas."

6   A.    Yes, sir.

7   Q.    And then going into the conversation, is that the

8   entire conversation as it appeared on the transcript?

9   A.    The transcript that they prepared for court back then,

10  this is the entire conversation that was transcribed.

11  Q.    And compared to what we just heard and what you

12  transcribed, is there something missing?

13  A.    Yes, sir, there is.

14            Where Bray says on their transcript, one, two,

15  three, four, five lines down, they just have one "That's

16  cool," and the recording actually has Bray saying "That's

17  cool.  That's cool.  Here, give that to Chris."

18  Q.    And as we just heard it played in court, did you have

19  any difficulty in making that transcription?

20  A.    No, sir.

21  Q.    All right.  And after this little excerpt, is anything

22  else transcribed?

23  A.    Yes, sir.  Well, not on their transcription that they

24  prepared for the trial back then, but we've transcribed the

25  whole body wire.

Page 1977

1  **Q.    The buy ends there, Frank Douglas gets out of the car,**
2  **correct?**
3  **A.    Correct, sir.**
4  **Q.    And is there then some driving time?**
5  **A.    Yes, there is.**
6  **Q.    And is there a conversation, a phone conversation with**
7  **Bray picked up at about 3:45 into the tape?**
8  **A.    Yes, sir.**
9          MR. TEITELBAUM:  Mr. Comber, please.
10  BY MR. TEITELBAUM:
11  **Q.    And that's in your transcription?**
12  **A.    Actually, yes, it's in the transcription, but since**
13  **you hear both sides of it, I suspect that it's not a**
14  **telephone conversation in a regular phone phone, but one of**
15  **the chirps, the direct-connects, back and forth.**
16          MR. TEITELBAUM:  Okay.  Could you play that,
17  please?
18              (Tape playing).
19  BY MR. TEITELBAUM:
20  **Q.    And the one, the voice receiving the call is who?**
21  **A.    Well, I don't -- I assume Bray's receiving the call**
22  **from -- it's Metcalf that asks "You met him at Raymond and**
23  **Mulberry, right" three times, and it's Bray responding.**
24          MR. TEITELBAUM:  Okay.  I'm sorry, could I
25  have the ELMR for one second again, please?

1    my deputy will swear you in.

2                        ROOSEVELT WILLIAMS,

3        of lawful age, a witness called by the Government,

4                being first duly sworn, was examined

5                        and testified as follows:

6        DIRECT EXAMINATION OF ROOSEVELT WILLIAMS

7    BY MR. TEITELBAUM:

8    Q.    Good afternoon, sir.  Would you state your name for

9    the jury, please?

10   A.    Roosevelt Williams.

11   Q.    And, Mr. Williams, how old are you, sir?

12   A.    Twenty-nine.

13   Q.    You are currently incarcerated, is that correct?

14   A.    Yes, sir.

15   Q.    And are you serving a sentence?

16   A.    Yes.

17   Q.    Is that a federal or state sentence?

18   A.    State.

19   Q.    What state is that?

20   A.    Kentucky.

21   Q.    And what is the sentence you're serving?

22   A.    Twenty-two years for murder and three years for

23   tampering with evidence.

24   Q.    Tampering with evidence?

25   A.    Yes, sir.

1   Q.   Did you admit knowledge that you, in fact, did do

2   sales like that to Mr. Bray?

3   A.   Yes, sir.

4   Q.   Now, what about the third sale, the one over 50 grams,

5   did you ever sell more than 50 grams, a big deal like that

6   with Jerrell Bray?

7   A.   No, sir.

8   Q.   And do you recall the date, what date it was you were

9   supposed to have done that?

10  A.   October 5th.

11  Q.   And you got arrested just about a month after that, is

12  that correct?

13  A.   Yes, sir.

14  Q.   Did you talk to your attorney about this?

15  A.   Yes, sir.

16  Q.   Do you recall your attorney's name?

17  A.   Harvey Bruner.

18  Q.   And as you spoke to Mr. Bruner, did you have an alibi

19  for that date?

20  A.   Yes, sir.

21  Q.   And what was your alibi, sir?

22  A.   I was -- I had got on a plane to go back to Chicago,

23  check on my son.  He was in the hospital.

24  Q.   Your -- this was the son that was living up there in

25  Chicago?

1   A.    Yes, sir.

2   Q.    And how old was your boy?

3   A.    At the time?  I think he was three.

4   Q.    Three?

5   A.    Yeah.

6   Q.    So he was a little boy and he was with his mom up

7   there?

8   A.    Yes, sir.

9   Q.    And you had received some type of information that he

10  was sick?

11  A.    Yes, sir.

12  Q.    All right.  And what did you do on that day,

13  October 5th?

14  A.    Well, October 5th, I got up early and had somebody

15  drop me off at the airport.  I scheduled -- I had my girl

16  the night before schedule a flight.

17  Q.    You were living with, you had a girlfriend, your

18  girlfriend down in Mansfield?

19  A.    Yes, sir.

20  Q.    All right.  So you had a ticket.

21        Did you have a reservation on a plane?

22  A.    Well, we had missed the first flight early that

23  morning so we had stayed at the airport and caught the next

24  flight out.

25  Q.    And was this, are we talking about the Columbus

1   airport or the Cleveland airport?

2   A.    Columbus.

3   Q.    And did you fly to Chicago that day?

4   A.    Yes, sir.

5   Q.    And were you able to see your child in the hospital?

6   A.    Yes, sir.

7   Q.    All right.  Did you have -- were you able to obtain

8   documentation for your attorney Mr. Bruner to give to the

9   government authorities?

10  A.    Harvey Bruner, I told him everything that went down.

11        He had subpoenaed the manifest and stuff.

12  Q.    And did there come a time when you were brought in,

13  you came in with Mr. Bruner and came down to the Federal

14  Courthouse here to meet with some people?

15  A.    Yes, sir.

16  Q.    And do you recall who was there?

17  A.    It was Lee Lucas, his partner, and my attorney.

18  Q.    And do you know who his partner was?

19  A.    I don't know his name offhand.  It was a black guy.

20  Q.    Black guy?

21  A.    Yeah.

22  Q.    All right.  And do you know whether or not Mr. Bruner

23  had the documentation that you were out of town on that day?

24  A.    Yes, he had that.

25  Q.    And was there -- what happened at this proffer

1    Q.    The way you talk today is the way -- your normal --

2    A.    Yes, sir.

3    Q.    -- voice?

4              Thank you, sir.  And finally, I would just

5    like to show you, hand you this book and there's a tab here.

6    This is Volume 1, and at Tab 29, and just ask you, there's a

7    few pages there.

8              If you would just look through them, please,

9    sir, and see if you recognize those documents.  Flip

10   through.

11             (Pause).

12   A.    Yeah, that's the Southwest Airline, the -- what do you

13   call it?

14   Q.    So looks like your attorney Mr. Bruner sent a subpoena

15   to the Southwest Airlines?

16   A.    Yes, sir.

17   Q.    And those documents, do you know, Mr. Bruner got

18   things back from the airlines, is that correct?

19   A.    Yes, sir.

20   Q.    And is that the receipts from your travel on

21   October 5th?

22   A.    Yes, sir.

23             MR. TEITELBAUM:  Thank you.  Thank you very

24   much, Mr. Williams.

25             THE COURT:  Mr. Roth, you may cross-examine.

1   much as you can do.

2                    (End of side-bar conference).

3        CROSS-EXAMINATION OF ROOSEVELT WILLIAMS

4   BY MR. ROTH:

5   Q.    Mr. Williams.

6   A.    Yes, sir.

7   Q.    You mentioned a proffer.

8   A.    Yes, sir.

9   Q.    And I think you said Mr. Lucas was present?

10  A.    Yes, sir.

11  Q.    And I think you said Mr. Ansari was present?

12  A.    Yes, sir.

13  Q.    And do you remember when that proffer was, sir?

14  A.    It was, like -- I can't remember the exact date.  I

15  think it was sometime in November, '05.

16  Q.    And during that proffer, and if you could, sir, let

17  me --

18                    MR. ROTH:  Can I approach, Your Honor, and get

19  it for him?

20                    THE COURT:  You may.

21                    MR. ROTH:  Thank you.

22                    THE COURT:  You may.

23  BY MR. ROTH:

24  Q.    Sir, prior to your proffer with Mr. Ansari and

25  Mr. Lucas, and you had a -- your attorney present?

1    did not issue the subpoena or the Court didn't issue the

2    subpoena for the records until a couple months after your

3    proffer?

4    A.    Yes, sir.

5    Q.    And the only thing you had at the proffer was the

6    boarding pass?

7    A.    Yes, sir.

8    Q.    And Agent Lucas told you when you showed him the

9    boarding pass, "Show me the rest of the records," correct?

10   A.    I can't remember that, sir.

11   Q.    Well, sir, you also indicated that your cell phone,

12   during the proffer, that your cell phone records could show

13   that there were calls made between you and your wife about

14   your sick son, correct?

15   A.    Yes, sir.

16   Q.    Okay.  You indicated that you had gotten a call from

17   your wife --

18   A.    Not my wife.  My son's mother.

19   Q.    Okay.  Your son's mother.

20             And that you told Agent Lucas that "I could

21   show you on my cell phone records that these calls

22   occurred," correct?

23   A.    Yes, sir.

24   Q.    And he said "Show me the records," correct?

25   A.    Yes, sir.

1    Q.    Okay.  And he also indicated that your attorney should

2    go beyond the boarding pass and get all the underlying

3    records, correct?

4    A.    Yes, sir.

5    Q.    Okay.  And that's what Mr. Bruner did, correct?

6    A.    Yes, sir.

7    Q.    And then when he got all the records, those records

8    were shown to Mr. Serrano, correct?

9    A.    Yes, sir.

10   Q.    And after Mr. Serrano got the records, he made the

11   decision -- the U.S. Attorney's Office made the decision

12   that you would plead to the two counts that occurred in July

13   and August, the smaller amounts, and they'd dismiss the more

14   than 50 grams, correct?

15   A.    Yes, sir.

16   Q.    And you also understood that Mr. Lucas agreed with

17   that?

18   A.    No, I didn't, sir.

19   Q.    Okay.  And then at some point the entire case was

20   dismissed, correct?

21   A.    Yes, sir.

22   Q.    Now, sir, you met Mr. Bray through Tyron Brown?

23   A.    Yes, sir.

24   Q.    And did you have a drug relationship with Tyron Brown?

25   A.    Yes, sir.

Page 2082

1          THE COURT:  Good morning.  You may be seated.

2          Step up, and before you take your seat my

3   deputy will swear you in.

4          Who is your next witness?

5          MR. COMBER:  Thank you, Your Honor.  The

6   government will call Detective Perry Wheeler.

7          THE COURT:  All right.

8                  PERRY WHEELER,

9      of lawful age, a witness called by the Government,

10          being first duly sworn, was examined

11              and testified as follows:

12          THE COURT:  You may proceed.

13          MR. COMBER:  Thank you, Your Honor.

14      DIRECT EXAMINATION OF PERRY WHEELER

15   BY MR. COMBER:

16   **Q.   Good morning, Detective.**

17   **A.   Good morning.**

18   **Q.   Detective, will you please state your name, spelling**

19   **your last name for the record?**

20   **A.   My name is Perry, middle initial Albert, Wheeler,**

21   **W-H-E-E-L-E-R.**

22   **Q.   And, Detective, how are you employed?**

23   **A.   Employed with the City of Mansfield Police Department.**

24   **Q.   If you would briefly summarize your training and**

25   **experience in law enforcement for the jury.**

1    on Mr. Williams himself?

2    A.    Our office did, yes, sir.

3    Q.    Okay.  As a result of your office's investigation into

4    Mr. Williams, had you personally actually seen him prior to

5    October 5th, 2005?

6    A.    Yes, sir.

7    Q.    On about how many occasions?

8    A.    I wouldn't be able to count how many.

9              There was three different locations where he

10   had been living or using houses as drug houses to sell

11   narcotics.

12   Q.    Under what circumstances would you have seen him prior

13   to October 5th?

14   A.    Well, I've seen him driving vehicles in the city,

15   around town.

16             I worked surveillance on one specific location

17   where I observed him for several hours with other people

18   from Chicago at a residence, outside the residence.

19   Q.    Okay.  Then focusing again back on October 5th, 2005,

20   what was to be your role in that controlled purchase?

21   A.    Mainly I believe it was just to work surveillance.  I

22   really wasn't given a specific role.

23   Q.    Do you know why you as METRICH were supposed to be

24   involved with that buy?

25   A.    I come to work at 3:00 p.m., 1500 hours, and I was

1                  At that point I used my binoculars to see who

2     he was.  The suspected target, Roosevelt Williams, is tall,

3     thin, light-skinned with freckles.

4                  The person that had made the transaction is

5     short, dark-skinned and stocky.

6     Q.    Those observations that you just described, were you

7     able to make those as that person was walking from the white

8     Suburban back to his Buick?

9     A.    That is correct.

10    Q.    At that point is the person walking towards you or

11    away from you?

12    A.    Towards me.

13    Q.    Once you realized that it wasn't the person you knew

14    to be Roosevelt Williams, what happens next?

15    A.    Well, at that point the vehicle exited the parking

16    lot.

17    Q.    When you say "The vehicle," specifically what vehicle,

18    sir?

19    A.    The 1985 Buick Regal with the white top.

20    Q.    Okay.

21    A.    I believe the white SUV exited, also, but I didn't pay

22    attention to which way it left the parking lot.

23                  I concentrated on the black Regal.  It had

24    exited the parking lot on Wood Street and went north on Wood

25    Street to Glessner Avenue, at which time I got behind it,

1   confirmed the license plate, wrote it down on a piece of

2   paper, and then at that time I called Detective Burkes who

3   was working in our office and had him run the plate.

4   Q.    For how long did you continue to follow this black

5   Buick?

6   A.    I believe it went -- and I'm not for certain -- I

7   believe it went east on Glessner.  I only followed it for

8   another block and I turned off.

9   Q.    At some point shortly thereafter, did you advise Agent

10  Lucas that the person at the buy was, in fact, not Roosevelt

11  Williams?

12  A.    Yes, I had spoken with Agent Lucas, informed him that

13  I believed that the person they bought suspected two ounces

14  of crack cocaine was not Roosevelt Williams.

15  Q.    What else did you tell Agent Lucas during that

16  conversation?

17  A.    That I had ran the temporary tag to the vehicle and it

18  returned to their confidential source Jerrell Bray.

19  Q.    Was there also something you observed about the type

20  of vehicle that was driven by the person who was supposed to

21  be Roosevelt Williams?

22  A.    Yes.

23  Q.    Please continue.

24  A.    Yes.  The 1985 Buick, black Buick Regal with the white

25  top was in moderate to poor condition.

1              "This officer contacted his immediate

2    supervisor Sergeant Michael Bammann, at which time this

3    officer was instructed to speak with Captain Larry Faith or

4    Agent Lee Lucas.  This officer advised Agent Lee Lucas of

5    his findings and was instructed by Lucas to gather

6    intelligence photos from the METRICH office for him to

7    review.

8              "This officer immediately did this task and

9    returned to the Sheriff's Department within 20 minutes to

10   find no officers there.  This officer left and received a

11   phone call from Captain Faith stating that Agent Lucas was

12   positive of his purchase of crack cocaine from Roosevelt

13   Williams.  This officer has had no contact with Agent Lucas

14   as of the writing of this report.  Detective Perry A.

15   Wheeler, badge number 187."

16   Q.   Sir, let's discuss that phone call that you reference

17   in the next-to-last paragraph.

18              When did you receive that phone call from

19   Captain Faith?

20   A.   It was while I was completing this supplement.

21   Q.   All right.  Describe for us exactly what happened.

22   A.   I receive a phone call from Captain Faith.  I explain

23   to him that I went to the Sheriff's Department, nobody was

24   there.

25              Captain Faith tells me or informs me that Lee

1          MR. COMBER: Nothing further, Your Honor.

2          THE COURT: Mr. Roth.

3          MR. ROTH: Your Honor, just a few minutes to

4    set up?

5          THE COURT: Sure.

6          MR. ROTH: Thank you.

7          (Pause).

8    CROSS-EXAMINATION OF PERRY WHEELER

9    BY MR. ROTH:

10   Q.   Good morning, Mr. Wheeler.

11   A.   Good morning, sir.

12   Q.   Sir, when is the first time that you -- the report

13   that we just talked about, you called it a supplemental?

14   A.   Yes, sir.

15   Q.   The report, that's in your handwriting, sir?

16   A.   Yes, sir.

17   Q.   Okay.  When is the first time that you turned that

18   over to the Richland County Sheriff's Office?

19   A.   I personally never turned it over to the Sheriff's

20   Department.

21   Q.   Sir, are you aware of anybody else from METRICH

22   turning it over to the Richland County Sheriff's Office?

23   A.   To the best of my knowledge I'm not positive if

24   anybody ever did.

25   Q.   Sir, when is the first time that you turned it over to

1   DEA?

2   A.   I personally never did, sir.

3   Q.   Sir, you know that no one ever did, is that true?

4   A.   I do not know that for certain.

5   Q.   Are you aware, sir, that the first time that Mr. Lucas

6   ever heard about your report was when he read it in the

7   "Cleveland Plain Dealer"?

8   A.   Am I aware of that, sir?

9   Q.   Yeah.

10  A.   No, sir.

11  Q.   So it's your view, sir, that your responsibility did

12  not extend to actually providing a copy of this report at or

13  about the time you drafted it to either Mr. Lucas, anyone in

14  DEA, Mr. Metcalf, Mr. Faith, or anybody in Richland County?

15  A.   I've explained to or had a conversation with Agent

16  Lucas telling him the same thing that's drafted in my

17  supplement.

18  Q.   Sir, isn't it true that the first time that you met

19  with the government, you told the government that you didn't

20  even speak to Mr. Lucas, you spoke to Captain Faith?

21  A.   No, I don't believe that's true.

22  Q.   Sir, I'm going to show you what has been marked

23  Wheeler 3500-1, and ask you to take a look at it, sir.

24          Have you seen that document before?

25  A.   Yes.

1               THE COURT:  Okay.  I'm going to sustain the

2    objection to the form of the question.

3               If there's -- if you want to do further

4    inquiry, I'm not precluding it at this point until I hear

5    more.

6    BY MR. ROTH:

7    Q.    Okay.  So it's your position that you never spoke to

8    Metcalf at all about this issue?

9    A.    That is correct.

10   Q.    Now, you indicated that for a period of time you were

11   conducting surveillances of Mr. Williams?

12   A.    Yes, sir.

13   Q.    And what period of time did that encompass,

14   approximately?

15   A.    Between five and six months.

16   Q.    Okay.  And had you obtained an inquiry from Kentucky

17   about a murder?

18   A.    I was contacted, myself and other agents within our

19   office were contacted by Kentucky State Police.

20   Q.    And they indicated to you that they thought

21   Mr. Williams was a suspect in a murder?

22   A.    Yes, sir.

23   Q.    Okay.  And was it as a result of that that you began

24   to conduct surveillances of Mr. Williams?

25   A.    We had received information about Roosevelt Williams

```
 1                      AFTERNOON SESSION
 2               THE COURT:  You may be seated.
 3               I think we're at the point of calling the next
 4  witness, is that right?
 5               MR. TEITELBAUM:  Yes, sir.  Mr. Conrad, come
 6  on in, sir.
 7               THE COURT:  All right.
 8               MR. TEITELBAUM:  Go right on up that ramp.
 9  The lady will give you the oath.
10               THE COURT:  Go right ahead and step up.
11  Watch; there's an incline there.
12               Before you sit down, the deputy will swear you
13  in.
14                      JEREMIAH CONRAD,
15        of lawful age, a witness called by the Government,
16               being first duly sworn, was examined
17                      and testified as follows:
18        DIRECT EXAMINATION OF JEREMIAH CONRAD
19  BY MR. TEITELBAUM:
20  Q.    Mr. Conrad, would you maybe pull that microphone down
21  a little towards you so everybody can hear you, and would
22  you state your name for us, please?
23  A.    Jeremiah Conrad.
24  Q.    Mr. Conrad, how old are you?
25  A.    Twenty-six.
```

1           So this all sort of happens pretty quick?

2    A.    Yeah, it was just like he pulled up, I seen him, he

3    was like "Hey, I need you to do this."

4           I figured, you know, he would, you know, hook

5    me up and then I could get on my feet and I'd be okay.

6    Q.    All right.  Was there any specific agreement that

7    there would be anything in it for you?

8    A.    Wasn't no amounts or anything like that; just the

9    assumption that I would look out for you, you look out for

10   me.

11   Q.    All right.  So, I'm sorry, you go over to a place

12   called the Stonewood apartments?

13   A.    Yes.

14   Q.    And how far away is that from Sturgess?

15   A.    Not far.  Mansfield is small.  You can go pretty much

16   anywhere in ten minutes.

17   Q.    Did you know the purpose for going over to Stonewood?

18   A.    No.

19   Q.    And what happens when you get to the Stonewood

20   apartments?

21   A.    He got out, told me he had to get something, he'd be

22   right back.

23   Q.    And you're in the car?

24   A.    Yeah.

25   Q.    And how long is Mr. Bray gone?

Page 2219

1    A.    Maybe 15, 20 minutes maybe.

2    Q.    And you're just sitting there in the car?

3    A.    Yeah.

4    Q.    Okay.  Had you seen any drugs yet?

5    A.    No.

6    Q.    Were the keys in the car?

7    A.    Yeah.

8    Q.    What was going through your mind while you're sitting

9    in the car?

10   A.    I wanted to take the car.

11   Q.    And but you didn't do it, I take it?

12   A.    No.

13   Q.    And at some point in time does Mr. Bray -- what kind

14   of car was it, by the way?

15   A.    I think it was like a Roadmaster.

16   Q.    Were you familiar with that car?  I mean, had you seen

17   Mr. Bray in it?

18   A.    Yeah.

19   Q.    Okay.  So he comes back to the car after 15, 20

20   minutes.

21              What happens?

22   A.    He got in and tossed me a bag of crack and told me

23   hold onto it.

24   Q.    All right.  And did you catch the bag?

25   A.    Yeah, like, kind of like it landed on my lap.

1    Q.    Did you get a chance to look at it?

2    A.    Yeah.

3    Q.    What do you recall about the packaging or the amount?

4    A.    It was -- the amount was, I don't know, I mean it was

5    a nice amount.

6              I remember I seen it and I know I would have

7    been happy to have it.  It was a couple big chunks like bag

8    inside of a bag, like two or three chunks and different bags

9    inside of one big bag.

10   Q.    Had you ever seen in your life a quantity of crack

11   like that?

12   A.    Not in person, no.

13   Q.    What's your reaction when this, you know, the bag this

14   size gets tossed in your lap?

15   A.    I thought if we got pulled over, I'm not going to be

16   able to hide that.

17   Q.    When you set out on this, this mission, did you have

18   any idea what quantity was going to be involved?

19   A.    No.

20   Q.    Okay.  So what do you do with the bag of drugs after

21   it falls in your lap?

22   A.    I had looked at it, and that's when I realized I'm not

23   going to be able to hide that.

24              And I set it off to the side like beside me.

25   Q.    Down on the seat beside your leg?

1    **A.**    Yeah.

2    **Q.**    Towards the door side or the middle?

3    **A.**    Towards the middle.

4    **Q.**    And what happens next, sir?

5    **A.**    We drove off from there and went to a gas station.

6              I believe he got gas, and he had went in and

7    left me out in the car again.

8    **Q.**    So you're sitting in the gas station with this bag of

9    dope still beside you?

10   **A.**    Yeah.

11   **Q.**    Okay.  And Mr. Bray goes in somewhere?

12   **A.**    Yeah, he does go into the gas station.

13   **Q.**    And then what happens?

14   **A.**    He was in there for quite awhile again, and that's

15   when I thought again like, you know, I'd like to take the

16   car and take the dope and --

17   **Q.**    So now you could drive off with the car and have the

18   dope?

19   **A.**    Yeah, because he had just got gas I believe so I

20   figured I had gas, car, dope, I figured I was good to go.

21   **Q.**    Were you seriously thinking of doing that?

22   **A.**    Yeah, I wanted to.

23   **Q.**    And what, what stopped you?

24   **A.**    Because I figured if he called, obviously the car is

25   in his name, he's going to have to report it stolen, I

1   figured if I got pulled over, then he could just say that

2   whatever was in the car was mine and I'd end up getting in

3   trouble for a lot more than what I would, like, wanted to.

4   Q.   So you waited for him then?

5   A.   Yeah.

6   Q.   And does he get back in the car?

7   A.   Yeah.

8   Q.   Now, at any time up to this point do you know if

9   Mr. Bray made any telephone calls in relation to the drug

10  deal to his customer?

11  A.   I wasn't really paying attention to exactly what he

12  was saying, but he was on the phone, like, numerous times.

13  Q.   Did you ever participate in a conversation or were you

14  asked to say anything to, you know, go along with the trick?

15  A.   No, he just said that the guy was coming and we was

16  supposed to meet him there.

17  Q.   All right.  And Mr. Bray comes back to the car?

18  A.   Yes.

19  Q.   And then what happens next?

20  A.   He got in the car.  We pulled over to the side.

21  Q.   In the same gas station?

22  A.   Yeah, just over away from the pumps and everything.

23  Q.   They have like parking areas?

24  A.   Yeah, like where trucks and things like that can park.

25  Q.   So is this a convenient store, too, or just a gas

```
1   station?
2   A.    Not really convenient.  I mean you buy beer,
3   cigarettes, normal --
4   Q.    Like a 7/11 type place?
5   A.    Yeah.
6   Q.    Okay.  And you pull over to the side and you guys stay
7   in the car?
8   A.    Yeah.
9   Q.    And what happens next?
10  A.    He said something about the guy was on the way or he
11  was coming in a truck.  I think he said something about he
12  was coming in a truck.
13  Q.    All right.  And eventually does somebody come?
14  A.    Yeah.
15  Q.    What happens?
16  A.    He came, he got in the back behind Bray.
17  Q.    Could you see the guy coming or --
18  A.    I didn't see him coming.  I seen him when he got in, I
19  turned around to glance at him.
20  Q.    All right.  And when you see this guy getting in the
21  car, what's your reaction?
22  A.    He didn't look like he smoked dope or sold dope.
23  Q.    Why not?
24  A.    He just didn't fit the profile, I guess.  Just --
25  Q.    Both on the streets and in jail, you've been around
```

1    dope guys?

2    A.    Yeah.

3    Q.    Your whole adult life?

4    A.    He didn't look like the normal people that I was used

5    to seeing that sold dope or smoked dope.

6    Q.    What did the guy look like?

7    A.    Taller guy, had a -- wouldn't say a beard, but he'd

8    gone a few days or whatever without shaving.

9              Had like either a ponytail or a mullet type

10   haircut.

11   Q.    Big guy, little guy?

12   A.    Bigger guy.

13   Q.    And what's your reaction as you see this guy getting

14   into the car?

15   A.    I just didn't think he was -- he didn't look like a

16   buyer or smoker or nothing.

17              He --

18   Q.    So what did you think he was?

19   A.    I -- I mean, the thought came that he was a cop, but

20   then again I just, I don't know, I guess I didn't

21   really -- I didn't know what was going on.  I was confused.

22   Q.    Did you talk to the guy?

23   A.    No.

24   Q.    What do you do as this person -- well, where does he

25   get in in the first place?

1   A.    He gets in behind Bray.

2   Q.    And what do you do?  You look over, see this guy, then

3   what do you do?

4   A.    I just turn around back to the front.

5   Q.    And does a drug deal proceed to happen in the car?

6   A.    Yes.

7   Q.    What happens?  Describe -- you're in the front seat?

8   A.    Yes.

9   Q.    Which way are you looking?

10  A.    Just straightforward like forward out my window, like

11  looking around, see --

12  Q.    Did you engage in any conversation with the guy?

13  A.    I believe he was trying to speak to me, but I

14  just -- I might have said maybe one, one or two words and

15  that was it.

16  Q.    And what occurs in relation to the drug deal, what

17  happens in the car?

18  A.    He said something about did it weigh right.

19  Q.    Well, where did the dope -- the dope is beside you?

20  A.    It's beside me, and he said something about did it

21  weigh right or did he have it?

22              He said yeah, he got --

23  Q.    Who said "Yeah"?

24  A.    Bray.

25  Q.    Okay.

1  **A.    He got a scale out of either beside him or out of the**

2  **middle.**

3  **Q.    Who is "he" again?**

4  **A.    Bray.**

5  **Q.    Bray did, okay.**

6  **A.    Out of the console thing, he pulled out a scale, and**

7  **the dope was weighed.**

8  **Q.    Okay.  Who gets the dope?  How does the dope get to**

9  **the scale?**

10  **A.    Either I handed the dope to Bray, or he had grabbed it**

11  **from off the seat.**

12  **             I can't say for sure.**

13  **Q.    Do you know, do you recall whether or not you ever**

14  **picked up the dope and handed it to the back seat?**

15              MR. ROTH:  Objection.  Asked and answered.

16              MR. TEITELBAUM:  It wasn't asked and answered.

17              THE COURT:  Okay.  Overruled.  You may answer

18  if you -- if you recall.

19  **A.    I didn't hand the other guy the dope.  I didn't.**

20  **BY MR. TEITELBAUM:**

21  **Q.    Was it -- the part that you didn't recall was whether,**

22  **if I --**

23              MR. ROTH:  I object to leading.

24  BY MR. TEITELBAUM:

25  **Q.    Okay.  What was the part you said you didn't recall?**

1    A.    I didn't give -- or when he got the scale out, I don't
2    know if I handed Jerrell the dope or if he grabbed the dope
3    from the seat.
4    Q.    Meaning --
5    A.    But I know I never handed the dope to anybody else.
6          If I did hand it to anybody, then it was
7    Jerrell.
8    Q.    Okay.  Thank you.  And does the dope get weighed up?
9    A.    Yes.
10   Q.    And what happens during the rest of the drug deal?
11   A.    Everybody kind of -- the guy in the back leaned
12   forward to look, Jerrell looked.  He kind of sat back.  I
13   was curious because of the amount it was so I leaned over to
14   look.  And I guess, I believe the guy in the back said that
15   was okay.
16          And I believe he grabbed the dope and then
17   handed Jerrell the money.  Jerrell handed me the money
18   because it was supposed to have been my transaction or
19   whatever, and then I kind of like flicked through it, you
20   know, I didn't -- it wasn't my money so I didn't care if he
21   shorted him or not.  And then I gave the money back to him.
22          The guy got out of the car, and that was it.
23   Q.    And do you recall whether or not during the time in
24   the car with this third person, whether you were ever
25   introduced by name?

1    A.    He had -- he had asked if he could get the drugs from
2    me from that point on, and I had said yeah.
3    Q.    Okay.
4    A.    And he had asked my name.  And I never said nothing
5    because of the whole situation, you know, I didn't know -- I
6    wasn't quite sure what was going on.
7              And Jerrell said that my name was Josh.
8    Q.    Now, when Mr. Bray said your name was Josh, did that
9    mean anything to you?
10   A.    No.
11   Q.    And did you say anything in response to that?
12   A.    No.  I just left it as --
13   Q.    You're fine with being Josh for that --
14   A.    Yeah, just whatever.  It could have been Bill, Bob,
15   anything, as long as he didn't say my real name, I didn't
16   care what he said.
17   Q.    Now, after the drug deal, what happened, sir?
18   A.    He got out of the car and I'm not sure, I don't think
19   nothing was really said between me and Bray or anything,
20   just he had put the money wherever in his pocket, in the
21   car, I'm not sure, and we drove off.
22              And he took me back to Sturgess.
23   Q.    So you gave the money back to Jerrell?
24   A.    Yes.
25   Q.    All right.  And do you go back to Sturgess?

1   somebody that, like, worked for him.  I don't know what he

2   was doing, I don't know.

3   Q.    Somebody from his office?

4   A.    Yeah.

5   Q.    Okay.  And did you agree to speak with them?

6   A.    Yeah.

7   Q.    And did you find out who it was he was representing?

8   A.    Yes.

9   Q.    And who was that?

10  A.    Josh Webb.

11  Q.    Did you know Josh Webb?

12  A.    Yes.

13  Q.    And how did you know Mr. Webb?

14  A.    I've known his sister and mother and little brother

15  for a little bit, not, you know, years and years, but I've

16  known them and heard of him.

17  Q.    Have you ever done any drug deals with Josh Webb?

18  A.    No.

19  Q.    What does Mr. Warner want from you?

20  A.    He was mentioning that my name got brought up from

21  somebody.  That I guess in that situation that it was me; in

22  reference to that drug deal, that it was me that did it and

23  not him.

24  Q.    And did he ask you if that was true?

25  A.    Yes.

1   **Q.   And what did you tell him?**

2   **A.   I was basically trying to give him some information to**

3   **help him with Josh and at the same time not screw myself in**

4   **the same process or whatever.**

5   **Q.   Did you tell him whether or not it was, in fact, you**

6   **in the car that day?**

7   **A.   Yes.**

8   **Q.   And you say "some information." You weren't fully**

9   **forthright with him?**

10   **A.   Yes.**

11   **Q.   And why was that, sir?**

12   **A.   I just -- I didn't want to -- I was trying to avoid**

13   **implicating myself in anything.**

14   **I just wanted to do the right thing and help**

15   **him out, but I wasn't trying to in return screw myself**

16   **trying to help him.**

17   **Q.   And when you say "Help him out," what do you mean?**

18   **What was your thought? Why did you talk to him at all?**

19   **A.   I just knew that I knew Josh had recently got married**

20   **and he had kids, and I just knew, you know, the situation**

21   **wasn't right and I don't know, I just felt that was the best**

22   **thing to do.**

23   **I figured I've always done wrong my whole life**

24   **so maybe if I did something right for once, then something**

25   **right would come back to me one day.**

Page 2291

1                    (Witness excused).

2                    MR. TEITELBAUM:  Ms. Moxley, Your Honor.

3                    THE COURT:  All right.  Come all the way down

4     to the front.  The witness stand is right here on my left.

5                    Be careful as you walk up, there's a grade.

6                    Before you sit down, my deputy will swear you.

7                         KARMIYA MOXLEY,

8          of lawful age, a witness called by the Government,

9               being first duly sworn, was examined

10                    and testified as follows:

11          DIRECT EXAMINATION OF KARMIYA MOXLEY

12     BY MR. TEITELBAUM:

13     Q.   **Would you kindly state your name for us, please, and**

14     **maybe spell your first name for the court reporter?**

15     A.   **K-A-R-M-I-Y-A.**

16     Q.   **And is it Karmiya?**

17     A.   **Yes.**

18     Q.   **And your last name?**

19     A.   **Moxley.**

20     Q.   **And, Ms. Moxley, how old are you?**

21     A.   **Twenty-six.**

22     Q.   **Twenty-six.  Where do you live?**

23     A.   **Columbus, Ohio.**

24     Q.   **And tell us where were you born and raised?**

25     A.   **Where was I born and raised?**

Page 2296

1   A.      Yes.

2   Q.      And what do you recall about that, Ms. Moxley?

3                   How did that first come -- well, let me ask

4   you this:  Was it the first time you ever did anything with

5   Jerrell Bray in terms of dealing drugs?

6   A.      Yes.

7   Q.      And was it the only time you ever did anything?

8   A.      Yes.

9   Q.      All right.  So there was one incident when you ever

10  got the -- found yourself in the middle of a drug deal, is

11  that correct?

12  A.      Yes.

13  Q.      And would you tell us, please, to the best that you

14  can recall, how this came up and how you ended up in the

15  middle of this?

16  A.      He came in one day and he just told me that he just

17  needed a female to ride with him, he didn't feel comfortable

18  riding by hisself.

19  Q.      Okay.  And were you offered anything for this?

20  A.      No.

21  Q.      And did you agree to do it?

22  A.      Yes.

23  Q.      All right.  And what happened next?

24  A.      He basically just said that he was going to give

25  Alexis a call stating where to go and where he was going to

1    pick me up.

2    Q.    Okay.  And do you recall then whether -- was this all

3    the same day?

4    A.    Yes.

5    Q.    All right.  Do you recall whether or not a call came

6    in?

7    A.    Yes.

8    Q.    And to whom did Mr. Bray speak?

9    A.    Who did he speak with when he called?

10   Q.    Yeah.

11   A.    Alexis Younger.

12   Q.    Did you ever have any phone conversation with Mr. Bray

13   in relation to this deal, where to go?

14   A.    No.

15   Q.    And so after this telephone call, what happens?

16   A.    We went where he said to go and he picked me up.

17   Q.    All right.  Let me stop you for a second.

18             We leave -- who goes?

19   A.    Me and Alexis Younger.

20   Q.    All right.  And since Mr. Bray called you, he's

21   obviously not at home, is that correct?

22   A.    Correct.

23   Q.    All right.  Do you recall, did you have a car?

24   A.    No.

25   Q.    Did Alexis have a car?

1    A.    Yes.

2    Q.    And do you recall what type of car she had?

3    A.    I don't remember.

4    Q.    Okay.  Did you have a cell phone at the time?

5    A.    I had one, but it wasn't on.

6    Q.    Okay.  And so where do you go?

7    A.    I can't say the exact street, but it was, like, in

8    between Arthur and Columbia in the alleys.

9    Q.    It was in an alley?

10   A.    Yes.

11   Q.    Right.  All right.  And Alexis drives you there?

12   A.    Yes.

13   Q.    And does Alexis stay with you?

14   A.    No.

15   Q.    You get out of Alexis's car?

16   A.    Yes.

17   Q.    All right.  And how far is this alley from where your

18   house was on Sturgess?

19   A.    Not even two minutes.

20   Q.    Okay.  And how long -- is there a period of time you

21   have to wait in the alley?

22   A.    I think we might have waited probably five, ten

23   minutes, if that.

24   Q.    Okay.  And then what happened?

25   A.    I got out the car and she pulled off and he pulled up.

Page 2299

1   Q.   And "he" being who?

2   A.   Jerrell Bray.

3   Q.   All right.  And what happened when Jerrell pulled up?

4   A.   I got into the back seat of the passenger side, and I

5   can't remember exactly how it was, either he went and picked

6   up the guy or the guy was already in the car.

7   Q.   Okay.  There was another guy involved with Jerrell?

8   A.   Yes.

9   Q.   White guy or black guy?

10  A.   White.

11  Q.   Did you know this person?

12  A.   No.

13  Q.   Did you know when you got into the car there was going

14  to be another person?

15  A.   No.

16  Q.   Did you know exactly what was going to go on in the

17  car?

18  A.   No.

19  Q.   Did you have anything with you when you got in the

20  car?

21  A.   Yes.

22  Q.   And what was that?

23  A.   A sock.

24  Q.   And what was in the sock?

25  A.   At that time when he opened it, drugs.

Page 2300

1    Q.    You recognized it to be drugs?

2    A.    Yeah.

3    Q.    What kind of drugs?

4    A.    Crack cocaine.

5    Q.    Okay.  Do you know the quantity or amount?  Do you

6    know much about crack cocaine?

7    A.    No.

8    Q.    All right.  So you get in the car, and if I understand

9    you correctly you're not sure, you can't remember whether

10   the white guy was in the car already or got in the car after

11   you did?

12   A.    Yes.  I don't remember that part.

13   Q.    Okay.  And you're in the car and you're carrying this

14   sock.

15              What happens next?

16   A.    I gave the sock to Jerrell.  When he looked at what it

17   was, he passed it over to the white guy.

18   Q.    And what did the white guy do with it?

19   A.    White guy got a scale, put it on a scale, weighed it,

20   said it was short by something.  And Jerrell Bray made it

21   seem like he was giving a guy a call, and which he didn't

22   talk to nobody, and said to give him two hundred back.

23              And he gave -- well, he counted it first and

24   then he told me to count it, and then he gave him two

25   hundred dollars back.

1    Q.    All right.  Let me just go back for one second.

2              A scale comes from somewhere in the car?

3    A.    Yes.

4    Q.    And did you have a scale?

5    A.    No.

6    Q.    And do you know where the scale came from?

7    A.    No, I wasn't paying attention.

8    Q.    And do you recall who laid the drugs out?

9    A.    The white guy.

10   Q.    Okay.  And then there was some discussion about the

11   drugs being light?

12   A.    Yes.

13   Q.    Okay.  And then you said Mr. Bray pretended to make a

14   phone call?

15   A.    Yes.

16   Q.    All right.  What do you mean by that?  Just what do

17   you recall happening there?

18   A.    He dialed maybe even two, three numbers and made it

19   seem like he pressed "send," and no sooner did he press

20   "send" he started talking.

21   Q.    Okay.  And could you hear his side of the

22   conversation?

23   A.    Whose side?

24   Q.    Jerrell's?

25   A.    Yes.

1   Q.   Could you hear another side of the conversation?

2   A.   No.

3   Q.   And this lead to a talk about giving two hundred back?

4   A.   Yes.

5   Q.   All right.  And did you have the money in your hands

6   at that point?

7   A.   Yes.

8   Q.   And what did you do?

9   A.   Gave him two hundred back and got out the car after

10  that.

11  Q.   All right.  So you get out of the car.

12       Are you still in this alley?

13  A.   No, I walked home.

14  Q.   I'm sorry, when you got out of the car, were you on a

15  street; were you in the alley?  Do you recall where you

16  were?

17  A.   An alley.

18  Q.   All right.  And you said it only took a minute or two

19  to drive there so it wasn't a far walk home?

20  A.   No.

21  Q.   And when you get home, what do you do?

22  A.   Basically went in and sat down.  About five, ten

23  minutes later, Jerrell came in and I gave him the money.

24  Q.   Okay.  Did you get anything?

25  A.   He gave me a hundred and told me to go pay it on a

Page 2496

1                          AFTERNOON SESSION

2                    THE COURT:  You may be seated.

3                    Announce who your next witness is.

4                    MR. COMBER:  Thank you, Your Honor.  The next

5      witness is Mr. Herman Price.

6                    THE COURT:  Mr. Price, stand up so you can be

7      sworn in by my deputy.

8                         HERMAN PRICE,

9          of lawful age, a witness called by the Government,

10                  being first duly sworn, was examined

11                       and testified as follows:

12                   THE COURT:  You may proceed.

13                   MR. COMBER:  Thank you, Your Honor.

14        DIRECT EXAMINATION OF HERMAN PRICE

15     BY MR. COMBER:

16     Q.    Sir, please state your name for the record.

17     A.    Herman Pineda Price.

18     Q.    Okay.  And, sir, give us a little bit of your personal

19     background.

20                  We can tell you're in jail now.  Where are you

21     in jail?

22     A.    I'm in prison in Detroit, Michigan at the Ryan

23     Correctional Facility.

24     Q.    On what charges, sir?

25     A.    Drugs and gun charges.

1   Q.   Did you ever send any female to help deliver any

2   drugs?

3   A.   No.

4   Q.   While down in Mansfield in 2005, had you heard of a

5   man by the name of Jerrell Bray?

6   A.   No.

7   Q.   Okay.  Had you ever personally met Jerrell Bray?

8   A.   No.

9   Q.   Then come November, 2005, are you, in fact, arrested

10  for selling drugs?

11  A.   Yes.

12  Q.   Okay.  Tell us about the actual day of the arrest.

13            What happens?

14  A.   It was about 6:30 in the morning, November 10th.  The

15  U.S. Marshals kicked in my door, and I was sleeping on the

16  couch.  And they handcuffed me.  And one of my sons was

17  upstairs in the bedroom getting ready for school.  And my

18  other son was in the bathroom getting ready.

19            And I informed them that one of my sons was

20  upstairs and one was in the bathroom, and once they got them

21  downstairs in the living room, one of the detective asked me

22  was anything -- he was -- he was a black guy.  He asked me

23  was anything in the house that he should know about that

24  shouldn't be here, because they was going to find it anyway.

25  Q.   Did you tell him?

1    A.    Yes.

2    Q.    What did you tell him?

3    A.    I told him that it was two ounces of crack that was up

4    in the kitchen cabinet, and I got four guns up under my

5    mattress in my bedroom.

6              And there was some money up under my mattress,

7    between my mattress in the bedroom.

8    Q.    Did you admit that the money was yours?

9    A.    Yes.

10   Q.    After you told that to the detective about the guns,

11   the drugs, and the money, what happened next?

12   A.    They proceed to search and then they found where I

13   told them it was at, they found it, and they still proceeded

14   to search through the house and that was it.

15             And I told them there was some marijuana in

16   the kitchen cabinet.

17   Q.    At that point are you taken out of the house?

18   A.    No.

19   Q.    What happens?

20   A.    They call my girlfriend LaTanya to come pick up my

21   sons and she arrived, picked them up, took them to school

22   and then they took me to Richland County jail.

23   Q.    While you're at the Richland County jail, were you

24   able to determine what you were being arrested for

25   specifically?

Page 2507

1    A.    No.

2    Q.    Did you know it was generally about drugs?

3    A.    I didn't know it was about drugs at all.

4              I mean, they showed me an indictment, but I

5    didn't even understand it.

6    Q.    After being at the Richland County jail for a while,

7    where were you taken?

8    A.    To Cleveland Federal Building.

9    Q.    What happened in the Cleveland Federal Building?

10   A.    We went in for an arraignment, and it was me and

11   Geneva France is on the indictment.  I didn't even know that

12   we was on the indictment until we got here.

13   Q.    Okay.

14   A.    And when we was brought into the courtroom and, you

15   know, I'm looking like I don't know her.

16   Q.    Referring to Geneva France?

17   A.    Yes.  And she was looking at me like she didn't know

18   me.  We didn't know what was going on.

19   Q.    Okay.  At some point after you get up here and you're

20   in front of a Federal Judge, are you able to go over the

21   indictment with anyone and understand exactly what you've

22   been charged with?

23   A.    Yes.

24   Q.    Okay.  Did you receive an attorney?

25   A.    Yes.

1   Q.   What was his name?

2   A.   Henry DeBaggis.

3   Q.   As you and Mr. DeBaggis went over the charges, what

4   was your understanding of specifically what you had been

5   charged with?

6   A.   Two counts of drug trafficking.

7   Q.   Supposedly occurring when?

8   A.   They said October 25th of 2005.

9   Q.   Did that date mean anything to you, sir?

10  A.   No.

11  Q.   Do you know who you were supposedly involved in this

12  drug trafficking with?

13  A.   They said it was with Geneva France.

14  Q.   Had you ever given Geneva France any drugs --

15  A.   No.

16  Q.   -- to deliver to anyone?

17  A.   No.

18  Q.   Had you even known Geneva France personally prior to

19  seeing her in Federal Court?

20  A.   I met her.  I didn't know her.

21  Q.   Okay.  When you met her on the one occasion, did you

22  introduce yourself as Ron Davis or by a street name?

23  A.   By a street name.

24  Q.   And that again was Jay?

25  A.   Yes.

1    Q.    Other than that one occasion, to your recollection did

2    you ever again or was there any other time when you had

3    actually seen Geneva France before getting here to Federal

4    Court?

5    A.    No.

6    Q.    After you understood that you were charged with

7    something occurring on the 25th of October, what did you and

8    your attorney decide to do?

9    A.    We didn't -- we didn't discuss anything.  He just set

10   up another Court date.  We waived my bond hearing.

11   Q.    Okay.  So you agreed to remain in custody?

12   A.    Yes.

13   Q.    A short time thereafter did you agree to sit down and

14   talk with the government?

15   A.    Yes.

16   Q.    Do you remember about how long after you were arrested

17   you actually agreed to sit down and talk with them?

18   A.    Maybe about a week or two.

19   Q.    Okay.  Tell us about that meeting.  Where did it

20   occur?

21   A.    It occurred in the Cleveland building, Cleveland

22   Federal Building.

23   Q.    Do you recall who was there?

24   A.    My attorney, Lee Lucas, and another detective.

25   Q.    Do you recall if the prosecutor was there as well?

1    A.    Yes.

2    Q.    Okay.  Were you willing to plead guilty to the offense

3    that you were charged with on October 25th?

4    A.    No.

5    Q.    Okay.  What were you willing to plead guilty to?

6    A.    To the drugs and guns that was found in my house.

7    Q.    Why wouldn't you plead guilty to the October 25th

8    offense?

9    A.    Because it never occurred.

10   Q.    Did the government agree to dismiss the indictment

11   against you?

12   A.    Yes.

13   Q.    And what did you wind up, in fact, pleading to, what

14   type of document?

15   A.    They agreed to dismiss the indictment and the weapons

16   and I pleaded out to the drugs, to the crack that they found

17   in the house.

18   Q.    Crack that they found in the house on the 10th of

19   November?

20   A.    On November the 10th.

21   Q.    Were you ultimately sentenced for the crime to which

22   you pled?

23   A.    Yes.

24   Q.    Okay.  Prior to being sentenced, do you know if they

25   determined the information pending against you up in

Page 2614

1          THE COURT:  Good morning.  You may be seated.

2          Call your next witness.

3          MR. COMBER:  Thank you, Your Honor.  The

4     government calls Mr. Blas Serrano.

5          THE COURT:  All right.  Mr. Serrano, you know

6     where the witness stand is, right here to my left.  Go ahead

7     and step up.

8          THE WITNESS:  Thank you, Your Honor.

9          THE COURT:  And my deputy will swear you in

10    before you actually sit down.  All right?

11                    BLAS SERRANO,

12    of lawful age, a witness called by the Government,

13          being first duly sworn, was examined

14                and testified as follows:

15          THE COURT:  You may proceed, Mr. Comber.

16          MR. COMBER:  Thank you, Your Honor.

17    DIRECT EXAMINATION OF BLAS SERRANO

18    BY MR. COMBER:

19    Q.   Good morning, sir.

20    A.   Good morning.

21    Q.   Would you please state your name, spelling your last

22    name for the record?

23    A.   My name is Blas, the last name is Serrano,

24    S-E-R-R-A-N-O.

25    Q.   Sir, how are you employed?

1   **A.    No, that's not discoverable.**

2   **Q.    Would the proffer reports of interviews with**

3   **co-defendants be turned over to Ms. France's attorney?**

4   **A.    No, that would not be discoverable under the Rules**

5   **either.**

6   **Q.    To the best of your recollection, other than the**

7   **audiotapes of the purported buys from Ms. France, and any**

8   **criminal history-related information about Jerrell Bray,**

9   **would anything else have been turned over to Ms. France's**

10  **attorney?**

11  **A.    I'm sorry?**

12  **Q.    Would anything other than the audiotapes of the**

13  **buy --**

14  **A.    Right.**

15  **Q.    -- and criminal history information related to Jerrell**

16  **Bray as the informant, anything other than those two**

17  **categories have been turned over to Ms. France's attorney?**

18  **A.    Not that I can recall, no.**

19  **Q.    In advance of going to trial on particular charges, do**

20  **you listen to the audiotapes that are involved with those**

21  **buys?**

22  **A.    Generally, no.**

23          **If it's a wiretap case, I do oftentimes listen**

24  **to them.   When you have multiple defendants in isolated**

25  **buys, the recordings are rather extensive.   There's a lot of**

1   Q.   Okay.   Thank you.   One of the buys at trial before

2   Judge Adams was the buy purportedly from Dwayne Nabors,

3   correct?

4   A.   Yes.

5   Q.   Okay.   And that buy occurred in essentially three

6   stages?

7   A.   Yes.

8   Q.   Okay.   At trial, was there any video played of any

9   stage of the Dwayne Nabors buy?

10  A.   No, there was not.

11  Q.   Okay.   To your recollection had you been provided with

12  any video of any stage of the Dwayne Nabors buy?

13  A.   No, I was not provided with any video.   My

14  understanding was or I was told that there was no video.

15  Q.   Told by whom, sir?

16  A.   By Special Agent Lucas and Detective Metcalf.

17  Q.   Okay.   In these trials, that being the France trial

18  and the Nabors trial, who is seated with you at counsel

19  table?

20  A.   Special Agent Lucas.

21  Q.   Anyone else?

22  A.   No.

23  Q.   What is Agent Lucas's role during the course of the

24  trial?

25  A.   Well, the case agent when he sits at trial is sort of

1                    In the event he was not being truthful and he
2      was being coerced, I wanted to explore that and also the
3      fact that the information came through a proffer.  It's a
4      confidential discussion that one doesn't disclose, not until
5      one has to actually call the person as a witness.
6                    And I wanted to explore whether, in fact, he
7      was not in collusion with the others; whether he was, you
8      know, then subject to potential retaliation from the others
9      if they knew he was cooperating.
10                   So there were a number of factors that I
11     wanted to explore before that.
12     Q.    Well, how did you explore that, sir?
13     A.    Well, I didn't have time because I immediately started
14     trial and I didn't get a chance to talk to Lee again.
15     Q.    What was the basis for your belief that Mr. Lee had
16     been coerced?
17     A.    Well, I had three officers who told me that the person
18     who was there at Platinum Status was Dwayne Nabors.
19                   For another, I felt that there was a vast
20     difference between Nabors and Lee and one could not, you
21     know, mistake one for the other.
22                   Nabors, I believe, was the supplier, the
23     one -- the dominant person based on the information that I
24     had, so in my experience those individuals are able to
25     coerce another individual to take the blame for them.

1   Q.   Well, it would be highly unusual if he didn't, isn't

2   that true?

3   A.   I don't know whether it would be highly unusual.

4   Q.   Well, sir, he -- you're going to trial.  There's only

5   one report of this deal.

6   A.   You're talking about this deal?

7   Q.   This deal.

8   A.   Oh, okay.  This deal, yes.

9   Q.   You had this DEA-6?

10  A.   Oh, yeah, I had this.

11  Q.   All right.

12  A.   No, I thought you were talking about all of them.

13  Q.   Okay.  Let's talk about this deal.

14  A.   Okay.

15  Q.   Paragraph 10.  Doesn't Mr. Lucas say that Detective

16  Metcalf and Sergeant Mayer made a videotape of the meeting

17  referenced in Paragraph 10?

18  A.   Yeah, that's -- that's what it says there.

19  Q.   Okay.  So, sir, you did know that there was a

20  videotape?

21  A.   No, I didn't know that.  I was told that there was no

22  videotape, nor is there a listing of the -- in the exhibits.

23  That's what I go by.

24           When I refer to the physical evidence, there's

25  no listing of a videotape and I was told that there was no

Page 2752

1          MR. ROTH:  I'll give you a hand.

2          MR. COMBER:  Is all this yours?

3          THE COURT:  You may proceed.

4          MR. COMBER:  Thank you, Your Honor.

5     REDIRECT EXAMINATION OF BLAS SERRANO

6  BY MR. COMBER:

7  **Q.    Sir, you were asked -- sir, you were asked about your**

8  **handwritten notes from the proffer with Jerry Moton, and**

9  **what was marked as Defendant's Exhibit 114.**

10         **Is a copy of that still in front of you, sir,**

11 **among all the other stuff?**

12 **A.    It should be, but I don't know which volume it is in.**

13         MR. COMBER:  Is it still up here, Tom?  Is it

14 still up here?

15         MR. ROTH:  Probably I took it back.

16         MR. TEITELBAUM:  It might be on the table.

17         MR. COMBER:  Not his notes.  I just want the

18 one you handed to him.

19         MR. ROTH:  Here it is.

20         MR. COMBER:  Okay.  Just so we all have a set.

21 BY MR. COMBER:

22 **Q.    Number 114, that's the actual one that Mr. Roth showed**

23 **to you, correct, sir?**

24 **A.    Yes.**

25 **Q.    Okay.  Mr. Roth directed your attention to Page 2**

1    where there's the name Chris Jordan?

2    A.    Yes.

3    Q.    Okay.  He asked you about the two lines below Chris

4    Jordan's name.

5              What's it actually say on the third line below

6    Chris Jordan's name?

7    A.    "Never bought."

8    Q.    "Never bought"?

9    A.    Yeah.  And my interpretation -- I take very cryptic

10   notes -- but is that he never bought from Chris Jordan.

11   Q.    Okay.  And then about two-thirds of the way down

12   there's a space and you have a drawing next to it.

13             Does that say "Jerrell still selling, can get

14   Chris to buy from Jerrell"?

15   A.    That's right, that's what Moton said.

16   Q.    Okay.  So as of the time of Mr. Moton's proffer on

17   December 13th, 2005, you were made aware that Mr. Bray, at

18   least according to Mr. Moton, was selling drugs on the side?

19   A.    Well, that's something that, yeah, he mentioned, but I

20   had no basis to -- in support of that.

21   Q.    I understand.  But as of December 13th, 2005, you at

22   least had Mr. Moton saying that Jerrell Bray was selling

23   beyond the control of the DEA, correct?

24   A.    Right.  That's what Moton said.

25   Q.    Okay.  Before you is Volume 1, the smallest of the

1  three binders.  I believe it's the furthest to your left.

2  A.   Right.

3  Q.   Directing your attention under Section 1-B --

4  A.   Right.

5  Q.   -- to Page 74.

6  A.   Yes.

7  Q.   This is the DEA-6 that was written after Mr. Moton's

8  proffer, correct?

9  A.   I believe so, yes.

10  Q.   And this DEA-6 was written by Agent Lucas?

11  A.   Yes.

12  Q.   Can we agree that nowhere in the 6 does Agent Lucas

13  recite what you recited in your notes, that Mr. Moton said

14  Jerrell Bray was dealing on the side?

15  A.   No, I don't see it there.

16  Q.   Okay.  Also, in fact, it says -- and let me get an

17  exact paragraph for you here -- Paragraph 8 on Page 75, that

18  Mr. Moton sold up to ounce quantities of crack to Chris

19  Jordan several times per day; that's what the 6 says,

20  correct?

21  A.   Yes.

22  Q.   But your notes, your notes indicate that he said he

23  never bought from -- that Mr. Moton said he never bought

24  from Chris Jordan, correct?

25  A.   Right.

1  Q.   Okay.  Was it ever turned over in the France trial,

2  was information ever turned over concerning Mr. Bray dealing

3  on the side?

4  A.   No, I don't believe it was.

5  Q.   Was it ever turned over for the Ballard trial?

6  A.   No.

7  Q.   For the Nabors trial?

8  A.   No.

9  Q.   You were asked about side-bar conference in the France

10  trial.

11            In Volume 2, the trial transcripts set, at Tab

12  5-B --

13  A.   I'm sorry.

14  Q.   Excuse me, that's my fault.  I stand corrected.

15            It was in Detective Metcalf's testimony so

16  it's part of the record but it's not actually in the

17  binders.  It's my mistake.

18            But when you were asked about the side-bar

19  about the photograph, isn't it true that you told the Court

20  "This is just to confirm the identification of the

21  defendant.  This is not something that the government is

22  obligated to provide"?

23  A.   I vaguely recall that.

24  Q.   So it's not that Mr. Mullin waived his right to the

25  photograph, it's that it was your position that you weren't

1                I think you know where the witness stand is

2      right here to my left.

3                THE WITNESS:  Good afternoon, Your Honor.

4                THE COURT:  All right.  Be careful.  Step up,

5      step up there, but be careful.  My deputy will swear you in

6      before you sit down.

7                          EDWARD MULLIN,

8          of lawful age, a witness called by the Government,

9                being first duly sworn, was examined

10                    and testified as follows:

11         DIRECT EXAMINATION OF EDWARD MULLIN

12     BY MR. TEITELBAUM:

13     Q.    Good afternoon, sir.  Sorry to keep you waiting.

14     A.    Good afternoon.

15     Q.    Would you state your name for the record, please?

16     A.    My name is Edward Mullin, M-U-L-L-I-N.

17     Q.    And Mr. Mullin, would you tell us, please, your

18     occupation or profession?

19     A.    I'm an attorney-at-law.

20     Q.    Practice here in Cleveland?

21     A.    Yes, sir.

22     Q.    And would you give the jurors a little bit of your

23     background?

24                You had a profession before you were a lawyer,

25     is that correct?

Page 2800

1  of your cross-examination?

2  A.     Twenty-four and 25, sir?

3  Q.     I'm sorry, go right through Page 27, Line 11.

4  A.     I finished scanning Page 26 and now I'm on 27.

5  Q.     Okay.  You can just go through Line 11 there, sir.  It

6  goes to another topic.

7  A.     Okay.

8  Q.     Lines 12 through 20 on Page 26, would you read those

9  to us, please?

10 A.     Line 12 on --

11 Q.     Twenty-six?

12 A.     -- 26.

13            The question:  "Do you remember hearing 'Take

14 two back'?

15            "Answer:  Yes.

16            "Question:  Who said that?

17            "Answer:  I heard Davis say it.  I heard

18 Jerrell say it.  And I heard her say it, your client.  Three

19 people I heard say it that day.

20            "Question:  Okay.  So when we play that tape,

21 you're going to be able to point out for the jury -- you're

22 going to be able to point out for the jury members where

23 Davis is being heard on that tape?

24            "Answer:  No.  I could hear Davis.  I'm next

25 to Mr. Bray.

1              "Question:  I'm referring to the CD."

2    Q.    Okay.

3    A.    Then there was an objection.

4    Q.    Okay.  And you can stop there, sir.

5              I take it the tape, you could not hear the

6    extra voice?

7    A.    You could not hear the extra voice.

8    Q.    And your point in this was -- to Mr. Bray, was what?

9    A.    My point was Mr. Bray was pretending that he was

10   calling this Mr. Davis saying "Take two back."

11             Agent Lucas was occupied at the time, and the

12   point was when Lucas then testified, Agent Lucas, he kind of

13   shut me down on that by saying "Oh, I could hear Mr. Davis

14   on the phone."

15   Q.    And these arguments about Mr. Bray being in control

16   and manipulating, did you make these in your closing

17   argument?

18   A.    Those were -- those were part of my closing argument,

19   yes, sir.

20   Q.    And again Ms. Bray was convicted?  I'm sorry,

21   Ms. France.

22   A.    Geneva France was convicted, yes.

23   Q.    One last thing, sir.

24             The other day when Ms. France was in, she was

25   directed to a passage and asked about your

1    closing -- comments you made in your closing arguments about

2    a Shakia Gordon?

3    A.    Shakia Gordon, I know -- I know the name.

4    Q.    Okay.  That's -- do you know the name Shakia Gordon?

5    A.    It was a name that was mentioned in the trial.

6    Q.    Okay.  And Ms. France was asked to look at Page 243

7    going into 244.

8    A.    Of which volume?

9    Q.    I'm sorry, it's in the gray volume, Exhibit 5.

10   A.    Oh.

11   Q.    Because that has the closing arguments in it.  The

12   jurors' books do not.

13   A.    This one here?

14   Q.    Yeah.

15   A.    Would you repeat the page number again?

16   Q.    Page 243 going into 244.

17   A.    I have 243 here, sir.

18   Q.    And at 243, spilling over to the next page, is there a

19   statement being made about Shakia Gordon and being involved?

20         Maybe if you could read that paragraph.

21   A.    May I start at the bottom of 243?

22   Q.    Sure.

23   A.    That's where I first notice the name in this passage.

24         "The Little S was researched.  It wasn't

25   Geneva France whose photo was produced, it was another

Page 2803

1    individual, a Shakia Gordon.  In fact, this was a

2    flimflam -- if this in fact was a flimflam operation by

3    Bray, Agent Lucas didn't want to look bad for the

4    government."

5              This, of course, is Mr. Serrano's closing.

6    Q.   Well, let me --

7    A.   It's not mine.

8    Q.   You did not -- you did not make that argument, did

9    you?

10   A.   No, this is not me speaking on those pages here.

11             243 and 244, we're into what's called close

12   close.  I believe I was completed by then.

13   Q.   All right.  This is the rebuttal argument and not your

14   argument?

15   A.   That's correct, sir.

16             MR. TEITELBAUM:  Thank you, sir.  That's all I

17   have.

18             THE COURT:  Mr. Roth.  Mr. Roth.

19             MR. ROTH:  Yeah.  Just a few minutes to set

20   up, Your Honor.

21             THE COURT:  Sure.

22        CROSS-EXAMINATION OF EDWARD MULLIN

23   BY MR. ROTH:

24   Q.   Sir, you were reading from a passage from Mr. Lucas's

25   testimony on 5-A at Page 26, and then you stopped.

Page 2804

 1                 What I'd like you to do, sir, is I'd like you
 2      to continue.
 3      A.      5-A?
 4      Q.      Yeah, you went down to the bottom of Page 26.  That's
 5      Tab 5-A.
 6      A.      Right.
 7      Q.      Okay.
 8      A.      Which line would you like me to start with, sir?
 9      Q.      Sir, at the top of -- I think you stopped at the
10      bottom of 26.
11                 You say on Line 22 on Page 26, "I'm referring
12      to the CD."
13                 And if you could just pick it up there on the
14      top of 27 with Mr. Lucas's response?
15      A.      Okay.  My question was "I'm referring to the CD."
16                 Mr. Serrano asked "May he complete the
17      answer?"
18                 The Court says:  "You may."
19                 The answer on the top of 27, Agent Lucas.
20                 "Answer:  Yeah, I'm -- no, I couldn't hear,
21      you won't hear that on the tape from his phone.
22                 "Question:  Okay."  And then he continued to
23      answer.  "Or his recorder in his pocket.  But being close
24      enough to him, I heard that just as I testified, 'Take two
25      back.'

1                      "But" -- my question:  "But it wasn't

2        recorded?

3                      "No.

4                      "Okay.  So the jury members can't hear that

5        when they take the tape into the deliberation, right?

6                      "Answer:  Obviously."

7    Q.     Okay.  You can stop there, sir.

8    A.     Okay.

9    Q.     So, sir, his point was that although it wasn't

10       recorded because it wasn't close enough to the recording

11       devices, Mr. Lucas who was sitting next to him could hear

12       it, was that his point?

13   A.     I'm -- I'm not sure I know exactly his point.

14                     His point was that he could hear it from where

15       he was seated.  The recording device was not the issue.  You

16       normally have the tape, you have the phone, you have the

17       recordings.

18                     In that particular case we did not have the

19       other party recorded, like we did in some others.

20   Q.     Well, sir, in order to do that, you have to

21       put -- Mr. Bray would have to put the earpiece in, correct?

22   A.     That sounds right.  I'm sure not knowledgeable about

23       that, but that makes sense, yes.

24   Q.     Okay.

25   A.     And apparently he did not.

```
 1                   AFTERNOON SESSION

 2              THE COURT:  You may be seated.

 3              Sir, you're still under oath.

 4              THE WITNESS:  Yes, sir.

 5       CROSS-EXAMINATION OF LARRY FAITH (RESUMED)

 6   BY MR. TEITELBAUM:

 7   Q.   Good afternoon, Captain.

 8   A.   Good afternoon.

 9   Q.   Sir, on the -- directing -- turning to the Geneva

10   France buy.

11   A.   Yes, sir.

12   Q.   And does October 25th sound like about the right date

13   to you, sort of near the end of the buys?

14   A.   Yes, sir.

15   Q.   Okay.  And on that day, you and Detective Metcalf were

16   together in a car for surveillance, is that correct?

17   A.   Yes, sir.

18   Q.   And Mr. Lucas was with Mr. Bray in the buy car?

19   A.   Yes, sir.

20   Q.   And do you recall who else was out that day?

21   A.   There were two other DEA agents.  I don't recall who

22   it was.

23   Q.   And are you familiar with Mr. Verhiley?

24   A.   Yes, sir.

25   Q.   And are you familiar with an Officer Stross or Stross,
```

Page 2937

1    to refresh yourself on an affidavit?

2    A.    Correct.

3    Q.    Yeah, sort of standard procedure, isn't it?

4    A.    Yes, sir.

5    Q.    And Detective Metcalf, is he much of a notetaker?

6    A.    No.

7    Q.    Sir, in your affidavit you specifically put that the

8    car was a silver Caprice, is that correct?

9    A.    Yes, sir.

10   Q.    And so, one, would it be accurate that one discrepancy

11   between your report and what was written in this report is

12   in Paragraph 4 on Page 53 where it refers to it as a silver

13   Lincoln?

14   A.    Yes, sir.  It says silver Lincoln.  I thought it was

15   what I had put down as a silver Chevy Caprice.

16   Q.    You saw it and so you typed your recollection of what

17   you saw, right?

18   A.    Yes, sir.

19   Q.    Okay.  And so on that incident, instead of just

20   following what the 6 said, you put what you believed you saw

21   and accurately put in the affidavit, right?

22   A.    Yes, sir.

23   Q.    Okay.  Now, in that same paragraph, sir, it

24   says -- one, it says it's a Lincoln instead of it being a

25   Caprice, and then the next sentence says "Detective Metcalf

1    and Captain Faith followed Davis to 187 South Adams Street."

2                That sentence is inaccurate, is it not, sir?

3    A.    Yes, sir.  I -- we didn't follow him to that

4    residence.

5    Q.    Okay.  And just to change topics for a second, sir,

6    the incident that you were asked about earlier where the

7    money was maybe taken, where the money was found in the car

8    at the end of the one Mott buy --

9    A.    Yes, sir.

10   Q.    -- when that, when the car returned, when Bray -- you

11   were upstairs monitoring the transaction, if I recall it

12   correctly?

13   A.    Yes, sir.  I believe so.

14   Q.    And when Bray comes back from the deal out in the

15   parking lot, are you out there in the parking lot, or are

16   you still up in the office, if you recall, sir?

17   A.    I may have come down into the parking lot.

18   Q.    Okay.

19   A.    I can't really --

20   Q.    You can't recall that type of detail.

21              And you were asked about 435 Tremont.  You

22   know a couple of buys went down there, is that correct?

23   A.    Yes, sir, I know of at least one.

24   Q.    Okay.  And other than that, are you familiar with that

25   address at all?

1    Q.    And where did you get the information that Mr. Nabors

2    was the top person in the organization?

3    A.    From Richland County Sheriff's Office.

4    Q.    And is there a specific individual?

5    A.    Most likely, I don't recall for sure, but it was most

6    likely Chuck Metcalf.

7                MR. ROTH:  No further questions, Your Honor.

8                THE COURT:  All right.  We'll take our

9    afternoon break now.

10               MR. COMBER:  Thank you.

11               (Recess taken).

12               THE COURT:  You may be seated.

13               Sir, you're still under oath.

14               You may proceed.

15               MR. COMBER:  Thank you, Your Honor.

16        CROSS-EXAMINATION OF ROBERT CROSS

17   BY MR. COMBER:

18   Q.    Sir, you had no prior law enforcement experience

19   before starting with DEA, correct?

20   A.    Correct.

21   Q.    And you arrived here in Cleveland to the DEA office in

22   July, 2005?

23   A.    Yes.

24   Q.    One month before Mr. Bray was signed up?

25   A.    Approximately, yeah.  I don't recall the exact dates,

1           MR. ROTH:  Objection.  Beyond the scope of

2     direct.

3           MR. COMBER:  Your Honor, he just talked about

4     DEA procedures and his lack of knowledge of some.

5           MR. ROTH:  Judge, we're on a different deal

6     now.

7           THE COURT:  Okay.  I'll give you limited

8     latitude, not unlimited.

9           MR. COMBER:  Thank you.

10    BY MR. COMBER:

11    Q.    Can we agree that the manner in which the Webb deal

12    was conducted violated DEA procedures?

13    A.    It was not the way that a standard deal should go,

14    yes.

15    Q.    Thank you.  You indicated that Detective Metcalf was

16    certain the voice in some of the pre-buy calls was that of

17    Danny Lee Brown?

18    A.    Yes.

19    Q.    And there were -- to your recollection, how many calls

20    were there before the buy?

21    A.    Two or three.

22    Q.    When did those calls take place?

23    A.    There was a couple the night before, and then again

24    the day of.

25    Q.    Okay.  So that the record's clear, Detective Metcalf

Verhiley - Direct

1    stolen some money?

2    A.    No, he didn't.

3    Q.    During that conversation, did you ever tell him

4    that in your opinion, Bray had stolen money?

5    A.    No, I did not.

6            MR. ROTH:  I have nothing further.

7            THE COURT:  All right.

8                    CROSS EXAMINATION

9    BY MR. COMBER:

10   Q.    Good morning, sir.

11   A.    Good morning.

12   Q.    Other than the type of report that was shown to

13   you in Exhibit-- in Defense Exhibit 507, your agency

14   didn't write detailed, substantive reports about these

15   buys, correct?

16   A.    That's correct.

17   Q.    So is it fair to say that the extent of the report

18   would simply be to refer back to whatever the DEA-6

19   report said?

20   A.    That is correct.

21   Q.    Is it also fair to say that your agency did often

22   provide a considerable amount of money in order to

23   conduct these deals?

24   A.    Yes, sir.

25   Q.    Let's say a deal was going to be for a thousand;

Verhiley - Cross

1   your agency might provide the whole thousand?

2   A.   Yes, sir.

3   Q.   Sometimes your agency would provide half of it?

4   A.   Yes, sir.

5   Q.   And in return for that, your agency would also

6   receive what are known as forfeiture funds, if there

7   were forfeitures, correct?

8   A.   Yes.  Only on the Federal level.

9   Q.   Please explain to the jury what we mean by

10  forfeiture funds on the Federal level.

11  A.   If, at the end of the case, if there was a

12  substantial amount of money that was seized, or

13  vehicles or residences or businesses, just depending on

14  whatever was seized, it would be split.  It would be a

15  percentage of either the money or the property.

16  Whatever was made from that forfeiture, whatever was

17  seized, if it was either auctioned off or it was cash,

18  Ohio BCI would receive a percentage of that, those

19  forfeiture funds.

20  Q.   Is it fair to say that the receipt of forfeiture

21  funds is at least one motivating factor in determining

22  what types of drug investigations to conduct?

23  A.   I'm sorry.  I didn't --

24  Q.   Whether or not you get forfeiture money is

25  important to the department?