Verhiley - Cross

1    A.    Not really.  Not to BCI.

2    Q.    Do you know if it is important to DEA?

3    A.    I don't know.

4    Q.    Do you know if that is something that is recorded

5    by DEA administrators, how much money was received

6    through forfeitures?

7    A.    I believe it would be, yes.

8    Q.    Did you testify at either of the Mansfield trials,

9    sir?

10   A.    No, sir.

11   Q.    And do you know who sat at counsel table

12   throughout both of the Mansfield trials?

13   A.    I had nothing to do with any of the Court

14   proceedings in the Mansfield case.

15   Q.    You indicated that many of the, if not all, I

16   believe your testimony was, of the deals that DEA was

17   involved with in Mansfield were coordinated by RCSO

18   before DEA got down to Mansfield?

19   A.    Yes, sir.

20   Q.    And the vast majority of the time, DEA still

21   participated in controlled calls immediately before the

22   deal.  Correct?

23   A.    If there were, yes.  Just to confirm that the deal

24   was set up.

25   Q.    But that didn't occur every single time, correct?

Exhibit 1

Verhiley - Cross

1    A.    That is correct.

2    Q.    And in fact, there was one deal where by the time

3    you arrived down to Mansfield, Mr. Bray was already out

4    with the target in his car.  Correct?

5    A.    Yes, sir.

6    Q.    And that was the Webb deal?

7    A.    Yes.  Joshawa Webb.

8    Q.    And to your recollection, did you participate in

9    any meeting the day of the Webb deal that actually

10   involved Mr. Bray?

11   A.    No.

12   Q.    To your knowledge, did Mr. Lucas participate in

13   any meeting the day of the Webb deal that actually

14   involved Mr. Bray?

15   A.    No.

16   Q.    Do you recall whether or not you wrote one of your

17   BCI reports for the Webb deal?

18   A.    I'm not sure.

19   Q.    Again, in that smaller Volume 1 that's in front of

20   you, also in that Tab 1-A, I would ask that you turn to

21   Page 49.

22        Sir, once you are there, would you review

23   Paragraph 2 on Page 49?

24   A.    Okay.

25   Q.    Can we agree that on 10/14, the day of the Webb

Verhiley - Cross

1    deal, where it says that you met with Mr. Bray, that
2    that paragraph is inaccurate?
3    A.    Yes.  If it was prior to, that is correct.
4    Q.    To your knowledge, you didn't meet with Mr. Bray
5    any time on the actual day of the Webb deal, correct?
6    A.    Not prior to, no.
7    Q.    Had you written one of your BCI reports
8    incorporating this DEA-6, would you have noted that
9    inaccuracy?
10   A.    I'm sorry.  If I wrote a BCI report --
11   Q.    Right.  Because you indicated you reviewed the
12   DEA-6's before you wrote the BCI report that
13   incorporated them.
14   A.    Yes, sir.
15   Q.    Had you noted that inaccuracy, would you have
16   reported that inaccuracy in your BCI report?
17   A.    Yes, I believe I would.
18   Q.    I would ask you to turn back to Page 17, the DEA-6
19   from the Mott deal.
20        Sir, the exhibit, Defendant's Exhibit 507, the
21   copy of your BCI report for this deal was completed on
22   the 15th of September, correct?
23   A.    Yes, sir.
24   Q.    Can we agree that Agent Lucas didn't sign his
25   report until the 19th of September?

Verhiley - Cross

1    referring back to earlier in the cobble, you at that

2    time didn't know that Mr. Bray had already indicated

3    the deal went down for $2425, correct?

4    A.    Right.  I didn't.  I wasn't privileged to that

5    information.

6    Q.    Even to this day, were you aware that Mr. Bray had

7    broadcast on the cobble that the deal in fact went down

8    for $2425?

9    A.    There was -- I had spoken to Kim Thomas in

10   reference to that.  I wasn't aware of that, though.

11   Q.    Thank you.  So we can agree that it is not

12   Mr. Bray that provides the buy money to Mr. Lucas,

13   correct?

14   A.    Correct.

15   Q.    You find the buy money and then provide it to

16   Mr. Lucas, correct?

17   A.    Yes.

18   Q.    And you find the buy money after you have already

19   begun the search of the vehicle.  Correct?

20   A.    Right.

21   Q.    Prior to the search of the vehicle, Mr. Bray did

22   not provide anything, any buy money to Mr. Lucas,

23   correct?

24   A.    That is correct.

25   Q.    Did you also write a BCI report that incorporated

Verhiley - Cross

1   Mr. Lucas' report?

2   A.   Yes, I did.

3   Q.   Okay.  I'm sorry.  That was 507, correct?

4   A.   That is correct.

5   Q.   Thank you.  And Paragraph 9 indicates, "The CS

6   returned the remaining $780 OGF to Agent Lucas."

7   Correct?

8   A.   Yes.

9   Q.   Had you read that paragraph before you drafted

10  your report?

11  A.   Possibly no.

12  Q.   Do you recall ever reading that paragraph and

13  saying to anyone, "Hold on, that's not what happened"?

14  A.   No, I didn't.

15  Q.   That paragraph goes on to indicate that "after the

16  return of the buy money, the CS' vehicle was again

17  searched."  Correct?

18  A.   Yes, sir.

19  Q.   And it was searched for negative results, correct?

20  A.   Yes, sir.

21  Q.   That's also not true, because your search revealed

22  $780 in buy money, correct?

23  A.   Yes, it did.

24  Q.   And that's a positive result, correct?

25  A.   Yes, sir.

Verhiley - Cross

1  Q.   Do you have a recollection of reviewing Mr. Lucas'
2  DEA-6 report of the Roosevelt Williams buy?
3  A.   No, I don't.
4  Q.   Do you have a recollection of reviewing two
5  different DEA-6s written by Mr. Lucas of the Roosevelt
6  Williams buy?
7  A.   No, I don't.
8  Q.   Okay.  I ask you to turn to Page 41, Volume 1-A in
9  front of you.  Once there, I ask that you review
10  Paragraph 5.
11  A.   Okay.
12  Q.   The next to last sentence "At this time, Williams
13  departed the vehicle and returned to his Buick Riviera,
14  as observed by Detective Metcalf and TFO Verhiley."
15  A.   Yes, sir.
16  Q.   Can we agree that is not accurate?
17  A.   Like I said, I'm not exactly sure if I was with
18  Detective Metcalf or not.  Personally, I don't remember
19  if I was or if I wasn't.
20  Q.   Understood.  Irrespective of whether you were with
21  Detective Metcalf, it is definitely inaccurate that
22  you observed the target, Williams, or whomever it was,
23  return to his Buick Riviera.  Correct?
24  A.   Correct.
25  Q.   I ask that you turn three pages ahead to Page 44.

Verhiley - Cross

1      Again, Paragraph 5, next to last sentence.

2  A.  Okay.

3  Q.  This is the second 6 written about the Roosevelt

4  Williams buy.

5      Can we agree that it is inaccurate that you

6  observed Mr. Williams depart the Bray/Lucas vehicle and

7  return to a Cutlass?

8  A.  Yes.

9  Q.  So irrespective of which report we go on, whether

10  it was a Riviera or a Cutlass, you never observed that

11  person get out of the Bray/Lucas vehicle and back into

12  his own vehicle.  Correct?

13  A.  That's correct.

14  Q.  You were asked about knowing Perry Wheeler,

15  correct?

16  A.  Yes.

17  Q.  At one of the conventions for the organization you

18  and Mr. Wheeler both belong to, you were actually told

19  by Mr. Wheeler about his identification of the person

20  who supposedly made the deal on the 5th of October,

21  correct?

22  A.  No.

23  Q.  Did you become aware that Mr. Wheeler had that

24  conversation at your convention?

25  A.  Yes, I was.

Clayton - Direct

1          **LEE LUCAS,**

2     the Defendant, being first duly sworn, testified as

3     follows:

4                    **DIRECT EXAMINATION**

5     BY MR. ROTH:

6     Q.   Sir, could you state your name and spell it for

7     the record, please?

8     A.   It is Lee Lucas.  L-u-c-a-s.

9     Q.   And how old are you, sir?

10    A.   I'm 41.

11    Q.   And could you give us some idea of your

12    educational background?

13    A.   I have a Bachelor's degree from Baldwin-Wallace

14    college, with business and psychology minors.

15    Q.   And were you born and raised in Cleveland?

16    A.   Yes, sir.

17    Q.   Could you tell us a little bit about your

18    background and family in Cleveland?

19    A.   I was born here in Cleveland, on West 123rd Street

20    and Lorain Avenue.  My mom and dad grew up here.  My

21    dad was a schoolteacher at West Tech for 34 years,

22    baseball and football coach.  I grew up here.  I

23    attended St. Ed's High School, and then I went to

24    Baldwin-Wallace College.  I'm married.  I have two

25    stepchildren, one that attends Ohio State, another at

Lucas - Direct

1    courtroom, you know what I mean --

2    A.    Yes.  I had no idea that any of that had happened.

3    Q.    Were you aware that he was using his own drugs in

4    these deals?

5    A.    No, sir.

6    Q.    Were you aware that he was staging phone calls?

7    A.    No, sir.

8    Q.    Were you aware that he was selling drugs?

9    A.    No, sir.  I mean, obviously that night, because I

10   arrested him for it.  Once I found out that he was

11   selling drugs, then we arrested him for that, and the

12   shooting.  But before that, no.

13   Q.    Now, to your knowledge, was anyone else aware, any

14   of the other law enforcement officials that he was

15   involved with in the Mansfield cases --

16   A.    No.

17   Q.    Did they know about any of that?

18   A.    No, sir.

19   Q.    Now, would it be accurate to say that you did most

20   of the reports, the DEA-6 reports on these deals?

21   A.    Yes, I did.

22   Q.    Could you tell us how that occurred?  In other

23   words, how it was that you accumulated the information

24   that you put in those reports?

25   A.    Like, just like I have done in every other case

### Lucas - Direct

1    A.    Yes.

2    Q.    Now, by that time, had Mr. Douglas pleaded guilty?

3    A.    Yes.

4    Q.    Okay.  Did you have a discussion with Mr. Serrano

5    as to exactly what it was that Mr. Douglas pleaded

6    guilty to?

7    A.    Yes.  He pled guilty to a prior deal before I was

8    involved, on March 17 of '05, with Tyron Brown and

9    Frank Douglas, when they delivered drugs -- or when

10   Frank Douglas delivered drugs on behalf of Tyron Brown

11   on the 17th of March.  I wasn't involved in that one,

12   but he also pled guilty to the 11/8/05 deal, the one

13   where I saw the guy jump in and out of the car, he pled

14   guilty to that one also.  But that was with Danny

15   Brown, Tyrone's brother.

16   Q.    So would it be accurate that when you testified at

17   the trial, you indicated in the courtroom that the

18   individual that you saw was Frank Douglas?

19   A.    Yes.  And I had had a discussion with Blas Serrano

20   in the pretrial conferences about how in-depth and what

21   we had -- how in-depth we had to go into that, and he

22   told me he is not on trial, you know it is Frank

23   Douglas, and I said yes.  I didn't have him identified

24   the day of the deal.  I identified him subsequently,

25   later on, before the trial, and that was my

Lucas - Direct

1    identification.  That's how I knew it was him.  Not

2    from who I saw then.  I didn't see him good enough, it

3    was raining, to say that it was him.  I knew it was him

4    from, obviously from the ID from Bray, and from him

5    pleading guilty to the deal.

6    Q.    And you were told about the ID from Bray how?

7    A.    From Chuck Metcalf.

8    Q.    And you put it in a report?

9    A.    I did.

10   Q.    Now, at the trial, did you intend to suggest that

11   when you saw this individual on November the 8th, 2005,

12   you actually knew it was somebody named Frank Douglas?

13   A.    No, sir, I did not.

14   Q.    Okay.  Did you indicate at some point that the

15   identification, in your testimony, that the

16   identification was made sometime later?

17   A.    Yes.  I believe there was some confusion on

18   cross -- or on direct.  When I was spoken to, or

19   questioned by Blas Serrano, and then Danny Brown, I

20   don't remember his name, his attorney questioned me,

21   and then I said I knew -- I knew who Frank Douglas was,

22   and then on redirect, when Blas Serrano got up again,

23   he clarified, when did you actually identify him.  And

24   I said later, after the deal.  Something to that

25   effect.

Lucas - Direct

1    A.    Yes.  Westco.

2    Q.    Now, two days prior to that deal, were you

3    involved in the stop of a green Bronco?

4    A.    Semi-involved.

5    Q.    Okay.  Could you tell us what your involvement

6    was?

7    A.    I was contacted again by Chuck Metcalf, who

8    advised that Bray had been contacted by Noel Mott, and

9    that they asked him to go up to Detroit to pick up a

10   larger amount of drugs, to drive up with him, and they

11   were going to follow cars back.  Bray was going to be

12   in his, and other people were going to go up to

13   Detroit, and they were going to pick up a couple, we

14   understood to be kilos of cocaine.

15        As they were driving up, I contacted -- I never

16   made it.  I never went to Mansfield.  I stayed up in

17   Cleveland.  It was happening too fast for us to get

18   down there.  And the routes they were going to take,

19   they were going to go up somewhere off by Toledo to get

20   up to Detroit, so from Cleveland, we never would have

21   made it.

22        At that point, I discussed with Chuck and other

23   guys in the office that we would make a stop, or

24   attempt to make a stop with the Ohio troopers of the

25   vehicle that we could identify, and hopefully seize the

Lucas - Direct

1   money. Our game plan was to take the money that they

2   were going to use to make the buy up in Detroit before

3   they got up to Detroit. That way, no one would get

4   arrested, if we just took the money and we didn't

5   arrest anyone, so the case could keep going, being that

6   it was only really the third day that we were involved.

7   That was only a day after the sixth buy we made with

8   Mott from 435 Tremont. It was the 9th -- or the 7th,

9   the next day, that they were going to go up there.

10   Q. And was there an intention to make the stop by the

11   trooper look like a normal traffic stop?

12   A. That is what was supposed to happen, and he would

13   run the dog, and that was the ruse we would make, and

14   he would find the money and seize the money and

15   identify who was in the vehicles.

16   Q. And Mr. Bray indicated there was a Mr. Mott

17   involved in this?

18   A. Yes.

19   Q. And anybody else?

20   A. At that point, 435 Tremont, that was supposed to

21   be a house the guys from Detroit were using to sell

22   drugs out of, so my understanding was there was a lot

23   of people in that, in that house. So who all was there

24   at that time, I don't remember, or if we knew who all

25   was in there.

Lucas - Direct

1    A.    Yes, but he had asked me do you have a picture of

2    Mr. Transou here in court, and if I could get it during

3    one of the breaks, I believe, and we got it, and I

4    actually said "Do you want to show this," and he looked

5    at it, and he laughed, and he said no.

6    Q.    What did you understand him to be referring to?

7    A.    The picture of Darren Transou, the driver's

8    license photo of Darren Transou.

9    Q.    And what was your understanding as to why he

10   didn't want to show it to the jury?

11   A.    Because the driver's license photo does not look

12   like the guy in the video.

13   Q.    Let me show you what's been marked Defense

14   Exhibits 2-A, 2-B, 2-C, and ask you to take a look at

15   them.

16   A.    Yes, sir.

17   Q.    And what are those photos?

18   A.    2-A is a booking photo of Lowestco Ballard.  2-B

19   is a booking photo of Arrico Spires.  And 2-C is the

20   only -- is the photo of Darren Transou, his Michigan

21   State police -- his Michigan DL photo, his driver's

22   license photo, and this is the only photo that I had

23   ever seen of him prior to trial, and that I have ever

24   seen of him, period, until he walked in here in person.

25   Q.    And to your knowledge, those photos were not shown

Lucas - Direct

1    Q.    And what did you observe?

2    A.    Two darker black Cadillacs parked.  Now, I did not

3    see the tags on the cars.  I saw two Cadillacs parked

4    there.  One was across the street from the white

5    houses, and one was parked in the driveway.

6         I didn't get the tags actually off the vehicles.

7    I saw the two black Cadillacs.  It wasn't until the

8    debriefing after, when I talked to -- I believe it was

9    Bray, and I don't remember specifically if Jamaal said,

10   too, but I know Bray said -- I asked what cars were

11   there to determine who may have been at the house, and

12   he told me that Albert Lee's and Nabors' Cadillacs were

13   there, and I put the tag numbers in to differentiate.

14   He didn't tell me the tags that night.  I put the tag

15   numbers in my car -- or in my report, because I knew

16   the tag number to Nabors' caddy and I also know the one

17   to Albert Lee.  So, I knew there were two caddies

18   there, and I added the actual tag numbers.  Even though

19   I had not been told specifically that tag number, I

20   knew them and I added them.

21   Q.    Now, did you also see a vehicle arrive after -- at

22   or about the time that Mr. Ansari and Bray arrived?

23   A.    I did.

24   Q.    And what did you see?

25   A.    I saw a car.  I can't remember -- I can't remember

Lucas - Direct

1   call?

2   A.   Yes.

3   Q.   And initially, did you just hear Mr. Bray's side

4   of it?

5   A.   Yes.

6   Q.   But at some point, did you play the tape back?

7   A.   Yes, because I was actually on the phone when he

8   was making that phone call.  I received a call.

9   Q.   You were speaking to somebody else?

10  A.   Yes.

11  Q.   On another call?

12  A.   Yes.

13  Q.   So after it, you actually listened to it?

14  A.   Yes.

15  Q.   And at some point, did you -- did you get the

16  impression -- and who was with you?  Was it just you

17  and Mr. Bray?

18  A.   No.  It was myself, Metcalf, Bray, and I think

19  Verhiley was sitting there with us, too, the three of

20  us.

21  Q.   And at some point after you listened to the call,

22  did you believe the call was a female?

23  A.   Yes, but it wasn't until -- at first Bray said,

24  "He said he is going to send his girl," and he said it

25  didn't make sense.  He seemed a little hinked up by it.

Lucas - Direct

1    It didn't seem right.

2         So we ended up playing it again and listening to

3    it, and then determined that it was in fact a female,

4    who seemed like she was talking deeper, trying to throw

5    her voice on that call, and she said she was going to

6    send her girl to do the deal.

7    Q.   So there was a female talking, and the female said

8    she was going to send her girl?

9    A.   Yes.

10   Q.   So did you think there were two girls involved in

11   it?

12   A.   Yes.

13   Q.   The one on the phone and somebody else?

14   A.   And she was going to send her girl.

15   Q.   Now, then, we go to N-19, Track 2.

16   A.   Yes.

17   Q.   Now, do you recall that that was an incoming or

18   outgoing call?

19   A.   I remember it being an incoming call.

20   Q.   And it indicates here that it is with -- it is

21   between Mr. Bray and an individual named Chris Jordan?

22   A.   Yes, sir.

23   Q.   On this day, did you know who Chris Jordan was?

24   A.   I asked Bray about the call afterwards, and I

25   don't remember whether he told me it was his friend,

### Lucas - Direct

1   much," and I lean over to Bray, and there is a

2   conversation where I'm saying, "I'm not going to pay

3   that much," and then Bray is on the phone saying, "he

4   is not digging that," as I reach over to him, and I'm

5   saying it so that the guy on the other end of the phone

6   can hear me.

7   Q.   All right.  Did you actually hear a voice on the

8   other end of the phone?

9   A.   I did.

10   Q.   And what did -- what did you hear that voice say?

11   A.   "Take two back."

12   Q.   And was that repeated?

13   A.   Yes.  By Bray.  He said, "take two back."  I

14   believe the girl said "take two back."  And she gave me

15   two back.  $200 back.

16   Q.   Now, would you agree that you cannot hear on the

17   tape recording that we've listened to, you cannot hear

18   the words, "take two back" coming over the telephone?

19   A.   I agree.

20   Q.   And can you explain why that could happen, but you

21   could hear it?

22   A.   His recorder is in the -- the cobble phone is in

23   his pocket and the recorder is in his pocket.

24        When you dial your phone, you dial and you -- you

25   are sitting in a car, and you dial here.  You dial the

Lucas - Direct

1          CROSS EXAMINATION

2    BY MR. TEITELBAUM:

3    Q.    Good afternoon, sir.

4    A.    Good afternoon, sir.

5    Q.    Mr. Lucas, did I understand you correct when you

6    were on direct at the beginning of your testimony that

7    you referred to Roosevelt Williams, or the person at

8    the Dairy Queen, as the person you thought then to be

9    Roosevelt Williams?

10   A.    Yes.

11   Q.    And would it be fair to state, sir, that today as

12   you sit here, you do not believe that was Roosevelt

13   Williams in the car?

14   A.    Sir, I really think the guy in the car looked like

15   Roosevelt Williams, but he had an alibi that showed

16   that he was on another plane, that he was on a plane

17   somewhere else, so I still think that the guy looked a

18   lot like him, and even when he walked into court, I

19   thought "God, it looks like him, and that's the guy,"

20   but it obviously isn't.  He had an alibi.

21   Q.    And you heard, you know, through the course of

22   your discussions -- how long have you had to review all

23   of the documents in this case?  How long have you had

24   the documents in this case?

25   A.    You gave us the reports of investigation two weeks

## Lucas - Cross

1  presenting a case, trying to sway a judge or a jury,

2  that referencing guns or expensive cars tends to make

3  the person look guiltier, right?

4  A.    If I believed that the person had expensive cars

5  and guns and that's what I believed, that's what I

6  would testify to.

7  Q.    Well, how about when you were sitting outside of

8  the house on Adams during the Davis deal?  Do you

9  recall telling the jury that you saw a gun in the hand

10  of Ron Davis when he was standing out in front of the

11  house?

12  A.    Yes, and I should have put it in my report and I

13  didn't.

14  Q.    So now you did see the gun in his hand.

15  A.    I believe I saw something in his hand when he went

16  in, and --

17  Q.    The fact of the matter is that Bray inside the

18  house sees the gun, and comes back into the car and

19  tells you he saw a gun inside the house, isn't it?

20  A.    Yes.  And then I put two and two together, that

21  what he had in his hand I believed was the gun.

22  Q.    So Ron Davis, or whoever it was, came over to meet

23  Jerrell Bray in the front yard, in daylight, carrying a

24  P-90 in his hand?

25  A.    He had something in his hand and I believe it was

3394
Lucas - Cross

1   a gun.

2   Q.   Do you recall on the tape when Bray gets back in

3   the car and Bray said, "Wow, he had a gun in there,"

4   you say, "Oh, did he?"

5   A.   Something to that effect.  After Chuck Metcalf

6   said "Why didn't you buy the drugs from him," and I

7   said -- or Bray said, "No, it was a gun he had."  And

8   then I said, "It was a gun?"  Something -- something

9   like that.

10  Q.   Let me come back to Mr. Nabors in a second, if I

11  could direct your attention back over to the

12  Davis/France buys.

13  A.   Yes, sir.

14  Q.   And in that trial, at the Geneva France trial, you

15  testified that you personally verified and/or dialed

16  the numbers on the first and third calls.  Is that

17  correct?

18  A.   Yes.  I think I said the third and then later I

19  said all the calls.  But I did.  I believe I did.

20  Q.   And you recall the phone charts that were here?

21  A.   Yes.

22  Q.   And would you acknowledge that the first call, the

23  call listed in your 6 at 2:05, was not dialed to the

24  Davis number?

25  A.   No, sir.  I think the times are wrong.  I think

Lucas - Cross

1    Q.    What do you disagree with?  What do they talk

2    about?

3    A.    Bray says twice that he is going to go meet the

4    girl, and at no point does Ron Davis say to him, what

5    are you talking about, what's going on.

6          I asked Bray, and I believe that also came out in

7    the trial, and Bray was asked why, and he said that --

8    and from speaking to him, he gave us an explanation,

9    and I believed it.

10   Q.    Bray goes over -- you have listened to that tape,

11   both back then and in preparation for this, have you

12   not?

13   A.    Yes, I have.

14   Q.    And in the midst of a conversation about putting

15   together a future drug transaction for an eighth, Bray

16   interjects twice "I'm going to go pick up that girl,"

17   and the individual says absolutely nothing, doesn't

18   react it to, does he?

19   A.    You're correct.

20   Q.    And then Jerrell Bray comes out and tells you at

21   the time, "He told me to go over and meet the girl on

22   Glessner."

23   A.    Correct.

24   Q.    And you have since licensed to the tape?

25   A.    Yes.

Lucas - Cross

1  Q.   And it is never said on there, is it?

2  A.   It's not.

3  Q.   When you got to trial, and Jerrell Bray is saying

4  that this occurred, didn't it strike you that Jerrell

5  Bray is saying things that are not on the tape?

6  A.   Yes, but also at that point I had asked Chuck

7  Metcalf at the same time, did you get that on tape, and

8  he said yes.  So, not everything is spelled out in a

9  drug deal.  There is a lot of things that are implied,

10  and I -- when I talked to Bray with Blas Serrano and he

11  gave us his explanation, we believed him.

12  Q.   Chuck Metcalf, when you met him, did you talk

13  about your mutual experiences in drugs?

14  A.   I'm sure we talked.

15  Q.   Wasn't it readily apparent that Chuck Metcalf had

16  very limited, if any, experience in drugs?

17  A.   Not according to Chuck Metcalf.

18  Q.   You have been around drug people your whole life,

19  haven't you?

20  A.   Yes.

21  Q.   And it wasn't apparent to you?

22  A.   At the time, I thought he was okay, that he hadn't

23  worked different smuggling cases, hadn't been out of

24  the country, but in his area and from the reports and

25  the things that I had seen them do, he was okay.

Lucas - Cross

1   parking lot as the CS, but did not make contact with

2   the CS.  This vehicle had pulled into the lot and

3   pulled next to SA Lucas' vehicle before pulling into

4   the parking lot.

5   A.   Correct.

6   Q.   So according to what you wrote that day, the black

7   Toyota came in, circled around, I believe you told

8   us --

9   A.   Yes.

10  Q.   Pulled beside you --

11  A.   Beside, but several car lengths over.

12  Q.   And then pulled in and parked in the parking lot

13  before the green Bronco?

14  A.   I believed that at the time.  It did pull in to

15  the lot.  It did make connection with Bray, but it

16  obviously must have pulled out, and I thought that

17  that's what happened when I wrote that 6.

18  Q.   And subsequently, you have determined that could

19  not have happened.

20  A.   Yes.  When I read the reports, I was able to --

21  and looked back at the video, and I did see it pull in

22  later, behind.

23  Q.   I'm sorry, I didn't mean to --

24  A.   It pulled in behind the green one.

25  Q.   So that is the black car, the same black car that

Lucas - Cross

1    pulls in in the video?

2    A.    It looks like it.  I mean, I can't say for sure,

3    but it seems like it is.

4    Q.    And that's the car that we know, when the plates

5    were run by the Sheriff's Office, comes back to Dickie

6    Sayer?

7    A.    Yes.

8    Q.    And we heard the testimony of Cheryl Kleer that

9    she drove that car to the deal?

10   A.    Yes.

11   Q.    And according to Cheryl Kleer's testimony, she

12   drove that black car, she was paid with a piece of

13   crack, followed Darren from his house, followed the

14   truck, followed the truck into the lot, and did not

15   know where she was going until she got there.

16          Is that what she testified to?

17   A.    That's what she says.

18   Q.    And she didn't say she came in and drove around

19   the lot.

20   A.    She did not.

21   Q.    She didn't say she drove back out.

22   A.    She did not say that.

23   Q.    She said she followed the truck into the lot,

24   correct?

25   A.    That's what she said.

Lucas - Cross

1   Q.   And that's what the video shows.

2   A.   That's what the video shows, the black car pulling

3   in behind.

4   Q.   So when you wrote your 6, you had it coming in and

5   waiting -- you had not looked at the video at the time

6   you wrote your 6, had you?

7   A.   I may have.  I don't know.  Probably not.  But

8   that's what I believed on the day, that it pulled in,

9   and I still to this day believe that she pulled in

10  beforehand.

11  Q.   And you believe that it pulled up beside you?

12  A.   Like I testified on here, it pulled up beside, but

13  several car lengths over, and then it pulled out.

14  Q.   And you were able to look over and see that it was

15  a black and white female passenger?

16  A.   It was a black -- a white female driver, and a

17  black girl as the passenger.

18  Q.   Right.  And you -- you could make out the race and

19  their gender?

20  A.   Yes.

21  Q.   And testifying here today about that, the car was

22  a few lengths down, so you could make out those

23  details, but you would not have been able to identify

24  them from the --

25  A.   No.  I put it together after.  When they pulled

3425

### Lucas - Cross

1   A.    No.    Because the Toyota was parked about, it was

2   about two -- there were two, maybe one or two empty

3   spaces between them, and I only saw them go once.

4        I heard the testimony he went twice from Kleer,

5   whatever her name was, but I only saw him go once, and

6   he went to the passenger side, and I saw him reach in,

7   and then after afterwards, from talking to Bray, it

8   made sense that he did an exchange, and I believe that

9   he did an exchange, which is basically what Kleer said

10  happened.

11  Q.    And take a look at Paragraph 9.  What does that

12  say?

13  A.    "The green Bronco departed" -- "At 4:33, the green

14  Bronco departed the parking lot, being driven by

15  Ballard, and was followed by the black Toyota.

16  Surveillance was terminated on the green Bronco and

17  black Toyota at this time."

18  Q.    Nowhere in your 6 do you record anywhere that you

19  followed those cars out onto Ashland Road and passed

20  them, did you?

21  A.    No.  I did not.

22  Q.    That's a pretty important detail, isn't it, the

23  detail where you actually made the identification of

24  the defendant?

25  A.    No, because I think that the identification was

Lucas - Cross

1    made more through the video that we had, so I was -- I

2    thought since we had the guy on video, that that was

3    the ID, but I did pull out and look at the black Toyota

4    and the green car.  I should have put it in the 6.  I

5    did not, obviously.

6    Q.    Again, you had your personal, I believe the

7    testimony in that one was about half the distance to me

8    and you, is that correct?

9    A.    Well, if I pull up next to a car --

10   Q.    Right.

11   A.    And there is a little space and then his car, and

12   the guy driving, as I pulled up, I looked at him as we

13   drove by.

14   Q.    About this distance?

15   A.    That's about right.  Maybe a little further.

16   Q.    So that was a pretty good -- that is a pretty

17   close view, "directly into the face" is the words you

18   used, right, of Mr. Ballard?

19   A.    Yes.

20   Q.    And you left that out of your report.

21   A.    No, but I testified to it the first time I was

22   asked, all the way through.  That's what happened.  But

23   I did leave it out of my report.  You're correct.

24   Q.    At the detention hearing, the first time you ever

25   mention this, you're asked the question about your

Lucas - Cross

1    observations in the parking lot, and the defense

2    attorney asked you, did he not, did you have any type

3    of binoculars, right?

4    A.   Yes.  I think I said the video camera, something

5    like that.

6    Q.   What would you estimate the distance here from --

7    in Picture 4, from you at that wall to where you say

8    the car was?

9    A.   I don't know.  Maybe a football field.

10   Q.   About a hundred yards?

11   A.   Yes.  More or less, something like that.

12   Q.   And would it be about the same distance from where

13   you were in the truck with the video camera?

14   A.   Maybe a little closer, because Bray's car would

15   have been more or less where the white -- if you are

16   still looking at 4, where the white SUV is or the white

17   pickup truck in the left-hand corner, and we were over

18   in the -- out of view, but if you are looking at 4, on

19   the right-hand side.  So, maybe a little bit closer,

20   but more or less around the same.

21   Q.   And the defense attorney asked you did you have

22   any type of binoculars, and you responded, did you not,

23   "no -- well, yes, they were a video camera, it had a

24   zoom."

25   A.   Yes.

Lucas - Cross

1    Q.    And you have seen the video here in court, did you

2    not?

3    A.    Yes.

4    Q.    Everybody else that has looked at that video,

5    that's testified, has said it is Darren Transou on the

6    video, true?

7    A.    Yes.  Well, everybody else, Chris Jordan, and

8    obviously Mr. Ballard.

9    Q.    Arrico Spires told you in the proffer on 6/7,

10   after his arrest, you have the wrong person, that's

11   Darren Transou on the video, didn't he?

12   A.    He didn't tell me, but I was told by Blas Serrano

13   that.

14   Q.    I'm sorry.  I'm using that as sort of the royal,

15   the case agent "you."  You knew that Arrico Spires said

16   that, correct?

17   A.    Yes, I did.

18   Q.    Did that concern you?

19   A.    A little bit, sure.

20   Q.    Was it particularly disturbing, or was it more

21   disturbing based on the fact that you already knew that

22   another person Jerrell Bray had identified, Roosevelt

23   Williams, had an alibi and was in Chicago the day he

24   said he was in the car with you?

25   A.    No, because we had a video, sir, and the picture

Lucas - Cross

1    that I had of Transou, who he said it was, did not look

2    like the guy in the video, and Blas Serrano and all of

3    my partners and everyone else looked at the video and

4    the picture of Ballard and we all believed that it

5    looked a lot like Ballard, that it looked like Ballard.

6        How could we go to trial if we didn't believe it

7    looked like him?  There is a video of him.

8    Q.   Wouldn't it be fair to state, sir, that every

9    single person that got indicted that went to trial was

10   identified -- was identified solely by either you or

11   one of these other officers looking at a picture and

12   saying, "Yes, that's the person I saw"?

13   A.   No.  No.  At one point, sure, that's how you make

14   an ID, you look at a picture.  But when the guy walks

15   into court, if you look at him, that's -- the initial

16   picture is for probable cause to arrest the guy, to

17   indict him.  But once you arrest him and you look at

18   him, if you look at him and say that's not him, then

19   you have to say that's not him.

20   Q.   All right.  And you looked at Roosevelt Williams

21   after you arrested him, and once you made the

22   identification from the picture, that stayed in your

23   mind and in your testimony, that it was Roosevelt

24   Williams?

25   A.   You're correct, sir.

Lucas - Cross

1    Q.    And same thing with Geneva France?

2    A.    Yes.

3    Q.    You look at the picture, you make the

4    identification, and you don't need any more evidence,

5    do you?

6    A.    No.   That's not true.   But I looked at the picture

7    and then I looked at the actual person that walked in,

8    and I still believe it was Geneva France, and I think

9    Lowestco Ballard looks a lot like the guy in the video.

10   Q.    And if Geneva France was sitting at that table or

11   in that stand today, you would take the stand and still

12   say it was Geneva France that was in the car with you,

13   wouldn't you?

14   A.    Yes, I would.

15   Q.    Now, during the Ballard trial, there were, I

16   believe, three phone calls setting up the deal.

17   A.    I don't remember.   It sounds right.   There were

18   several phone calls that were made.   I don't remember

19   exactly.

20   Q.    And the calls were played, the first call, you

21   recall, was the one where the call is placed and

22   Mr. Ballard starts laughing and says "Where the heck is

23   Eastgate Apartments, where is Ashland Road"?

24   A.    Yes.

25   Q.    Well, you know, do you not, that Mr. Ballard grew

Lucas - Cross

1    up and lived within a half-mile of the Eastgate

2    Apartments, right off Ashland Road?

3    A.    That came out in the trial.  I did not know that

4    at that time.

5    Q.    And Mr. Transou is one of the Detroit people that

6    was coming down to take over Mansfield?

7    A.    Yes.  But again, at the time of trial, I didn't --

8    I did not know that Lowestco Ballard lived close to

9    there.

10   Q.    You know it now, right?

11   A.    I know he is from Mansfield, and from seeing in

12   the testimony and the info we have now, yes.

13   Q.    The second phone call talks, is a telephone call

14   to the same number, same voice, wherein the individual,

15   Mr. Bray, says "I've got 32," and they talk about

16   meeting up in the apartments.  Is that correct?

17   Should we play that?  Would that help?

18   A.    I don't know.  I don't recall.  Is that the one

19   where it says about Westco, and they actually say about

20   Westco?  Is that the one you're talking about?

21   Q.    Yes, sir.

22   A.    That was done on the same day, I believe, yes.

23   Q.    As a matter of fact, you testified -- well, and

24   the third call was a call, again, to the same number,

25   same voice, calling in for directions en route to the

Lucas - Cross

1    apartment building.  Is that correct?

2    A.    I recall that, yes.

3    Q.    Okay.  And the second one, you're correct, in the

4    middle of the call, the individual says "You better

5    hurry up, my man Westco wants one."

6    A.    Yeah.  Well, then, I don't know if it's to the

7    same number.  Then that wouldn't make sense, that it

8    was to the same number, or that it was the same voice.

9    Isn't that the one that -- we didn't play it in trial,

10   right?  The Government did not play that one in trial.

11   Q.    Correct.  The Government did not play that one in

12   trial.

13   A.    Yeah.  In pretrial, that's the one that Bray

14   identified when he was with Blas, and said that it was

15   Davis on that call, that it wasn't Ballard.

16   Q.    And on direct examination -- I'm sorry, on

17   cross-examination, Mr. Bray was asked, he was played

18   the call by the defense attorney, and Mr. Bray said,

19   "No, no, that call had nothing to do with this deal.

20   That was to Ron Davis."  Do you recall that?

21   A.    Not exactly, but I know they played it, and

22   whatever came out, it came out.

23   Q.    Do you recall sitting there as case agent, hearing

24   Bray crossed on that, and then taking the stand and

25   confirming from your own knowledge and information that

Lucas - Cross

1    it was Ron Davis, a call to Ron Davis made as part of a
2    separate investigation?
3    A.    I don't specifically recall it here, but it could
4    have happened.
5    Q.    And if it did happen, if it is in the testimony,
6    that is not true, is it?
7    A.    No.  Why wouldn't it be true?
8    Q.    It was the same phone number, and it is the same
9    voice.  That would make it extremely unlikely it was to
10   Ron Davis, right?
11   A.    Yes, but it would make it -- yes.  Yes.  If it is.
12   Q.    And that is -- you're right.  That's the call
13   where it references my man Westco.
14   A.    Yes.
15   Q.    And in your transcript, the transcript prepared
16   and given to the defense, the line, the reference to
17   "my man Westco" was left out of the transcript.
18   Correct?
19   A.    I think so.  Yes.
20   Q.    And in the samples you prepared currently for
21   this, that line was left out, was it not?
22   A.    That I prepared for this?
23   Q.    Yes, sir.  Did you prepare some draft transcripts?
24   A.    For this trial?  I did.  But I thought they were
25   the videos.

3434

### Lucas - Cross

1    Q.   So you testified at the trial, you confirm with

2    Mr. Bray that the call was to Ron Davis?

3    A.   Yes.  That's what he told us.

4    Q.   And you told the jury, when asked, that the Davis

5    trial was for the same amount of money, $3200; that it

6    involved the same amount of drugs, an eighth, and it

7    involved a broken-down car.  Do you recall testifying

8    to that?

9    A.   To the broken-down car part, I don't, but I do

10   recall that I said that we had conversations with Davis

11   about an eighth.

12   Q.   And that was just plain untrue, wasn't it?

13   A.   No.

14   Q.   The Davis deal was supposed to be for $2500 for

15   two and a half ounces, it never involved $3200, and it

16   didn't involve an eighth, did it?

17   A.   No, but there were other conversations in the same

18   Davis deal where we went and bought two and a half

19   ounces from Davis, but in the house, when he spoke to

20   Davis, they talked about an eighth, and also on the way

21   over to Joe Ward's house, when he passed Big J, which

22   we were told was Davis, he yells out the window to him,

23   "Hey, I'm looking for an eighth," so there was contact

24   within that conspiracy for Davis, and talk about an

25   eighth.

Lucas - Cross

1   Q.   You told the Nabors, et al jury that the call, the

2   Davis call related to a deal, a deal that went down,

3   that Davis was prosecuted for, that took place right

4   around the same time, at latest a couple weeks later.

5   Isn't that what you told the jury?

6   A.   I may have.

7   Q.   And that's wrong, because the Davis deal didn't

8   take place until 10/25.  Is that correct?

9   A.   No.  I'm confused now.

10   Q.   You told the jury that call two, track two in the

11   Ballard deal -- which took place on September 9, right?

12   A.   Yes.

13   Q.   That the second call, which didn't fit into the

14   deal, actually was part of the Davis deal which took

15   place on 10/25.  Is that correct.

16       That's a stupid question.

17   A.   I'm kind of confused.

18   Q.   You're testifying at the Ballard trial.

19   A.   I am.

20   Q.   Nobody in that courtroom knows anything about the

21   Davis trial other than you and the prosecutor.

22   A.   Correct.

23   Q.   There is a call that doesn't fit in.  Track 2

24   doesn't fit because the person says "my man Westco,"

25   and the call is supposed to be to Westco Ballard,

Lucas - Cross

1  right?

2  A.  Correct.

3  Q.  So Bray, sua sponte, on the stand says --

4  A.  No.  No.

5  Q.  It was in trial prep?

6  A.  Trial prep.

7  Q.  And in trial prep, when asked about it, this

8  doesn't make any sense, says it is to Ron Davis,

9  correct?

10 A.  Correct.

11 Q.  And on the stand he is asked about it on the

12 defense, and he says yes, that was to Ron Davis.

13 A.  Yes.

14 Q.  And you're sitting there.

15 A.  Yes.

16 Q.  And you take the stand now to corroborate Jerrell

17 Bray, and confirm that that call was part of the Ron

18 Davis deal, right?

19 A.  The call was to Ron Davis.  Whether it was that

20 exact deal or not, we did have contact with Davis on

21 two occasions before the trial took place in which

22 there was conversations with Davis about an eighth.

23 Q.  Sir, didn't you tell us on direct that Chris

24 Jordan had introduced Jerrell Bray to Ron Davis, or as

25 the Government suggests, Marcus English, the night

### Lucas - Cross

1    before the Geneva France deal, and they exchanged phone

2    numbers, and that's how they met?

3    A.    To do a buy, correct.

4    Q.    They were introduced, and they didn't know each

5    other, have each other's phone numbers, did they,

6    before that buy?

7    A.    Correct.

8    Q.    So if in fact Bray didn't know Ron Davis until

9    10/24, it is not possible that he could have made a

10   phone call, a controlled investigative phone call to

11   him on September 9, is it?

12   A.    The deal of Joe Ward, which was long before that,

13   which was at least on 9/13, he drove by on the way and

14   yelled out "Big J," which we've established through his

15   own testimony was him, was Ron Davis saying that it was

16   him, and they drove by each other on the way, and he

17   said that it was -- "hey, do you know anyone that has

18   an eighthy," and he yells it on the window on the tape

19   we played here.

20         So, they obviously knew each other somehow, but to

21   set up that specific deal, that's what Bray told us,

22   that Chris Jordan set it up, so yes.

23   Q.    When Ron Davis was arrested and his discovery

24   material was given to him, was he given that tape?  Did

25   you give that to Mr. Serrano and say, oh, this is a

Lucas - Cross

1  call with Ron Davis that we happened to do six weeks

2  earlier?

3  A.   I don't think we realized it was him until on that

4  tape recording, and we couldn't have done that, because

5  we were -- we didn't realize that that tape, that that

6  call, we didn't figure that out until the trial prep,

7  which was in June or July.  So, we couldn't have done

8  that because we wouldn't have known about it.

9  Q.   So if I understand it, you come down to Mansfield

10 on September 9 to do, specifically to do a deal with

11 Ballard, a $3200 deal, correct?

12 A.   Yes.

13 Q.   And you come down, and you're going to make the

14 tapes to do that deal, do that deal, go back to

15 Cleveland to do your, the rest of your work here?

16 A.   Yes.  But what you have to understand, and I've

17 testified before, is all of the tapes and all of the

18 CDs that are burned were burned onto a CD and provided

19 to us by Chuck Metcalf.  I did not know how to do that.

20 Chuck Metcalf gave us those.

21       When we were provided with those, with that disk,

22 and we were told to make transcripts of this, that's

23 what we did, either myself or other guys in the office.

24 But we put them together, and we took them over to Blas

25 Serrano.

Lucas - Cross

1   there wasn't an exchange.

2   Q.   And you also, they also asked about a female voice

3   on that tape, didn't they?

4   A.   Correct.

5   Q.   A female voice that says the words "take it."

6   A.   They did.  I don't know if they said "take it" but

7   they said there was a female voice.

8   Q.   And you testified that you had Bray under constant

9   surveillance, and he could not have met anybody before

10   he went up on the Wards' porch, right?

11   A.   You're correct.

12   Q.   So who said "take it"?

13   A.   It couldn't have been Younger, like he said,

14   because I was here when she testified, and she said she

15   never brought him any dope over to Joe Ward's house and

16   had never been there.

17   Q.   Before Bray, when Bray leaves his car, before he

18   goes up onto the porch at Ward's house, a female voice

19   on the tape says "take it," correct?

20   A.   That wasn't in the tape I made.  I heard female

21   voices and kids yelling and screaming, and I never saw

22   him meet with the female.

23   Q.   But you have heard the tape, and you hear it on

24   there, right?

25   A.   You hear something.  I'm not sure if it is "take

3445
Lucas - Cross

1    it" or not.

2    Q.    So if it is a female voice that says "take it,"

3    then Jerrell Bray did meet with a female before going

4    up on the porch, correct?

5    A.    I don't know if that "take it" was to Jerrell, or

6    if it was somebody yelling on the porch, or whether it

7    was Joe Ward yelling something.  I don't know who it

8    was.

9    Q.    When you're in the car with Jerrell Bray on the

10   France deal --

11   A.    On the France deal, yes, sir.

12   Q.    And France is in the car, you say on the tape, the

13   deal is over, "Okay, let's take Little S home."

14   A.    Yes.  Something like that.

15   Q.    Jerrell goes a few feet in the car, stops, and

16   says "No, we have a long way to go, we'll let Little S

17   over here," and lets Little S out?

18   A.    I don't think it was a few feet.  He went up a

19   little bit further, and we ended up dropping her off.

20   Q.    A few seconds' worth on the tape, correct?

21   A.    I don't know exactly.

22   Q.    And isn't it a fact that after Little S gets out

23   of the car, probably four or five times you say to

24   Jerrell, "Let's go back to his house, let's go back to

25   his house, let's meet with him"?

Lucas - Cross

1    on November 8.

2    Q.    Just like Johnny Robertson did, too, right?

3    A.    I think so.

4    Q.    And Johnny Robertson, that was the buy at Joe and

5    Mary's?

6    A.    Yes.  He had the green and white car, if I

7    remember.

8    Q.    And if I recall your report correctly, Robert

9    Harris, that was the deal where he brought the drugs,

10    it was light, he went back, put rocks in it, and gave

11    it to Mr. Ansari.  Is that correct?

12    A.    Yes.

13    Q.    And then, according to your report, I believe it

14    reads that Detective Ansari saw him walk -- saw Robert

15    Harris walk over to Robertson's car and give the money

16    to Robertson, is that correct?  You can look at your 6.

17    A.    Can you direct me there?

18    Q.    Yes, sir.  It's definitely 1-A, and that is

19    Page 46, sir.

20    A.    Can I read it, sir?

21    Q.    Yes, please.  Sure.  You can tell from the 6.  It

22    is probably around paragraph five or six the deal

23    starts up.

24    A.    Yes.

25    Q.    And by the way, Mr. Harris, the camouflage shirt,

Lucas - Cross

1    that's what Roosevelt Williams was wearing at the Dairy
2    Queen, too, wasn't it?
3    A.    He had some kind of camouflage on.
4    Q.    So according to Paragraph 6, Harris goes over to
5    the car, and Detective Ansari sees him hand the money
6    to Robertson?
7    A.    Yes.  That's what I was told.  An exchange of
8    money.
9    Q.    And the next sentence says that afterwards, Harris
10   walks into the store and Detective Verhiley sees him in
11   possession of a large wad of money?
12   A.    Can I explain?
13   Q.    Sure.
14   A.    Yes.  In the proffer of -- that's what we observed
15   in the proffer of Robertson.  Robertson admits that he
16   got $1500 for the buy.  We paid Harris $2000, so I
17   believe the $500, the large amount of money in his hand
18   was that extra money that he had.
19   Q.    Were you at the proffer of Robertson?
20   A.    No.  I read it.
21   Q.    So he got $500 for walking the drugs over to a
22   house, from a house?
23   A.    That's according to the proffers.
24   Q.    And of course you heard Mr. Robertson here, is
25   that correct?

3462

Lucas - Cross

1  myself, and each time we asked him, it was the
2  connections on who was who and which guy he thought was
3  supplying others, and even in the Nabors 6, it was --
4  he had told us about Tyron Brown getting drugs from
5  Nabors, and that's how it came to pass that he even
6  knew that Nabors was on, then.
7  Q.   And because Jerrell Bray said Tyron Brown was
8  getting drugs for Nabors, Tyron Brown got charged with
9  the September 20th deal, didn't he?
10 A.   Part of it, yes.
11 Q.   By the way, everybody that went to trial at the
12 Nabors trial was acquitted of all counts relating to
13 every buy that was done.  Isn't that a fact?
14 A.   Everything that Jerrell Bray testified to was
15 discounted, and they were let go on the things that
16 Bray was involved in.
17 Q.   If I'm not mistaken, you, Ansari, and Metcalf,
18 didn't the three of you personally testify that you
19 observed Dwayne Nabors, all at the first occasion, and
20 Ansari and you placing his car there at the second?
21 A.   Yes.  He was acquitted on the conspiracy, and I
22 think it was a hung jury on the distribution.
23 Q.   So nobody was convicted, including all of the
24 police identifications of the individuals at any of
25 these buys, were they?

Lucas - Cross

1   A.   Correct.

2   Q.   Now, sir, when you go down to Mansfield, or what

3   you were doing in Cleveland, the case was designated as

4   an OCDETF case, correct?

5   A.   Yes.

6   Q.   Organized Crime Drug Enforcement Task Force?

7   A.   Yes.

8   Q.   And it was also, I believe, made a priority

9   targeted organization?

10  A.   Organization, yes.

11  Q.   And those are funding sources?

12  A.   Yes.

13  Q.   And it helps your case to hit these funding

14  mechanisms, is that correct?

15  A.   Yes.   That's what we were told at the time.   Our

16  direction from our ASAC and our RAC was to work these

17  cases.

18  Q.   And the other day, when Mr. Ferster was here, he

19  was asked about your 2005 evaluation as an agent.   Is

20  that correct?

21  A.   Yes.

22           MR. ROTH:   Judge, I would object.   Beyond the

23  scope of direct.

24           MR. TEITELBAUM:   Goes to motive, Your Honor.

25           MR. ROTH:   Judge, I still object.

Lucas - Cross

1   Bray pled guilty.  Is that correct?

2   A.   Correct.

3   Q.   And you set forth out there specifics, such as who

4   made various observations, who could identify people.

5   A.   Yes.

6   Q.   And looking back at it, you're aware that a number

7   of those observations are incorrect.  Isn't that true?

8   A.   You know, when I made them, some of them were

9   incorrect, and some of them I spoke to the people about

10  that made the observations back then, or I went off on

11  of my DEA-6s or I spoke to the guys at that point and

12  they confirmed it at that point, and now I've heard

13  testimony where people have forgotten in this trial

14  things that they told me back then, but for the most

15  part, yes.

16  Q.   Like, for example, on Page 238, under France --

17  A.   Which one, sir?

18  Q.   Page 238, Number 5, Geneva France.

19  A.   Okay.  We're still on number one?  Because I went

20  to the case notes one.

21  Q.   Yes.  Page 238.  It is in the case notes.

22  A.   Okay.  I'm sorry.  One more time.  Which tab?

23  Q.   238.  It is Tab 26.

24  A.   Okay.  Tab 26.

25  Q.   And you can see page numbers down in the corner

Lucas - Cross

1    there?

2    A.    Tab 26, 238?

3    Q.    238.

4    A.    Okay.

5    Q.    And for example, right about in the middle of the

6    page, "Lucas, Metcalf, Stross are all able to

7    positively identify Geneva France as Little S"?

8    A.    Yes.  That's what I believed at the time.

9    Q.    And you later came to realize that wasn't the

10   fact, right?

11   A.    Correct.

12   Q.    And underneath, "Metcalf, Faith, Stross, Verhiley

13   all observed Little S go" -- I think it should say "go"

14   -- it says "got and stand on the front porch at 121

15   Glessner"?

16   A.    I believe that Bill Stross said it and Tom

17   Verhiley at the time had said it, and the

18   communication, my understanding of the communication

19   was that it came from Larry and Chuck, that she was on

20   the porch.  So, that was my understanding when I wrote

21   that.

22   Q.    Jump ahead a few pages to Page 231.

23   A.    I'm sorry.  One more time?

24   Q.    231.

25   A.    Yes, sir.

Lucas - Cross

1    Q.    At the top of the page, "Federal prosecutors only

2    take slam dunk case after they have reviewed all the

3    cases.  The cases that Greg White dismissed were slam

4    dunk cases, that's why they took them."

5    A.    A lot of them, I believe a lot of them -- at the

6    time, I felt that way, and a lot of the guys who

7    actually, the cases that we did, came in and testified

8    that they actually did do what they did, and I believe

9    those were solid cases.

10   Q.    And then later on, about the middle of the page,

11   where you -- you write that "Greg White, the U.S.

12   Attorney, only dismissed the cases because he wanted to

13   be a Federal Judge and wanted to look fair to the

14   public eye"?

15   A.    Yes.  I wrote that.

16   Q.    And that's what you believed at the time?

17   A.    Yes.

18   Q.    And you were going to send this to your attorney?

19   A.    Yes.

20   Q.    Did you have any intent, sir, that other people,

21   such as Stross and Verhiley, Ansari, would read what is

22   in effect your -- a report from you of what occurred on

23   France and those other cases?

24   A.    Yes.

25   Q.    And was it part of your intention that it would

### Lucas - Cross

1    assist people to coordinate their stories?

2    A.    It was my understanding that we were all going to

3    be represented by the same people in our civil matters

4    in our cases, and I had been told by Alicia Kulwig out

5    of DEA headquarters to put together all of our -- to

6    put together all of the reports and a summary, and that

7    all of us were represented together, and then my boss

8    had told me the same thing, that I wasn't going out on

9    the street at that point to work on this.  So, yes,

10   that's true.

11   Q.    Just one quick issue on the Ballard case.  I want

12   to show you one.

13        Can you read that sir?  Let me zoom this out a

14   little, I guess.

15        Sir, do you see the green A, which I guess would

16   be on the right-hand side of the screen?

17   A.    Yes.

18   Q.    And do you see it says "Eastgate Shopping Center"

19   there?

20   A.    Yes.

21   Q.    And then there is sort of like a white little

22   circle right underneath the "A"?

23   A.    Yes.

24   Q.    And 42 is Ashland Road.  Is that correct, sir?

25   A.    I don't know, but I think so.