679

1   MR. ROBEY: No, sir.
2   MR. CAMPBELL: No, Your Honor.
3   MR. GREVEN: No.
4   MR. SHAMANSKY: No, Your Honor.
5   THE COURT: Get the jury.
6   (Jury in).
7   THE COURT: Please be seated, ladies and
8   gentlemen.
9   MR. SERRANO: At this time, Your Honor, we
10  will call Jamaal Ansari.
11  THE COURT: Sir, approach the witness stand
12  here to my right. Please remain standing while I administer
13  the oath or affirmation.
14          JAMAAL ANSARI,
15  of lawful age, a witness called by the Government,
16      being first duly sworn, was examined
17         and testified as follows:
18  THE COURT: Sir, be seated in the witness
19  stand. If you would adjust the microphone so your testimony
20  can be heard.
21      A few preliminary instructions.
22      Please wait until the attorneys complete their
23  questions before you begin to respond. It's sometimes
24  difficult for the court reporter and the listeners when two
25  individuals are speaking at the same time. I know you can

Exhibit 2

684

A. A dark colored Cadillac, I believe a black or navy blue.

Q. Was he by himself or with somebody else?

A. No, sir. There was another individual with him.

Q. And can you tell us what happened after he arrived?

A. They pulled into the lot. They parked in front of the shop.

Bray went around and was talking to Nabors. I was trying to get close so I asked him if everything was okay. At that time either Nabors or the other individual in the vehicle asked who I was. He said I was his uncle and they said it was okay. They went on talking. I stayed where I was by the Corvette.

Q. And you indicated that -- before that the buy was supposed to be for $10,000?

A. Yes, sir.

Q. Who had the money?

A. Bray had the money.

Q. Now, after that, you saw that conversation take place or that meeting. Can you tell us what happened after that?

A. Yes, sir. They completed the conversation. Mr. Nabors turned his vehicle around, he stopped right by me, I looked at him, he looked at me, the other individual in the car leaned over and looked at me. They didn't say anything and then they drove off.

685

1   Q.  Now, do you see Dwayne Nabors here in the courtroom?

2   A.  Yes, sir.

3   Q.  Can you identify him for us for the record?

4   A.  The gentlemen off to your right with the white striped
5 shirt on and beige pants.

6       MR. SERRANO: May the record reflect he has
7 identified the defendant Dwayne Nabors, Your Honor?

8       THE COURT: The record will so reflect,
9 please.

10   Q.  So after you returned to your vehicle, what happened
11 then?

12   A.  I interviewed Bray. Bray said that he was advised
13 that they would contact us to where to meet them to purchase
14 the narcotics.

15   Q.  Did you actually leave that location to another
16 location?

17   A.  Yes, sir. We were going to go back and confer with
18 Special Agent Lucas and the other members of our
19 investigation team.

20       While en route to do that, Bray received a
21 call telling us to go to an area, I think it's off of Fourth
22 Avenue.

23   Q.  Could it have been Pleasant Street?

24   A.  It might.

25       MR. SHAMANSKY: Object.

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | THE COURT: Ready to proceed, gentlemen.                      |
| 2  | We'll have the jury and the defendant's                      |
| 3  | brought forward.                                             |
| 4  | (The jury was returned to the courtroom                      |
| 5  | and the following proceedings were conducted                 |
| 6  | in open court.)                                              |
| 7  | THE COURT: Please be seated ladies and                       |
| 8  | gentlemen.                                                   |
| 9  | Counsel for the government, you may call                     |
| 10 | your next witness, please.                                   |
| 11 | MR. SERRANO: At this time we'll call                         |
| 12 | Special Agent Lee Lucas.                                     |
| 13 | - - -                                                        |
| 14 | LEE LUCAS                                                    |
| 15 | called as a witness by and on behalf of the                  |
| 16 | Government was first duly sworn and testified                |
| 17 | as follows:                                                  |
| 18 | THE COURT: Please be seated on the                           |
| 19 | witness stand, sir. You've heard me give the                 |
| 20 | instructions to others, I won't repeat them at this          |
| 21 | time.                                                        |
| 22 | THE WITNESS: Yes, sir.                                       |
| 23 | THE COURT: Counsel, you may begin with                       |
| 24 | your inquiry.                                                |
| 25 | DIRECT EXAMINATION                                           |

1  A      Yes.

2  Q      And what were the circumstances?

3  A      We were -- I was told by Chuck Metcalf that the
4  black truck was too hot, you have to move out of area.
5  But we were right on them and there was no one who could
6  get there to see -- by the time he could park, by the --
7  we had to keep surveillance on him, so whether Jerrell
8  Bray wanted me to move and get the car out, that's not
9  his call, that's my call. I wanted to make sure that I
10  could see him throughout the whole buy.

11         So I followed him all the way around. He
12  parked in front of the house. I jumped out of the
13  passenger, I slid over -- I was driving and Matt was in
14  the back seat. I slid out of the back of the passenger's
15  side, Matt jumped in and I walked down the street. I
16  went on foot, I walked down the street so that I could
17  keep an eye on Jerrell Bray the whole time as he parked
18  his car in front of the residence, 144 Hedges, walked
19  across the street and went up on the porch and went
20  through the front door.

21  Q      Did you actually walk by the residence?

22  A      Absolutely.

23  Q      Did you see any --

24  A      I was across the street but I walked by the
25  residence.

1118

1   Q      Did you see any individuals there in the immediate
2   area of the residence?
3   A      On the front porch I saw Joe Ward, I saw his mom
4   Johnie Parker, and I saw another guy who I haven't
5   identified yet.
6   Q      Could you identify Joe Ward and Johnie Parker for
7   the record, please?
8   A      Joe Ward is seated -- is a black male with a white
9   button down shirt without a tie with the neck open.
10              MR. SERRANO: May the record reflect he
11      had identify the defendant, Joe Ward.
12              THE COURT: The record may so reflect.
13  BY MR. SERRANO:
14  Q      What about Johnie Parker?
15  A      Johnie Parker is the black female with the white
16  pants and the gray top on, with glasses.
17              MR. SERRANO: May the record so reflect.
18              THE COURT: The record will reflect the
19      witness has identified Miss Parker.
20  BY MR. SERRANO:
21  Q      Now, after you observed Jerrell Bray approach the
22  residence, did there come a time when he went inside the
23  residence?
24  A      Yes.
25  Q      And I gather you could not see him when he went

```
 1   inside, correct?
 2   A      No. But I stayed across the street so that I
 3   could see when he came out. I stayed on foot, across the
 4   street, so I could see when he came out and got in his
 5   car.
 6   Q      And about how long did he stay inside the
 7   premises?
 8   A      It wasn't long, couple, maybe five, ten, minutes.
 9   I don't remember exactly but it wasn't an hour or half,
10   hour, anything like that.
11   Q      After he came out what happened then after that?
12   A      He got in his car. I radioed -- well, I Nexteled
13   that he was getting out, because I didn't have a radio
14   with me I used my Nextel, and told the guys he's out,
15   have someone else follow him. I walked down the street.
16   He was followed to the station by other officers.
17          Matt picked me up and we ended up going back by
18   Hedges. And again, Johnie Parker and his mom were out on
19   the porch again when we drove by.
20   Q      Now on that day we heard here some questions about
21   him having a contact with a female prior to arriving at
22   the residence?
23   A      There were kids out in the yard. There were kids
24   on the street. He never met any female driving down
25   that -- when he pulled around, he parked in front of the
```

```
 1   house, never met anyone until he went into the house.
 2         They were yelling back and forth, and you know,
 3   talking and yelling from the porch but he never met
 4   anyone.
 5   Q    Now, calling your attention to the date of
 6   September 20th, 2005.
 7         Was there a controlled buy conducted on that
 8   day?
 9   A    Yes, there was.
10   Q    And who was the target of that controlled buy?
11   A    Dwayne Nabors.
12   Q    And do you know how much it was supposed to be
13   purchased from him?
14   A    It was supposed to be a half a kilo of crack for
15   $10,000.
16   Q    And what happened prior to the actual controlled
17   purchase?
18   A    We had to get the money, which we pulled our money
19   together, 4,000 came from DEA; 3,000 from the Cleveland
20   Police Department; and 3,000 from Ohio BCI, the state
21   police.
22   Q    Now, in relation to that buy, what were your
23   duties on that day?
24   A    It was basically the same thing. I was the
25   surveillance agent searching the informant, his vehicle,
```

03/23/2006 03:07 8022542662 LOEWYREYESLAW PAGE 03/04
Case: 1:07-cv-03750-SO Doc #: 133-6 Filed: 09/01/10 9 of 12. PageID #: 2368

1122

1  Cadillac, both that came back to Dwayne Nabors.
2      Jerrell Bray and Jamaal Ansari arrived.
3  Jerrell went in for a second, he went in for a short
4  time, came out. He advised Jamaal that Dwayne's not here
5  yet. Jamaal Nexteled me and told me he's not here yet.
6      So we waited and eventually a black -- another
7  black Cadillac, a different one, this one was registered
8  to Albert Lee, arrived. And I saw Jerrell Bray go up to
9  the passenger's side of this vehicle. There was some
10 motions like they were speaking. I obviously couldn't
11 overhear what was being said.
12     And when the vehicle left, myself and Chuck
13 Metcalf, who were together, jumped in our car. We left.
14 They made a right pulling out of the lot, we had to make
15 a left to get behind them. We went up a distance until
16 we could pull up next to them.
17     I identified Dwayne Nabors as being the driver,
18 and there was another black male, who at that time we
19 didn't have identified, as the passenger.
20 Q    Have you been able to identify the second
21 individual as of now?
22 A    Yes.
23 Q    And who was that?
24 A    A guy named Davis.
25 Q    Now, the individual that you referred to as Dwayne

1134

1  950.
2       We followed the informant over to an alley
3  behind Mulberry. And it was very difficult to set up
4  surveillance in an alley behind houses.
5       So as the informant drove in, I observed a
6  black male jump in the car with the informant, was in
7  there very short. And as we were driving down to the end
8  of the street, the male jumped out.
9  Q    That male, had you seen that male before?
10 A    Yes.
11 Q    And do you know his identity or were you able to
12 establish his identity?
13 A    Yes.
14 Q    Who was that?
15 A    Frank Douglas.
16 Q    And on what prior occasions had you become aware
17 of Frank Douglas?
18 A    Frank Douglas was involved in another prior
19 delivery in which we ordered drugs, I believe it was from
20 again Tyron Brown, and Frank Douglas was involved in
21 dropping the drugs off.
22 Q    Now I presented you with a number of exhibits.
23 Can you describe those for us, the ones you recognize?
24 Refer to the Exhibit Number and describe it for the jury.
25 A    Okay. Government's Exhibit 19, this is the crack

1209

```
 1
 2            MONDAY AFTERNOON SESSION - JULY 17, 2006
 3               THE COURT:  Please be seated, ladies and
 4      gentlemen.
 5               On behalf of Mr. Ward, counsel you may
 6      cross examine.
 7               MR. CAMPBELL:  Thank you, your Honor.
 8                           - - -
 9                      CROSS EXAMINATION
10   BY MR. CAMPBELL:
11   Q      Good afternoon.
12   A      Good afternoon.
13   Q      Detective Lucas, you know I'm Jim Campbell, I've
14   met you before.  We've talked a couple times during the
15   trial, and I represent Joe Ward.
16   A      Yes, I do.
17   Q      If you don't understand what I ask you or are
18   confused with a question, please tell us.
19   A      Yes.
20   Q      You would agree as part of your job it is very
21   important to be accurate, as best you can, in your
22   records, is that right?
23   A      I try to.
24   Q      And it's important because people are going to
25   rely on them, like coming into court today, coming into
```

```
 1   do it.
 2   Q        This pickup truck that's right behind Mr. Bray's
 3   truck, right in front of Mr. Ward's house, is that right?
 4   A        That I was driving.
 5   Q        So when Mr. Bray says on page 3 of Government
 6   Exhibit Number 6, at the top of the page:  Source, tell
 7   them to stay back.  Big Jay saw them, too.  Hang lose
 8   somewhere, whatever.  Do not let the black truck come
 9   down Hedges.
10            Do you remember that?
11   A        Yes.
12   Q        And you are telling us you are directly behind
13   Bray at that time, directly behind his car?
14   A        Yes.  I'm not listening to him as we just
15   established.  I'm behind and Chuck Metcalf, who is back
16   at the station, is listening to it.
17            So then Chuck, you hear him directing, saying
18   stay back, throughout the tape, at a different point.
19   Stay back.  Don't let the black truck go by.
20            That's me, because as I was too close to him I
21   wanted to make sure he didn't meet with anyone,
22   especially we drove by Davis.  I was right there to make
23   sure there was no hand off.
24   Q        And you've reviewed this transcript up to page 4
25   about the middle -- down to about the middle of the page.
```