09 MAY 12  PM 4:43

NORTHERN DISTRICT OF OHIO
CLEVELAND

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | CRIMINAL NO. **1:09 CR 0222** |
| ) | |
| Plaintiff, ) | JUDGE: **JUDGE DOWD** |
| ) | |
| ) | VIOLATIONS: |
| v. ) | |
| ) | Title 18, §242, |
| ) | United States Code |
| ) | Title 18, §1001(a)(3), |
| LEE MICHAEL LUCAS ) | United States Code |
| ) | Title 18, §1503(a), |
| Defendant. ) | United States Code |
| ) | Title 18, §1623(a), |
| ) | United States Code |
| ) | |
| ) | [UNDER SEAL] |

I N D I C T M E N T

The Grand Jury charges:

COUNTS ONE - SEVEN

At all times material to this Indictment:

1.    The Drug Enforcement Administration (DEA), a component of the United States Department of Justice, a law enforcement agency of the United States government, was charged, pursuant to the provisions of Title 21, United States Code, Section 878, with upholding and enforcing the provisions of the Uniform Controlled Substances Act, Title 21, United States Code, Section 801 et. seq.

EXHIBIT

3

2.    The defendant, LEE MICHAEL LUCAS, served as a
Special Agent of the DEA assigned to the Cleveland Resident Agency
Office which was responsible for handling drug law enforcement
matters in northeast Ohio.  As a Special Agent of the DEA, the
defendant, LEE MICHAEL LUCAS, was sworn to uphold and defend the
Constitution and the Laws of the United States.

3.    Between August 17, 2005 and May 16, 2007, Jerrell
Bray ("Bray"), not a defendant herein, was registered by and acted
as a cooperating source, or confidential source (CS), for the DEA.
A CS is a private individual who  provides information to and/or
pro-actively assists law enforcement agencies in carrying out
investigative activities.  The defendant, LEE MICHAEL LUCAS, served
as Bray's control agent.  Bray was compensated by the DEA for his
services.

4.    Between September 6, 2005 and November 8, 2005, the
defendant, LEE MICHAEL LUCAS, was responsible for over-seeing and
participating in a series of controlled purchases, also known as
undercover buys or controlled buys, of cocaine and cocaine base,
also known as crack, arranged and transacted by Bray in the City of
Mansfield, Richland County, Ohio.   During this period, Bray
conducted 15 controlled buys under the supervision of the
defendant, LEE MICHAEL LUCAS.

5.    The DEA Form 6 ("DEA-6") was the standard format by
which Special Agents of the DEA document their official reports of

2

investigative activity. A DEA-6 is authored by a Special Agent to record and document each significant event in a criminal investigation. The DEA-6 is created on and entered into the DEA's computer database as part of the permanent file maintained on each case.

6. Each of the controlled purchases made by Bray and supervised by the defendant, LEE MICHAEL LUCAS, was documented in a DEA-6. These DEA-6s served as the only written summaries of the transactions and served as the bases for charging decisions and presentations of the cases to the grand jury.

7. Between November 10, 2005 and March 15, 2006, 18 individuals were charged via federal indictments with various violations of the federal narcotics laws as a result of the 15 controlled buys supervised by the defendant, LEE MICHAEL LUCAS. As a result of these indictments, two trials, involving seven defendants, were conducted in the Northern District of Ohio: United States of America v. Geneva France ("U.S. v. France"), and United States v. Dwayne Nabors, Jason Westerfield, Lowestco Ballard, Joe H. Ward, Johnie R. Parker and Danny Lee Brown ("U.S. v. Nabors, et al.").

8. In 13 of these 15 controlled purchases arranged and carried out by Bray, under the supervision of the defendant, LEE MICHAEL LUCAS, Bray intentionally caused 17 separate individuals to be wrongfully charged by intentionally mis-identifying the person who provided the drugs, providing individuals with his own drugs

3

and then retrieving them to make the individuals appear as the drug suppliers, and/or staging scripted recorded conversations, in order to make individuals appear to be the drug suppliers. In particular:

    a.    On September 6, 2005, Bray placed a controlled call to a confederate (hereinafter C-1), whose identity is known to the grand jury, to arrange for C-1 to deliver crack to Bray. Bray falsely told law enforcement that the call had been made to Noel Mott. Thereafter, Bray made a controlled purchase of crack from C-1 in a residence in Mansfield. Bray falsely identified C-1 to law enforcement as being Noel Mott and falsely identified Jim Williams to law enforcement as having introduced Bray to Mott for the purpose of furthering the drug transaction.

    b.    On September 9, 2005, Bray placed a controlled call to C-1 to arrange for C-1 to deliver crack to Bray. Bray falsely told law enforcement that the call had been made to Lowestco Ballard. Thereafter, Bray made a controlled purchase of crack from C-1 in the parking lot of an apartment complex in Mansfield. Bray falsely identified Lowestco Ballard to law enforcement as having been the individual who delivered the crack.

4

c.  On September 13, 2005, Bray drove to the home of Joe Ward and Johnie Parker in Mansfield in order to effect a controlled buy of crack. En route, Bray picked up his own crack from a confederate (hereinafter C-2) before arriving at the Ward/Parker home. Shortly thereafter, during the meeting inside of the Ward/Parker home, Bray purchased ten dollars worth of marijuana. Bray later turned over his crack and the ten dollars worth of marijuana to law enforcement. Bray falsely told law enforcement that both the crack and the marijuana had been sold to him by Joe Ward and Johnie Parker.

d.  On September 13, 2005, Bray placed a controlled call to a confederate (hereinafter C-3), whose identity is known to the grand jury, to arrange to have crack delivered to Bray. Bray falsely told law enforcement that the call had been made to Tyron Brown. Bray had previously provided C-3 with crack to bring to the buy. Thereafter, Bray made a controlled purchase of crack from another confederate (hereinafter C-4), whose identity is known to the grand jury, in an alley in Mansfield. Bray falsely told law enforcement that he did not know C-4's name.

5

e.  On September 15, 2005, Bray placed a controlled
    call to C-1 to arrange for C-1 to deliver crack to
    Bray.  Bray falsely told law enforcement that the
    call had been made to Noel Mott.  Thereafter, Bray
    made a controlled purchase of crack from C-1 in a
    residence in Mansfield.  Bray falsely identified
    Noel Mott to law enforcement as having been the
    individual who delivered the crack. As he returned
    from the controlled purchase, Bray falsely told law
    enforcement that he had spent all of the money
    provided to him by law enforcement to make the
    controlled purchase.  In fact, Bray had not spent
    all of the money on the controlled purchase.
    Instead, Bray had hidden $780 of the money in his
    vehicle before returning to meet with law
    enforcement.  During a search of Bray's vehicle
    upon his return from the controlled purchase, law
    enforcement discovered the secreted $780.

f.  On September 20, 2005, Bray participated in a
    controlled meeting with two other individuals in
    the parking lot of a business in Mansfield to
    arrange for the purchase of one-half kilogram of
    crack.  Bray falsely identified one of these
    participants to law enforcement as Dwayne Nabors.

6

As a result, Bray participated in a controlled purchase with a third individual from whom Bray received a portion of the one-half kilogram of crack. Thereafter, Bray met with the individual whom he had previously falsely identified as Dwayne Nabors and others at a house in Mansfield to receive an additional quantity of cocaine.

g.   On September 27 and 29, 2005, Bray made controlled purchases of crack from James Burton. One on of these two occasions, Bray brought his own crack to Burton's residence, and, after engaging in innocuous conversation with Burton, turned in his crack to DEA, purporting that it ahd been provided to him by Burton.

h.   On October 5, 2005, Bray placed a controlled call to C-3 to arrange for C-3 to deliver crack to Bray. Bray falsely told law enforcement that the call had been made to Roosevelt Williams. Bray had previously provided C-3 with the crack to bring to the buy. Thereafter, Bray, together with the defendant, LEE MICHAEL LUCAS, made a controlled purchase of crack from C-3 in a parking lot in Mansfield. Bray falsely identified Roosevelt

Williams to law enforcement as having been the individual who delivered the crack.

i. On October 11, 2005, Bray placed a controlled telephone call to C-3 to arrange for C-3 to deliver crack to Bray in a parking lot in Mansfield. Bray falsely told law enforcement that the call had been made to Johnny Robertson. Bray had pretextually arranged for Robertson to come to the parking lot at the same time as the controlled buy. Bray had previously provided C-3 with the crack to bring to the buy. Thereafter, C-3 delivered the crack to Bray. Bray falsely told law enforcement that Robertson was the ultimate supplier of the crack.

j. On October 14, 2005, Bray falsely told law enforcement that he had arranged for a controlled purchase of crack from Joshawa Webb. Instead, Bray arranged for a confederate (hereinafter C-5), whose identity is known to the grand jury, to travel with Bray to meet with the defendant, LEE MICHAEL LUCAS, in order for C-5 to pose as a source of crack during the controlled purchase. Prior to the controlled purchase, Bray gave C-5 the crack that C-5 was to give to the defendant, LEE MICHAEL LUCAS. Bray and C-5 met the defendant, LEE MICHAEL

8

LUCAS, in a parking lot in Mansfield and the defendant, LEE MICHAEL LUCAS, purchased the crack from Bray and C-5. Bray falsely identified C-5 as being Joshawa Webb.

k.  On October 25, 2005, Bray placed a series of controlled calls to a confederate (hereinafter C-6), whose identity is known to the grand jury, and others. Bray falsely told law enforcement that these calls had been made to Ron Davis, or were otherwise in furtherance of a purchase of crack from Ron Davis. As a result of these calls and one controlled meeting with an unwitting party whom Bray falsely identified as Ron Davis, Bray and the defendant, LEE MICHAEL LUCAS, met with C-6 in an alley in Mansfield. C-6 sold to the defendant, LEE MICHAEL LUCAS, the crack which had been provided to C-6 by Bray earlier in the day. Bray falsely identified C-6 to law enforcement as Geneva France.

l.  On October 27, 2005, Bray provided Nolan Lovett with crack, asking Lovett to briefly store the crack for Bray in exchange for a cash payment. Thereafter, Bray placed a controlled call to Lovett advising that he would be coming to meet him. Bray then went to a residence in Mansfield where Lovett

was located, recovered his own crack, retained the money provided by law enforcement for the controlled purchase, and delivered the crack to law enforcement. Bray falsely told law enforcement that the crack had been supplied by Lovett.

m. On November 8, 2005, Bray placed a controlled call to C-3 to arrange for a controlled purchase of crack. Bray falsely told law enforcement that the call had been made to Danny Lee Brown. Bray had previously provided C-3 with crack to bring to the buy. Thereafter, Bray met another confederate (hereinafter C-7), whose identity is known to the grand jury, in an alley in Mansfield and purchased the crack. Several months later, C7 was falsely identified as having been Frank Douglas.

9. The defendant, LEE MICHAEL LUCAS, knowingly included false and misleading information and concealed evidence favorable to accused individuals in DEA-6s of drug purchases made by Bray.

10. The defendant, LEE MICHAEL LUCAS, had an affirmative obligation to report misconduct by an informant to his superiors within DEA. The defendant, LEE MICHAEL LUCAS, likewise had an affirmative obligation to report to the prosecuting authority all acts which might tend to either impeach the credibility of an informant or exculpate a defendant.

10

11.    The defendant, LEE MICHAEL LUCAS, serving as the government's case agent, sat at the counsel table with the prosecutor throughout each of the above-referenced trials, and testified for the prosecution at each trial.  The defendant, LEE MICHAEL LUCAS, knowingly testified falsely about material matters at each trial.

12.    On or about the dates listed below, in the Northern District of Ohio, the defendant, LEE MICHAEL LUCAS, did corruptly influence, obstruct and impede, and corruptly endeavor to influence, obstruct and impede, the due administration of justice in the cases referenced below, each of which constitutes a separate count of this Indictment, by providing false and misleading evidence to and concealing evidence favorable to an accused from the United States District Court, federal prosecutors, the accused and their counsel, and grand and petit jurors as follows:

## COUNT ONE

The Grand Jury further charges:

Beginning on or about September 9, 2005 and continuing thereafter to on or about July 26, 2006, in the case of the U.S. v. Nabors, et al., the defendant, LEE MICHAEL LUCAS, knowingly placed false information in his DEA-6 dated September 9, 2005, signed September 10, 2005, and captioned "Purchase of Ex-2 from Lowestco BALLARD on 9-9-05 Ac of N-2," and thereafter knowingly testified falsely before both United States District Judge David D. Dowd, who presided over Lowestco Ballard's detention hearing on December 15, 2005, and before United States District Judge John R. Adams and the jury before whom Lowestco Ballard was tried beginning on July 10, 2006.

In violation of Title 18, United States Code, Section 1503(a).

12

## COUNT TWO

The Grand Jury further charges:

From on or about September 15, 2005 and continuing thereafter until on or about July 26, 2006, in the case of U.S. v. Nabors, et al., the defendant, LEE MICHAEL LUCAS, knowingly failed to disclose in his DEA-6 dated September 15, 2005, signed September 19, 2005 and captioned "Purchase of Ex-5 from Noel MOTT on 9-15-05," and thereafter knowingly withheld from prosecutors, the Court, Noel Mott, Noel Mott's counsel, and the other defendants charged in conjunction with Mott and their counsel, material and relevant information concerning the conduct of Bray that was likely to have negatively impacted Bray's credibility and DEA's ability to have continued to utilize Bray as a confidential source after September 15, 2005.

In violation of Title 18, United States Code, Section 1503(a).

13

## COUNT THREE

The Grand Jury further charges:

Beginning on or about September 20, 2005 and continuing thereafter until on or about January 3, 2007, the defendant, LEE MICHAEL LUCAS, in the case of <u>U.S. v. Nabors, et al.</u> knowingly placed false information in his DEA-6 dated September 20, 2005, signed September 26, 2005 and captioned "Purchase of Ex-7A and Ex 7-B," and thereafter knowingly testified falsely before United States District Judge John R. Adams and the jury before whom Dwayne Nabors was tried beginning on July 10, 2006.

In violation of Title 18, United States Code, Section 1503(a).

## COUNT FOUR

The Grand Jury further charges:

Beginning on or about October 5, 2005 and continuing thereafter until on or about April 10, 2006, in the case of <u>United States of America v. Roosevelt Williams</u>, the defendant, LEE MICHAEL LUCAS, knowingly failed to disclose in his DEA-6 dated October 5, 2005, signed October 6, 2005, and captioned "Purchase of Ex-10 from Roosevelt WILLIAMS Ac of N-11," and thereafter knowingly withheld from prosecutors, the Court, Roosevelt Williams, Roosevelt Williams' counsel, and the other defendants charged in conjunction with Williams and their counsel, relevant and material information likely to have negatively impacted both the defendant, LEE MICHAEL LUCAS, and Bray's credibility and reliability in regards to their suitability to render accurate identifications of individuals with whom they dealt.

In violation of Title 18, United States Code, Section 1503(a).

## COUNT FIVE

The Grand Jury further charges:

Beginning on or about October 14, 2005 and continuing thereafter until on or about July 16, 2007, in the case of U.S. v. Nabors, et al., the defendant, LEE MICHAEL LUCAS, knowingly placed false information in his DEA-6 dated October 14, 2005, signed October 14, 2005, captioned "Purchase of Ex-12 from Joshawa WEBB and Acquisition of N-17 and N-18."

In violation of Title 18, United States Code, Section 1503(a).

## COUNT SIX

The Grand Jury further charges:

Beginning on or about October 25, 2005 and continuing thereafter until on or about May 18, 2006, in the case of <u>U.S. v. France</u>, the defendant, LEE MICHAEL LUCAS, knowingly testified falsely before United States District Judge Patricia Ann Gaughan and the jury before whom Geneva France was tried beginning on February 13, 2006.

In violation of Title 18, United States Code, Section 1503(a).

## COUNT SEVEN

The Grand Jury further charges:

Beginning on or about November 8, 2005 and continuing thereafter until on or about July 26, 2006, in the case of <u>U.S. v. Nabors, et al.</u>, the defendant, LEE MICHAEL LUCAS, knowingly testified falsely before United States District Judge John R. Adams and the jury before whom Danny Lee Brown was tried beginning on July 10, 2006.

In violation of Title 18, United States Code, Section 1503(a).

## COUNT EIGHT

The Grand Jury further charges:

On or about September 9, 2005, in the Northern District of Ohio, the defendant, LEE MICHAEL LUCAS, in a matter within the jurisdiction of the executive branch of the United States Government, did knowingly and willfully make a false writing or document knowing the same to contain materially false, fictitious and fraudulent statements and entries, that is, the defendant, LEE MICHAEL LUCAS, authored a DEA-6, dated September 9, 2005, and signed it on September 10, 2005, captioned "Purchase of Ex-2 from Lowestco Ballard on 9-9-05 AC of N-2," wherein the defendant, LEE MICHAEL LUCAS, wrote that:

"At approximately 4:18 PM, S/A Lucas and [M.M.] observed a black Toyota Corolla, Ohio tag number *** ****, being driven by a white female with a black female as the passenger arrive at the apartments. This vehicle parked in the same row in the parking lot as the CS, but did not make contact with the CS. This vehicle had pulled into the lot and pulled next to S/A Lucas' vehicle before pulling into the apartment parking lot." In truth and fact, the defendant, LEE MICHAEL LUCAS, well knew and believed that the black Toyota had not pulled in next to his vehicle.

"S/A Lucas observed Ballard walk to the black Toyota Corolla and make an exchange with the black female passenger. Ballard then returned to his green Bronco and made an exchange with

19

the CS." In truth and fact, the defendant, LEE MICHAEL LUCAS, well knew and believed that he had not observed Lowestco Ballard, nor anyone else, make any exchange with any occupant of the black Toyota.

In violation of Title 18, United States Code, Section 1001(a)(3).

20

## COUNT NINE

The Grand Jury further charges:

On or about December 15, 2005, in the City of Akron, Summit County, in the Northern District of Ohio, the defendant, LEE MICHAEL LUCAS, while under oath as a witness in the detention hearing of Lowestco Ballard, as part of the case of <u>U.S. v. Nabors, et al.</u>, in the United States District Court for the Northern District of Ohio, did knowingly make a false and material declaration, in that the defendant, LEE MICHAEL LUCAS, did testify as follows:

Q:   <u>Did you personally do surveillance of Mr. Ballard?</u>

A:   <u>I did.</u>

Q:   <u>Did you observe him engage in any drug transactions yourself?</u>

A:   <u>I did.</u>

Q:   What was the date you did your surveillance and made these observations?

A:   I believe it was September 9th of 2005.

Q:   Was this captured on any type of videotape?

A:   It was.

Q:   Was it captured on any type of audio tape?

A:   It was, and I saw him myself.

Q:   What was the distance, when you say you saw him, what was the distance away that you saw him from?

21

A:   Probably from where I am now to maybe the back wall.

Q:   Can you give us an estimate as far as feet, please?

A:   Maybe, what is that, 20 yards.

Q:   What time of day did this happen on September 9th?

A:   It was in the afternoon.

Q:   Daylight?

A:   Daylight.

Q:   Were you using anything to enhance your vision like binoculars?

A:   We did have binoculars it was a video camera.   I observed the hand to hand transaction, and then, as we pulled out, he pulled out, he was driving a large green Bronco with the fancy rims.   And I pulled up - I was closer to him than myself and the judge--and I looked him right in the face after he pulled out of the parking lot directly at the meeting.


        The material declaration that the defendant, LEE MICHAEL LUCAS, had pulled up close enough to the referenced Bronco after it left the parking lot at the conclusion of the drug transaction, so that the defendant, LEE MICHAEL LUCAS, was able to look directly into the face of the driver, purported to be Lowestco Ballard, was knowingly false, in that the defendant, LEE MICHAEL LUCAS, then and

                              22

there, well knew and believed, that he had not pulled up close to the referenced Bronco and looked right in the face of the driver, purported to be Lowestco Ballard, after the referenced Bronco had left the parking lot at the conclusion of the drug transaction.

In violation of Title 18, United States Code, Section 1623(a).

23

## COUNT TEN

The Grand Jury further charges:

On or about July 17, 2006, in the City of Akron, Summit County, in the Northern District of Ohio, the defendant, LEE MICHAEL LUCAS, while under oath as a witness in the trial of U.S. v. Nabors, et al., in the United States District Court for the Northern District of Ohio, did knowingly make a false and material declaration, in that the defendant, LEE MICHAEL LUCAS, did testify as follows:

> Q: Showing you Government's Exhibit 33. Can you tell us if you recognize that?
>
> A: Yes. This is the video that myself and M.M. were together in a black pickup truck, and we did it together. M.M. would have it, sometimes he would pass it over, depending on the view.
>
> > MR. SERRANO: May we play the video recording at this time, your Honor?
> >
> > THE COURT: Yes, Sir
> >
> > (Video Played)

BY MR. SERRANO:

> Q: Now as the video is playing, can you describe what is happening so we can understand?
>
> A: That's a vehicle that we observed throughout this investigation being driven by members that we were

24

investigating. And it's a big green Ford Bronco
with the fancy rims on it.

And the car with the hood up, and the guy who was
on the phone with the blue shirt on, that's the
informant, Bray.

We had sent Bray over to the place, sat by his
vehicle and had him sit there. We searched him,
gave him the buy money, and sent him over there.

Q: Is there a name for those brown buildings?

A: Eastgate or Heritage Apartments. That's Bray.
And then he meets with Lowestco Ballard. And then
they walk over to the informant's vehicle.

At that point I got out of the vehicle, walked over
to the side. Mr. Ballard went over to a black
Toyota Corolla that had two females in it. And the
two females had pulled in earlier. Then we didn't
know they were related in the beginning, a white
and a black female pulled in with a Toyota Corolla,
it was black. They pulled in and they parked over
in that line of cars. And then maybe four or five
minutes later the green Bronco pulls in.

And Ballard, at that point, went over - had went
over to the black car, talked to the female, the
black female, I believe she was the passenger. And

25

then they came, he walked back over and met with Bray in his Bronco.

Q: Now that green Bronco, what other person had been using that car to this date?

A: Well, we saw a guy name ARRICO SPIRES was driving it one day. We had it stopped by the highway patrol on another date in which a guy named D.T. was driving it, but the tag actually comes back to a M.L. That's who it was registered to. We seen several people driving this vehicle. This is the third person we've seen driving this vehicle now. That's Bray reaching inside as they are weighing the drugs.

The video lasts about ten minutes.

And they shake hands and they separate. Bray goes back to his vehicle and Ballard departs. And there is the green car pulling out, and we are pulling up. And there is the black car I told you about earlier that actually brought the drugs, the Toyota.

Q: Now, did you come close to the individual who made the actual sale?

A: Yes.

Q: How close were you?

26

A:   As we pulled out, as – when the video stops, he had
     pulled out and made a left at the light and the
     black car followed him.  We pulled up just close
     enough, I pulled up, I was driving the pick up.  I
     looked over at the driver of the – at Ballard, I
     was closer than I am to you, probably half of that,
     looked at him and then got a look at the girls and
     then we pulled off, and assisted following Bray
     back to the meet spot.  We recovered the drugs from
     Bray.

Q:   Now, the individual that you saw on the tape, do
     you see him here in the courtroom?

A:   I do.

Q:   Could you point him out and identify him for the
     record?

A:   Seated at the back of the table with a yellow shirt
     on, a black male with glasses on, yellow shirt and
     a tie.

            MR. SERRANO:   May the record reflect he
            had identified Lowestco Ballard, your
            Honor?

            THE COURT:   The record will so reflect.

27

The material declaration that, subsequent to the drug transaction, the defendant, LEE MICHAEL LUCAS, pulled up just close enough to the referenced Bronco to allow him to be able to look over and identify the driver as being Lowestco Ballard, was knowingly false, in that the defendant, LEE MICHAEL LUCAS, then and there, well knew and believed, that he had not pulled up close enough to the referenced Bronco after it left the parking lot at the conclusion of the drug transaction to be able to look over and identify the driver as being Lowestco Ballard.

In violation of Title 18, United States Code, Section 1623(a).

28

## COUNT ELEVEN

The Grand Jury further charges:

On or about July 17, 2006, in the City of Akron, Summit County, in the Northern District of Ohio, the defendant, LEE MICHAEL LUCAS, while under oath as a witness in the trial of <u>U.S. v. Nabors, et al.</u>, in the United States District Court for the Northern District of Ohio, did knowingly make a false and material declaration, in that the defendant, LEE MICHAEL LUCAS, did testify as follows:

Q:  Now, calling your attention to the date of September 20th, 2005.

Was there a controlled buy conducted on that day?

A:  Yes, there was.

Q:  And who was the target of that controlled buy?

A:  Dwayne Nabors.

Q:  And do you know how much it was supposed to be purchased from him?

A:  It was supposed to be a half a kilo of crack for $10,000.

Q:  And what happened prior to the actual controlled purchase?

A:  We had to get the money, which we pooled our money together, 4,000 came from DEA; 3,000 from the

29

Cleveland Police Department; and 3,000 from Ohio
BCI, the state police.

Q:  Now in relation to that buy, what were your duties
on that day?

A:  It was basically the same thing. I was the
surveillance agent searching the informant, his
vehicle, and provided the money. And then I was
the surveillance agent on that day also.

Q:  Were you by yourself or in company of another
officer?

A:  No, we started out myself and C.M. We had the
video camera and we set up across the street.

Q:  And did you actually record or videotape any
activities on that date?

A:  We did. I didn't - we started out across the
street from Nabors' business, it is a rim shop, a
music store, and it's right on one of the main
roads, Park Avenue, Parkview Avenue. It is one of
the main roads in -

Q:  Park Avenue West?

A:  Park Avenue West in Mansfield. And it has, I think
it's two lanes and two lanes on the other side.
We were directly across the street in a car
dealership. And as we pulled up, and we pulled in,

30

a salesman came up, he kept on talking to us.  So
we were able to keep surveillance on Bray and J.A.
and security for our $10,000.  But at that point we
were not allowed to video.

Q:   And while you were there, can you tell us what you
observed on that day?

A:   Parked in the lot was a white Corvette and a black
Cadillac, both that came back to Dwayne Nabors.
Bray and J.A. arrived.  He went in for a second, he
went in for a short time, came out.  He advised
J.A. that Dwayne's not here yet.  J.A. Nexteled me
and told me he's not here yet.

So we waited and eventually a black – another black
Cadillac, a different one, this one was registered
to Albert Lee, arrived.  And I saw  Bray go up to
the passenger's side of this vehicle.  There was
some motions like they were speaking.  I obviously
couldn't overhear what was being said.

And when the vehicle left, myself and C.M., who
were together, jumped in our car.  We left.  They
made a right pulling out of the lot, we had to make
a left to get behind them.  We went up a distance
until we could pull up next to them.

31

> I identified Dwayne Nabors as being the driver, and there was another black male, who at the time we didn't have identified, as the passenger.

The material declaration, that, at the conclusion of the meeting, the defendant, LEE MICHAEL LUCAS, got into a vehicle with C.M., pulled up next to the suspect Cadillac and identified Dwayne Nabors as the driver, was knowingly false, in that the defendant, LEE MICHAEL LUCAS, then and there, well knew and believed that he had not been in the same car as C.M., had not pulled up beside the Cadillac, and did not identify Dwayne Nabors as the driver of the Cadillac.

In violation of Title 18, United States Code, Section 1623(a).

## COUNT TWELVE

The Grand Jury further charges:

On or about July 17, 2006, in the City of Akron, Summit County, in the Northern District of Ohio, the defendant, LEE MICHAEL LUCAS, while under oath as a witness in the trial of <u>U.S. v. Nabors, et al.</u>, in the United States District Court for the Northern District of Ohio, did knowingly make a false and material declaration, in that the defendant, LEE MICHAEL LUCAS, did testify as follows:

Q:  Now, you indicated that at some point you went over to a location on Hill Street?

A:  Yes.

Q:  Would that have been *** Hill Street?

A:  Yes.

Q:  Would you know who actually had any connections to that address? If you know?

A:  James Burton. Whose street name was Unc, or Uncle, or Uncle Wee Wee. And I believe Albert Lee was also involved or seen at that residence throughout the investigation.

Q:  And how long after the calls were made did you actually go to the Hill location?

A:  It was probably four, close to five hours later.

Q:  <u>And did you actually go there to Hill?</u>

A:  <u>Yes.</u>

Q:   Were you by yourself or with somebody else?

A:   No, I was with someone else in the car.

Q:   And what did you observe at that time when you went to Hill?

A:   The same black Cadillac that was registered to Dwayne Nabors that I observed earlier at Platinum Express. I saw two Cadillacs at Platinum Express that day.

The material declaration, that the defendant, LEE MICHAEL LUCAS, observed the Cadillac registered to Dwayne Nabors at the Hill Street address, was knowingly false, in that the defendant, LEE MICHAEL LUCAS, then and there, well knew and believed, that he did not observe the Cadillac registered to Dwayne Nabors at the Hill Street address.

In violation of Title 18, United States Code, Section 1623(a).

34

## COUNT THIRTEEN

The Grand Jury further charges:

On or about February 14, 2006, in the City of Cleveland, Cuyahoga County, in the Northern District of Ohio, the defendant, LEE MICHAEL LUCAS, while under oath as a witness in the trial of U.S. v. France, in the United States District Court for the Northern District of Ohio, did knowingly make a false and material declaration, in that the defendant, LEE MICHAEL LUCAS, did testify as follows:

> Q: So then did there come a time when after you weighed the crack cocaine you had something to say about it?
>
> A: Yes.
>
> Q: What did you say?
>
> A: That it was short. In summary, it was short, and I wasn't going to pay $2,500 for something that wasn't worth $2,500 basically.
>
> Q: And after you said that, what action was taken then?
>
> A: I showed the defendant the scale with the drugs on it and said, look, this is short, it's not enough. And I told Bray to call him, Ron Davis, to tell him that it was short, that I wasn't going to pay that much.
>
> Q: And did he, in fact, call him?

A:    Yes, he did.

Q:    And you heard the recording here in court, am I correct?

A:    I did.

Q:    Now, was there a response from Ron Davis then at that time?

A:    Yes.

Q:    And what was that?

A:    Take two back, which as take $200 back.

Q:    And after he said that, what happened?

A:    I turned to her, and she said "Take two back," in a question.  I don't remember whether it was Bray or myself but basically we said, yeah, we've got to get two back.  She handed me back $200.

                          . . .

Q:    Okay.  And in fact, you had mentioned to, Mr. Bray, "These two, 300,"  you heard that, right?

A:    Yes.

Q:    But all we could hear on the tape was "Take two back" --

A:    I was –

Q:    Do you remember him saying that?

A:    Yes.  And I also remember, I was close enough, I mean, when Jerrell and I –

Q:    I'll ask the questions.  Do you remember –

36

MR. SERRANO: May the witness finish the answer, Your Honor?

THE COURT: No. There wasn't a question before him. Go ahead.

Q: Do you remember hearing "Take two back"?

A. Yes.

Q: Who said that"

A. I heard Davis say it, I heard Jerrell say it, and I heard her say it, your client. Three people I heard say it that day.

Q: Okay. So when we play that tape, you're going to be able to point out for the jury members where Davis is being heard on that tape?

A: No. I could hear Davis, I'm next to Mr. Bray –

Q: I'm referring to the CD.

MR. SERRANO: May he complete his answer, Your Honor?

THE COURT: You may.

A: Yeah, I'm - no, I couldn't hear. You won't hear that on the tape from his phone –

Q: Okay.

A: – or his recorder in his pocket, but being close enough to him, I heard that just as I testified, "Take two back."

Q: But it wasn't recorded?

37

A:    No.

Q:    Okay.   So the jury members can't hear that when
      they take that tape in to deliberate, right?

A:    Obviously.


The material declaration, that the defendant, LEE MICHAEL
LUCAS, heard Ron Davis tell Bray over Bray's telephone to "Take two
back," was knowingly false, in that the defendant, LEE MICHAEL
LUCAS, then and there, well knew and believed, that he had not
heard the voice of Ron Davis, or of anyone, say "Take two back" to
Bray during this purported telephone call.

In violation of Title 18, United States Code, Section
1623(a).

## COUNT FOURTEEN

The Grand Jury further charges:

On or about February 14, 2006, in the City of Cleveland, Cuyahoga County, in the Northern District of Ohio, the defendant, LEE MICHAEL LUCAS, while under oath as a witness in the trial of U.S. v. France, in the United States District Court for the Northern District of Ohio, did knowingly make a false and material declaration, in that the defendant, LEE MICHAEL LUCAS, did testify as follows:

> Q:    Okay. On October the 25th of 2005, were you aware that there was a contact, a telephonic contact with Ron Davis on that day?
>
> A:    Yes.
>
> Q:    And at approximately what time was that?
>
> A:    About 2:05 in the afternoon. I was present and overheard it, watched the tape recording, actually was there and dialed the numbers.
>
> Q:    Now, when you're using a source to dial the telephone number of a target, what procedure is followed?
>
> A:    Usually I'll have them give me the number and dial it, or the person will dial it and I watch it, and afterwards I look at his phone to make sure that's the number they dialed.

39

Q:     Now in this particular case, was a telephone number
       directed to Ron Davis dialed?

A:     Yes.

Q:     And was the conversation recorded?

A:     Yes, it was.

                    .  .  .

Q:     Now, in terms of the buy itself, was there
       communication with the target, that being Ron
       Davis, prior to the actual drug transaction?

A:     Well, we made a call, we made two tape-recorded
       calls to the same phone number.  And at first -
       eventually - first directed to go to *** Glessner,
       which from prior investigation we had identified as
       being associated with Davis, and then we were told
       to go over on Adams, which we knew was *** South
       Adams, which was another residence his vehicle was
       parked at a lot.

Q:     Now, you were here in court when there were
       recordings played, am I correct?

A:     Yes.

                    .  .  .

Q:     Okay.  The call from Ron Davis, the third one - do
       you remember which one I mean, the third one?

A:     Yes, the third one.

                         40

Q:   The CD showing both the same phone number to each one –

A:   Yes.  That was me.

Q:   Pardon me?

A:   You did what, sir?

Q:   The day I noted down the number we called and looked at the phone, and then when we made the transcript and I made my report of the deal, I put on those times that's the number we called, and the time.

                    .  .  .

Q:   Well, you did know he was discussing something on the phone with somebody.  You didn't have a recording of that on your side, right?

A:   I didn't know whether it was his wife or his girlfriend, like I said earlier.  I don't know what he was doing on the side with his love life.

Q:   All right.  In fact, you didn't honestly know who he was talking to, correct?

A:   No.  I – with him and with informants, with these calls afterwards, I checked his phone.  Of course I did.

                        41

The material declaration that the defendant, LEE MICHAEL LUCAS, personally ensured that Bray was actually placing calls to the number purported to belong to the target, Ron Davis, was knowingly false, in that the defendant, LEE MICHAEL LUCAS, had not verified that the telephone numbers dialed by the informant belonged to Ron Davis.

In violation of Title 18, United States Code, Section 1623(a).

### COUNT FIFTEEN

The Grand Jury further charges:

On or about July 17, 2006, in the City of Akron, Summit County, in the Northern District of Ohio, the defendant, LEE MICHAEL LUCAS, while under oath as a witness in the trial of <u>U.S. v. Nabors, et al.</u>, in the United States District Court for the Northern District of Ohio, did knowingly make a false and material declaration, in that the defendant, LEE MICHAEL LUCAS, did testify as follows:

> Q:   Now, calling your attention to November the 8th of 2005.   Was there another controlled purchase conducted on that day?
>
> A:   Yes, there was.
>
> Q:   And who was the target of that controlled purchase?
>
> A:   Danny Lee Brown.
>
> Q:   Can you tell us what happened prior to the actual drug purchase, in terms of your participation?
>
> A:   Well, the night before we had come down in order to make a purchase, after being advised that Danny Brown, after speaking to the informant.   We came down on the day before, November 7th, to make a buy. We made several telephone calls and we planned on making the buy that night.   They were late at night.   After I believe 9:30, 9:35, something like

43

that, Brown quit answering his phone. So we drove
back to Cleveland.

The following day we drive back down. Made some
more tape recorded calls. Met with the informant.
Searched the informant, made sure the informant
didn't have any drugs or money again. Provided the
informant with $950 with the buy money, which was
consistent with the tapes that I overhead heard on
the amount. We were supposed to buy an ounce, and
this ounce of crack was 950.

We followed the informant over to an alley behind
Mulberry. And it was very difficult to set up
surveillance in an alley behind houses.

So as the informant drove in, I observed a black
male jump in the car with the informant, was in
there very short. And as we were driving down to
the end of the street, the male jumped out.

Q:    That male, had you seen that male before?

A:    Yes.

Q:    And do you know his identity or were you able
       to establish his identity?

A:    Yes.

Q:    Who was that?

A:    Frank Douglas

44

Q:   And on what prior occasions had you become
     aware of Frank Douglas?

A:   Frank Douglas was involved in another prior
     delivery in which we ordered drugs, I believe
     it was from again Tyron Brown, and Frank
     Douglas was involved in dropping the drugs
     off.

                  .  .  .

Q:   Okay.  So you are doing surveillance on the
     8th, I assume?

A:   I am.

Q:   You are watching Bray, your confidential
     informant, to see what happens?

A:   Yes.  I remember that day, it was raining.

Q:   And I think you said that because it's in an
     alley it's a little bit harder to do
     surveillance.

A:   It was.  It was very difficult.

Q:   But  Bray drives his car down this alley?

A:   He does.

Q:   And into this car comes some African American
     guy, I think it says in the police report,
     wearing a headband or wristbands, right?

                    45

A:  I think it was a skully, skull cap, as I remember it.

Q:  Black shirt and black headband, does that sound about right?

A:  Yes.

Q:  And then in this case there is an exchange of money for drugs, correct?

A:  Yes.

Q:  <u>And the person who actually does the deal is this guy named Frank Douglas, correct?</u>

A.  <u>Yes.</u>

Q:  <u>We're sure about that?</u>

A:  <u>Positive.</u>

The material declaration that the defendant, LEE MICHAEL LUCAS, observed a black male, whom he was able to identify as Frank Douglas, get into and out of the informants' vehicle was false, in that the defendant, LEE MICHAEL LUCAS, then and there, well knew and believed that he did not observe anyone get into or out of the informant's car.

In violation of Title 18, United States Code, Section 1623(a).

## COUNT SIXTEEN

The Grand Jury further charges:

Paragraphs 1 through 11 of this Indictment are re-alleged and incorporated as if fully set forth herein.

Beginning on or about September 9, 2005 and continuing thereafter to on or about July 26, 2006, in the Northern District of Ohio, the defendant, LEE MICHAEL LUCAS, while acting under the color of law, did knowingly and willfully deprive Lowestco Ballard of the right to be free from arrest and seizure without probable cause and the right not to have false evidence knowingly presented against him, as is guaranteed by the Fourth and Fifth Amendments to the Constitution and the Laws of the United States, by knowingly engaging in the conduct described in Counts 1, 8, 9 and 10 of this Indictment.

In violation of Title 18, United States Code, Section 242.

47

## COUNT SEVENTEEN

The Grand Jury further charges:

Paragraphs 1 through 11 of this Indictment are re-alleged and incorporated as if fully set forth herein.

Beginning on or about September 20, 2005 and continuing thereafter until on or about January 3, 2007, in the Northern District of Ohio, the defendant, LEE MICHAEL LUCAS, while acting under the color of law, did knowingly and willfully deprive Dwayne Nabors of the right to be free from arrest and seizure without probable cause and the right not to have false evidence knowingly presented against him, as is guaranteed by the Fourth and Fifth Amendments to the Constitution and the Laws of the United States, by knowingly engaging in the conduct described in Counts 3, 11, and 12 of this Indictment.

In violation of Title 18, United States Code, Section 242.

## COUNT EIGHTEEN

The Grand Jury further charges:

Paragraphs 1 through 11 of this Indictment are re-alleged and incorporated as if fully set forth herein.

On or about February 14, 2006, in the Northern District of Ohio, the defendant, LEE MICHAEL LUCAS, while acting under the color of law, did knowingly and willfully deprive Geneva France of the right to due process of law, as is guaranteed by the Fifth Amendment to the Constitution and the Laws of the United States, by knowingly engaging in the conduct described in Counts 6 and 14 of this Indictment.

In violation of Title 18, United States Code, Section 242.

A TRUE BILL

Original Document - - Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.

49